# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

**JOHN ALLEN RUBIO,**
     Petitioner,

    *v.*

**LORIE DAVIS, Director,**
Texas Department of
Criminal Justice,
Correctional Institutions Division,

    Respondent.

Case No. 1:18-CV-00088

District Judge Rolando Olvera

---

# PETITION FOR WRIT OF HABEAS CORPUS
## PURSUANT TO 28 U.S.C. § 2254

Lee B. Kovarsky
*Principal*
Phillips Black, Inc.
Texas Bar No. 24053310
500 West Baltimore, Room 436
Baltimore, Maryland 21201
434-466-8257 (tel.)
l.kovarsky@phillipsblack.org

Kristin Swain
*Associate*
Phillips Black, Inc.
PO Box 8745
Saint Louis, MO 63101
(888) 532-0897
l.kovarsky@phillipsblack.org
k.swain@phillipsblack.org

JASON D. HAWKINS
Federal Public Defender

JEREMY SCHEPERS
Supervisor, Capital Habeas Unit

Jessica Graf (TX 24080615)
Derek VerHagen (TX 24090535)
Assistant Federal Defenders

Office of the Federal Public Defender
Northern District of Texas
525 S. Griffin St., Ste. 629
Dallas, TX 75202
214-767-2746 (phone) 214-767-2886 (fax)
jessica_graf@fd.org
derek_verhagen@fd.org

**THIS IS A CAPITAL CASE**

## PETITION FOR WRIT OF HABEAS CORPUS
## PURSUANT TO 28 U.S.C. § 2254

Petitioner John Allen Rubio, through counsel, pursuant to all rights available under the Constitution, laws, or treaties of the United States, respectfully petitions this Court for a writ of habeas corpus declaring unconstitutional and invalid his conviction for capital murder as well as the resulting death sentence.

## TABLE OF CONTENTS

PETITION FOR WRIT OF HABEAS CORPUS  PURSUANT TO 28 U.S.C. § 2254 .. i

TABLE OF CONTENTS ................................................................. ii

TABLE OF AUTHORITIES ........................................................ vii

INTRODUCTORY STATEMENT ................................................. 1

PARTIES ..................................................................................... 4

JURISDICTION AND VENUE ..................................................... 4

STATEMENT OF FACTS .............................................................. 4

        A.  The crime. ................................................................. 5

        B.  Trials and direct review. ......................................... 10

        C.  State post-conviction proceedings ......................... 25

CLAIMS FOR RELIEF .............................................................. 29

Claim 1    Rubio's Sixth Amendment right to counsel was violated because the defense failed to include a mental health expert as a member of the defense team. ................................................. 29

      A.  Trial counsel's performance was prejudicially deficient, violating the Sixth Amendment ............................................. 30

          1.  Trial counsel's performance was deficient .................... 31

          2.  The deficiency was prejudicial. ..................................... 34

      B.  Any default is excused by state habeas counsel's failure to raise this substantial claim. ............................................. 36

Claim 2    Rubio's Sixth Amendment right to counsel was violated because the defense failed to investigate and present evidence about the existence and effects of Fetal Alcohol Spectrum Disorder and Temporal Lobe Epilepsy ...................... 36

      A.  Trial counsel's performance was prejudicially deficient, violating the Sixth Amendment ............................................. 37

          1.  Trial counsel's performance was deficient .................... 37

          2.  The deficiency was prejudicial. ..................................... 43

B.  28 U.S.C. § 2254(d) does not preclude relitigation. ............. 45

    1.  Section 2254(d) does not bar relitigation because Rubio was denied a meaningful opportunity to be heard in state post-conviction proceedings................... 46

    2.  Section 2254(d) does bar relitigation because Rubio satisfies § 2254(d)(1)...................................................... 47

    3.  Section 2254(d) does bar relitigation because Rubio satisfies § 2254(d)(2)...................................................... 47

Claim 3  Rubio's Sixth Amendment right to counsel was violated because the defense failed to investigate and prepare for his guilt/innocence phase defense. .................................................... 48

A.  Trial counsel's performance was prejudicially deficient, violating the Sixth Amendment............................................. 48

    1.  Trial counsel's performance was deficient..................... 49

    2.  The deficiency was prejudicial. ...................................... 54

B.  Any default is excused by state habeas counsel's failure to raise this substantial claim. ............................................. 54

Claim 4  The State violated Rubio's right to due process under the Fourteenth Amendment by engaging in a flagrant and ongoing pattern of misconduct. .................................................. 54

A.  The State's conduct violated Rubio's due process rights. 55

    1.  District Attorney Armando Villalobos is currently serving a thirteen-year federal prison sentence for abuses of power occurring during the time of Rubio's trial....................................................................... 55

    2.  Villalobos blacklisted Rubio's attorneys while taking bribes for pleas and dismissals in other cases. ............................................................................. 59

    3.  While Villalobos was enriching himself and the D.A.'s Office, the prosecution repeatedly interfered with Rubio's defense funding. ......................................... 59

4.   The prosecution continually abused its subpoena power to obstruct attorney-client communication and intimidate the defense................................ 61

5.   The prosecution violated the trial court's gag order to drum up publicity for Rubio's trial. ......................... 62

6.   Rubio's attorney for his first capital murder trial worked at the D.A.'s Office during his second.............. 63

7.   The State sought death against Rubio based on the results of a survey......................................... 64

B.   This claim is unexhausted, but Rubio can overcome any potential default. ...................................... 64

Claim 5   The State violated Rubio's right to equal protection under the Fourteenth Amendment when it pursued the death penalty against him because of his indigent status and on the basis of a survey.................................... 65

A.   Rubio's equal protection rights were violated. ..................... 66

1.   Rubio was selectively prosecuted in violation of his equal protection rights. ................................. 66

2.   The State's reliance on a survey to seek death against Rubio violated his equal protection rights. ...... 70

B.   This Court can review this claim on the merits.................. 71

Claim 6   The State violated *Napue v. Illinois* when it elicited testimony that it knew, or should have known, to be false and misleading. .......................................... 73

A.   The State committed a *Napue* violation when it elicited material testimony from Dr. Welner that it knew, or should have known, to be false. ............................. 74

1.   The State elicited false and misleading testimony that Rubio was psychiatrically unmedicated prior to his second trial and that there was no evidence of further psychiatric decline during that time................ 75

2.   The State knew or should have known that the testimony was false. .................................... 77

iv

        3.   There is a reasonable likelihood that the false testimony affected the jury. ............................................ 78

    B.  This claim is unexhausted, but Rubio can overcome any potential default. ................................................. 79

**Claim 7**   Rubio's Sixth Amendment right to counsel was violated because the defense failed to investigate and present evidence related to Rubio's mental health during his prior incarceration. ................................................ 80

    A.  Trial counsel's performance was prejudicially deficient, violating the Sixth Amendment ........................................... 81

        1.   Trial counsel's performance was deficient. ................... 81

        2.   The deficiency was prejudicial. ...................................... 83

    B.  Any default is excused by state habeas counsel's failure to raise this substantial claim. ............................................. 83

**Claim 8**   The State violated Rubio's due process rights by eliciting false testimony from A.P. Merillat. ............................................ 84

    A.  Merillat's false testimony violated Rubio's due process rights. ................................................................................ 87

        1.   Merillat's testimony was false and misleading. ........... 88

        2.   The State knew or should have known that the testimony was false. ...................................................... 88

        3.   There is a reasonable likelihood that the false testimony affected the jury. .......................................... 89

    B.  This claim is unexhausted, but Rubio can overcome any potential default. ................................................. 90

**Claim 9**   The State violated *Brady v. Maryland* by failing to disclose Merillat's false testimony in *Velez*. ............................................ 91

    A.  The State's suppression of Merillat's false testimony in *Velez* violated *Brady*. .......................................................... 91

        1.   Merillat's false testimony in *Velez* was favorable impeachment evidence. ................................................. 92

        2.   The State suppressed Merillat's false testimony in *Velez*. ............................................................................ 92

3.   The suppressed impeachment evidence was material. ........................................................................ 93

B.   This claim is unexhausted, but Rubio can overcome any potential default. .................................................. 94

Claim 10   Rubio's Sixth Amendment right to counsel was violated because the defense failed to prepare for, and rebut, Merillat's false testimony during the punishment phase. ......... 95

A.   Trial counsel's performance was prejudicially deficient. ..... 95

1.   Trial counsel's performance was deficient. .................... 95

2.   The deficiency was prejudicial. ..................................... 96

B.   Any default is excused by state habeas counsel's failure to raise this substantial claim. ............................................ 96

PRAYER FOR RELIEF ........................................................................ 97

VERIFICATION BY ATTORNEY ...................................................... 99

CERTIFICATE OF SERVICE ............................................................ 100

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Ake v. Oklahoma,*
    470 U.S. 68 (1985) ................................................................. 60

*Alcorta v. Texas,*
    355 U.S. 28 (1957) ............................................................ 74, 87

*Anderson v. Johnson,*
    338 F.3d 382 (5th Cir. 2003) .............................................. 72

*Brady v. Maryland,*
    373 U.S. 83 (1963) .......................................... 78, 91, 92, 95

*Busby v. Davis,*
    925 F.3d 699 (5th Cir. 2019) .............................................. 73

*Coleman v. Thompson,*
    501 U.S. 722 (1991) ............................................................ 72

*Cullen v. Pinholster,*
    563 U.S. 170 (2011) ............................................................ 40

*Dist. Attorney's Office for Third Judicial Dist. v. Osborne,*
    557 U.S. 52 (2009) .............................................................. 46

*Escamilla v. Stephens,*
    749 F.3d 380 (5th Cir. 2014) .............................................. 72

*Giglio v. United States,*
    405 U.S. 150 (1972) ...................................................... 78, 87

*Hansberry v. Lee,*
    311 U.S. 32 (1940) .............................................................. 46

*House v. Bell,*
    547 U.S. 518 (2006) ............................................................ 80

*Lassiter v. Dep't of Social Servs. of Durham County, N.C.,*
    452 U.S. 18 (1981) .............................................................. 55

*Lewis v. Thaler,*
    701 F.3d 783 (5th Cir. 2012) .............................................. 72

*Lucio v. Davis,*
__ F. App'x __, 2019 WL 3425186 (5th Cir. 2019) ................................ 63

*Mooney v. Holohan,*
294 U.S. 103 (1935) ............................................................ 87

*Mullane v. Central Hanover Bank & Trust Co.,*
339 U.S. 306 (1950) ............................................................ 47

*Murray v. Carrier,*
477 U.S. 478 (1986) ................................................. 65, 73, 90

*Napue v. Illinois,*
360 U.S. 264 (1959) ..................................................*passim*

*Oyler v. Boles,*
368 U.S. 448 (1962) ............................................................ 70

*Porter v. McCollum,*
558 U.S. 30 (2009) ....................................................... 38, 43

*Rhines v. Weber,*
544 U.S. 269 (2005) ....................................... 64, 79, 90, 94

*Rompilla v. Beard,*
545 U.S. 374 (2005) ....................................... 49, 81, 83

*Salas, et al. v. Cameron County,*
1:10-CV-037 (S.D. Tex. Feb. 22, 2010) ................................ 59

*Sawyer v. Whitley,*
505 U.S. 333 (1992) ............................................................ 80

*Sears v. Upton,*
561 U.S. 945 (2010) ............................................................ 43

*Strickland v. Washington,*
466 U.S. 668 (1984) ..................................................*passim*

*Strickler v. Greene,*
527 U.S. 263 (1999) ....................................... 78, 91, 95

*Trevino v. Thaler,*
569 U.S. 413 (2013) ....................................... 36, 54, 83, 96

*United States v. Agurs,*
427 U.S. 97 (1976) ............................................................ 77

*United States v. Armstrong,*
    517 U.S. 456 (1996) ................................................................ 66

*United States v. Bagley,*
    473 U.S. 667 (1985) ...................................................... 91, 92, 94

*United States v. Barham,*
    595 F.2d 231 (5th Cir. 1979) ................................................. 78

*United States v. Batchelder,*
    442 U.S. 114 (1979) ................................................................ 70

*United States v. Dvorin,*
    817 F.3d 438 (5th Cir. 2016) ................................................. 74

*United States v. Lawrence,*
    179 F.3d 343 (5th Cir. 1999) ................................................. 66

*United States v. O'Keefe,*
    169 F.3d 281 (5th Cir. 1999) ................................................. 77

*United States v. Shannon Shields,*
    2:04-cr-20254-BBD-tmp (W.D. Tenn.) ................................. 20

*United States v. Villalobos,*
    No. 1:12-CR-374 (S.D. Tex.) ............................................ 66, 68

*Vitek v. Jones,*
    445 U.S. 480 (1980) ................................................................ 46

*Ward v. Stephens,*
    777 F.3d 250 (5th Cir. 2015) ................................................. 71

*Wayte v. United States,*
    470 U.S. 598 (1985) ................................................................ 66

*Wiggins v. Smith,*
    539 U.S. 510 (2003) ................................................. 38, 49, 81

**State Cases**

*Bigby v. State,*
    892 S.W.2d 864 (Tex. Crim. App. 1994).............................. 49

*Estrada v. State,*
    313 S.W.3d 274 (Tex. Crim. App. 2010)........................*passim*

*Rubio v. State*,
  241 S.W.3d 1 (Tex. Crim. App. 2007) .................................................. 10

*Rubio v. State*,
  No. AP-76,383, 2012 WL 4833809 (Tex. Crim. App. Oct. 10, 2012) .................... 25

*Ex parte Rubio*,
  No. WR-65,784-02, 2018 WL 2329302 (Tex. Crim. App. May 23, 2018) ........ 28, 71

*Texas v. John Allen Rubio*,
  No. 2003-CR-457-B (Tex. 138th Dist. Ct.—Cameron County) .............................. 4

*Velez v. State*,
  2012 WL 2130890 (Tex. Crim. App. June 23, 2012) ...................................*passim*

*Williams v. State*,
  958 S.W.2d 185 (Tex. Crim. App. 1997) .................................................. 60

## Federal Statutes

28 U.S.C. § 1331 ............................................................................. 4

28 U.S.C. § 2241 ............................................................................. 4

28 U.S.C. § 2254 .....................................................................*passim*

## State Statutes

Tex. Code Crim. Proc. art. 37.071 ................................................ 34, 43, 44

Tex. Code Crim. Proc. art. 42.09 ..................................................... 57

Tex. Penal Code § 8.01 ................................................................ 49

## Constitutional Provisions

U.S. Const. amend. VI ...............................................................*passim*

U.S. Const. amend. XIV................................................... 54, 65, 66, 73

## Other Authorities

Brandi Grissom, *Andre Thomas: A Struggle for Sanity Behind Bars*, TEXAS
  TRIBUNE (Feb. 25, 2013) ............................................................. 53

Emma Perez-Trevino, *Convicted killer Amit Livingston to return to the
  Valley*, The Herald (July 14, 2015) ................................................ 57

*Guidelines and Standards for Texas Capital Counsel*, State Bar of Texas (2006) ............................................................................................ 31, 32

*Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, American Bar Association 31 HOFSTRA L. REV. 913 (2003) ................................................................................*passim*

Laura Tillman, *The Long Shadow of Small Ghosts: Murder and Memory in an American City* (2016)............................................................................ 70

*Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases*, 36 HOFSTRA L. REV. 677 (2008) .......................... 38

## INTRODUCTORY STATEMENT

This case is well known because two parents murdered their three young children. What is not well known is that this case is *also* about an individual with severe mental illness, a defense team that was not equipped litigate his impairments, and a notorious district attorney's regime that was steeped in scandal and misconduct.

John Allen Rubio's history of severe mental illness spans his entire life, and the lifelong qualities of the illness were never presented at trial. Every day that she was pregnant with Rubio, his mother drank a six-pack of beer. From an early age, Rubio needed treatment for hallucinations, and he experienced delusions that he was the "chosen one." In the third grade, he was diagnosed as emotionally disturbed and placed in special education. He was physically and sexually abused throughout his youth, and at age eight his mother began to prostitute him out to grown men.

During his adolescence, Rubio self-medicated by huffing spray paint and abusing cocaine. By early adulthood, he and his cognitively impaired common law wife, Angela Camacho, were intermittently homeless and struggled to hold down jobs. Rubio, Camacho, and their three young children eventually moved into a small apartment with Rubio's mother and two other adults. In the days leading up to the crime, Rubio slipped into a psychosis involving delusions that dated back to his childhood. Believing himself a protagonist in a good-versus-evil struggle for the world, he became paranoid about innocent people on the bus, interpreted a birthmark on a person's face to be a sign from the devil, and convinced himself that his mother had used witchcraft to curse him and his family. In the early morning hours of March 11,

2003, convinced of his role in the war between good and evil on earth, Rubio nailed the apartment door shut, and killed the family's pet hamsters with a hammer. With Camacho's help, he ultimately killed the three children, whom he believed to be possessed by his deceased grandmother, a woman his family had long told him was a witch.

After his first conviction was reversed on a Confrontation Clause issue, Nat Perez, Jr. and Ed Stapleton were appointed to represent Rubio in his second trial. Although Stapleton was technically second chair counsel, he took the lead on the mental health investigation. Stapleton, who had never before tried a death penalty case, recruited a social worker who he had known socially to be the mitigation specialist. He did not, however, request the appointment of a qualified mental health professional to serve as a part of the core defense team. It quickly became apparent that the mitigation specialist was not qualified to assist counsel in making decisions about what mental health evidence to investigate and develop. Rather than hire a qualified individual, Stapleton took it upon himself to be the team's mental health "expert."

Stapleton was in over his head. He failed to recognize the need to pursue red flags that Rubio suffers from Fetal Alcohol Spectrum Disorder (FASD), Temporal Lobe Epilepsy (TLE), brain damage, severe trauma, and other psychiatric issues. Counsel's failures prejudiced Rubio's competency trial, as well as the guilt/innocence and punishment phases of the trial on the merits. *See* Claims One, Two, Three, and

Seven. Both Stapleton and Perez later acknowledged—on the record at the state habeas hearing—that they provided ineffective assistance to Rubio.

The State's misconduct also played an important role in the case. Now serving a thirteen-year sentence on a federal corruption conviction, Cameron County District Attorney ("CCDA") Armando Villalobos was engaged in a set of pay-to-play schemes that facilitated favorable plea deals for wealthier clients and severe sentences for indigent ones. Rubio had no money, and was therefore prosecuted selectively, based on indigence and in violation of the Equal Protection Clause. *See* Claim Five. Moreover, Villalobos spent over $400,000 to secure the expert testimony of Dr. Michael Welner and his team at The Forensic Panel—at least a portion of which was paid from Villalobos's illegal asset forfeitures. At trial, Dr. Welner testified falsely that Rubio could not be schizophrenic because he showed insufficient signs of psychosis while unmedicated. *See* Claim Six. While all of this was going on, the CCDA Office continually interfered with funding for Rubio's defense. *See* Claim Four.

The mental health issues at play in Rubio's case make it complex and notorious, to be sure. But, the complexity does not excuse trial counsel's failures to prepare and present an adequate defense. Nor does the notoriety justify the State's misconduct. Accordingly, Rubio respectfully requests this Court grant the following petition for writ of habeas corpus and order a new trial.

## PARTIES

Petitioner John Allen Rubio is an inmate of the Texas Department of Criminal Justice (TDCJ). Rubio's TDCJ number is 999462 and he is housed at the Polunsky Unit, Livingston, Texas.

Respondent Lorie Davis is the Director of TDCJ's Correctional Institutions Division and an agent of the State that has custody of Rubio. She has custody pursuant to the judgment and sentence of death entered against Rubio on August 2, 2010, in *Texas v. John Allen Rubio*, No. 2003-CR-457-B (Tex. 138th Dist. Ct.—Cameron County).

## JURISDICTION AND VENUE

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 2241(a), and 2254(a). Venue is proper in the United States District Court for the Southern District of Texas under 28 U.S.C. § 2241(d) because it is the court for the district within which Rubio was convicted and sentenced and the district where he remains in custody.

## STATEMENT OF FACTS

Along with his wife, John Rubio killed his three young children. Both Rubio and his wife insisted that Rubio believed he was "the chosen one" in a struggle between good and evil, that evil witchlike spirits inhabited their apartment and took control of the children, that Rubio had to dispossess them, and that the only way to do that was by separating their heads from the bodies. The State, by contrast, has argued that the family was struggling financially, and that Rubio and Camacho killed the children because the parents could not support them.

4

## A. The crime.

On March 11, 2003, believing them to be possessed by his deceased grandmother, Rubio cut off the heads of his three young children: Julissa, (three); John Estefan (one); and Mary Jane (two months).[1] At the time of the offense, Rubio was living with his common law wife, Camacho, who was cognitively impaired.[2] The family had previously lived on the street, and also in a vacated home with no electricity and no running water. 63 RR 275. Child Protective Services took the children away for a period, but Rubio and Camacho got an apartment and were able to get them back. *Id.* at 277–80. Rubio took parenting classes, got a job, and—for a period—stopped using drugs. *Id.* at 278. Thereafter, in order to make more money, Rubio washed cars and worked as a prostitute. *Id.* at 140. Rubio's mother, who was also a drug-addicted prostitute, *id.* at 280–81, paid little rent but lived with the family. So did two of her friends. *Id.* at 249–50, 281.

Among other things, Rubio had a severe drug problem, using marijuana, powdered cocaine, and crack. 63 RR 284–85, 298. He regularly inhaled spray paint ("spray") to get high, and had been doing so five days before the murders. *Id.* at 189, 286.[3] Rubio also had a boyfriend, Jose Luis Moreno, who frequently provided Rubio

---

[1] Julissa and John Estefan were not Rubio's biological children, although all testimony in the case is that he treated them as though they were his own. *See, e.g.*, 63 RR 304 (testimony of Camacho).

[2] *See State Briefs: Mom Accused in Kids' Death Called Retarded*, Houston Chronicle News Services (May 29, 2004), https://www.chron.com/news/houston-texas/article/state-briefs-mom-accused-in-kids-deaths-called-1474671.php (last visited August 30, 2019).

[3] Rubio began using spray somewhere between twelve- and fifteen-years old, and continued to do so up until the murders—using up to five cans a day. 66 RR 29. Rubio

with the inhalants. *Id.* at 190. Camacho knew about Moreno, but tolerated his relationship with Rubio because of the material assistance, in the form of money and groceries, that Moreno gave to the family. *Id.* at 283–84.

As the time of the murders approached, Rubio was increasingly gripped by a delusion, seemingly present in some form or another since childhood, that he was the protagonist in a good-versus-evil struggle for the world. Indeed, emotional disturbance landed him in special education classes starting in the third grade, and he frequently sought mental health professionals in Harlingen, Texas, when he began to report that he was the "chosen one." 65 RR 159–65, 238–39. His mother, who began to facilitate Rubio's transition to prostitution at around 8 years old, 66 RR 28, explained that, as Rubio used more and more spray, he started to hear voices, see shadows, and report that God was telling him to save the world. 65 RR 180–81. Rubio also told Moreno that Rubio believed that he was the "chosen one." 63 RR 87.

In the days before the murders, Rubio and Camacho had largely secluded the family in order to prepare for the ultimate good-versus-evil confrontation, periodically dousing the apartment with bleach to the point that it became difficult to breathe. 66 RR 24–25. The day before the offense, Rubio and Camacho had gone to the hospital to retrieve records necessary to get food stamps, 63 RR 170,[4] and Rubio's behavior

---

told one mental health professional that he last used spray three days before the murders. *Id.* at 29.

[4] The State would eventually build much of its case around the theory that the trip to the hospital for the documents necessary to get food stamps disclosed the financial desperation that motivated the murders.

started to become especially erratic on the way home. Rubio began telling Camacho that the people on the bus with them were physical threats, and that a woman waiting at a stop wanted to steal their money. *Id.* at 174. Rubio refused to allow John Estefan to accept candy from a little girl, believing that the girl was attempting to poison him. *Id.* at 175–76. When they got off the bus, Rubio told Camacho that a woman with "marks" on her forehead had made a devil's sign and that they needed to rush home. Camacho agreed and they ran back to the apartment. *Id.* at 177–78, 199–200.

When they returned home, Rubio "tested" Julissa by sweeping an egg over her and cracking it into a glass of water. 63 RR 230–31. Rubio concluded that someone had done something evil to her, and neither Rubio nor Camacho could sleep that night. *Id.* at 168. Rubio was so scared for the family that he wanted to take them to a hotel, but could not find his wallet. *Id.* at 294. When Rubio's mother—who he believed to be a witch—came home at about 2:00 a.m., she refused Rubio's request that she help him ward off evil spirits. *Id.* at 232–23. Before leaving the apartment at 3:00 a.m., she told him that *he* had the power, and that he would have to use it. *Id.* at 233–34.

Rubio's paranoia continued to spiral throughout the night and early morning. At some point, he became concerned that evil spirits would try to enter the apartment, and nailed the back door shut. 63 RR 217, 253–54. He also threw a blanket over the bedroom mirror. *Id.* at 217–18. Believing his mother "and the transvestite that was living with us" to have cast a spell on the family's three pet hamsters, Rubio killed the animals with a hammer and bleach. *Id.* at 219, 254–55. He told Camacho that he

killed the hamsters because they were possessed by witchcraft. *Id.* at 254–55. He began telling Camacho that he was on the right side of a struggle between good and evil men—with seven on each side. Despite believing that he was on the good side, John referred to himself as the "anti-Christ." *Id.* at 142, 168.

At some point, Rubio decided that, as part of this struggle, he needed to kill the children because they were spiritually possessed by his deceased grandmother, who he also believed to be a witch. The circumstances of each child's death are the subjects of the divergent testimony explained below, as Rubio and Camacho gave slightly different accounts at different times. What is clear is that Rubio, with some assistance from Camacho, decapitated Mary Jane, then Julissa, and then John Estefan. They put the children's heads in plastic bags. At some point, Rubio and Camacho had sex for what they reasoned would be the final time, and then took a shower. 63 RR 153–55. After the murders, they tried to clean the apartment and then walked to the corner store. *Id.* at 151–52, 161–62.

The murders were discovered when Rubio's brother and Camacho's friend came over for a visit. When they saw the crime scene, Camacho told them that "it was the three witches" who had "moved the tables, the clothing, the furniture." 67 RR 140. Rubio's brother and Camacho's friend immediately left the apartment to locate police. *Id.* at 137–43. A police officer arrived at the apartment, and Rubio simply said "the kids are in the backroom." 60 RR 73, 113–14. When the officer saw one of the headless bodies, Rubio put his hands together and said "arrest me." *Id.* at 74–76. On his way to the police station, Rubio told an officer: "I cut my daughter's head off. She was

8

looking at me like she was possessed . . . . I remember seeing a bunch of cats through my window." *Id.* at 134–38.

Camacho initially made three statements to the police in short succession, although they contradicted one another. In the first, she told police that Rubio killed the children because he delusionally believed that they were possessed by his deceased grandmother. 63 RR 247. Law enforcement thereafter told Camacho (falsely) that Rubio had confessed that they killed the children because they did not want the children to suffer the hardships of their poverty, and Camacho changed her story to corroborate what she then believed to be Rubio's account. *Id.* at 247. (During Rubio's second trial, Camacho would testify adamantly that the second statement was false. *Id.* at 247, 254–55.) In her third, videotaped statement, and despite police efforts to get her to say that she and Rubio killed the children due to financial stress, Camacho mentioned "bad spirits," explained that Rubio killed the hamsters because they were making the children suffer, remembered the kids waking up scared, and described things as being "weird." 79 RR 46–49 (State Trial Exhibit 255).

Prior to Rubio's second trial, and over five years after her first three statements, Camacho gave a final statement that again mirrored her first: Rubio believed the children were possessed. 78 RR 221–23 (State Trial Exhibit 254).

### B.    Trials and direct review.

Rubio and Camacho were both indicted for capital murder.[5] Rubio was first convicted and sentenced to death in 2003, but the Texas Court of Criminal Appeals ("TCCA") ordered a retrial on the grounds that Camacho's out-of-court statements were unconstitutionally introduced against Rubio without him having an opportunity to confront her on the witness stand. *Rubio v. State*, 241 S.W.3d 1 (Tex. Crim. App. 2007).

In July 2010, Rubio was again tried for capital murder. During the second prosecution, Rubio alleged that he was not competent to stand trial, and he pleaded not guilty by reason of insanity. 3 CR 648–50. Competency was resolved first, before a Cameron County jury. 6 CR 1367–68. Two mental health experts testified for the defense,[6] and three testified for the State.[7] A major issue was whether Rubio was feigning impairments, 24 RR 38, 123, 150–51, 173; 27 RR 8, and the State's experts generally testified that he was, 28 RR 223, 227, 296. The State's experts emphasized that Rubio had low-average-to-average intelligence, and therefore concluded that he was not putting forth full effort on testing instruments. *Id.* at 225–59. The Cameron County jury found him competent to stand trial. 33 RR 27–28.

---

[5] Rubio was indicted on four counts. Three were capital counts for the murder of a child under six, and the fourth was for having committed multiple murders during the same criminal transaction. 1 CR 38–40.

[6] These were clinical psychologist Jolie Brams (14 RR 6–89 and 24 RR 40–208) and psychiatrist Raphael Morris (24 RR 208–29 and 25 RR 1–112).

[7] These were neuropsychologist James Seward (14 RR 89–139 and 28 RR 72–180), psychologist Troy Martinez (26 RR 134–197 and 27 RR 1–51), and forensic psychologist Eric Drogin (28 RR 180–300).

Before the second trial, and upon the trial court's decision to deny resources for more than one expert, Rubio's lawyers complained about the court's failure to fund the defense. 35 RR 1–10. Specifically, Rubio's lawyers complained about the gross injustice of the State paying one of its experts (Dr. Welner) hundreds of thousands of dollars, while the defense was being starved of resources. *Id.* at 4. Seeking to bolster the judge's expressed belief that "the District Attorney's Office is limited in the money that is available to them to try this case[,]" *id.* at 4, and after the judge asked, point-blank, whether Dr. Welner would be costing the State $400,000, the State's attorney answered: "Not for $400,000, no, sir."[8] *Id.* at 9–10. The back-and-forth over resource asymmetries occurred in the context of defense counsel's request for an expert to do a functional-MRI ("fMRI"). *Id.* at 7. The trial court denied the request, reasoning that it was "expensive, very expensive, extremely expensive." *Id.* at 7. The court further explained that the expense was not "necessary" because the requested defense expert "was going to be testifying simply about the insanity issue," and "you had already designated an expert and had an expert to deal with it." *Id.* at 7.

The trial judge ultimately ordered the case transferred to Hidalgo County. 8 CR 1825. During the State's guilt-phase case in chief, eight Brownsville police officers and one member of U.S. Border Patrol testified about the crime scene and the immediate aftermath of the murders.[9] Two members of the Texas Department of

---

[8] Dr. Welner and his company, The Forensic Panel, were, in fact, paid over $400,000 for expert services and testimony.

[9] The BPD officers were: Effrain Cervantes (60 RR 55), Chris Ortiz (60 RR 172), Juan Hernandez (60 RR 235; 61 RR 3), Samuel Estaban (64 RR 2), Thomas Clipper (64 RR

Public Safety and a member of the Texas Department of Criminal Justice testified as to forensic matters, as did a Cameron County forensic pathologist and autopsy technician.[10] Among other witnesses was Moreno, Rubio's boyfriend, who testified that Rubio had told him that someone could get away with murder if they claimed insanity. 63 RR 59.

The most important lay witness in the State's case was Camacho, who by 2010 was serving a life sentence for the murders. 63 RR 131. She explained that Rubio frequently inhaled spray paint provided by his boyfriend Moreno, and that, when he was intoxicated, Rubio would "start talking to God and himself" and "would act like he was one of the cartoons." *Id.* at 190.

She testified that the thought of killing the children first came up on the morning of March 11, and that the reason was that "[Rubio] said they were possessed and I believed him." 63 RR 141. Specifically, she testified that Rubio believed that the children had been possessed by his deceased grandmother. *Id.* at 194–95. According to Camacho, Rubio continued to state that the children were possessed as the murders were taking place. *Id.* at 156, 181, 195. After John Estefan was dead, Camacho asked Rubio to kill her, but he was unable to do so. *Id.* at 158. Camacho and Rubio then went to the store, and when they returned home they discussed how, if

_____

157), Rolando Trujillo (71 RR 14), Julio Sanchez (71 RR 21), and John Mathew Jones (72 RR 1). The Border Patrol agent was Miguel Cadriel (60 RR 127).

[10] The TDPS personnel were: Jose Angel Juniga (63 RR 1) and Roland Castanada (71 RR 40). The TDCJ employee was Robert Peters (71 RR 56). The forensic technician was Arnold Argulin (62 RR 30), and the forensic pathologist was Dr. Marguerite Dewitt (64 RR 222).

they were unable to escape to Mexico, they would be separated when they were in prison. *Id.* at 163, 167. When her brother-in-law arrived at the apartment, Camacho defended Rubio as "crazy." *Id.* at 164–65.

Camacho is extremely impaired, 78 RR 211 (State Trial Exhibit 252), and was clearly confused by many things while testifying, but was adamant that the second statement that she gave to police—the one in which she stated the children were murdered because of money problems—was false. 63 RR 258 ("All of that is a lie."). Camacho explained that Brownsville police officers had told her that Rubio provided them with the money-problems story, and that she had just been trying to conform her narrative with his: "Because the detective, I don't know which one, they told me that John Allen Rubio was saying that that is why we killed the babies. That's why we killed the babies. And that's why I tried to be like him. I tried to be in the same page. So I said that, but it wasn't that." *Id.* at 247.

On cross examination, Camacho explained, in more detail, how she and Rubio provided for the children. 63 RR 195–96. Twice a day, they went to Good Neighbor Settlement Home, where people who were impoverished or homeless would go to eat and take care of other basic life necessities. *Id.* at 195–97. There, Rubio was "loving [and] playful" with his kids. 67 RR 22. They received supplemental nutrition from the Program for Women, Infants, and Children, and they also had food stamps and Medicaid. *Id.* at 234; 63 RR 251. The staff at the Settlement Home observed that Rubio "would feed the kids and tend to the kids," and Camacho "would take care of them, tend to them; not as caring as [Rubio] would." 67 RR 29. In fact, Rubio "would

ask for the food for the children first. He would feed them and then he would come back for his food." *Id.* at 37–38. Camacho reaffirmed that Rubio never complained about having to take care of or provide for the kids; she testified that she made that statement to the police because they had been yelling at her. 63 RR 226–27, 252. She explained that she had told the story about killing the children because they could not provide for them only because the police had (falsely) told her that Rubio was providing them with that explanation. *Id.* at 252. She also reversed herself several times regarding whose idea it was to flee to Mexico—first saying it was her own, then testifying that it was an idea that she and Rubio had together. 66 RR 166–67, 216.

The first witness for the defense was Hilda Barrientes, Rubio's mother. She testified that she drank a six-pack of beer every day when she was pregnant with Rubio. 65 RR 151–55. Rubio had been in special education classes starting in the third grade, and frequently sought help for hallucinations from mental health professionals in Harlingen. *Id.* at 159–65. When he was a child, he would say that he was the "chosen one." *Id.* at 238–39. His mother facilitated his path to prostitution— she first prostituted him at age 8 (66 RR 28)—and it eventually became clear that most of the people interested in paying him for sex were men. 65 RR 176–77. She explained that Rubio began using spray as he matured, and that he again began to hear voices, see shadows, and report that God was telling him to save the world. *Id.* at 180–81. When she testified as to events on the night of the murders, she noted that Rubio had asked her why she was performing witchcraft on him. *Id.* at 216–17.

14

Next, the defense presented Dr. William Valverde, a board certified psychiatrist. Dr. Valverde had been the neutral, court-appointed competency expert during the 2003 proceedings, when he had found Rubio competent to stand trial. Dr. Valverde was again called to testify because, during the course of examining Rubio for the 2003 trial, Dr. Valverde also concluded that he was insane at the time of the offense. 66 RR 2. Dr. Valverde had thirty-four years of professional experience working with offenders who had colorable mental health issues, including those who were feigning symptoms. *Id.* at 18.

In 2003, Rubio had conveyed to Dr. Valverde his experiences starting three days before the murders: having seen a birthmarked woman, concluding that her appearance was a sign of the end of times from the Book of Revelation, and rushing his family back to their apartment. 66 RR 24. Rubio and Camacho secluded themselves for days preparing for the cataclysm, ritualistically cleaning the apartment with bleach to the point that it became difficult to breathe. *Id.* at 24–25. Rubio had thrown his mother out of the apartment for nonpayment of rent and, believing her to be a witch, saw a candle that she had left behind as a demonic signal of retribution. *Id.* at 25. He associated the onset of agitation in the hamsters with the retribution, and killed the hamsters as described above. *Id.* at 25–26. After that, he began to believe that his deceased grandmother had possessed his children[11] and that

---

[11] Specifically, Rubio reported to Dr. Valverde that Julissa was "in her crib and was running back and forth, jumping back and forth, walking back and forth in the crib." 66 RR 25. Rubio told Dr. Valverde that, when Rubio called Julissa by her name, she responded with the Spanish word for "grandma." Rubio said he'd never heard Julissa

the only way to purge her spirit was to commit the murders by severing the heads from the bodies—something he had seen in a movie. *Id.* at 26–27. During his initial evaluation, Dr. Valverde formed the impression that Rubio "had symptoms consistent with paranoid schizophrenia." *Id.* at 30.

Dr. Valverde went back to visit Rubio five more times, each time asking Rubio to repeat different parts of his story about the murders and the run-up thereto, to determine whether Rubio was feigning psychosis or misrepresenting something else. 66 RR 33–34. Rubio's accounts had only "very few minor variations from one telling of the story to another." *Id.* at 34. Dr. Valverde also reached the conclusion that the symptoms he was observing were not from the spray because there was no change in his behavior or functioning after his spray use ended. *Id.* at 36. Dr. Valverde testified he believed that, at the time Rubio committed the murders, Rubio was legally insane: that Rubio was suffering from a severe mental disease or defect that prevented him from knowing the difference between right and wrong. *Id.* at 42–44.

On cross-examination, the State exposed the fact that the trial lawyer responsible for Dr. Valverde—Stapleton, who was on his first death penalty trial— had prepared the witness with the wrong statutory definition of insanity. 66 RR 39, 45 (focusing on understanding of moral wrongness rather than understanding of illegality). Dr. Valverde was also unaware of other important evidence. For example, trial counsel had not flagged for Dr. Valverde the testimony of Moreno, who stated

---

use that word and that he asked her again who she was, and she again said that she was Rubio's grandmother. *Id.* at 25–26.

that Rubio claimed to know how to commit the "perfect crime" by feigning insanity. *Id.* at 72. Nor had Dr. Valverde been able to review Angela Camacho's statements about the night of the incident. *Id.* at 75–76.

The other defense expert presented at the guilt-innocence phase of the trial was Dr. Raphael Morris, a forensic psychiatrist. 66 RR 101. Dr. Morris, who interviewed Rubio five or six times starting in 2008, *id.* at 108, for a total of around 31 hours, *id.* at 173, testified that Rubio had paranoid schizophrenia and substance abuse dependence, *id.* at 128–29. Specifically, Dr. Morris opined that Rubio had been in the early, "prodromal" phase of schizophrenic psychosis, *id.* at 131, and that, during the week before the murders, Rubio had "florid delusions," *id.* at 213. Dr. Morris based his diagnosis not only on the interview, but on the set of social, medical, and mental health histories that he compiled. *Id.* at 110. Dr. Morris testified specifically as to the insanity defense—that Rubio had a "severe mental disease or defect" and that "at the exact moment that he [committed the offense] he did not know it was wrong." *Id.* at 138–39.

With respect to the notion that Rubio was malingering his psychosis, Dr. Morris stated, "[t]here is no chance that he is able to make up this extensive story." 66 RR 199. He continued: "I don't think that there is any way that he could be lying to me about the kinds of delusional ideas of reference that he has. They are too systematized, too consistent over a two-year period." *Id.* at 201. He explained that although Rubio no longer harbored the grandiose belief that he was the "chosen one," he continued to have a number of other delusions. *Id.* at 217–22. He also emphasized

that Dr. Valverde was in the best position to evaluate the effect that Rubio's mental impairments had on the offense. *Id.* at 237.

Notably, even though Moreno reported that he had observed Rubio having what Moreno described as "seizures" or "absent seizures," Dr. Morris discounted the diagnostic significance of that information. 66 RR 239. Dr. Morris explained that there are "a lot of reasons why a person can be shaky and/or tune out or not be able to communicate," and that "seizure has not been diagnosed" from the results of the limited testing that trial counsel gave him. *Id.* at 239–40.

As had been the case with Dr. Valverde, Dr. Morris was prepared with the incorrect standard for insanity—an issue that was exposed in cross-examination. 66 RR 171 (conceding that he was focused on understanding of moral wrongness rather than understanding of illegality). Dr. Morris, moreover, was unable to fully corroborate the degree of genetic loading for mental health problems because members of Rubio's family had not been primed to cooperate. *Id.* at 193–94. Additionally, Dr. Morris had not been made aware that Camacho had claimed that Rubio talked about killing the children months before the incident. *Id.* at 184. Nor had he ever been able to interview Moreno, who testified that Rubio disclosed knowledge of how to commit the "perfect crime." *Id.* at 182, 208. Finally, Dr. Morris had been unable to review Dr. Welner's interview with Rubio. *Id.* at 217.

In rebuttal, the State sought to establish that Rubio was faking mental illness by having two jailhouse informants testify that Rubio said he wasn't crazy. First, the State called Jose Luis Gutierrez, who had been convicted of murder in Cameron

County, and who was housed near Rubio in the Cameron County Jail during 2009.
68 RR 84–86, 91–93. Gutierrez testified that Rubio told him, in sign language, that
Rubio's trial lawyers instructed Rubio to malinger on an IQ test so that he could plead
insanity. *Id.* at 98. The court struck all of Gutierrez's testimony as unreliable. *Id.* at
116–118. The State then called its next witness, Rolando Garza, to testify that he
observed the 2009 conversation with Gutierrez while all three men were in the
Cameron County Jail. *Id.* at 123, 140–41. Garza testified that Rubio told Gutierrez
that Rubio cut his kids heads off first so the kids wouldn't suffer. *Id.* at 142. Garza
testified that, when he told Rubio that Rubio wasn't insane, Rubio "shushed" him and
stated that "they don't know that." 68 RR 143. Garza, however, falsely testified that
Rubio cut the children's limbs off after decapitating them, *id.* at 142, which was
inconsistent with the evidence presented at trial. He also claimed that Rubio planned
to put the bodies in the dumpster *id.*, which was inconsistent with Camacho's
testimony that she wanted the kids buried with Rubio's grandmother, and that Rubio
wanted to bury the kids in his old family home, 63 RR 165–66.

The last witness the State called was forensic psychiatrist Michael Welner, 69
RR 2, and Dr. Welner's testimony loomed over rest of the proceeding, including the
punishment phase.[12] Dr. Welner was the chairman of The Forensic Panel, a forensic

---

[12] Dr. Welner's fee model, in which he outsources much of the forensic work to paid
subcontractors and calls the process "peer review," has been criticized in various cases.
*See Second Yates Expert Paid $242,966.74*, Houston Chronicle, (October 1, 2006),
https://www.chron.com/news/casey/article/Second-Yates-expert-paid-242-966-74-
1511591.php (last visited September 3, 2019). The model has also been criticized as
creating a pecuniary interest for the subcontracting experts to sign off on each other's

psychiatry practice that essentially allowed Dr. Welner to subcontract different parts of the forensic work, especially the specialized psychiatric expertise necessary to corroborate the forensic conclusion. *Id.* at 15–16, 151–52. In discussing The Forensic Panel, Dr. Welner repeatedly referred to its practices as "peer review," although the "review" in question was not for the purposes of academic publication, was being done for profit, and was not anonymous. *Id.* at 15–23. Dr. Welner admitted that he was "not sophisticated in psychological testing," and explained that he relied on a neuropsychologist who subcontracted with The Forensic Panel to help him interpret test results from instruments administered by others, including State expert Jim Seward. *Id.* at 62, 109–11.

Dr. Welner testified that, because Rubio reported that he no longer believed that he was the "chosen one," the belief was insufficiently fixed and false to support a diagnosis of schizophrenia. 69 RR 79–80. Dr. Welner was also skeptical of the "chosen one" delusion because, he believed, Rubio had developed a narrative around that story sometime after the murders. *Id.* at 104 ("At the time that this happened and the information derived and presented, he wasn't talking about saving the world. Only in recent reports by expert witnesses and stuff like that is he being represented

---

conclusions in order to ensure further consulting work. *See United States v. Shannon Shields*, 2:04-cr-20254-BBD-tmp (W.D. Tenn.), Doc. 557 at 12–13. Additionally, and contrary to the impression he creates by using the term "peer review" prolifically, the vast majority of Dr. Welner's published works are non-peer reviewed newsletters and articles published online for his own companies and publications. *See* 79 RR 239–49 (State Trial Exhibit 275) (Dr. Welner's CV includes at least 121 "published" works from non-peer reviewed, non-academic sources).

as thinking that he was saving the world at the time."). Dr. Welner dramatically emphasized the absence of evidence showing brain damage: "I think that I need to point out that his neuropsychological testing demonstrated that he had *no evidence of brain damage and that he had no evidence of brain disease.*" *Id.* at 114 (emphasis added). He also noted that the magnetic resonance imaging (MRI) and electroencephalogram (EEG) "were both normal—consistent with normal findings on a neuropsychological test." *Id.* at 115. He stated that an fMRI and a CAT scan were "irrelevant to the matter at hand," reporting "with medical certainty that [they] will never be relevant . . . ." *Id.* at RR 113.

Finally, Dr. Welner testified that he did not believe that Rubio had schizophrenia. 69 RR. 128. He explained that "any history . . . of him experiencing peculiar phenomena [has been] pinpointed . . . to times that he was intoxicated." *Id.* at 129. He emphasized that "he has been appreciated by many people in his life, who spent a lot of time with him, as normal." *Id.* at 129. Crucially, according to Dr. Welner, *even though Rubio was not taking anti-psychotic medication*, Rubio had not experienced the decline typically associated with the first (prodromal) stage of schizophrenia. *Id.* at 130–32. ("But we are talking seven years, and the great majority of the time he has not been on anti-psychotic medications. . . . [A]n unmedicated chronic schizophrenic would not be able to maintain that intact presentation for a sustained period of time.").[13]

_____

[13] In addition to Gutierrez, Garza, and Dr. Welner, the State also called for rebuttal purposes: Ruben Alvear, a distant ex-boyfriend of Rubio's mother, who testified that,

On July 26, 2010, the jury found Rubio guilty on four counts of capital murder. 70 RR 102. At the punishment phase, and in order to trigger a death sentence, the State urged the jury to find that Rubio was a future danger and that there was insufficient mitigation. The State called ten lay witnesses—mostly law enforcement and correctional personnel.[14] On the question of future danger, the State focused on three fires that Rubio started while in prison, and the fact that he had tested positive for marijuana there. 73 RR 114, 139.

---

from his perspective (he did not live with the family), the family's life was relatively normal (RR 68 RR 1–18); Dean Garza, a Cameron County Sheriff's Department infirmary administrator who testified that he never saw Rubio express remorse about the killings and that Rubio generally kept his cell clean (68 RR 19–69); and Gilbert Flores, a Cameron County Sheriff's Lieutenant who oversaw the facility that housed Rubio starting in 2007, who testified that he had no issues with Rubio and that Rubio generally kept his cell clean (68 RR 70–80).

[14] The lay witnesses were: BPD Officer Rolando Trujillo, who arrested Rubio for public intoxication and marijuana possession in 2001 (71 RR 14–21); BPD Officer Julio Sanchez, Jr., who arrested Rubio for a Class C misdemeanor assault in 2002 (71 RR 22–39); TDPS Lieutenant Rolando Castaneda, who testified that Rubio was inappropriately light-spirited in the jail infirmary after the murders (71 RR 44–54); TDCJ Guard Robert Peters, who testified that Rubio started a fire in December 2004 (71 RR 55–91); BPD Officer John Matthew Jones, who testified that he had arrested Rubio for stolen-vehicle possession in 2001, and that, while transporting Rubio to the jail for the murders in this case, Rubio was insufficiently concerned about what had just happened (72 RR 2–30); TDCJ Corrections Sergeant Traleasa Turner, who testified that, in 2004, Rubio used his arm to prevent guards from closing the slot to his cell (72 RR 30–56); TDCJ Corrections Sergeant Jonell Stringer, who testified that Rubio tested positive for marijuana in 2005 (72 RR 65–80); TDCJ Corrections Officer Eston Earl Loving, who testified that he wrote a report about Rubio starting a fire in November, 2004 (72 RR 81–97); TDCJ Corrections Officer Billy Alexander, who testified that Rubio started a fire on New Year's Eve 2004 (72 RR 98–138); and Cameron County Probation Officer Lorena Mendoza, who testified that Rubio showed little remorse when Mendoza met with him after the murders (72 RR 139–62).

To bolster its case on future dangerousness, the State called two experts, Armond Merillat (72 RR 162) and Alan Brantley (73 RR 2). Merillat testified as a prison classification expert, and for the purpose of conveying to the jury that correctional facilities and the classifications they used could not eliminate the risk of violence for incarcerated offenders. He did not testify specifically as to risks Rubio presented. 72 RR 168. Outside the presence of the jury, the prosecution requested that Merillat not be cross-examined on the basis of another case in which his false testimony—overstating the risk that murderers would have opportunities to be violent in prison—caused the capital sentence to be overturned. *Id.* at 178. The State repeatedly emphasized that the case, *Estrada v. State*, 313 S.W.3d 274 (Tex. Crim. App. 2010), was not a relevant topic of cross examination because the false testimony given there was a "single, specific instance." *Id.* at 178–79. (The State had disclosed *Estrada* to trial counsel.) When asked in front of the jury, Merillat only stated that he had given the false testimony in *Estrada*. *Id.* at 198.[15] Brantley simply testified that Rubio would present a risk of future violence, based on a ten-factor framework that he developed but never tested empirically. 73 RR 24–29.[16]

---

[15] As is explained in Claim Eight, *infra*, there had been multiple cases in which Merillat made the same mistake. Both the State and Merillat himself failed to disclose or mention that Merillat had provided nearly identical false testimony in another Cameron County case prior to Rubio's trial. *Velez v. State*, 2012 WL 2130890 (Tex. Crim. App. June 23, 2012) (finding Merillat testified falsely in a 2008 Cameron County trial).

[16] The State also recalled forensic pathologist Marguerite Dewitt, who testified that the children suffered during the murders. 73 RR 69–71.

The defense called ten lay witnesses and one expert. In terms of lay witnesses, they called: Rubio's special education teacher, who testified that Rubio was impaired but well-behaved (73 RR 128); four Cameron County law enforcement employees who testified generally that Rubio did not behave dangerously while he was housed at the Cameron County Jail (*id.* at 134, 138, 142–44); and five members of the clergy who met Rubio after the murders and testified generally that he should not be executed (*id.* at 154–61). Trial counsel's primary strategy—to have clergy testify as to the wrongfulness of the death penalty—was scrambled when the judge refused to permit it. *Id.* at 161–63.

The defense also recalled Dr. Jolie Brams, a clinical psychologist who had testified at the competency proceeding. 14 RR 6–89. Dr. Brams testified that Rubio's mental health issues were at least partially a result of "genetic loading" for substance abuse and "toxic parenting." 73 RR 172–73. She diagnosed Rubio with, among other things, hyperactivity, ADHD, a learning disability, an emotional disorder, and psychosis. *Id.* at 173–79. She explained that she had learned that, when Rubio was an infant, his mother was "drunk, high on crack, something like that," *id.* at 185, but Dr. Brams did not opine as to the physiological and mental health effects of prenatal exposure to intoxicants.

The punishment phase testimony ended on July 28, 2010. The next day, the jury received the charge, heard punishment-phase closings, and announced that it had answered the special issues in a way that required the court to impose a death sentence. 74 RR 67–69, 71.

Rubio appealed, represented by Bill Hubbard. There were three points of error asserted: (1) an allegation that the trial court abused its discretion in allowing Dr. Brantley to testify on future dangerousness; (2) a boilerplate allegation that the "10-12" rule, which bars defendants from informing jurors that a hung jury results in a life sentence, violates the constitution; and (3) a sufficiency-of-the-evidence challenge to the adverse NGRI finding. The TCCA affirmed the conviction and sentence, in an unpublished opinion, on October 10, 2012. *Rubio v. State*, No. AP-76,383, 2012 WL 4833809 (Tex. Crim. App. Oct. 10, 2012).

### C.   State post-conviction proceedings.

At the conclusion of the trial, before an appeal was taken, the trial court appointed David Schulman to represent Rubio in state post-conviction proceedings. On November 2, 2011, Rubio made a sealed motion "for Funds to Retain Professional Services Regarding Evaluation of Suspected Fetal Alcohol Spectrum Disorder (FASD)." SHCR 52. After a series of exchanges with the trial court precipitated no movement on the case, Rubio sought mandamus relief to move the investigation forward. SHCR 53–58. The TCCA eventually entered an order directing the trial court to decide the funding motion; and, on January 24, 2013, the trial court signed an order funding the preliminary investigation. SHCR 64. The preliminary diagnosis of FASD was made on July 10, and it was at that time that Temporal Lobe Epilepsy ("TLE") was discovered. SHCR 58. On July 18, Rubio moved for the funding necessary to complete the fact development around FASD and TLE. SHCR 59, n.57. The trial court again took no action on the motion, and state post-conviction counsel went to

the TCCA with a recusal motion. SHCR 61. The TCCA denied it and, on September 11, ordered him to file his initial application within 30 days. SHCR 62.

State post-conviction counsel filed the initial state post-conviction application on October 11, 2013. That application contained six claims: (1) a claim that trial counsel was constitutionally ineffective for failing to investigate fetal alcohol spectrum disorder ("FASD") (Orig. Tex. App. 18); (2) a claim that trial counsel's failure to investigate FASD represented a distinct Sixth Amendment violation associated with a failure to discover temporal lobe epilepsy ("TLE") (Orig. Tex. App. 47); (3) a claim that the state post-conviction court's failure to fund a sufficient investigation into FASD represented a due process violation and produced Sixth Amendment violations (Orig. Tex App. 52); (4) a boilerplate claim that the Texas "10-12" rule violated due process and related constitutional provisions (Orig. Tex. App. 68); (5) a slightly modified version of the boilerplate fourth claim, alleging that the 10-12 rule violates the Eighth Amendment by preventing the jurors from being sufficiently informed about the implications of their answers to the special issues (Orig. Tex. App. 68); and (6) a boilerplate claim that the Texas appellate process violates the Eighth Amendment because it fails to provide meaningful appellate review of the jury's answers to the special issues (Orig. Tex. App. 110).

Several years after filing the initial state application, and just two days before the August 8, 2016 state post-conviction hearing, state habeas counsel finally met with trial counsel for the first time. (Supp. Tex. App. 2). At that meeting, and at the hearing that followed, state post-conviction counsel heard, apparently for the first

time, how the CCDA's Office interfered with the defense. (Supp. Tex. App. 3). When trial counsel Ed Stapleton testified at the August 8 hearing, he also reported how the CCDA, Armando Villalobos, ran a pay-to-play scheme that resulted in especially aggressive prosecutions against poorer defendants. SHRR 182–84.

At that hearing, Ed Stapleton and Nat Perez both stated that they provided ineffective assistance of trial counsel. SHRR 187. Stapleton testified that he was ineffective under oath, and Perez yelled, from the jury box: "We provided ineffective assistance of counsel." *Id*. Stapleton had been in charge of the mental health evidence, and explained that Rubio's trial was actually his first death penalty trial. *Id*. at 188. He also explained that he did not understand that the defense team should include— distinct from testifying mental health experts—a team member who was a mental health professional capable of guiding the attorneys in making pertinent litigation choices. *Id*. at 168–69 ("I think I made a mistake in putting the team together."); *id*. at 178 ("I think that was an error. I think I did not have anybody adequate on the team to fill that role."). In an exchange with Stapleton, who was on the witness stand, the state post-conviction judge, who was also the trial judge, agreed with the proposition that the case was sufficiently close that, had life-without-parole been the sentencing alternative, Rubio would not have received the death penalty. *Id*. at 191.

On November 9, 2016, state post-conviction counsel filed what was labeled as a "supplemental" application, although the Texas courts treated it as successor that needed to be authorized by the TCCA. The state successor application included four new claims: (1) that Rubio was denied equal protection by the State's refusal to plea

27

bargain, which was a result of the CCDA's pay-to-play rules (Supp. Tex. App. 8–12); (2) that Rubio was denied the right to introduce a full mitigation case "because there was a breakdown in the system" (Supp. Tex. App. 12–16); (3) that Rubio was denied effective assistance of counsel because of the interference of the CCDA's Office (Supp. Tex. App. 16–21); and (4) that Rubio was denied effective assistance of counsel because the trial court failed to properly fund the defense team (Supp. Tex. App. 21–30).

The TCCA denied all relief on May 23, 2018. *Ex parte Rubio*, No. WR-65,784-02, 2018 WL 2329302, at *1 (Tex. Crim. App. May 23, 2018). With respect to the six claims in the initial application, the TCCA denied the three related to FASD and TLE on the merits, and it denied the three boilerplate challenges as procedurally defective. *See id.* at *3. The TCCA dismissed all four claims appearing in what it designated as the successor application—holding that, for various reasons, each failed to meet the pertinent authorization criteria. *See id.* at **4–5. The TCCA expressly stated that it was denying the challenges in the successor application "without reviewing the merits of the claims raised." *See id.* at *5.

On June 6, 2018, Rubio moved this Court to appoint Lee Kovarsky and the Capital Habeas Unit from the Northern District of Texas ("FPD"), and this Court granted that motion two days later. (Doc. 3). On June 7, 2018, state post-conviction counsel filed a suggestion for reconsideration with the TCCA, arguing that the court should revisit its May 23 decision on its own initiative. Both Parties to this Matter recognized that the pendency of the suggestion in state court had effects on the

28

federal limitations period that were very unclear. The Parties agreed that Rubio would file a "shell petition" on or before the 70th day following the TCCA's disposition of the suggestion, that he would file an amended petition on or before the 135th day following the filing of the shell petition, and that—if Rubio abided by these timelines—the Director would expressly waive her limitations defense with respect to all claims appearing in, and claims relating back to those appearing in, the shell petition. App. at 001–03.

When Rubio learned that the TCCA had disposed of his suggestion, the Parties executed a rider to the initial agreement regarding limitations. In that rider, the Parties agreed that Rubio would file his shell petition on or before September 4, 2019, and that he would file his amended petition on or before the 135th day following the filing of the shell. This shell petition follows. App. at 004–05.

## CLAIMS FOR RELIEF

**Claim 1**      **Rubio's Sixth Amendment right to counsel was violated because the defense failed to include a mental health expert as a member of the defense team.**

Although most capital cases involve complex issues related to mental health, few rival the John Rubio case. He had a childhood history of emotional disturbance and hallucinations, engaged in adolescent prostitution facilitated by his own mother, and was both homeless and a polysubstance abuser as he transitioned to adulthood. Delusions and hallucinations rooted in these lifelong mental health issues were inextricably intertwined with the crime itself. No attorney could be expected to adequately investigate and understand this case without having a qualified mental

health professional as part of the core defense team. Such a professional's job is to help counsel make decisions about what mental health evidence to investigate and develop, and this person is distinct from the set of testifying experts that might take the stand at trial. Despite the fact that professional guidelines mandate just such a team structure, Rubio's trial counsel attempted to go it alone.

The team's mitigation specialist, selected and overseen by a lawyer who was himself working his first death penalty trial, fell far short of the qualifications necessary to fill this role. The result was an underdeveloped and disjointed presentation at the competency trial, as well as at the guilt/innocence and punishment phases of the trial on the merits. As *both* trial lawyers readily admitted at the state habeas hearing, their failures in this regard constituted ineffective assistance of counsel in violation of the Sixth Amendment.

### A.   Trial counsel's performance was prejudicially deficient, violating the Sixth Amendment.

Under the Sixth Amendment, a criminal defendant is guaranteed the right to effective assistance of counsel. To establish ineffective assistance of counsel, Rubio must show that trial counsel's performance was deficient and that counsel's deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In assessing counsel's performance, courts look to the "[p]revailing norms of practice as reflected in [the] American Bar Association standards and the like." *See Strickland*, 466 U.S. at 688–89. To establish prejudice, Rubio must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different." *Id.* at 694. A reasonable probability is "a probability sufficient to undermine confidence in [the] outcome." *Id.* at 693–94.

### 1. Trial counsel's performance was deficient.

Under the 2003 ABA Guidelines, a capital defense team should consist of two attorneys, a fact investigator, a mitigation specialist, and "at least one member qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments." *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, American Bar Association 31 Hofstra L. Rev. 913 (2003) [hereinafter "*ABA Guidelines*"], Guideline 4.1(A). This guideline reflects the national standards on defense services, which have long recognized that capital counsel must have access to adequate supporting services in order to provide quality representation. *ABA Guidelines*, Guideline 4.1 at cmt. The 2006 *Guidelines and Standards for Texas Capital Counsel*, published by the State Bar of Texas, mirror the requirements of the ABA Guidelines on this and other matters. *See Guidelines and Standards for Texas Capital Counsel*, State Bar of Texas (2006) [hereinafter "*Texas Guidelines*"], Guideline 3.1(A). "In particular, mental health experts are essential to defending capital cases" because issues such as "psychiatric impairment, combined with a history of physical and sexual abuse, are common among persons convicted of violent offenses on death row." *Id.*; *see also id.* ("Counsel's own observations of the client's mental status, while necessary, can hardly be expected to be sufficient to detect the array of conditions . . . that could be of critical importance."). Thus, the defendant's mental health status is often vital to "numerous issues that arise at various junctures during the proceedings," including

31

competency to stand trial, sanity at the time of the offense, and the jury's decision at the punishment phase of the case. *Id.*

Ultimately, it is counsel's duty to ensure that the team is properly assembled. *ABA Guidelines*, Guideline 10.4; *see also Texas Guidelines*, Guideline 10.1. While the team's mitigation specialist may theoretically be qualified to screen individuals for the presence of mental or psychological disorders or impairments, when that is not the case, counsel must retain an additional defense team member to serve in that role. *See ABA Guidelines*, Guideline 4.1 at cmt. ("Subsection A(2) mandates that at least one member of the defense team (whether one of the four individuals constituting the smallest allowable team or an additional team member) be a person qualified by experience and training to screen for mental or psychological disorders or defects and recommend such further investigation of the subject as may seem appropriate."). In fact, the *Texas Guidelines* presume that the mental health expert and the mitigation specialist roles will be served by different individuals. *See Texas Guidelines*, Guideline 10.1. Either way, the individual who fills the mental health role should be an internal member of the defense team and not a testifying expert. *See ABA Guidelines*, Guideline 10.4 at cmt. ("[C]ounsel should structure the team in such a way as to distinguish between experts who will play a 'consulting' role, serving as part of the defense team covered by the attorney client privilege and work product doctrine, and experts who will be called to testify, thereby waiving such protections."); *see also Texas Guidelines*, Guideline 10.1 (explaining that trial counsel should secure a "mental health associate" for the defense team, separate from the mitigation

specialist, who can determine whether legitimate mental health issues exist and recommend that counsel retain other appropriate experts).

Trial counsel deficiently failed to include the appropriate mental health expert on the defense team. Although he had never before tried a death penalty case, second chair counsel Stapleton took the lead on forming the defense team. Counsel requested the court appoint Carmen Fisher as the mitigation specialist. Stapleton was acquainted with Fisher and her husband, a local attorney, but had never used Fisher as a mitigation specialist. However, he was aware that she had earned a master's degree in social work and, at the time, he envisioned that Fisher would serve the dual role of mitigation specialist *and* mental health consultant for the defense team.

During the lead up to trial, it became clear to counsel that while Fisher was capable of reviewing records, she was not qualified to screen individuals for the presence of mental or psychological disorders or impairments. Trial counsel had a duty to request the court appoint a qualified mental health consultant. Counsel failed to do so, and instead attempted to rely on their own understanding of mental health to prepare the case.

When Stapleton was called to testify at Rubio's state habeas hearing regarding a different claim—ineffective assistance of counsel for failure to investigate and present Fetal Alcohol Spectrum Disorder and Temporal Lobe Epilepsy—he described his assembly of the team as a "mistake" and openly stated that he rendered ineffective assistance for having included Fisher on the team as a substitute for the mental health expert required by the Guidelines. 1 SHRR 168–70, 178–80, 187. Lead counsel,

Perez, who was seated in the courtroom gallery at the time, also chimed in, "We provided ineffective assistance of counsel." *Id.* at 187.

### 2. The deficiency was prejudicial.

Trial counsel's failure to assemble the minimum required defense team prejudiced Rubio at the competency trial, and at both the guilt/innocence and punishment phases of the trial on the merits. The deficiency was particularly prejudicial at the punishment phase, when Rubio would have needed to convince only a single juror to spare his life. *See* Tex. Code Crim. Proc. art. 37.071 § 2(g) (imposing unanimity requirement).

Had trial counsel retained a consulting mental health expert as a member of the defense team, they would have recognized the need to present testifying experts regarding, among other things: Rubio's exposure to extreme trauma beginning in utero and continuing into adulthood; neuropsychological deficits and evidence of significant brain damage; and various psychiatric conditions. All of such testimony would have been highly relevant to Rubio's competency at the time of trial, his sanity at the time of the offense, and punishment. Such a defense team member would also have helped trial counsel identify the lay witness content necessary to support any expert diagnoses.

A qualified trauma expert would have reviewed testimony, affidavits, and other evidence. He or she could have testified that Rubio experienced extreme neglect and abuse in his early life, including physical and sexual abuse, and that he exhibits symptoms consistent with post-traumatic stress disorder. Such extreme trauma is

associated with frontal and temporal lobe dysfunction, as well as with hypervigilance, dissociation, and relationship problems.

A qualified neuropsychologist could have administered a complete neuropsychological battery and confirmed that Rubio suffers deficits in executive functioning as well as limbic system dysfunction, which are indications of frontal lobe and other brain damage. Intelligence and memory testing also establish that Rubio exhibits a pattern of deficits in working and delayed memory, as well as processing speed—all of which are consistent with brain damage. A neuropsychologist also could have explained that the amalgamation of Rubio's pre-natal alcohol exposure, childhood abuse and neglect, early substance abuse, and head injuries, combined with the fact that his brain was still developing at the age of 22, would have significantly impaired his cognitive functioning at the time of the offense.

Such findings would have warranted the retainer of a brain imaging expert who could have analyzed the multiple MRIs, fMRIs, PET scans, and EEGs that Rubio has undergone since the offense. This expert could have testified that the indications of brain damage from the neuropsychological testing are corroborated by Rubio's brain imaging.

A qualified psychiatrist could have testified, among other things, that Rubio exhibits psychotic symptoms, including fixed and delusional hyper-religious beliefs that are clearly outside of the cultural norm. There is also evidence that Rubio suffers from mood disorders, such as depression and manic episodes. The convergence of these symptoms with Rubio's extensive history of auditory and visual hallucinations,

hyper-religious and grandiose delusions, and amotivational behavior in the form of social isolation, indicates schizoaffective disorder.

Moreover, had counsel included a qualified mental health professional on the core defense team, they would have uncovered evidence that Rubio suffers from FASD and TLE—both of which would significantly impair his functioning.

Had counsel properly assembled the defense team to include a mental health consultant, there is a reasonable probability that the outcome of the competency trial, guilt/innocence phase of the merits trial, and/or punishment phase of the merits trial would have been different. *See Strickland*, 466 U.S. at 694. Accordingly, Rubio requests this Court reverse his conviction and sentence.

### B. Any default is excused by state habeas counsel's failure to raise this substantial claim.

State habeas counsel did not raise this substantial ineffective assistance of counsel claim in state habeas proceedings. State habeas counsel's ineffectiveness excuses any default of the claim that the Director may allege. *See Trevino v. Thaler*, 569 U.S. 413, 429 (2013). Section (A), *supra,* demonstrates the substantiality of the underlying claim.

### Claim 2 Rubio's Sixth Amendment right to counsel was violated because the defense failed to investigate and present evidence about the existence and effects of Fetal Alcohol Spectrum Disorder and Temporal Lobe Epilepsy.

Rubio's conviction and death sentence violated the Sixth Amendment because trial counsel failed to investigate and present evidence that he suffers from Fetal Alcohol Spectrum Disorder ("FASD") and Temporal Lobe Epilepsy ("TLE"), as well as

the impact of these conditions on his life. The federal relitigation bar in 28 U.S.C. § 2254(d) does not preclude merits consideration of this claim because the state post-conviction process violated Rubio's due process right to a meaningful opportunity to be heard, and because he satisfies the exceptions to the relitigation bar in any event.

## A. Trial counsel's performance was prejudicially deficient, violating the Sixth Amendment.

To establish ineffective assistance of counsel, Rubio must show that trial counsel's performance was deficient and that counsel's deficiency prejudiced the defense. *See Strickland*, 466 U.S. at 687. Trial counsel's failure to investigate and present evidence regarding FASD and TLE meets both prongs of this test. Therefore, Rubio's Sixth Amendment right to counsel was violated and Rubio's conviction and sentence should be reversed.

### 1. Trial counsel's performance was deficient.

Investigation is the backbone of trial defense, for all phases of the litigation. With respect to the guilt phase, professional norms prevailing at the time of Rubio's trial underscore defense counsel's paramount duty to investigate and prepare both liability- and sentencing-related defenses. *See ABA Guidelines*, Guideline 1.1 at cmt. ("With respect to the guilt/innocence phase, defense counsel must independently investigate the circumstances of the crime and all evidence—whether testimonial, forensic, or otherwise—purporting to inculpate the client."); *id.* at Guideline 10.7(A) ("[C]ounsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty."); *id.* at 10.11.(A) ("[C]ounsel at every stage of the case have a continuing duty to investigate issues

37

bearing upon penalty and to seek information that supports mitigation or rebuts the prosecution's case in aggravation.").

With respect to punishment, part of counsel's duty under prevailing norms is to investigate mitigation reasonably and fully. *See ABA Guidelines*, Guideline 10.7; ABA Mitigation Guideline 10.11, *Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases*, 36 Hofstra L. Rev. 677, 689 (2008) ("*ABA Mitigation Guidelines*"). More specifically, and with respect to mitigation, failure to make reasonable investigative decisions in light of available information constitutes deficient performance. *See Wiggins v. Smith*, 539 U.S. 510, 527 (2003) ("[A] court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further."); *id.* at 523 (explaining that focus of deficiency inquiry is on "whether the investigation supporting counsel's decisions . . . was itself reasonable"). Counsel may not "ignore[] pertinent avenues for investigation of which he should have been aware." *Porter v. McCollum*, 558 U.S. 30, 40 (2009).

In this case, trial counsel failed to explore investigatory threads leading to evidence of FASD and TLE, even though they knew that Rubio's mother, Hilda Barrientes, consumed massive amounts of alcohol throughout her pregnancy, and that such consumption created substantial physiological and mental health risks for Rubio. In short, Barrientes' alcohol abuse during pregnancy was a major red flag— information that was in counsel's file and mentioned during competency proceedings—that counsel failed to investigate.

38

Some of those red flags came from the 2003 trial. At that proceeding, Rubio was represented by Nat Perez and Alfredo Padilla. At the second trial, he was once again represented by Perez, who then partnered with new co-counsel, Ed Stapleton. Not only did counsel from the 2010 trial have access to the record from Rubio's 2003 trial, but Perez was physically present for relevant testimony. Perez heard Dr. Valverde testify that Rubio's "mother apparently had a heavy drug use problem" and that "throughout his academic career, John had difficulties." 28 RR 87 (2003).[17]  In fact, during his closing argument, Perez specifically referenced "the alcohol and drugs that John was exposed to." 33 RR 175 (2003). The information presented regarding Barrientes' drinking at the first trial put counsel on notice that prenatal alcohol consumption could be the source of important mitigation evidence at the second trial.

There were also red flags for FASD all over the investigation that preceded the 2010 trial. Trial counsel had a report stating that Barrientes abused alcohol throughout her pregnancy with Rubio. Barrientes told a defense expert that she "drank about a six-pack per day throughout her pregnancy." SHCR 135 (Fabian Report).[18] The expert's report noted that "maternal alcohol and nicotine use during pregnancy" is a "family risk factor relevant to this case." SHCR 151 (Fabian Report). Two other experts working with the defense team included in their reports or notes for their trial testimony that Barrientes was drinking while pregnant, and they

---

[17] References to the record from Rubio's first trial will be marked with "(2003)" but references to the current record will not.
[18] Report by John Matthew Fabian, Psy.D., J.D., ABPP dated July 12, 2010, was attached as Exhibit A to Rubio's State Habeas Original Application.

flagged this potential risk factor in Rubio's background. SHCR 162 (Pinkerman & Gonzales Report).[19] One of these experts (Dr. Jolie Brams) included in her notes for her PowerPoint slides that she intended to testify that one of the factors impacting Rubio was "in utero insult . . . smoking and drinking, drugs." SHCR 177.[20] Additionally, in a note found in counsel's files from an interview of Rubio on April 1, 2009, the unknown interviewer stated that "Mother may have been drinking and doing drugs-marijuana during pregnancy." App. at 011.[21] Rubio's Social Security and school records indicate a history of childhood emotional disorders. 73 RR 176.

Red flags also came out during the 2010 competency proceedings, which took place in Cameron County, before the case was transferred to Hidalgo County for the guilt and punishment phases. Dr. Raphael Morris testified that Barrientes "couldn't stay sober" and had a significant history of substance abuse that possibly contributed to Rubio's own poly-substance abuse problems. 24 RR 228. He also testified that Rubio's psychotic symptoms could be related to his mother's in utero consumption, and that FAS and low birth weight are two risks of consuming alcohol while pregnant. 24 RR 228. Barrientes and other family members also offered competency testimony that she had a problem with alcohol. That testimony included express references to

---

[19] Report by John Pinkerman, Ph.D. and Vittorio T. Puente, Ph.D. dated June 8, 2009, was attached as Exhibit B to Rubio's State Habeas Original Application.

[20] Dr. Brams's notes were attached as Exhibit D to Rubio's State Habeas Original Application.

[21] This note from trial counsel's file does not appear in the state court record and, under *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011), cannot be used to determine whether Rubio satisfies § 2254(d)(1) or (d)(2). This Court, however, must consider the note after § 2254(d) is deemed satisfied, when it evaluates the claim on the merits.

the fact that Barrientes exposed Rubio to "about a six pack" daily, throughout his prenatal development. 25 RR 250, 252; *see also* SHCR 135–38 (Fabian Report) (detailing information about Barrientes' drinking while pregnant and issues with Rubio's development). Barrientes also smoked "about half a pack of cigarettes per day throughout her pregnancy." SHCR 135 (Fabian Report). Rubio's uncle testified that Barrientes "was doing drugs" and appeared to be "stoned" during her pregnancy. He also witnessed her using "spray" while pregnant. 25 RR 134–35.

Despite trial counsel's access to many experts and witnesses who knew about and/or expressly noted Rubio's in utero exposure to alcohol and other intoxicants, they failed to investigate further.

That failure was especially baffling because of the evidence that Rubio's prenatal exposure to drugs and alcohol had a significant effect on his life. Counsel knew that Rubio had lifelong issues navigating the world. Trial counsel knew that he had always struggled with a "foggy brain," and that he had "profound" learning disabilities and dyslexia that had been observed starting in the third grade. App. at 025),[22] SHCR 135 (Fabian Report), 73 RR 173–74. During the competency hearing, Rubio's uncle testified that Rubio had a "mental problem" and recalled that, when Rubio was thirteen or fourteen, Rubio believed that he was going to "destroy the devil." Trial counsel knew that Rubio had been placed in special education, sustained taunts

---

[22] As with the content of footnote 21, *supra*, these mitigation notes cannot be used to determine whether Rubio satisfies § 2254(d)(1) or (d)(2), but may be used to evaluate the claim on the merits if either subsection is satisfied.

for being "mentally retarded," spoke with a lisp, struggled with attention and concentration, and was very hyper from an early age. SHCR 135 (Fabian Report), 73 RR 173. The lawyers knew he had failed the first grade, had been in special education, and had been in an Individualized Education Program ("IEP") from about the second or third grade to the ninth or tenth. SHCR 136 (Fabian Report).

Counsel also knew that Rubio's erratic behavior dove tailed with his delusions as he got older. Rubio always had a "short fuse" and was "very off-balanced" emotionally. SHCR 164 (Pinkerman & Gonzales Report). Trial counsel had information detailing how Rubio would spontaneously cry or get angry, and sometimes laugh uncontrollably for no perceptible reason. *Id.* Counsel learned Rubio he would bang his head against the wall when frustrated. *Id.* Rubio's brother told the defense team that, when Rubio was sixteen, he talked about their maternal grandmother coming to him in his sleep. SHCR 164 (Pinkerman & Gonzales Report). At eighteen, Rubio informed his brother that their grandmother—who was believed to be a "curandera" (witch) (SHCR 166)—told Rubio that he was "the chosen one" (SHCR 164) (Pinkerman & Gonzales Report). Rubio also told his brother that there was an imaginary door that Rubio could travel through. *Id.* Rubio would sometimes talk to himself, especially when watching cartoons. SHCR 165 (Pinkerman & Gonzales Report). He would also sit and talk to himself after dreaming that his deceased grandmother came to tell him that he would "change the world." *Id.* On one occasion, he said that "I understand grandmother." *Id.* When at his grandmother's

house, Rubio reported someone having touched him and that he "felt" something there. *Id*.

Rubio's trial attorneys were exposed to multiple red flags for FASD, and to symptomology consistent with that condition, yet unreasonably failed to investigate further.

### 2. The deficiency was prejudicial.

Deficient performance represents a Sixth Amendment violation only if the deficiency was sufficiently prejudicial—i.e., whether it had a reasonably probable effect on a guilt or sentencing phase outcome. *Strickland*, 466 U.S. at 698. With respect to the sentencing phase, the prejudice inquiry looks to the "the totality of available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceedings[s]," and evaluates how the difference would have affected the sentencing phase. *Porter*, 558 U.S. at 41 (quoting *Williams v. Taylor*, 529 U.S. 362, 397–98 (2000)). The inquiry into whether a "facially deficient mitigation investigation might have prejudiced the [petitioner]" should never be foreclosed based on "counsel's effort to present some mitigation evidence." *Sears v. Upton*, 561 U.S. 945, 955 (2010). With respect to sentencing, and under Texas law, Rubio would have needed to convince only a single juror to spare his life. *See* Tex. Code Crim. Proc. art. 37.071 § 2(g) (imposing unanimity requirement).

Had counsel reasonably investigated the red flags for FASD, they would have discovered not only that Rubio had *that* condition, but that he had TLE as well. Rubio has a neuropsychological test profile consistent with FASD. SHCR 546 (Adler

Affidavit). [23] Previous testing revealed that Rubio demonstrates deficits in four domains: academics, attention, verbal learning and memory, and executive functions. *Id*. In order to make an FASD diagnosis, The Center for Disease Control diagnostic guidelines require no more than three domains with impaired functioning. *Id*. That testing is consistent with digital photographs of Rubio's face, which were analyzed using FAS Facial Photographic Analysis Program and indicate that he has FASD-consistent facial features.

Trial counsel had a magnetic resonance imaging "MRI" and an EEG performed on Rubio on May 7, 2009. SHCR 547 (Adler Affidavit). They failed to have the more sensitive Quantitative EEG ("QEEG") conducted. *Id*. After trial, these images were reviewed and indicated that on some imaging "slices" Rubio's right hippocampus appeared smaller in size than his left. SHCR 47. A difference of size in the hippocampus can indicate TLE. SHCR 551. (Adler Affidavit). While brain abnormalities are often found in those with FASD, the absence of such does not exclude FASD as a diagnosis. *Id*.

Had counsel competently investigated the red flags for FASD, they would have retained a mix of mental health and/or medical professionals with expertise in FASD and TLE, and those professionals could have presented evidence that has been discovered during post-conviction proceedings to the jury, at both guilt and sentencing phases of the trial. Had counsel competently investigated the red flags,

_____

[23] The affidavit of Dr. Richard Adler signed July 12, 2013, was attached as Exhibit W to Rubio's State Habeas Original Application.

they also could have incorporated their knowledge of FASD and TLE into their voir dire strategy, and could have included questionnaire items eliciting potential juror beliefs about consuming alcohol during pregnancy. SHRR 47–48.

Had the jury that heard guilt- and sentencing-phase evidence been presented with evidence that a competent investigation would have uncovered, and had the jury been selected with that evidence in mind, there is a reasonable probability that the investigation's results would have had affected the guilt- or sentencing-phase outcome. Indeed, the trial judge stated, on the record, that the punishment phase of the case was on a razor's edge, agreeing that Rubio would not have gotten a death sentence if the jury would have had life without parole as an alternative. SHRR 191. Whereas the jury was presented only with snippets of symptoms that were largely attributed to Rubio's life choices, a competent investigation would have instead linked those attributes and the mental impairments that go with them to FASD and TLE.

## B.    28 U.S.C. § 2254(d) does not preclude relitigation.

28 U.S.C. § 2254(d) generally precludes relitigation of claims decided on the merits in state court, with two exceptions. Specifically, it provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

In this case, § 2254(d) does not preclude relief for three independent reasons. First, § 2254(d) is disabled because it simply does not apply where the state post-conviction

45

proceedings violated due process. Second, it is disabled because Rubio can satisfy the exception in § 2254(d)(1). Third, it is disabled because he can satisfy the exception in § 2254(d)(2).

> **1. Section 2254(d) does not bar relitigation because Rubio was denied a meaningful opportunity to be heard in state post-conviction proceedings.**

28 U.S.C. § 2254(d) does not bar relitigation because the state post-conviction proceedings violated due process. It violates due process for a court to apply preclusion and enforce a prior judgment against a litigant where doing so would be fundamentally unfair. *See Hansberry v. Lee*, 311 U.S. 32, 41 (1940). Because § 2254(d)'s relitigation bar is a preclusion provision, it is subject to this constitutional limitation on its application. Specifically, where the prior state adjudication failed to comport with due process, it will in turn violate due process for the federal court to apply preclusion and enforce that constitutionally defective judgment against the habeas petitioner.

A state court adjudicating a habeas corpus claim must at minimum honor fundamental tenets of due process. *Dist. Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 67–69 (2009). Although states have no constitutional obligation to provide an avenue for collaterally challenging a criminal judgment, state statutes which provide for such relief create liberty and, in capital cases, life interests that are entitled to the procedural protections of the Fourteenth Amendment's due process clause. *See id.*; *see also Vitek v. Jones*, 445 U.S. 480, 488 (1980). At a fundamental level, "there can be no doubt that at a minimum [the Due Process Clause] require[s] that deprivation of life, liberty or property by adjudication be preceded by notice and

opportunity for hearing appropriate to the nature of the case." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950).

The state post-conviction proceedings here violated due process. The Court permitted the parties to plead claims and answers thereto, but it refused to fund the investigation necessary to provide factual support. Specifically, it refused to respond to timely requests for expert funding necessary to develop evidence of FAS and TLE in the case.

### 2. Section 2254(d) does bar relitigation because Rubio satisfies § 2254(d)(1).

28 U.S.C. § 2254(d)(1) disables the relitigation bar if an inmate shows that the state decision "involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." In this case, Rubio satisfies § 2254(d)(1) because the state decision was legally unreasonable—with respect to both deficiency and prejudice.

### 3. Section 2254(d) does bar relitigation because Rubio satisfies § 2254(d)(2).

28 U.S.C. § 2254(d)(2) disables the relitigation bar if an inmate shows that the state decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." In this case, Rubio satisfies § 2254(d)(2) because the state decision was factually unreasonable—with respect to both deficiency and prejudice.

**Claim 3      Rubio's Sixth Amendment right to counsel was violated because the defense failed to investigate and prepare for his guilt/innocence phase defense.**

The central issue for the jury at the guilt/innocence phase of trial was whether Rubio was sane at the time of the offense. There is significant evidence that he was not. He had an extensive history of mental health issues and there was considerable evidence that he was psychotic around the time of the crime—including evidence that he was experiencing delusions and hallucinations. Trial counsel, however, failed to adequately investigate and prepare Rubio's sanity defense. As a result, both testifying defense experts applied the incorrect legal standard in assessing Rubio's sanity, and both were subject to painful cross-examinations that revealed they had not been supplied critical information about the case in preparation for their testimony. Counsel further failed to present hundreds of entries from Rubio's TDCJ and jail records documenting Rubio's symptoms of severe mental illness in the time between his two trials—documents that directly contradict the testimony of the State's expert witness, Dr. Welner, that Rubio likely did not suffer schizophrenia because he did not exhibit continuing symptoms after his arrest. Trial counsel's failure to investigate and prepare constituted deficient performance that prejudiced the guilt/innocence phase of Rubio's trial, depriving Rubio of his Sixth Amendment right to effective counsel.

### A.     Trial counsel's performance was prejudicially deficient, violating the Sixth Amendment.

To establish ineffective assistance of counsel, Rubio must show that trial counsel's performance was deficient and that counsel's deficiency prejudiced the

defense. *See Strickland*, 466 U.S. at 687. Trial counsel's failure to investigate and prepare Rubio's guilt/innocence phase defense meets both prongs of this test. Therefore, Rubio's Sixth Amendment right to counsel was violated and Rubio's conviction and sentence should be reversed.

### 1. Trial counsel's performance was deficient.

#### a. Trial counsel have a duty to investigate and present evidence at the guilt/innocence phase of trial.

Trial counsel have a duty to undertake a reasonable investigation into the case. *Wiggins*, 539 U.S. at 521; *Strickland*, 466 U.S. at 690–91. The *ABA Guidelines* emphasize that the guilt/innocence investigation should be conducted regardless of any statements or requests by the client or counsel's perception of the likelihood of success. *ABA Guidelines*, Guideline 10.7(A)(1); *see also Texas Guidelines*, Guideline 11.1(A)(1). In the course of the investigation, counsel should interview witnesses, retain and prepare experts, and request and review various records related to the client, including medical, criminal, and correctional records, among others. *See ABA Guidelines*, Guideline 10.7 at cmt; *id.* at Guideline 10.11(F)(2); *Texas Guidelines*, Guidelines 10.1(B)(2)(b), 11.1(A)(3)(b); *see also Rompilla v. Beard*, 545 U.S. 374, 398 (2005).

#### b. Trial counsel failed to inform their experts of the correct legal standard for insanity.

To establish an insanity defense, a defendant must show that he did not know his conduct was "wrong." Tex. Penal Code § 8.01. The TCCA has long interpreted this to mean the defendant did not know his conduct was "legally wrong." *Bigby v. State*, 892 S.W.2d 864, 878 (Tex. Crim. App. 1994). However, counsel allowed both of Rubio's

defense experts at the guilt/innocence phase of trial to assess Rubio's sanity under the incorrect legal standard.

> For example, the following exchange took place during Dr. Morris' testimony:

> STATE:   You are saying that [Rubio] did not know what he was doing was morally wrong? That's not the definition of insanity in the state of Texas?

> DR. MORRIS:   You are right.

> STATE:   You didn't apply the proper standard, did you?

> DR. MORRIS:   No, not in this report.

66 RR 171. Dr. Valverde likewise testified that he assessed Rubio under the wrong standard. *Id.* at 45. Thus, despite the fact that the focus of the guilt/innocence phase of trial was Rubio's sanity, counsel failed to present a single witness who testified that Rubio met the correct standard. This constitutes deficient performance.

### c. Trial counsel failed to prepare their expert witnesses to testify.

Not only were Drs. Valverde and Morris subjected to damaging cross examinations regarding their application of the wrong standard, but they were further exposed for their lack of knowledge about critical information relating to Rubio's case. As two examples, Dr. Valverde was unaware of Jose Luis Moreno's testimony that Rubio claimed to know how to commit the "perfect crime" by feigning insanity, 66 RR 72, and had not reviewed certain statements made by Angela Camacho regarding the night of the incident, *id.* at 75–76. As three more examples, Dr. Morris testified that he was not aware that Camacho had claimed Rubio talked about killing the children months before the incident, *id.* at 184, that he never

interviewed Moreno even though he would have liked to, *id.* at 182, 208, and that he did not review Dr. Welner's interview with Rubio, *id.* at 217.

All of this information was readily available to trial counsel.[24] Effective counsel would have provided their testifying experts with such information, not only to ensure that the experts provide a reasonably informed opinion, but also in anticipation that the State would use it to cross-examine them. Counsel's failure to prepare their expert witnesses constitutes deficient performance.

> ### d. Trial counsel failed to investigate and present information related to Rubio's documented history of mental illness in TDCJ and jail records.

"Counsel should use all appropriate avenues, including signed releases, subpoenas, court orders, and requests or litigation pursuant to applicable open records statutes, to obtain all potentially relevant information pertaining to the client . . . ." *ABA Guidelines*, Guideline 10.7 at cmt. Here, trial counsel deficiently failed to secure readily available records and other documentation that would have conclusively rebutted a core premise of the State's sanity case.

In its rebuttal case, the State presented Dr. Welner to testify that Rubio does not suffer from schizophrenia and was sane at the time of the offense. Dr. Welner explained that schizophrenia is a chronic condition that does not come and go. He claimed that there was a brief period in which Rubio was on anti-psychotic medication

---

[24] Trial counsel also failed to investigate information from the Cameron County Health Department that Rubio's advanced syphilis infection combined with his malnutrition may have caused increased delusions around the time of the crime.

prescribed by defense expert Dr. Valverde, but that the "great majority" of the seven years between the first and second trials (2003 to 2007) Rubio was unmedicated. 69 RR 131–32. Dr. Welner testified that he would expect a schizophrenic inmate to "crumble" if untreated for such a long period of time. *Id.* at 132 ("In other words, if they are brittle, that's a setting in which they crumble unless they are medicated. [Rubio] has been unmedicated in these settings and he hasn't crumbled."). Dr. Welner testified that, on the contrary, there was no evidence of further decline while Rubio was incarcerated and that there was an absence of psychotic symptoms during that time. Based on the above, he surmised that Rubio must not be schizophrenic. *See* 69 RR 131–33. The State brought this point up repeatedly during its closing argument. 70 RR 44–45, 85, 86, 89–90.

Dr. Welner's logic is undermined by the fact that Rubio was actually treated for schizophrenia and other mental health issues throughout the 7 years between trials, and that Rubio still presented with severe mental illness during that time. Rubio's TDCJ and jail records contain over 100 entries indicating severe mental health issues, including: auditory and visual hallucinations of demons, night terrors, feeling people jump on him and choke him in his sleep, depression, anxiety, insomnia, poor hygiene and unkempt appearance. At one point, TDCJ referred Rubio to Jester IV, the state's inpatient psychiatric unit, for assessment. Jester IV is typically reserved for only the most severely mentally ill.[25] While there, mental health

---

[25] In 2013, while more than 20% of the 290 death row inmates in TDCJ at the time were diagnosed with mental illness, only eight inmates were housed at Jester IV. *See*

professionals determined that Rubio "appears to be experiencing active auditory hallucinations, hearing the voices of his victims as well as the voice of God," and otherwise "presented with delusional thinking." App. at 048. The attending mental health staff found that Rubio "did not appear to malinger or hold back" during the assessment. *Id.* at 049. The following day, a physician's assistant at Jester IV (not Dr. Valverde) prescribed the anti-psychotic medication Thorazine, also known as chlorpromazine. *Id.* at 054. Rubio's symptoms briefly subsided, but later returned in the form of severe depression and anxiety. In a 2006 entry that would have been particularly relevant to Dr. Welner's testimony, Rubio informed staff, "I'm having problems. . . . I'm having bad depression and my world is crumbling." *Id.* at 079.

Overall, the records show that Rubio was on antipsychotics and antidepressants for nearly the entire time between his first trial in 2003 and his return to county jail in 2007. While it is unclear whether Rubio's prescriptions were continued at the county jail upon his return, the records clearly show that Rubio was prescribed Wellbutrin (antidepressant) and Vistaril (anti-anxiety) for his depression, anxiety, and insomnia in June 2010—weeks before Dr. Welner signed his report and approximately one month before his testimony.

The TDCJ and county jail records that contradict Dr. Welner's testimony would have been available to counsel had they obtained a signed release and requested the records from the appropriate state and county agencies.

---

Brandi Grissom, *Andre Thomas: A Struggle for Sanity Behind Bars*, Texas Tribune (Feb. 25, 2013).

### 2.   The deficiency was prejudicial.

Trial counsel's failure to prepare their experts and failure to investigate and present readily available evidence documenting Rubio's severe mental illness undermines confidence in the jury's determination of sanity at the guilt/innocence phase of trial. Absent trial counsel's deficient performance, there is a reasonable probability the jury would have found Rubio insane at the time of the offense. Accordingly, this Court should reverse Rubio's conviction and sentence.

### B.   Any default is excused by state habeas counsel's failure to raise this substantial claim.

State habeas counsel did not raise this substantial ineffective assistance of counsel claim in state habeas proceedings. State habeas counsel's ineffectiveness excuses any default of the claim that the Director may allege. *See Trevino*, 569 U.S. at 429. Section (A), *supra,* demonstrates the substantiality of the underlying claim.

### Claim 4   The State violated Rubio's right to due process under the Fourteenth Amendment by engaging in a flagrant and ongoing pattern of misconduct.

Three years after Rubio was sentenced to death, CCDA Armando Villalobos faced his own criminal predicament—a thirteen-year sentence for corruption crimes involving abuse of power, civil asset forfeiture fraud, and an extensive bribery scheme in which the CCDA's Office treated defendants favorably in exchange for hefty payoffs. While Villalobos was abusing his position for personal enrichment, and that of his office, he was also personally prosecuting Rubio, an indigent defendant who could not afford to buy Villalobos's favor.

Headed by Villalobos, the CCDA's Office engaged in a broad pattern of misconduct and abusive prosecutorial tactics both before and during Rubio's trial. This misconduct pervaded the CCDA's actions in Rubio's case, rendering Rubio's trial fundamentally unfair in violation of his constitutional right to due process.

## A.   The State's conduct violated Rubio's due process rights.

The prosecution's repeated misconduct resulted in a fundamentally unfair trial for Rubio. Villalobos gave favorable pleas, dismissals, or the opportunity to abscond to wealthier defendants, but the prosecution repeatedly interfered with Rubio's ability to present a defense. The right to due process encompasses the requirement of "fundamental fairness" in criminal proceedings. *Lassiter v. Dep't of Social Servs. of Durham County, N.C.*, 452 U.S. 18, 24 (1981) ("[T]he phrase expresses the requirement of 'fundamental fairness,' a requirement whose meaning can be as opaque as its importance is lofty."). The fundamental fairness inquiry is situation-specific and must be evaluated on a case-by-case basis. *See id.* at 25. To obtain relief, Rubio must show that prosecutorial misconduct occurred and that it rendered his proceedings fundamentally unfair. Here, the volume and consistency of misconduct show that Rubio's trial was fundamentally unfair. The prosecution's actions violated Rubio's right to due process and this Court should reverse his conviction and sentence.

### 1.   District Attorney Armando Villalobos is currently serving a thirteen-year federal prison sentence for abuses of power occurring during the time of Rubio's trial.

Armando Villalobos was elected District Attorney of Cameron County in 2004, shortly after Rubio's first trial. During his tenure as the county's top prosecutor, Villalobos accepted exorbitant payoffs from wealthy defendants in exchange for

favorable plea bargains or, in one instance, the opportunity to flee from justice. He farmed out civil asset forfeiture cases to his friends in exchange for lucrative kickbacks. He bribed judges. And he used his ill-gotten gains to fund Rubio's prosecution. His actions contributed to an atmosphere in which Rubio could not receive a fair trial.

Villalobos was convicted in May 2013 of several counts involving RICO, conspiracy, and extortion. Federal prosecutors presented evidence that from October 2, 2006, through May 3, 2012, Villalobos and others schemed to illegally generate income for themselves and others "through a pattern of bribery and extortion, favoritism, improper influence, personal self-enrichment, self-dealing, concealment and conflict of interest."[26] Villalobos accepted over $100,000 in bribes and kickbacks in exchange for "favorable acts of prosecutorial discretion" and used his office's civil asset forfeiture department for his own personal enrichment. *Id.*

Of the many instances of bribery presented in the federal trial, one stands out as particularly egregious.[27] In 2007, the CCDA's Office prosecuted Amit Livingston, the son of a wealthy doctor, for the murder of Livingston's mistress. The case was handled by the same team of prosecutors in charge of Rubio's case. Livingston was permitted to post a $500,000 bond and, while the criminal case was pending,

---

[26] Press Release, U.S. Attorney's Office for the Western District of Texas, Former Cameron County District Attorney Armando Villalobos Sentenced to Federal Prison in Connection with South Texas Bribery Scheme (Feb. 11, 2014).

[27] The information in the following two paragraphs comes from the transcripts of Villalobos's federal trial.

Villalobos recruited his former law partner, Eddie Lucio, to represent the victim's family in a wrongful death suit. On the eve of trial, Villalobos personally negotiated a deal with Livingston for a 23-year sentence of imprisonment. The same day that Livingston pled guilty, Livingston also settled the wrongful death suit by forfeiting the $500,000 bond to the victim's family. Lucio was paid $200,000 from that forfeiture and kicked $80,000 over to Villalobos for the referral. At Livingston's guilty plea, the prosecution agreed to permit Livingston 60 days to get his affairs in order before entering custody—an arrangement that is common in federal criminal cases, but an illegal one under state law. *See* Tex. Code Crim. Proc. art. 42.09(1). Livingston absconded.[28] In response to the immediate and hostile public backlash, the judge who permitted Livingston 60 days to self-surrender threatened to hold a show-cause hearing to place the blame on Villalobos. Villalobos settled that matter by bribing the judge. Shortly thereafter, Villalobos began courting the media to garner publicity for his decision to seek the death penalty against Rubio.

Beyond his cash-for-favors scheme, Villalobos also abused the CCDA's Office's civil forfeiture unit for personal gain. When the police department seized large quantities of suspected drug money, Villalobos had a plan to get some of the money for himself and some for the CCDA's Office. In one such instance, the police seized a

---

[28] Livingston was eventually caught and extradited back to the United States, after Villalobos began his federal sentence. Emma Perez-Trevino, *Convicted killer Amit Livingston to return to the Valley*, The Herald (July 14, 2015), https://www.brownsvilleherald.com/news/local/convicted-killer-amit-livingston-to-return-to-the-valley/article_0083f5e2-2a38-11e5-8e1c-776c25091dcf.html.

truck containing $90,000. Villalobos again called his former partner, Eddie Lucio, and another attorney, Oscar De La Fuente, to represent the driver and passenger of the truck as interested parties in the forfeiture proceedings. Neither attorney did any work representing their purported clients; still, Villalobos managed to get each of them $42,000 in attorney's fees as part of the forfeiture settlement. Both attorneys gave Villalobos a kickback for the arrangement. In another instance, the police seized $500,000 from inside the walls of a suspected drug house. Villalobos again called De La Fuente to represent the owner of the house in the forfeiture proceedings. Villalobos made all of the settlement arrangements, including using county money to pay for De La Fuente to visit the homeowner in prison. De La Fuente was paid $97,000 for his involvement, of which $2,000 was kicked back to Villalobos, and the D.A.'s Office received the rest of the money.

The CCDA's asset-forfeiture fund was later used in part to fund the prosecution's star expert at Rubio's trial—Dr. Welner—whose company, The Forensic Panel, was paid over $400,000 for their involvement in the case. However, the State actually represented to the Court that Dr. Welner *was not* paid that much. At a pretrial hearing, Rubio's lawyers complained about the gross injustice of the State paying one of its experts hundreds of thousands of dollars, while the defense was being starved of resources. 35 RR 4. Seeking to bolster the judge's expressed belief that "the District Attorney's Office is limited in the money that is available to them to try this case[,]" 35 RR 4,  and after the judge asked, point-blank, whether Dr.

Welner would be costing the State $400,000, the State's attorney answered: "Not for $400,000, no, sir." 35 RR 9–10.

### 2. Villalobos blacklisted Rubio's attorneys while taking bribes for pleas and dismissals in other cases.

While Villalobos was accepting bribes from defendants who could afford to pay, the indigent defense system in Cameron County was suffering from lack of funds. In February 2009, a group of defense attorneys filed a Petition for Intervention in state court requesting that funds provided to the county's indigent defense program be equal to funds provided to the CCDA's Office. *Salas, et al. v. Cameron County*, 1:10-CV-037 (S.D. Tex. Feb. 22, 2010) (Doc. 1). One of the defense attorneys who filed the petition was Nat Perez, Rubio's lead counsel. Villalobos opposed parity in funding for indigent defense. In response, Villalobos and others in his office formed a "blacklist," naming the attorneys who had joined the parity request. The prosecutors in the CCDA's Office were provided a list of names and were informed that these attorneys were not to receive probation or plea bargain agreements for their cases and that they were not even allowed in the CCDA's office to review discovery. The intent was clear—make these attorneys undesirable to the clients. The blacklisted attorneys filed suit in federal court. *Id.* Ed Stapleton, Rubio's second-chair attorney, represented them. Eventually, all of the attorneys on the blacklist—with the exception of Nat Perez—were able to obtain plea bargains. *Id.* (Doc. 71).

### 3. While Villalobos was enriching himself and the D.A.'s Office, the prosecution repeatedly interfered with Rubio's defense funding.

From the very beginning of Rubio's retrial proceedings, the prosecution interfered with his defense team's ability to fund the case. Rubio's team quickly

indicated that they had concerns about Rubio's competency to stand trial and that they planned to pursue an insanity defense at trial. Thus, the defense utilized ex parte motions and hearings for funding pursuant to *Ake v. Oklahoma*, 470 U.S. 68 (1985). The prosecution repeatedly interjected itself into the proceedings to the point that the judge recused himself from the case.

While the CCDA's Office was receiving money through Villalobos's forfeiture scheme, the prosecution objected to the use of county funds for court-appointed experts. When the issues of competency and sanity were initially raised, Judge Nelson began looking for experts for the court to appoint on the issues. Judge Nelson determined that none of the local Brownsville experts were available and provided the defense and the prosecution with the names of two potential experts from Corpus Christi that the court could appoint. The State objected to the use of any county money to fund non-local court-appointed experts, arguing that the court failed to prove that local experts were unavailable. 2 CR 402−04.

The prosecution also objected to county money being used for the defense's experts. The prosecution vehemently objected to Judge Nelson holding ex parte hearings on the defense's funding requests, which are permissible under state and federal law. *See, e.g.*, *Ake*, 470 U.S. at 68; *Williams v. State*, 958 S.W.2d 185 (Tex. Crim. App. 1997). The State argued that the judge was not allowed to hold ex parte hearings on defense funding and that the State must be permitted to respond to defense requests for expert funding. 2 CR 385−87. When the ex parte funding requests continued, the State demanded that the court cease using county funds for

the defense's experts until the court held a hearing on the issue and allowed the State to respond. 5 CR 1087–90. Judge Nelson refused to cede to the prosecution's demands, causing the State to subpoena Judge Nelson's court staff to testify about the ex parte hearings on defense funding. In response, Judge Nelson recused himself. 8 RR 1903.

### 4. The prosecution continually abused its subpoena power to obstruct attorney-client communication and intimidate the defense.

The State abused its subpoena power to seize attorney-client privileged information and to interfere with the defense's ability to prepare the case. Early in 2008, after Rubio moved from death row to the county jail, the CCDA's Office used a subpoena to seize all of Rubio's property from the jail, including correspondence with his attorneys. 1 CR 139. The prosecution seized this information without warning the defense and kept the privileged material in the CCDA's office until the court ordered that it be turned over for in camera review. The State's feeble argument in reply was that, while they had sole custody of privileged materials for a length of time, they did not look at any of it. *Id.* at 223.

After the defense learned the abused its subpoena power to raid Rubio's county jail cell, the State admitted that they had done the same for Rubio's belongings from death row. After Rubio was moved from death row back to the county jail for retrial, the State again used a subpoena, instead of a warrant, to obtain the property Rubio was forced to leave at death row. *Id.* at 315. This material also included privileged legal papers. The State claimed that Rubio abandoned the property, meaning the State had full right to access it, but again claimed they did not look at the attorney-

client privileged material. *Id.* at 435. The court ultimately ruled that the State could not use any of the seized materials at trial. *Id.* at 410.

Judge Nelson continued to grant ex parte requests from the defense for expert funding, leading the State to abuse subpoena power. When the State was not allowed access to the ex parte requests, the State issued subpoenas for all of the defense's experts, for both defense attorneys, and for Judge Nelson's court staff. 5 CR 1115; 8 CR 1903. The defense attorneys perceived the subpoenas as a "lightly veiled threat."

### 5. The prosecution violated the trial court's gag order to drum up publicity for Rubio's trial.

Shortly after Rubio's case was remanded for retrial, the trial court implemented a gag order, finding that if "counsel for the parties continue to provide press releases and grant interviews to the media, the pre-trial publicity will interfere with the defendant's right to a fair trial by an impartial jury." 1 CR 135. Thus, the court ordered all of the attorneys to refrain from making statements to the press about the case. *Id.* The prosecution ignored the order.

Four months after the judge signed the order, Villalobos himself told the local newspaper that he was disappointed in the lack of news coverage on Rubio's case. 8 CR 1912. After that, the press approached the Brownsville Police Department to release Rubio's written and videotaped confessions. 5 CR 1140. The department sought the opinion of the CCDA's Office and then released the confessions, which were quickly posted online. *Id.* at 1141. And shortly before trial, Villalobos again spoke to the press, emailing the local newspaper that he was disappointed that the trial was moved out of the county, that the Office would have to move its entire "war

room" to Hidalgo County, and that the Office was sure it would still be able to secure the death penalty. 8 CR 1912. When the court set a hearing on the violations, Villalobos was out on vacation. 19 RR 20.

### 6. Rubio's attorney for his first capital murder trial worked at the D.A.'s Office during his second.

Rubio was represented by the same lead counsel in both capital murder trials—Nat Perez. During Rubio's first trial, second chair counsel was Alfredo Padilla. Padilla then went on to successfully represent Rubio on direct appeal of the 2003 conviction and capital sentence. Padilla crafted the winning appellate argument, that Rubio's Confrontation Clause rights were violated at trial, and argued the case before the Texas Court of Criminal Appeals (TCCA). However, before the TCCA handed down its opinion granting Rubio a new trial, Padilla accepted employment in the CCDA's Office, working for Villalobos.

Padilla was hired by Villalobos to do three things: be the lead prosecutor on death penalty cases, handle the Office's civil forfeiture cases, and represent the Office in federal court. In fact, during his tenure with the CCDA's Office, Padilla obtained a death sentence against Melissa Lucio[29] and represented the Office against the indigent defense attorneys in the blacklist lawsuit. Because he was also a member of the Office's civil forfeiture department, he was called to testify against Villalobos in his federal criminal trial.

---

[29] Lucio's conviction was later overturned. *Lucio v. Davis*, __ F. App'x __ , 2019 WL 3425186 (5th Cir. 2019).

When Rubio's case was remanded for retrial, his defense counsel repeatedly sought to disqualify the CCDA's Office because of Padilla's employment. 3 CR 728. While the CCDA's Office assured defense counsel and the court that there was a "Chinese wall" between Padilla and the prosecution team, Padilla regularly attended Rubio's pretrial hearings. 8 CR 1903.

### 7. The State sought death against Rubio based on the results of a survey.

The State sought death against Rubio based on the results of a survey it conducted of the community. Long after trial, Villalobos stated that he was under intense pressure to pursue the death penalty against Rubio. LAURA TILLMAN, THE LONG SHADOW OF SMALL GHOSTS: MURDER AND MEMORY IN AN AMERICAN CITY 153 (2016). Villalobos wrote a letter explaining that his office conducted polling in the county and, based on the results of that poll, he concluded that the city wanted to see Rubio sentenced to death. *Id.* The decision to seek death against Rubio by relying, at least in part, on a community survey was fundamentally unfair. Rubio is aware of no other case in which the CCDA's Office utilized public polling as a basis for seeking a death sentence, thus treating Rubio differently from similarly-situated defendants.

### B. This claim is unexhausted, but Rubio can overcome any potential default.

This claim was not presented to the state courts during Rubio's post-conviction proceedings. Rubio anticipates filing a motion seeking to stay and abey his federal proceedings, so that he may return to state court and exhaust this and other unexhausted claims. *See Rhines v. Weber*, 544 U.S. 269, 278–79 (2005) (holding that district courts have discretion to stay habeas proceedings in federal court to allow the

petition to present unexhausted claims in state court). Because he can plausibly excuse his failure to present this claim in a prior application, thereby allowing him to litigate the claim in a subsequent state application, it would be premature to determine that this claim is procedurally defaulted. Even if this claim is eventually defaulted, Rubio can establish cause and prejudice to overcome that default based on the State's flagrant misconduct, an external impediment to raising this claim previously. *See Murray v. Carrier*, 477 U.S. 478, 488 (1986) ("[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule.").

**Claim 5**      **The State violated Rubio's right to equal protection under the Fourteenth Amendment when it pursued the death penalty against him because of his indigent status and on the basis of a survey.**

During Villalobos' tenure as CCDA, he granted exceptional favors—ranging from probation to outright dismissal for violent crimes—to defendants who could afford to pay him. *See* Claim Four. While the attorneys of wealthy defendants had direct access to the District Attorney himself, the indigent were subjected to harsh penalties. Moreover, not only were Rubio's attorneys court-appointed, they were also blacklisted by Villalobos, hampering their ability to seek pleas for their clients. Shortly after Villalobos arranged for a murderer to flee for a $500,000 payment, he publicly and aggressively sought the death penalty for Rubio. The disparate treatment of indigent and non-indigent offenders demonstrates that the State

engaged in selective prosecution in violation of Rubio's Fourteenth Amendment right to equal protection.

### A.   Rubio's equal protection rights were violated.

#### 1.   Rubio was selectively prosecuted in violation of his equal protection rights.

Selective prosecution violates a defendants equal protection rights. *United States v. Armstrong*, 517 U.S. 456, 465 (1996). To demonstrate that Rubio was selectively prosecuted, he must show that: (1) others similarly situated to Rubio have not been prosecuted and (2) the selection of Rubio for prosecution was invidious or in bad faith. *Id.* Thus, he must show that the decision to prosecute had a "discriminatory effect and that it was motivated by a discriminatory purpose." *Wayte v. United States*, 470 U.S. 598, 608 (1985). The bad faith standard is met by a showing that the prosecution was based on some impermissible or arbitrary consideration. *See United States v. Lawrence*, 179 F.3d 343, 350 (5th Cir. 1999).

##### a.   Others similarly situated to Rubio were given favorable plea bargains.

Cameron County defendants charged with violent crimes—but who had means to make payments that redounded to the benefit of the CCDA—were given favorable plea bargains, dismissals, or the opportunity to abscond. But the State vigorously pursued the death penalty against Rubio, who is indigent, because he could not pay. The facts demonstrate that Rubio was selected for such vigorous prosecution as a result of his indigent status.

Many of the favorable plea bargains given to defendants charged with violent crimes were discussed in the federal prosecution of Villalobos. *See United States v.*

*Villalobos*, No. 1:12-CR-374 (S.D. Tex.). The bribery scheme was simple. Certain defense attorneys kept Villalobos on "retainer" by periodically giving him cash. In exchange, Villalobos kept his door open to them. When a defense attorney wanted a favorable plea bargain, they did not go to the assistant district attorney in charge of the case. Instead, they made an appointment with Villalobos and worked out a "plea agreement," often leaving a cash-filled envelope making a reelection campaign contribution. Later on, offending defense attorneys were also given the opportunity to contribute to Villalobos's congressional campaign. Attorneys who did not have this retainer arrangement—like Perez and Stapleton—were denied access to Villalobos and to the plea-bargaining channel that he controlled.

Oscar De La Fuente was one of the attorneys who paid for access to Villalobos, and his clients certainly benefitted. For example, De La Fuente represented Jose Alfredo "Pepe" Villarreal, a man on Cameron County's "Top 10 Most Wanted" list for murder.[30] Villarreal's brother also owned the house at the center of a $500,000 fraudulent forfeiture proceeding overseen by Villalobos. *See* Claim Four. De La Fuente made a deal with Villalobos to dismiss Villarreal's murder case if Villarreal's brother signed off on the $500,000 forfeiture. To shield himself from negative press for dismissing the case, Villalobos brought in a special prosecutor and the case against Villarreal was dismissed six days later. After that, De La Fuente gave

---

[30] *Officials update Cameron County's 'Top 10 Most Wanted'*, Valley Central (April 20, 2009), https://valleycentral.com/news/local/gallery/officials-update-cameron-countys-top-10-most-wanted#photo-1.

Villalobos a "campaign contribution" of $5,000. This was not the only instance of cash for favors.

De La Fuente frequently got unbelievable results for his clients through his paid arrangement with Villalobos. He represented Hervey Roel on an aggravated assault charge. Roel was placed on deferred adjudication probation for shooting a person, and De La Fuente arranged for Villalobos to terminate Roel's probation early. Shortly after, Roel was arrested again for stabbing his girlfriend with scissors. Villalobos reduced the charge to a misdemeanor and Roel was given probation. In another case, De La Fuente represented Daniel Jaurez on an aggravated assault charge for strangling his wife. Villalobos agreed to misdemeanor probation.

In the federal prosecution of Villalobos, De La Fuente testified for the government. De La Fuente stated that, when Villalobos found out they were being investigated by the FBI, Villalobos told De La Fuente that "he had a defense to any type of investigation done on him. That he would just say it was prosecutorial discretion on the deals he was giving me." *United States v. Villalobos*, No. 1:12-CR-374, 11RR 1581 (S.D. Tex. May 15, 2013).

Beyond these pay-to-play agreements, Villalobos took money where he could. The lead assistant district attorney on Amit Livingston's case, *see* Claim Four, would not offer less than 40 years for the murder conviction. Villalobos referred the victim's family to his former law partner to file a wrongful death suit, convinced Livingston to settle the suit by forfeiting his $500,000 bond, and gave Livingston 60 days to report to jail. During that 60-day reporting window, Livingston fled the country.

Villalobos received substantial negative media attention for losing Livingston, and Villalobos began a very public campaign to execute Rubio shortly thereafter.

Not only did Rubio lack the funds to personally bribe Villalobos, his court-appointed lawyers were on Villalobos' "blacklist." *See* Claim Four. A group of attorneys who sought to increase funding for indigent defendants were singled out by Villalobos, and their clients suffered the consequences. Villalobos especially ensured that Nat Perez would not get the benefit of any favorable plea negotiation.

### b. Villalobos prosecuted Rubio in bad faith.

While Villalobos was accepting bribes for favors for other violent defendants, he publicly and vigorously sought the death penalty for Rubio. Rubio and other indigents did not get the benefit of paid access to Villalobos, and they were punished accordingly. Moreover, indigent defendants represented by attorneys singled out on the blacklist were treated even more unfavorably. Villalobos's relentless prosecution of Rubio was the result of Rubio's indigent status.

Villalobos made his decisions with publicity in mind. He knew that dismissing Pepe Villarreal's murder case would be unpopular so he appointed a special prosecutor to do it. He also needed to recover from the media backlash over Livingston's prosecution. When Villalobos gave Livingston the opportunity to abscond in exchange for $500,000, the public outcry was significant. The judge presiding over Livingston's case threatened Villalobos with a show cause hearing, prompting Villalobos to bribe the judge to avoid the hearing and any accompanying bad publicity. Around this time, Rubio's case was remanded by the TCCA for retrial. Villalobos immediately began to assess whether a death sentence against Rubio would be

electorally beneficial. He repeatedly violated the judge's gag order by speaking to the press and lamenting that the case was not generating enough media attention. His office counseled the police department to release Rubio's confession tapes before trial.

Villalobos's oppressive prosecution of Rubio was the result of corruption on the part of a prosecutor who, on the one hand, granted favors to those who could pay and, on the other, harshly prosecuted the indigent. In doing so, Villalobos violated Rubio's right to equal protection by selecting him for prosecution in bad faith.

### 2. The State's reliance on a survey to seek death against Rubio violated his equal protection rights.

The State relied on the results of a community survey in determining whether or not to seek a death sentence against Rubio, in violation of his equal protection rights. Prosecutorial discretion is not unfettered, but is "subject to constitutional constraints." *United States v. Batchelder*, 442 U.S. 114, 125 (1979). Equal protection is violated if the decision to prosecute is "based upon an unjustifiable standard such as race, religion, or other arbitrary classification." *Oyler v. Boles*, 368 U.S. 448, 456 (1962). Here, the State sought death against Rubio based on the results of a survey it conducted of the community. Long after trial, Villalobos stated that he was under intense pressure to pursue the death penalty against Rubio. LAURA TILLMAN, THE LONG SHADOW OF SMALL GHOSTS: MURDER AND MEMORY IN AN AMERICAN CITY 153 (2016). Villalobos wrote a letter explaining that his office conducted polling in the county and, based on the results of that poll, he concluded that the city wanted to see Rubio sentenced to death. *Id.* The decision to seek death against Rubio by relying, at least in part, on a community survey was an arbitrary, unjustifiable decision. Rubio

is aware of no other case in which the CCDA's Office utilized public polling as a basis for seeking a death sentence, thus treating Rubio differently from similarly-situated defendants. Singling Rubio out in such a way was an impermissible exercise of prosecutorial discretion that violated his equal protection rights.

### B.     This Court can review this claim on the merits.

The TCCA either decided the claim on the merits within the meaning of § 2254(d), or it did not. Either way, *this Court* can also conduct merits review, unencumbered by the relitigation bar appearing in 28 U.S.C. § 2254(d) or by the doctrine of procedural default.

First, even if this Court determines that the TCCA adjudicated an equal protection claim on the merits, its review remains unimpaired by 28 U.S.C. § 2254(d) because Rubio has fundamentally altered the claim in federal court. As the first claim in his subsequent application in state court, Rubio argued that he was denied equal protection by the State's refusal to discuss the possibility of a plea bargain. *Ex parte Rubio*, 2018 WL 2329302 at *4. While the TCCA order asserted that it did not review the merits of the claims raised, *id.* at *5, it also discussed the factual basis for the claim as "speculative", *id.* at 4, which suggests that the court did, in fact consider the merits of the claim.

The newly discovered information about the survey is crucial, material evidence that fundamentally alters the equal protection claim to the state court. In such situations, the two claims are analyzed as distinct—with the federal claim being analyzed as an unexhausted challenge. *See Ward v. Stephens*, 777 F.3d 250, 258−59 (5th Cir. 2015) (holding that the post-*Pinholster* test for sameness is "when [a

petitioner] presents material additional evidentiary support to the federal court that was not presented to the state court" and finding sameness because the inmate's "argument on federal habeas *varie[d] only slightly* [from the argument presented to state court]") (emphasis added); *Escamilla v. Stephens*, 749 F.3d 380, 395 (5th Cir. 2014) ("The new evidence presented to the district court did not 'fundamentally alter' his claim, but merely provided additional evidentiary support for his claim that was already presented and adjudicated in the state court proceedings.") (internal citations omitted); *Lewis v. Thaler*, 701 F.3d 783, 791 (5th Cir. 2012) (holding that a federal claim is the same when new evidence "supplements" the state claim, but not when it "fundamentally alter[s]" it); *Anderson v. Johnson*, 338 F.3d 382, 386–88 (5th Cir. 2003) (relying on familiar fundamental-alteration test and concluding that the allegations fell on the "same-claim" side of the line because both the state and federal claims alleged a common deficient failure to interview the same witness).[31]

Second, even if the claim was not adjudicated on the merits within the meaning of § 2254(d), it is not procedurally defaulted because the state procedural ground was not "independent" of the federal question. A state procedural denial does not constitute a procedural default, within the meaning of the federal doctrine, when the state decision was not based on an independent state law ground. *See Coleman v. Thompson*, 501 U.S. 722, 729–32 (1991) (discussing the operation of the adequate and

---

[31] Even if § 2254(d) applies because this Court determines that the state decision was on the merits of the equal protection claim presented to the federal court, Rubio can still disable the relitigation bar on the grounds that the state decision was legally unreasonable under § 2254(d)(1) or factually unreasonable under § 2254(d)(2).

independent state ground doctrine in the habeas context). Even where the TCCA states that it has not decided a claim on the merits, procedural default does not bar federal review if the putative state ground is not independent of the federal question. *See, e.g.*, *Busby v. Davis*, 925 F.3d 699, 706–10 (5th Cir. 2019) (holding that the TCCA had, in fact, considered the merits of a claim despite an explicit assertion from that court to the contrary). Here, and as explained above, the TCCA's decision was based in part on its belief that the equal protection claim was "speculative," which indicates that the state procedural ground was not entirely independent of federal law.

Finally, even if this claim is treated as having been defaulted because this Court determines that the TCCA did not decide it on the merits and the state procedural ground was independent of federal law, Rubio can establish cause and prejudice to overcome that default based on the State's misconduct, an external impediment to raising this claim previously. *See Murray*, 477 at 488 ("[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule.").

In short, whether this Court believes that this claim was decided on the merits in state court or not, Rubio is entitled to relief.

**Claim 6**      **The State violated *Napue v. Illinois* when it elicited testimony that it knew, or should have known, to be false and misleading.**

Under the Fourteenth Amendment, a prosecutor may not knowingly elicit testimony that it knows or should know to be false—or, although not actively seeking false testimony, allow such testimony to go uncorrected. *See Napue v. Illinois*, 360

73

U.S. 264, 269 (1959) (citing *Alcorta v. Texas*, 355 U.S. 28, 78 (1957)). In this case, the prosecution elicited false testimony from Dr. Welner when it asked him to testify that Rubio did not have schizophrenia and that he was unmedicated. The *Napue* claim is unexhausted and a Texas remedy remains available, so Rubio will be requesting a stay-and-abeyance order necessary to exhaust it.

### A. The State committed a *Napue* violation when it elicited material testimony from Dr. Welner that it knew, or should have known, to be false.

The State must avoid presenting evidence that might be considered misleading, and evidence presented to the jury that is false or gives it a "false impression" must be corrected by the prosecution. *See Napue*, 360 U.S. at 269; *Alcorta*, 355 U.S. at 31. In the Fifth Circuit, a *Napue* claimant must prove three elements: (1) the falsity of a witness statement; (2) the State's culpable elicitation or failure to correct it; and (3) materiality. *See United States v. Dvorin*, 817 F.3d 438, 451–52 (5th Cir. 2016). The State elicited crucial, false testimony from Dr. Welner when Dr. Welner told the jury that Rubio was not on anti-psychotic medication between his arrest and the 2010 trial. Dr. Welner then told the jury that Rubio could not be schizophrenic because an unmedicated schizophrenic could not function as well as Rubio did in a prison environment. This testimony was also false, as dozens of entries in Rubio's TDCJ records show that he suffered symptoms of severe mental illness throughout the time between trials.

1.  **The State elicited false and misleading testimony that Rubio was psychiatrically unmedicated prior to his second trial and that there was no evidence of further psychiatric decline during that time.**

The State elicited false testimony that Rubio was not on anti-psychotic medication while he was incarcerated, and that he did not exhibit symptoms of psychosis before his second trial.[32] As the State's direct examination of Dr. Welner wound down during the guilt/innocence phase, it elicited his opinion that Rubio did not have schizophrenia. In an extended exchange with the examining prosecutor, Dr. Welner repeatedly asserted that Rubio did not have schizophrenia because he had not been medicated in prison and Rubio's functioning there was inconsistent with what one would expect of an unmedicated schizophrenic:

> [A:] Furthermore, in custody, socially, there has been no evidence for further decline. And he would decline, as would be the course of a chronic disease condition, such that the defense psychiatrist correctly pointed out. He is as integrated socially in custody as anybody else might be.
>
> Q: And that's without the aid of anti-psychotic medication?
>
> A: That's right. And he is not on anti-psychotics. . . .
>
> A: . . . He has not been on medication. There is a brief period in which he was on anti-psychotic medications which Doctor Valverde prescribed. But we are talking seven years, and the great majority of the time he has not been on anti-psychotic medications. . . . And for schizophrenia, chronic schizophrenia, an unmedicated chronic schizophrenic would not be able to maintain that intact presentation for such a sustained period of time. . . . In other words, if they are brittle, that's a setting in which they crumble unless they are medicated. He has been unmedicated in

---

[32] Dr. Welner also testified falsely, and with a preposterous degree of certainty, that the absence of advanced brain imaging could have no effect on the result of the case. Specifically, Dr. Welner stated that an fMRI and a CAT scan were "irrelevant to the matter at hand," and emphasized "with medical certainty that [they] will never be relevant . . . ." 69 RR 113.

> these settings and he hasn't crumbled. Furthermore, this violent episode
> hasn't been replicated in custody to this degree or to any remote degree.

69 RR 130–33. The basic premises of Dr. Welner's reasoning were false. Rubio *was* heavily dosed with anti-psychotic during the seven years following his arrest and preceding his 2010 trial, and Rubio *did* exhibit symptoms of psychosis.

The list of antipsychotics prescribed during Rubio's pretrial custody is long. In April 2003, Dr. Valverde prescribed Rubio Risperdal, a powerful anti-psychotic frequently used to treat psychotic patients. App. at 033. Dr. Valverde upped the dosage in October of that year. *Id.* In May 2004, Rubio was sent to Jester IV, the TDCJ inpatient psychiatric facility, where he was given a Thorazine (chlorpromazine) prescription, which is a drug specifically used to treat psychotic disorders like schizophrenia. *Id.* at 054. The records from this psychiatric facility include Rubio's recognition that he needs the prescribed medication and that the medication helps him. The Thorazine prescription is confirmed or referenced throughout the TDCJ Health Records until at least December 2007. The Thorazine appears to have been discontinued, at least for a bit, in 2008. The Hidalgo County jail records, however, indicate that, by the time of trial, Rubio was again taking Wellbutrin and Vistaril. Dr. Welner's testimony was not just false, but egregiously so.

Moreover, the TDCJ Health Records include over 100 entries documenting symptoms of severe mental illness. These range from Rubio hallucinating that he is being attacked by a tiger in his prison cell, to seeing faces in the walls, to hearing the voice of God. They further document near-debilitating depression and anxiety at multiple points throughout the years, with Rubio once telling staff, "I'm having bad

depression and my world is crumbling." App. at 079. These entries directly contradict Dr. Welner's testimony. *Compare id.*, *with* 69 RR 132 (testifying that if Rubio were schizophrenic he would have "crumbled" in prison).

> **2. The State knew or should have known that the testimony was false.**

Whether the State intended to elicit the false statement or merely failed to correct it is immaterial; the State meets *Napue*'s knowledge criterion merely by allowing false evidence to go uncorrected. *See Napue*, 360 U.S. at 269. The use of false testimony can also be unconstitutional if it is merely the case that the prosecution "should have known" of its falsity. *See United States v. Agurs*, 427 U.S. 97, 103 (1976); *United States v. O'Keefe*, 169 F.3d 281, 292 (5th Cir. 1999).

The State knew, or should have known, that Dr. Welner's testimony was false. Dr. Welner reported that he reviewed 104 items[33] in support of his opinion. His sources of information included TDCJ Medical records, medication administration records, and Cameron County Jail Medical records. He also reviewed testimony from Dr. William Valverde, M.D. who originally prescribed Rubio Risperdal. As part of his review, Dr. Welner also reviewed reports drafted by several of the defense team's experts that highlighted Rubio's obvious mental health issues. During Dr. Welner's testimony, it is clear that the majority of documentation he reviewed was provided by the State. The State went as far to confirm that their office never withheld any

---

[33] Dr. Welner's report lists 104 items reviewed but he testified at trial that he has reviewed, "to date, 109 sources of information . . . exclud[ing] any kind of medical literature or articles or stuff like that." 69 RR 49.

information requested by Dr. Welner. 69 RR 51. Records provided by the State, and reviewed by Dr. Welner, included information regarding the medications prescribed to Rubio prior to his trial in 2010, as well as his mental health status during that period. Therefore, the State knew or should have known that the testimony elicited from Dr. Welner was false.

### 3. There is a reasonable likelihood that the false testimony affected the jury.

The standard for *Napue* materiality is whether, taking all the false testimony together, "the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury." *Giglio*, 405 U.S. at 154 (quoting *Napue*, 360 U.S. at 271). *Napue*'s "reasonable likelihood" standard is lower than the *Brady* materiality standard, and is akin to a harmless-error rule: "It is a brother, if not a twin, of the standard ('harmless beyond a reasonable doubt') for determining whether constitutional error can be held harmless. A strict standard is appropriate because, as the Supreme Court has explained, false testimony cases involve not only 'prosecutorial misconduct,' but also 'a corruption of the truth-seeking function of the trial process.'" *United States v. Barham*, 595 F.2d 231, 242 (5th Cir. 1979) (quoting *Agurs*, 427 U.S. at 104 and other internal citations omitted); *see also Strickler v. Greene*, 527 U.S. 263, 299 (1999) (Souter, J., concurring in part and dissenting in part) (explaining that reasonable-likelihood standard is a harmless-error rule).

In this case, the issue of whether Rubio had a psychotic disorder was central to two different issues: to the NGRI defense, which affected his guilt-phase result, and to mitigation, which affected his punishment-phase result. With respect to both

effects, Dr. Welner's falsehoods were extremely prejudicial. Specifically, Dr. Welner was the State's only expert who testified to the jury about Rubio's mental health,[34] and his conclusion that Rubio was not schizophrenic was supported, in large part, by his repeated insistence that schizophrenia was inconsistent with what Dr. Welner asserted to be Rubio's unmedicated prison functioning.

But Rubio *was medicated* while he was in prison, and *did not* function well during that time. In light of that information, Dr. Welner's analysis falls apart. Dr. Welner's extended explanation about how Rubio could not *possibly* be schizophrenic and function at a supposedly acceptable level in prison is obviously wrong; Rubio was taking anti-psychotic medication and still displayed symptoms of psychiatric decline. Dr. Welner's factually unsupported observations about Rubio's functioning had a reasonable probability of affecting the jury's conclusion that Rubio was guilty, and its conclusion that he deserved a death sentence.

## B.    This claim is unexhausted, but Rubio can overcome any potential default.

The present federal claim was not presented, in any manner, in state post-conviction proceedings and it is therefore unexhausted. Rubio expects to seek a stay under *Rhines v. Weber*, 544 U.S. 269 (2005), so that he may return to state court and exhaust it. To the extent the claim is procedurally defaulted, it is excused under, among other things, the miscarriage-of-justice exception. The default would be excused under that exception because, absent Dr. Welner's crucial

---

[34] Different experts testified to a different jury for the competency phase.

misrepresentations, no reasonable juror would find that Rubio was sane at the time of the offense and therefore guilty, and because no reasonable juror would find that Rubio deserved the death penalty if he were found guilty of capital murder. *See House v. Bell*, 547 U.S. 518, 538 (2006) (miscarriage-of-justice gateway for guilt finding); *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992) (miscarriage-of-justice gateway for death sentence).

**Claim 7      Rubio's Sixth Amendment right to counsel was violated because the defense failed to investigate and present evidence related to Rubio's mental health during his prior incarceration.**

During the seven years between his first and second trials, Rubio generated a trove of medical records from both TDCJ and the county jails. In those records, staff consistently documented his severe mental illness and cognitive impairment—including hallucinations, delusions, and significant deficits in intellectual functioning—as well as the anti-psychotics that were prescribed as treatment. The records are particularly compelling for Rubio because they reflect the observations of presumably neutral informants: correctional staff. Nevertheless, trial counsel failed to uncover and present these records, and instead allowed the State to leave the impression that Rubio went largely unmedicated for the better part of a decade without any significant mental health symptomology. *See* Claim Three (noting that State expert Dr. Welner testified that Rubio did not present with symptoms of mental illness despite being unmedicated for the "great majority" of the time between trials). Counsel's failure to utilize these records constitutes deficient performance that

prejudiced Rubio's guilt/innocence and punishment phase presentations, in violation of the Sixth Amendment.

### A.  Trial counsel's performance was prejudicially deficient, violating the Sixth Amendment.

To establish ineffective assistance of counsel, Rubio must show that trial counsel's performance was deficient and that counsel's deficiency prejudiced the defense. *See Strickland*, 466 U.S. at 687. Trial counsel's failure to investigate and prepare evidence related to Rubio's mental health during his prior incarceration meets both prongs of this test. Therefore, Rubio's Sixth Amendment right to counsel was violated and his conviction and sentence should be reversed.

#### 1.  Trial counsel's performance was deficient.

Trial counsel have a duty to undertake a reasonable investigation into the case, at both the guilt and sentencing phases. *See Wiggins*, 539 U.S. at 521; *Strickland*, 466 U.S. at 690–91. Trial counsel's duties include a requirement that they to conduct a reasonable investigation into potential mitigating evidence. *Wiggins*, 539 U.S. at 522–23. Among other things, the *ABA Guidelines* instruct counsel to "use all appropriate avenues" to collect records related to the client's history and functioning, including those from prior incarcerations. *See ABA Guidelines*, Guideline 10.7 at cmt.; *see also Rompilla*, 545 U.S. at 385–87 (finding that trial counsel have a duty to investigate records from a prior incarceration).

Throughout the seven years between his trials, Rubio was treated for schizophrenia, anxiety, and depression, yet he still presented with severe symptoms of mental illness during that time. In fact, there are over 100 entries in Rubio's state

and county jail records documenting mental health issues such as auditory and visual hallucinations, night terrors, depression, anxiety, insomnia, poor hygiene and unkempt appearance. The symptoms were so severe that TDCJ referred Rubio to Jester IV, the inpatient psychiatric unit for Texas inmates, where staff noted that that Rubio "appears to be experiencing active auditory hallucinations, hearing the voices of his victims as well as the voice of God," and otherwise "presented with delusional thinking." App. at 048. A mental health professional at the psychiatric unit even prescribed the anti-psychotic medication Thorazine, which Rubio was prescribed for the next three to four years. *See* Claim Three.

Rubio's TDCJ records also contain evidence of significant cognitive impairment. One entry shows that Rubio scored a 60 on an IQ test administered at some point during his incarceration—well within the range for a diagnosis of intellectual disability. App. at 080. Moreover, the records indicate that Rubio exhibited sincere remorse for his actions. For example, staff recounted symptoms of severe depression, including waking up crying from nightmares about the offense. *Id.* at 074, 085. Rubio also reported feeling remorseful, and some staff observed him suffering crying spells. *See, e.g.*, *id.* at 049, 053, 074, 082, 086.

Trial counsel's failure to uncover these readily available records and present them to the jury constituted deficient performance. *See ABA Guidelines*, Guideline 10.7 at cmt. ("Counsel should use all appropriate avenues, including signed releases, subpoenas, court orders, and requests or litigation pursuant to applicable open

records statutes, to obtain all potentially relevant information pertaining to the client . . . .").

### 2. The deficiency was prejudicial.

Trial counsel's failure to investigate and present these records prejudiced Rubio at both the guilt and punishment phases of his trial. During both phases, the State suggested that Rubio feigned mental illness—even going so far to claim that Rubio was unmedicated yet did not present with mental health symptoms during his seven years of incarceration between trials. *See* Claim Three. This presentation painted Rubio as cold-blooded and irredeemable. Had counsel presented Rubio's state and county incarceration records, which were real-time documentation of Rubio's struggles with severe mental illness and cognitive impairment, there is a reasonable probability that the guilt- and sentencing-phase outcomes would have been different. *See Rompilla*, 545 U.S. at 390–93 (finding prejudice where counsel failed to review records from prior incarceration which included mitigating evidence that was not otherwise available through other avenues).

### B. Any default is excused by state habeas counsel's failure to raise this substantial claim.

State habeas counsel did not raise this substantial ineffective assistance of counsel claim in state habeas proceedings. State habeas counsel's ineffectiveness excuses any default of the claim that the Director may allege. *See Trevino*, 569 U.S. at 429. Section (A), *supra,* demonstrates the substantiality of the underlying claim.

**Claim 8**       **The State violated Rubio's due process rights by eliciting false testimony from A.P. Merillat.**

During the punishment phase of Rubio's trial, the State called A.P. Merillat to testify as an expert on prison violence and prison classifications. Merillat is now notorious for providing false testimony in Texas death penalty cases—specifically, for inflating the risk of violence posed by capitally prosecuted inmates living in the general prison population. Consistent with that notoriety, he misled Rubio's jury regarding significant components of TDCJ's classifications system, and also the extent to which he testified falsely in other cases.

Merillat has a history of providing false testimony regarding TDCJ's classification system, which has led to the reversal of two death sentences. *See Velez v. State*, 2012 WL 2130890 (Tex. Crim. App. June 23, 2012); *Estrada*, 313 S.W.3d 274 (Tex. Crim. App. 2010). TDCJ inmates receive status designations corresponding to the danger they pose, with G-1 being the lowest and G-5 being the highest. Because inmates with lower designations tend to pose a lower threat, they are allowed in places and to take part in activities that might create risk for those with higher designations.

In February 2007, Merillat provided false testimony in *Estrada*, inflating the perception of risk by stating that that an inmate sentenced to life without parole could receive a less restrictive custody status designation. *Estrada*, 313 S.W.3d at 286–87. In July 2005, TDCJ had issued a regulation that, effective September 1, 2005, placed a G-3 floor on the classification level for individuals convicted of capital murder and sentenced to life without parole. *Id.* at 287. Merillat falsely claimed that such

individuals could be classified below G-3—and thereby have access to more dangerous environments than was possible—despite the regulation being published over a year and a half prior to his testimony. *Id.* Similarly, Merillat provided false testimony in Manuel Velez's capital murder trial in Cameron County, Texas, in October 2008. He again testified that individuals were eligible for a less restrictive custody status than they actually were. *Velez*, at \*31–32. The CCA held that "[b]oth Merillat and the state knew or should have known . . . that Merillat's testimony about the G classification of inmates who were sentenced to life without parole was false." *Id.* at \*32.

On March 15, 2010, the State disclosed their intent to call Merillat as an expert witness in Rubio's case. CR 1481. Prior to his testimony, the court held a hearing outside the presence of the jury. During this hearing, the State brought up the reversal in *Estrada*, which occurred about five weeks prior to Merillat's testimony in this case. 72 RR 178. Previously, the State had sent a letter to trial counsel on July 6, 2010, containing an affidavit that Merillat prepared in January 2009 regarding his false testimony in *Estrada*. *Id.*; App. at 020–24. The State argued that defense counsel should be prevented from cross-examining Merillat regarding his false testimony in *Estrada*, because it was "a single, specific instance" and was "irrelevant" to Rubio's case. 72 RR 178; *see also id.* at 179 (referring to the *Estrada* false testimony as "one single, specific instance"). The trial court denied the State's request and held that defense counsel could cross-examine Merillat on his false testimony in *Estrada*. *Id.* at 180–81.

85

Merillat then testified in the jury's presence. When describing his qualifications, he explained that he recently received "[a] very special award" from the Cameron County District Attorney's Office. 72 RR 189. He was qualified as an expert in the areas of prison violence, opportunities to commit violence while in prison, and prison classifications. *Id.* at 197. Merillat explained that TDCJ classifies individuals using various levels. For those in general population, those levels range from G-1, the least restrictive, to G-5, the most restrictive. 72 RR 206. He explained that general population inmates, among other privileges, "don't have to be escorted . . . [or] handcuffed" outside of their cells, that they are "able to come and go to work or school or make various appointments," and that they can have group recreation time. 72 RR 203–04. Merillat also discussed the various work opportunities inmates have, including that G-2 inmates—a custody level that Rubio could reach—"can have any type of job inside the penitentiary, free room [sic] without an escort." *Id.* at 207. Specific to Rubio, Merillat also testified that TDCJ would not look at prior disciplinary issues he had when determining how to classify him. *Id.* at 209–10.

The State brought up Merillat's false testimony in *Estrada* during the direct exam. The State asked him whether he "had ever made a mistake" while testifying. 72 RR 197. He again presented *Estrada* as the only instance of the mistake. *Id.* at 198. He asserted that TDCJ had changed its classification system "just prior" to his testimony, and that he "gave what amounted to bad information." *Id.* at 198. He made no mention of his testimony in *Velez*.

86

Trial counsel conducted a brief cross of Merillat. During cross, Merillat admitted that the TDCJ policies regarding classifications were updated in 2005, but he did not get copies of the new version until 2009. 72 RR 234. Trial counsel challenged Merillat's statement that the change occurred "just prior" to his testimony in *Estrada*, which Merillat insisted was accurate. *Id.* He testified that he "was absolutely wrong" when he testified that the classification system was more lenient than it actually was. *Id.* at 235. Merillat also took "issue" with trial counsel's suggestion that TDCJ "works," in the sense that it keeps inmates and people that work with inmates safe. *Id.* at 231.

### A.    Merillat's false testimony violated Rubio's due process rights.

Rubio's due process rights were violated when the State sponsored false testimony through Merillat including, but not limited to, TDCJ's classification system, the restrictions that are placed on inmates, and his history of false testimony. Presentation of false testimony violates due process and is "inconsistent with the rudimentary demands of justice." *Mooney v. Holohan*, 294 U.S. 103, 112 (1935). To establish a due process violation, a petitioner must show that false testimony was presented to the jury, that the prosecution knew or should have known of its falsity, and that the false testimony "could . . . in any reasonable likelihood have affected the judgment of the jury." *Giglio v. United States*, 405 U.S. 150, 153–54 (1972) (quoting *Napue*, 360 U.S. at 271; *see also Alcorta*, 355 U.S. at 31 (finding the defendant's due process rights were violated where State's witness "gave the jury [a] false impression"). Moreover, "[t]he principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any

concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness." *Napue*, 360 U.S. at 269.

### 1. Merillat's testimony was false and misleading.

Merillat's testimony was false, or at least gave the jury a false impression, in multiple respects. His testimony regarding TDCJ both overstated the privileges an inmate like Rubio would have if he were sentenced to life and understated the restrictions placed on inmates. *Compare* 72 RR 181–240, *with* App. at 013–19. This testimony gave the jury the false impression that Rubio would be more likely to commit acts of violence in TDCJ than was true. Merillat also gave the jury the false impression that his previous false testimony in *Estrada* was an issue limited to that case. 72 RR 197–98. In fact, and as he should have been well aware, he provided nearly identical false testimony in *Velez* on the same subject. Moreover, his statement that the policy change had occurred "just prior" to his testimony in *Estrada* was inaccurate, and never corrected by the State. 72 RR 198.[35]

### 2. The State knew or should have known that the testimony was false.

The State knew, or should have known, that this testimony was false. Merillat, who the State proffered as an expert regarding prison violence and classifications, 72 RR 197, certainly should have been aware of TDCJ's policies in these areas, but apparently was not. The TCCA has held that both Merillat and the State—in another

---

[35] Trial counsel did attempt to impeach Merillat on this point, but never pinned down the date of his testimony in *Estrada* in comparison to when the policy changed.

case out of Cameron County—should have been aware of TDCJ regulations regarding classifications and attributed knowledge to both parties. *Velez*, 2012 WL 2130890 at *32. Rubio asks this Court to find the same. Additionally, because Merillat provided false testimony previously in another Cameron County case regarding prison classifications, *see id.*, the State should have been aware that Merillat had falsely testified in *Velez* as well as *Estrada*. Although the *reversal* in *Velez* occurred after Rubio's trial, the State can fairly be attributed knowledge of the false testimony because of the factual parallel between the testimony in *Velez* and *Estrada*.

### 3. There is a reasonable likelihood that the false testimony affected the jury.

There is a reasonable likelihood that this false testimony could have impacted the jury. *See Napue*, 360 U.S. at 271. A necessary question for the jury was whether Rubio would be a continuing threat to society, which would require them to assess his likelihood of committing violence in prison. As such, testimony pertaining to TDCJ's classifications procedures, and how they affected Rubio's opportunity to behave dangerously while in prison, was critical to answer this question. Merillat's version gave the jury a false impression that Rubio had greater opportunity to behave violently in prison, by understating the restrictions that TDCJ would place on him if he received a life sentence. The State highlighted the importance of Merillat's testimony during closing argument, utilizing his testimony to argue that Rubio would be a future danger. 73 RR 33, 35. The State had facilitated Merillat's attempt to downplay the falsity of his testimony in *Estrada* as a one-time mistake, and not a reason to question his opinion across cases. 72 RR 197–98. Had the jury learned that

Merillat's false testimony was not a one-off incident, but was instead a pattern, it would have significantly diminished Merillat's credibility in the eyes of the jury on this important issue.

### B. This claim is unexhausted, but Rubio can overcome any potential default.

This claim was not presented to the state courts. Rubio anticipates filing a motion seeking to stay an abey his federal proceedings to return to state court and exhaust this and other unexhausted claims. *See Rhines*, 544 U.S. at 278–79 (holding that district courts have discretion to stay habeas proceedings in federal court to allow the petition to present unexhausted claims in state court). Because Rubio can plausibly argue that he should be permitted to litigate the false testimony claim in a subsequent state post-conviction application, it would be premature to determine that this claim is procedurally defaulted.

Even if this claim is eventually defaulted, Rubio can establish cause and prejudice to overcome that default based on the State's knowing reliance on this false testimony, an external impediment to raising this claim previously. *See Murray*, 477 U.S. at 488 ("[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule."). Alternatively, Rubio can satisfy the miscarriage-of-justice exception because, absent these crucial misrepresentations, no reasonable juror would find that Rubio deserved the death penalty. *See Sawyer v. Whitley*, 505 U.S. 333, 336 (1992) (miscarriage-of-justice gateway for death sentence).

**Claim 9**        **The State violated *Brady v. Maryland* by failing to disclose Merillat's false testimony in *Velez*.**

The State violated Rubio's due process rights when it suppressed materially favorable impeachment evidence that trial counsel could have used to significantly damage Merillat's credibility. While the State turned over information to trial counsel regarding Merillat's false testimony in *Estrada*, it suppressed that he had also provided nearly identical false testimony in *Velez*, another death penalty case out of Cameron County. The failure to turn over this favorable impeachment evidence allowed the State to present a misleading narrative to the jury regarding Merillat's credibility.

### A.        The State's suppression of Merillat's false testimony in *Velez* violated *Brady*.

In *Brady v. Maryland*, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). Subsequently, the court clarified that *Brady* includes evidence that can be used to impeach the state's witnesses. *United States v. Bagley*, 473 U.S. 667, 676 (1985) (citing *Giglio*, 405 U.S. at 154); *see also Strickler*, 527 U.S. at 281–82 ("There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."). Evidence meets the materiality standard when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the

proceeding would have been different." *Bagley*, 473 U.S. at 682. This standard parallels the prejudice requirement from *Strickland* for prevailing on an ineffective assistance of counsel claim. *Id.*

### 1. Merillat's false testimony in *Velez* was favorable impeachment evidence.

Rubio is able to establish all three elements of his *Brady* claim. First, the fact that Merillat provided false testimony in *Velez* is favorable impeachment evidence. *See Bagley*, 473 U.S. at 676. To be clear, Rubio is of course not suggesting that he would have been able to utilize the reversal of the death sentence in *Velez* at his trial, as that occurred after his sentencing. However, the factual content of testimony triggering reversal in *Velez* was nearly, if not entirely, identical to the content triggering reversal in *Estrada*. In both cases, the CCA found that Merillat falsely testified that the defendant would be eligible for a less-restrictive custody classification than was actually true. *Estrada*, 313 S.W.3d at 286–87; *Velez*, 2012 WL 2130890 at *31–32. Thus, had defense counsel been in possession of the fact that Merillat offered similar testimony in *Velez* as he did in *Estrada*, they could have impeached both his credibility and specific testimony offered in Rubio's case. The State repeatedly asserted that Merillat's false testimony in *Estrada* was a "single, specific instance," 72 RR 178–79, and when asked about mistakes in his prior testimony, only told the jury of his false testimony in *Estrada*. *Id.* at 197–98.

### 2. The State suppressed Merillat's false testimony in *Velez*.

Second, this impeachment evidence was suppressed by the State. Trial counsel filed a pretrial motion requesting all available *Brady* material. CR 116–20. The State

responded to this motion by noting that it had an open file policy and that it would notify the defense "in a timely matter" if it became aware of any mitigating or exculpatory evidence. CR 332–33. Subsequently, on July 6, 2010, the State sent trial counsel a letter noting that Merillat's testimony, and a January 2009 affidavit in *Estrada*, "may possibly be impeachment evidence." App. at 020. However, to the best of Rubio's knowledge, the State never informed trial counsel of Merillat's false testimony in *Velez*.

Because Merillat gave nearly identical false testimony in *Velez*—and because Velez was also prosecuted by the Cameron County District Attorney's Office—the State suppressed impeachment evidence that they were, or should have been, aware of. *See Velez*, 2012 WL 2130890 at *32 ("Both Merillat and the state knew or should have known . . . that Merillat's testimony about the G classification of inmates who were sentenced to life without parole was false.") Rubio is not arguing for a broad rule that prosecuting agencies are required to scour every instance of their expert's prior testimony for false statements. Instead, based on the specific facts of his case, namely that the State was on notice that Merillat testified falsely in *Estrada*, and the same prosecuting agency that tried Rubio sponsored nearly identical false testimony in *Velez*, they were, or should have been, aware of this impeachment evidence. Thus, by not providing this impeachment evidence to trial counsel, it was suppressed by the State.

### 3.  The suppressed impeachment evidence was material.

Third, the undisclosed impeachment evidence was material, as there is a reasonable probability that the failure to disclose it affected the outcome of the

penalty phase. *See Bagley*, 473 U.S. at 682. A necessary question for the jury to answer was whether Rubio would be a continuing threat to society, which would require them to assess his likelihood of committing violence in prison. As such, testimony pertaining to TDCJ's classifications procedures, and the restrictions they place on inmates, was critical to answer this question. The State highlighted the importance of Merillat's testimony during closing argument, utilizing his testimony to argue that Rubio would be a future danger. 73 RR 33, 35. Yet, Merillat was able to downplay the importance of his false testimony in *Estrada* as a single instance of mistaken testimony. 72 RR 197–98. Had the jury learned that this was not, in fact, a one-off incident but instead a pattern, it would have significantly impacted Merillat's credibility in the eyes of the jury on this important issue.

## B. This claim is unexhausted, but Rubio can overcome any potential default.

This claim was not presented to the state courts. Rubio anticipates filing a motion seeking to stay an abey his federal proceedings to return to state court and exhaust this and other unexhausted claims. *See Rhines*, 544 U.S. at 278–79 (holding that district courts have discretion to stay habeas proceedings in federal court to allow the petition to present unexhausted claims in state court). Because plausible arguments exist regarding his failure to have previously presented this claim to the state courts that could allow it to proceed as a successive state habeas application, it would be premature to determine that this claim is procedurally defaulted. Even if this claim is eventually defaulted, Rubio can establish cause and prejudice to overcome that default based on the State's failure to disclose this impeachment

evidence. *See Strickler*, 527 U.S. at 289 (holding that cause to overcome procedural default of the claim was established in part on the state's failure to turn over *Brady* material).

**Claim 10**   **Rubio's Sixth Amendment right to counsel was violated because the defense failed to prepare for, and rebut, Merillat's false testimony during the punishment phase.**

### A.   Trial counsel's performance was prejudicially deficient.

To establish ineffective assistance of counsel, Rubio must show that trial counsel's performance was deficient and that counsel's deficiency prejudiced the defense. *See Strickland*, 466 U.S. at 687. Trial counsel's failure to prepare for, and rebut, Merillat's false testimony regarding the prison system and prison classifications meets both prongs of this test. Therefore, his Sixth Amendment right to counsel was violated and Rubio is entitled to a new punishment phase.

#### 1.   Trial counsel's performance was deficient.

Here, trial counsel's failure to prepare for Merillat's testimony constituted deficient performance that fell below prevailing professional norms. Trial counsel did not retain an expert on prison classifications, despite being on notice of Merillat's previous false testimony regarding the subject in *Estrada*. Nor, it appears, did they do basic research into the TDCJ classification system in preparation for Merillat's testimony. Objectively reasonable counsel, having been placed on notice of Merillat's prior false testimony, would have at minimum taken this step to prepare to cross-examine Merillat. *See ABA Guidelines*, Guideline 1.1 at cmt. (Explaining that trial counsel "must be able to challenge zealously the prosecution's evidence and experts through effective cross-examination.").

95

## 2.   The deficiency was prejudicial.

Had trial counsel prepared for and rebutted Merillat's testimony in accordance with prevailing professional norms, there is a reasonable probability that the outcome of the penalty phase would have been different. *See Strickland*, 466 U.S. at 694. TDCJ's classifications procedures, and what restrictions they place on inmates, are central to the question of whether a person will be considered a future danger during their incarceration. Had trial counsel adequately prepared, they would have been able to counter Merillat's false testimony and present the accurate version of TDCJ's classification system and the significant restrictions TDCJ places on inmates. *See* App. at 013–19. The defense could have answered Merillat's false testimony either by cross examining Merillat or by presenting an expert of its own. Instead, the jury was allowed to hear Merillat's false version that overstated the privileges and understated the restrictions that TDCJ inmates have. Accordingly, Rubio requests this Court overturn his sentence.

## B.   Any default is excused by state habeas counsel's failure to raise this substantial claim.

State habeas counsel did not raise this substantial ineffective assistance of counsel claim in state habeas proceedings. State habeas counsel's ineffectiveness excuses any default of the claim that the Director may allege. *See Trevino*, 569 U.S. at 429. Section (A), *supra,* demonstrates the substantiality of the underlying claim.

## PRAYER FOR RELIEF

WHEREFORE, John Allen Rubio, requests that this Court consider his Petition for Writ of Habeas Corpus and grant the following remedies and such other relief as the Court deems appropriate:

1.  Issue a writ of habeas corpus to have him brought before it, to the end that he may be discharged from his unconstitutional confinement and restraint and be relieved of his unconstitutional sentence of death;

2.  Allow Petitioner leave to conduct discovery pursuant to Rule 6 of the Rules Governing 28 U.S.C. § 2254 Cases to more fully develop the factual bases demonstrating the constitutional infirmities in his conviction and sentence;

3.  Conduct an evidentiary hearing pursuant to Rule 8 of the Rules Governing 28 U.S.C. § 2254 Cases; and

4.  That this Court grant such other relief as law and justice require.

Respectfully submitted,

DATE: September 4, 2019

*/s/ Lee Kovarsky*
Lee B. Kovarsky
Principal Attorney

*/s/ Kristin Swain*
Kristin Swain
Associate Attorney

Phillips Black, Inc.
PO Box 8745
Saint Louis, MO 63101
(888) 532-0897
l.kovarsky@phillipsblack.org
k.swain@phillipsblack.org

JASON D. HAWKINS
Federal Public Defender

JEREMY SCHEPERS
Supervisor, Capital Habeas Unit

*/s/ Jessica Graf*
Jessica Graf (TX 24080615)

*/s/ Derek VerHagen*
Derek VerHagen (TX 24090535)
Assistant Federal Public Defenders

Office of the Federal Public Defender
Northern District of Texas
525 S. Griffin St., Ste. 629
Dallas, TX 75202
214-767-2746
214-767-2886 (fax)
jessica_graf@fd.org
derek_verhagen@fd.org

*Counsel for Petitioner*

98

## VERIFICATION BY ATTORNEY

I, the undersigned, am an attorney at the office appointed by this Court pursuant to 18 U.S.C. § 3599 to represent Petitioner John Allen Rubio in these proceedings. I have met with Rubio, consulted with other staff in the Federal Defender's Office regarding the case and our co-counsel, and directed experts and investigators regarding the circumstances of Rubio's conviction and sentence of death. It is in that capacity that I verify this Petition. I declare under penalty of perjury that the foregoing allegations in this Petition are true and correct to the best of my knowledge and that this Petition for Writ of Habeas Corpus is being filed using this Court's CM/ECF system on September 4, 2019.

Subscribed by me September 4, 2019,
in Dallas, Texas.

*/s/ Derek VerHagen*
Derek VerHagen

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Petition for a Writ of Habeas Corpus has been served by CM/ECF upon counsel for Respondent on September 4, 2019:

> Stephen Hoffman
> Assistant Attorney General
> Criminal Appeals Division
> Office of the Attorney General
> P.O. Box 12548
> Austin, TX 78711-2548
> Stephen.Hoffman@oag.texas.gov

> _/s/ Derek VerHagen_
> Derek VerHagen