IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

JOHN ALLEN RUBIO,       §
      Petitioner,       §
      §    CIVIL NO. 1-18-CV-00088
v.       §    **\*DEATH PENALTY CASE\***
      §
LORIE DAVIS,       §
Director, Texas Department of       §
Criminal Justice, Correctional       §
Institutions Division,       §
      Respondent.       §


## RESPONDENT'S MOTION FOR SUMMARY JUDGMENT WITH BRIEF IN SUPPORT

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

MARK PENLEY
Deputy Attorney General
For Criminal Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

\*GARRETT GREENE
Assistant Attorney General
Criminal Appeals Division

P.O. Box 12548, Capitol Station
Austin, Texas 78711–2548
(512) 936–1400

\*Counsel of Record

_____

ATTORNEYS FOR RESPONDENT

_____

# TABLE OF CONTENTS

**Page**

RUBIO'S ALLEGATIONS ................................................................... 1

STATEMENT OF THE CASE ............................................................. 2

STATEMENT OF FACTS .................................................................. 4

I.    Facts Relating to Guilt/Innocence ............................................ 4

II.   Facts Relating to Punishment ................................................ 7

    A. The State's future dangerousness evidence ......................... 7

       1. The brutal nature of the crime ................................... 7

       2. Evidence showing the Murders were calculated and
          that Rubio knew his conduct was wrong .......................11

       3. Rubio's lack of Remorse ...........................................13

       4. Prior Criminal Record ..............................................14

       5. Uncharged Criminal Conduct ....................................15

       6. Disruptive and dangerous behavior while incarcerated, and
          the potential for such behavior ....................................15

    B. The defense's case in Mitigation .....................................20

ARGUMENT ...................................................................................27

I.    Rubio Fails to Excuse the Default of any Unexhausted Claim and his
    Newly Presented Evidence Cannot be Considered .............................31

II.   Rubio's Claim That Trial Counsel Were Ineffective for Failing to
    Include a Mental Health Expert as Part of the Defense
    Team is Procedurally Defaulted and Unsupported by the
    Record. .........................................................................34

A. The IATC Standard..........................................................................36

B. This claim and supporting affidavits are barred from consideration
on federal habeas review....................................................................38

C. Trial counsel adequately investigated, developed, and presented,
evidence of trauma, impaired neurocognitive functioning, and
psychiatric issues................................................................................39

    1. Testimony concerning trauma was presented
    at Trial..........................................................................................41

        a. Competency Proceedings.........................................................42

        b. Guilt/Innocence.....................................................................44

        c. Punishment...........................................................................45

    2. Trial Counsel Investigated Impaired neurocognitive
    functioning....................................................................................47

    3. Psychiatric Issues........................................................................53

        a. Competency Proceedings.........................................................54

        b. Guilt/Innocence.....................................................................54

        c. Punishment...........................................................................55

D. Even assuming trial counsel were deficient on this point, Rubio is
unable to prove prejudice given the overwhelming evidence of his
guilt, along with all the aggravating evidence before jury...............59

III. The CCA Reasonably Rejected Rubio's Claim that Trial counsel were
Ineffective for failing to Investigate FASD and this new Evidence in
Support is Barred by Pinholster...........................................................61

A. The newly presented affidavits are barred by Pinholster............62

B. The CCA reasonably rejected this claim.....................................63

    1.Trial Counsel were not deficient...............................................68

2. Any alleged deficiency was not prejudicial even when considering Rubio newly presented Pinholster barred evidence..................................................................................73

IV.  Rubio's Claim that Trial Counsel Were Ineffective for Failing to Prepare for and Investigate Rubio's Insanity Defense is Unexhausted and Procedurally Defaulted, and Refuted by the Record, ...........................................................................................82

A. This claim and supporting evidence are barred from consideration on federal habeas review.................................................................83

B. Trial counsel adequately investigated and presented Rubio's insanity defense, and even assuming they were deficient on this point, Rubio is unable to prove prejudice...................................................84

1. Relevant Facts......................................................................84

a. Testimony of Dr. Valverde and Dr. Morris..................84

b. Testimony of Dr. Welner...............................................88

2. Rubio has not shown trial counsel were Constitutionally ineffective for failing to prepare Dr. Valverde and Dr. Morris or that he was prejudiced by such...............................................91

3. Trial Counsel investigated Rubio's TDCJ Records...............101

V.  Rubio Fails to Show Dr. Welner's Testimony was False ........ ..........111

A. This claim and supporting evidence are barred from consideration on federal habeas review.................................................................112

B. Even still, Rubio's *Napue* claim fails on the merits because he fails to show falsity knowledge and materiality.......................................113

VI.  Rubio's Claim That the Prosecution Engaged in Misconduct by Repeatedly Interfering With his Ability to Present a Defense is Unexhausted and Procedurally Defaulted, and Also Refuted by the Record........................................................................................118

A. This claim and supporting evidence are barred from consideration on federal habeas review.................................................................118

B. Rubio fails to show that any alleged misconduct rendered his trial fundamentally unfair .......................................120

    1. Rubio provides no proof that his attorney were "blacklisted" ...................................................................................121

    2. Rubio provides no evidence the DA's office prevented the defense team from being funded ..........................................124

    3. Rubio provides no proof of harm from Padilla's employment with the Cameron County DA's Office ...................................................................................125

    4. Rubio shows no harm stemming from the use of subpoenas by the State ...............................................................126

    5. Rubio has not shown the state violated the trial court's gag order or that it harmed him .................................................128

VII.    Rubio fails to show he was selectively prosecuted. ...................................................................................132

  A. This claim is barred from consideration on federal habeas review................................................................132

  B. Rubio fails to show he was selectively prosecuted. The State sought the death penalty for Rubio because of the brutality of his crime, not on the sole basis of a survey, or because he was indigent. ...................................................................................137

VIII.    Rubio Fails to Show That the Testimony of A.P Merillat in his Case was False or that the State Suppressed Such Evidence, and That it was Material to the Outcome of his Trial. Also, Because of This, he Cannot Show Trial Counsel Were Ineffective for not Challenging Merillat's Testimony........................................144

  A. These claims and any supporting affidavits are barred from federal habeas review...................................................145

  B. Rubio fails to show the State suppressed favorable, material evidence, or knowingly presented materially false or misleading testimony..............................................................147

    1. Testimony of A.P. Merillat in Rubio's trial...............147

**2. *Brady* and *Napue* case law**......................................151

**3. Rubio's *Napue* claim fails because he has not shown falsity or materiality (Claim 8), (Claim 10)**..................152

**4. Rubio's *Brady* claim fails because he cannot show suppression or materiality (Claim 9)**..........................159

**CONCLUSION** ............................................................................ 164

**CERTIFICATE OF SERVICE** ................................................... 166

# MOTION FOR SUMMARY JUDGMENT

Petitioner John Allen Rubio was convicted and sentenced to death for the murders of Julissa Quesada, Mary Jane Rubio, and John E. Rubio—all children under the age of six. Rubio now challenges his presumptively valid capital murder conviction and death sentence by filing a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Respondent denies all of Rubio's assertions of fact except those supported by the record or admitted herein. Further, some of Rubio's claims are procedurally barred because they were not properly raised in state court, and he has failed to show that any of his claims have merit, or that he is entitled to further factual development. The Director respectfully requests that Rubio's petition be denied with prejudice and that he be denied a certificate of appealability.

## RUBIO'S ALLEGATIONS

The Director understands Rubio to assert the following claims for relief:

1. His trial counsel were ineffective for failing to include a person with qualifying mental health expertise as a member of the defense team.

2. His trial counsel were ineffective for failing to investigate evidence about the existence and effects of prenatal exposure to intoxicants.

3. His trial counsel were ineffective for failing to investigate and prepare for his guilt/innocence phase defense.

4.   His due process rights were violated when the State engaged in an ongoing pattern of misconduct.

5.   His equal protection rights were violated when the State selectively prosecuted him because of his indigent status and based on a public survey.

6.   The State violated *Napue*[1] when it elicited false testimony from Dr. Welner.

7.   His trial counsel were ineffective for failing to investigate and use evidence related to Rubio's mental health during his prior incarceration.

8.   The State violated *Napue* when it elicited false testimony from A.P. Merillat.

9.   The State violated *Brady*[2] when it failed to disclose the false testimony of A.P. Merillat in *Velez.*[3]

10.  His trial counsel were ineffective for failing to challenge the false testimony of Merillat during the punishment phase.

Amended Petition for Writ of Habeas Corpus (Pet.) at 1–176, ECF No. 24.

## STATEMENT OF THE CASE

Rubio was first convicted and sentenced to death in 2003, but the Texas Court of Criminal Appeals (CCA) reversed the conviction, holding that the trial court erred during the guilt/innocence phase of trial by admitting the out-of-court statements of Rubio's common law-wife and accomplice, Angela

---

[1] 360 U.S. 264 (1959).

[2] 373 U.S. 83 (1963).

[3] *Velez v. State*, No. AP-76,051, 2012 WL 2130890 (Tex. Crim. App. Jun. 13, 2012) (not designated for publication).

Camacho. *See Rubio v. State*, 241 S.W.3d 1, 11 (Tex. Crim. App. 2007). After being retried in July 2010, Rubio was again convicted and sentenced to death for capital murder in a judgment entered on August 2, 2010. CR[4] 2382–92. *Id.* The CCA affirmed Rubio's conviction on direct appeal. *Rubio v. State*, No. AP-76,383, 2012 WL 4833809, at *1 (Tex. Crim. App. Oct. 10, 2012) (not designated for publication), cert. denied 571 U.S. 852 (2013). Rubio filed a state application for writ of habeas corpus raising six claims for relief. SHCR at 2–125.[5] After holding an evidentiary hearing, the trial court entered findings of fact and conclusions of law recommending that relief be denied. SHRR[6] at 1–203; 2nd Supp. SHCR 1–15. The CCA issued an order adopting some of the trial court's findings and conclusions, providing additional reasoning related to some of Rubio's claims, and denying habeas relief based on the adopted findings and its own review.[7] *Ex parte Rubio*, 2018 WL 2329302, at *4. Additionally, the CCA dismissed Rubio's subsequent application as an abuse of the writ. *Id.* at

---

[4] "CR" refers to the clerk's record of pleadings and documents filed during Rubio's capital-murder trial in cause number 03-CR-457-B.

[5] "SHCR" refers to the Clerk's Record of Rubio's habeas pleadings in cause WR-65,784-02.

[6] "SHRR" refers to the state habeas reporter's record and is preceded by the volume number and followed by the relevant page number.

[7] The CCA rejected finding twenty-two and the first paragraph of finding fifty-four. *Ex parte Rubio*, No. WR-65,784-02, 2018 WL 2329302, at *4 (Tex. Crim. App. May 23, 2018) (not designated for publication).

4–5. Rubio then filed a suggestion for reconsideration with the CCA. ECF No. 17-1 at 1–5. Both the Director and Rubio agreed to a specified timeline where Rubio would file a "shell petition" after the CCA's disposition of the suggestion for reconsideration, followed by an amended petition. *Id.* The Director agreed that if Rubio abided by the agreed-upon timelines, the Director would expressly waive her statute of limitations defense with respect to all claims appearing in, and relating back to those appearing in Rubio's shell petition. ECF No. 17-1 at 1–4; Supp. App. 1–2. This petition follows.

## STATEMENT OF FACTS

## I.    Facts Relating to Guilt/Innocence

On state habeas, the CCA provided the following summary of the facts of Rubio's capital crime:

> [Rubio]'s common[-]law wife and co-defendant, Angela Camacho, testified at his second trial that she had three children: Julissa Quesada, who was three years and one month old; John Rubio, who was one year and two months old; and Mary Jane Rubio, who was about two months old. [Rubio] was only the biological father of Mary Jane, but he acted as a father to all three children. In 2002, Child Protective Services ("CPS") removed Julissa and John from the home. The couple was ordered to find suitable housing and take parenting classes, and [Rubio] was ordered to obtain employment and submit to periodic drug testing. The couple eventually complied. However, shortly after CPS returned the children, [Rubio] lost his job and resumed his abuse of spray paint and other substances. At one point when Camacho was pregnant with Mary Jane, [Rubio] asked her what she would do if he killed the children. She thought he was "playing."

Camacho testified that they received a notice informing them that Julissa's food stamp benefits would be terminated because of a problem with her social security number. On the day before the offense, the family went to the hospital to get a copy of Julissa's records, but the hospital did not provide the records. Their rent was due the next day and they did not have enough money to pay it.

Camacho stated that, in the early morning hours, [Rubio] nailed the back door shut. He killed their pet hamsters with a hammer and bleach. He began talking about the anti-Christ and he told Camacho that he was one of the seven good men. He told her that the children were possessed and that he was going to kill them. He ordered her to go into the bathroom. She complied. He then decapitated their two-month-old baby, Mary Jane, and screamed for Camacho. Camacho came out of the bathroom and saw that [Rubio] was trying to stab and decapitate Julissa, but the child was screaming and struggling. [Rubio] told Camacho to hold her legs. Camacho held her legs while [Rubio] stabbed and decapitated her. [Rubio] then washed the girls' bodies in the kitchen sink and put them into trash bags. He put the girls' heads into a bucket.

Camacho recalled that, when [Rubio] came out of the kitchen, he told her to have sex with him, stating that he would call his friends to come over and rape her and then he would kill himself if she did not comply. They had sexual intercourse and took a shower together. Baby John was asleep in his crib during these events. When the baby woke up crying, Camacho went to the bedroom to change his diaper. [Rubio] came into the room and told her that John was possessed. She told [Rubio] "no," and she picked John up and held him. [Rubio] grabbed the baby from her, took him into the kitchen, and stabbed and decapitated him. When Camacho saw John's decapitated body on the kitchen floor, she asked [Rubio] to kill her. He tried unsuccessfully to break her neck, then he placed John's body onto a bed, and he put John's head into a plastic bag.

The couple then walked to the store and bought milk. [Rubio] told Camacho that they would go to prison forever. They discussed plans to bury the children's bodies and flee to Mexico. While they

were sitting in the apartment, [Rubio]'s brother and a friend arrived for a visit and saw the boy's body on the bed. The visitors left the apartment screaming and then flagged down a passing police office to report the crime.

When the investigating officer arrived at [Rubio] and Camacho's home, [Rubio] admitted him into the apartment. [Rubio] gestured toward the back of the apartment. The officer testified that, as he moved toward the back of the apartment, he saw the headless body of a child, which he at first mistook to be a plastic doll. He asked, "What happened here?" [Rubio] then stood, held out his hands together towards the officer, and said, "arrest me." Other officers arrived and eventually found the decapitated bodies of all three children. [Rubio] was taken to the police station, where he confessed to killing the three children, stating that he believed that the children were possessed by the spirit of his dead grandmother.

In Camacho's second statement to police, she told a different version of these events. In this statement, Camacho said that the reason that she and [Rubio] decided to kill the children was because of money problems and not because they believed that the children were possessed. She said that they decided that it was better for the children to die than for them to suffer. At [Rubio]'s second trial, Camacho admitted making this statement to police, but insisted that it was not true and that the officers tricked her by telling her that [Rubio] had changed his story.[8]

*Ex parte Rubio*, 2018 WL 2329302, at *2.

---

[8] This portion of Camacho's testimony was disputed by Detective Samuel Lucio, one of the detectives who took Camacho's second statement. 64 RR 42. Instead, he testified that Camacho changed her story in the second statement after being confronted with statements "obtained from other witnesses" about the financial problems of Rubio and herself. 64 RR 134–35.

II.     **Facts Relating to Punishment**

A.      **The State's future dangerousness evidence**

1.      **The brutal nature of the crime**

As an initial matter, the jury was presented with significant evidence at both the guilt/innocence and punishment phases of trial demonstrating that Rubio is a future danger. *See* 10 CR 2360 (jury charge indicating that in determining answers to the Special Issues the jury "shall consider evidence submitted to you in this whole trial," including the guilt/innocence phase). Not only did the jury hear extensively about the brutality of the crime—which involved Rubio killing and decapitating his three young children, but they also had Rubio's own words from statements to police wherein he remorselessly relayed vivid details of the murders. SX 258, 262A; 64 RR 10–11, 64. In one of these statements, Rubio recalls struggling to cut the head off of two-month-old Mary Jane with a regular kitchen knife. He describes looking for a different knife, but when he is unable to find one, he resorts to ripping her head off. *See* SX 258 ("I then ripped her head off with my hands. It was very hard, but I managed to pull her head from her body.").

Indeed, the jury heard that, and more, from Rubio himself. According to his statement, on the night of the murders Rubio was in his apartment along with his common law wife, Angela Camacho, and his three children, Julissa, John, and Mary Jane. Rubio decided that his children were acting weird. SX

262A at 54. He began choking Julissa, and thought he had killed her, but after a few moments Julissa suddenly took a deep breath. He then told Camacho, "Hold her down while I choke her again," which she did. SX 262A at 66–67. He tried choking Julissa again, but "she didn't want to die." So, he directed Camacho to bring him a knife. Camacho brought Rubio a knife, and he stabbed Julissa five to six times in the chest. According to Rubio, Julissa still would not die. *Id.* at 67–70. So, he moved the still struggling little girl to the floor and turned her around onto her stomach. He then began "chopping" her neck from the back, finally decapitating her after five to ten minutes.[9] Camacho assisted Rubio in holding Julissa down. *Id.* at 70–71.[10]

Rubio then told Camacho that Mary Jane was next. He began to choke her but, again, he was unsuccessful in utilizing that method to kill her. So, he decapitated her as well, describing Mary Jane's murder as "easier" than Julissa's *Id.* at 74–76. He put the two bodies in trash bags and the heads in separate bags. *Id.* at 78. After that, according to Rubio, baby John began looking at him "real mean," so "I did the same thing, choked, stabbed him in

---

[9] According to Camacho's testimony, Julissa was conscious and screaming as Rubio cut off her head. 63 RR 148.

[10] Rubio gave a written statement to police on March 11, two days prior to his videotaped confession. According to the written statement, Julissa screamed "You are killing me, you are killing me," and "mom, please tell dad to stop." SX 258. Camacho testified that Julissa pleaded "Papi, stop, don't hurt me." 63 RR 189.

the chest, I think, and cut his head off." *Id.* at 82–84. Baby John's head was then placed in a bucket, while his body was laid on a bed in anticipation of placing it in a trash bag as Rubio had done with the others. After that, Rubio watched some television, took a shower with his wife, and the two engaged in sexual intercourse.[11] *Id.* at 79–81, 86–87.

Marguerite Dewitt, the forensic pathologist who performed the autopsies on the three victims, detailed the vast suffering the children underwent at the hands of Rubio. She testified that one-year-old John E. Rubio had multiple "sharp force" injuries to the chest, consisting of "almost an unaccountable" number of a combination of stabs and cuts. 65 RR 29. In addition to this, John E. Rubio had eleven cut or stab wounds to the right neck, an incised wound to the right side of the scalp, two cut or stab wounds below and lateral to the left eye, two cuts and two punctures of the left side of the scalp, and multiple puncture wounds of the left side of the face and on the left side of the neck below the ear. *Id.* at 31. Beyond that, he had twenty-eight stab or cut wounds involving the neck, scalp, eye, and cheek. *Id.* at 43. Also, bruising indicated that John E. Rubio would have been alive—whether conscious or

---

[11] Camacho's testimony differs somewhat from Rubio's statement; according to her, Mary Jane was killed first, then Julissa, then John. She also testified that the shower and sex occurred subsequent to the deaths of Mary Jane and Julissa, but before Rubio beheaded John. She also mentions that after the murders the two of them took a walk to a supermarket to buy milk. 63 RR 146–63

unconscious—when at least some of the trauma was occurring. *Id.* at 46. Dewitt testified to an irregularity in the wound near the torso side of the child's decapitation, indicating that it took more than one cut to complete the decapitation. *Id.* at 40. She explained that the decapitation would be very difficult to accomplish, given the skin, muscle, fat tissue, bone, and nerves one has to cut through. *Id.* at 40; SX 138, 141–42, 144, 146, 154. There was also evidence of asphyxia, corroborating the statements from Rubio and Camacho that the children were manually strangled, and then revived. 65 RR 48. Petechia were present, which Dewitt testified can happen in children when they cough really hard, but that it could also develop if a child was struggling, straining, and crying to stay alive. *Id.* at 50. Ultimately, Dewitt concluded that John E. Rubio's death was due to a combination of asphyxia, sharp force injury, incised stab wounds, and multiple wounds of the neck, chest, and face—with the manner of death being homicide. *Id.* at 50–53.

Dewitt testified that two-month-old Mary Jane had a series of deep stab wounds to the back, along with petechia present around her left eye. *Id.* at 53. In addition to various contusions, abrasions, and facial petechia, Mary Jane's autopsy revealed "jagged pieces" of skin remaining where the head was severed from the body. SX 102, 106. Dewitt testified that this was consistent with Rubio's claim that he had ripped her head off. 65 RR 57–58. Dewitt concluded

that Mary Jane's cause of death was due to homicidal violence associated with decapitation, multiple stab wounds, and asphyxia. *Id.* at 61–62.

Regarding three-year-old Julissa, Dewitt testified that several "irregular stab wounds were present, which could indicate that the victim was moving and trying to get away while being stabbed." *Id.* at 35. She testified that Julissa had twenty-one stab wounds to the chest, associated with sharp injuries. *Id.* at 64. Along with a multitude of cuts to the diaphragm, esophagus, and heart. *Id.* Dewitt testified that there was evidence of asphyxia, and that Julissa had the most petechia present of all the victims—which could coincide with testimony that Julissa pleaded with Rubio not to hurt her. *Id.* at 66. She testified that, like the other children, Julissa's body showed an "irregular decapitation line." *Id.* at 71. Julissa's death was caused by homicide with homicidal violence, including decapitation, multiple stab and cut wounds, and asphyxia. *Id.* at 75.[12]

## 2. Evidence showing the murders were calculated and that Rubio knew his conduct was wrong

While Rubio pleaded not guilty by reason of insanity, the State produced significant evidence showing that Rubio committed the murders with

---

[12] Dewitt also testified during the punishment phase that there was a reasonable medical certainty that the three children were conscious at the time many of the stabbing and cutting wounds were inflicted. She identified superficial wounds inflicted on the children prior to their decapitations that would have caused the children a great deal of pain. 73 RR 71–82.

calculation and with an aim toward escaping responsibility for them. Rubio's and Camacho's statements revealed that on the morning prior to the murders, Rubio nailed the back door to the apartment shut. SX 262A at 92; 63 RR 139–45. The jury also heard evidence that Rubio and Camacho attempted to clean up the crime scene after the murders. In his written confession, Rubio stated that after the murder, "[M]y wife and I started to clean up the house." SX 258. Camacho testified that at Rubio's direction, she washed the children's bodies and cleaned blood from the murder weapons and the carpeting. 63 RR 149–51. Camacho also testified that she and Rubio took a shower after killing the first two children. *Id.* at 154–55. According to Rubio's written statement, this shower was to clean off "from all the blood." SX 258.

Rubio's brother, José Luis Lopez—who first located the victims' bodies— testified that when he arrived at the apartment the floor was wet;[13] one of Camacho's written statements explained that was because she had cleaned it subsequent to the murders. 67 RR 137; SX 252. Additionally, cleaning supplies found at the scene included bottles of "Joy" and "Pine-sol" cleaning fluids, a five-gallon bucket with a red liquid inside, bath towels on the floor, moist towelettes, and a new box of trash bags. SX 174A, 174B; 61 RR 21–22, 71–93. Camacho testified that the cleaning supplies were purchased by Rubio shortly

---

[13] Detective Lucio's testimony also indicated this much. 64 RR 25.

before the murders. 63 RR 192, 201–03. The trash bags were used by Rubio and Camacho to store the children's bodies. *Id.* at 149–50.

Detective Lucio testified that it appeared Rubio had tried to conceal the bodies of Mary Jane and Julissa in plastic trash bags stored in the back bedroom, and that it looked like Rubio and Camacho were also planning to place baby John in a bag found next to his body. 64 RR 28–32. Detective Lucio also noted that a table in the apartment had been moved in an apparent effort to block off access to the room containing the bodies. *Id.* at 32.

Camacho testified that she and Rubio planned to put the bodies of the children in an H-E-B cart and transport them to a house where they had previously lived to bury them at that location. 63 RR 166. She testified that Rubio said they could go to Mexico because it would be "harder over there to find" them. *Id.* at 167.

### 3. Rubio's lack of remorse

The State presented evidence during punishment that Rubio lacked remorse for the crimes. Officer John M. Jones testified that approximately one to two days after the murders he was tasked with transporting Rubio from the city jail to the county jail in Brownsville. He described Rubio's behavior during that time as "jovial" and noted that Rubio carried on a conversation with him in the car, asking Officer Jones whether he would be placed in general population or segregated in his own cell. 72 RR 5–7. Officer Jones further

testified that nearly the entire time Rubio was being transported to county jail, he kept looking over his shoulder to see where Camacho was because she was being transported in the vehicle behind Rubio. *Id.* At the county jail, there was a brief period of time in which Rubio and his wife could see each other. *Id.* Officer Jones testified that Rubio and Camacho were "smiling and waving at each other, trying to get each other's attention." *Id.*

Texas Ranger Rolando Castaneda testified that three days after the murders he executed a warrant for Rubio's hair and blood. He went to the Carrizales-Rucker detention center to collect the samples from Rubio and found him "laughing and smiling," with no indication of remorse. 71 RR 44–50. At the time of the murders, Rubio was on probation for possession of marijuana. Rubio's probation officer, Lorena Mendoza, testified that eighteen days after the murders she visited him in jail to advise him of the motion to revoke that she had filed. 72 RR 152–153. She testified that Rubio expressed to her that he was unhappy with the way the staff were treating him, complained that he was hungry, and asked for a hamburger to eat. *Id.* at 153–54. She testified that Rubio never mentioned his children during this visit, nor did he express any remorse. *Id.*

### 4. Prior criminal record

The jury also heard evidence that Rubio had been previously arrested for possession of marijuana, public intoxication, and possession of a stolen vehicle.

71 RR 17–19; 72 RR 2–5. He also tested positive for marijuana and cocaine while on probation for the marijuana charge. 72 RR 139–48. Officer Julio Sanchez testified that in January 2002 he responded to a domestic disturbance call and encountered Rubio's common law wife, Angela Camacho, who appeared frightened and reported that Rubio was yelling at and threatening her. Camacho advised that she feared for her safety and the safety of the seven-day-old baby at the scene. Officer Sanchez then spoke to Rubio, whom he characterized as intoxicated on spray paint and angry because he thought Camacho had taken away his paint can. Officer Sanchez placed Rubio under arrest for assault. 71 RR 24–29.

### 5. Uncharged criminal conduct

José Luis Moreno, whom Rubio had been having an affair with, testified that he and Rubio once visited the home of "Ivan," a romantic rival who competed with Rubio for Moreno's affection. Moreno stated that during that visit Rubio had produced an ice pick next to his leg and had expressed his intent to use it to stab Ivan. Moreno was able to convince Rubio to leave the residence without assaulting anyone. 63 RR 84.

### 6. Disruptive and dangerous behavior while incarcerated, and the potential for such behavior

The State elicited testimony involving Rubio's long and dangerous history of misconduct while on death row. TDCJ guard Traleasa Turner

testified that on August 13, 2004, Rubio "took over" the "bean" slot in the door of his cell by sticking his arm out of it so that correction officers could not close it. This created security issues within the facility, as Rubio could have assaulted officers or others through the open slot. These actions caused a significant disruption within the facility. 72 RR 32–39. TDCJ Officer Jonell Stringer testified that on May 30, 2005, she administered a drug test to Rubio, and the results of that test were positive for marijuana. *Id.* at 65–67.

TDCJ Officer Eston Loving testified that on November 24, 2004, Rubio started a fire outside of his cell, which Loving extinguished. During the subsequent disciplinary hearing, Rubio stated "I did it and I'm going to start another one." *Id.* at 82–90. And he did. TDCJ guard Robert Peters testified that on December 5, 2004, during the 1:15 a.m. count, he observed that Rubio had again started a fire with newspapers and pushed it outside in front of his cell. 71 RR 62–67.

Officer Billy Alexander testified that Rubio started yet another fire on January 1, 2005. 72 RR 102–12. In this case, Rubio set his own cell on fire, and the plexiglass and paint on the cell door ignited into flames. *Id.* The officers on the scene initially placed wet towels over their faces until they were provided with gas masks to protect against smoke inhalation. *Id.* Officer Alexander indicated that this fire was "out of control," and that he had to risk his own safety to remove Rubio from the burning cell. *Id.* Once Rubio was placed in an

adjoining shower room, Officer Alexander returned to the burning cell. After the fire was extinguished, he noticed that Rubio had piled wet blankets and towels on one side of the cell to protect himself from the blaze he started. *Id.* He also noticed that in anticipation of the fire Rubio had put away his personal items so they would not get burned or wet. *Id.* Rubio was examined and cleared by the medical staff on scene, and Officer Alexander returned Rubio to his cell. *Id.* As he was being placed inside, Rubio told the officer "Happy New Year." *Id.* Two other offenders on death row had to be treated for smoke inhalation in connection with this incident. *Id.* Officer Alexander testified that these fires endangered both staff and other inmates. Rubio's actions in this regard caused general disruption within the facility that put others at risk, as officers in other pods had to respond to the fires instead of performing routine safety and security checks on the inmates. *Id.* at 113–17.

The State's expert on the prison system, A.P. Merillat, testified as to the additional opportunities to commit crime in prison that Rubio would have were he to receive a life sentence *Id.* at 181–227.

Former Supervisory Special Agent for the FBI and president of a behavior science consulting business, Alan C. Brantley, testified that Rubio was a continuing threat to society. 73 RR 93. For most of his twenty-year career at the FBI, Brantley was a criminal analyst, responsible for threat analysis and assessment of dangerousness in violent crime matters. *Id.* at 94. Before he

joined the FBI, Brantley was a senior psychologist for the North Carolina Department of Corrections, where he provided services to the inmate population as well as evaluations for pre-sentence diagnostic studies, testing for parole consideration, and evaluations of inmates for assignment to the governor's mansion. *Id.* at 95. Brantley testified that Rubio, "when confronted with multiple acute stressors, and when under the influence of illicit drugs or chemicals, can be very dangerous." *Id.* at 103.[14] The stressors that confronted Rubio at the time of the offense were financial (threat of eviction because he could not pay the rent), , relational (the children's mother was threatening to leave him if he did not end his affair with Moreno), being physically and psychologically unable to provide adequate care for the children, and the prospect of going to jail on a probation revocation. *Id.* at 103–04, 227–28. For

---

[14] In preparing his analysis in Rubio's case, Brantley reviewed voluminous materials, including: crime scene photographs; autopsy photographs; investigative reports and police reports; mental health evaluations; witness statements; statements from Rubio and Camacho; school records; jail records; Texas Department of Criminal Justice (TDCJ) records which included medical, mental health, and custody related records. 73 RR 13. Brantley also interviewed correctional officers who had knowledge of the security measures and custody classification system of death row. 73 RR 113. Based on this information, Brantley organized his assessment into ten major categories (1) nature and severity of the offense; (2) history of emotional problems and mental health complaints; (3) history of drug abuse and arrest; (4) age of onset of childhood adjustment problems; (5) history of childhood physical and sexual abuse; (6) lack of remorse and empathy for victims; (7) poor insight and judgment; (8) victim population; (9) failure to benefit from past intervention efforts; and (10) history of institutionalization. 73 RR 14, 105–07.

an individual like Rubio, the pressure of those destabilizing influences, plus the effects of drugs or alcohol, created a lethal combination. *Id.* at 103–04.

Brantley stated that if Rubio were placed into the general prison population, he would be exposed to some of the same types of stressors that confronted him at the time of the offense, and he would have access to illegal substances. *Id.* at 110. In general population, Rubio would interact with other inmates who had a variety of personalities and agendas, and based on Rubio's history, it was likely that he would have adjustment problems stemming from the availability of money and sex. *Id.* at 112. During Rubio's first stay on death row he was in level 3, the "lowest level." *Id.* Further, Rubio's disciplinary records reflected that, even when he was in the most secure custody level of death row, he had set multiple fires and tested positive for marijuana. *Id.* at 113–14. There would be increased opportunities for such behavior in general population. *Id.* Brantley testified that there was a high probability that a person like Rubio would commit criminal acts of violence in the future if housed in general population. *Id.*

In its closing arguments, the State reiterated that death row has the highest level of security within the TDCJ system, yet Rubio was able to take over a door slot, possess and smoke marijuana, and start multiple fires. 74 RR 34–35.

## B.     The defense's case in mitigation

The very nature of Rubio's insanity defense involved the frontloading of mitigation evidence. This led to trial counsel presenting evidence—starting during guilt/innocence—that although Rubio's actions were appalling, they were the result of an acute mental disorder, which due to institutional neglect, lifelong destitution, and family abuse, was never appropriately treated or kept in check.

Hilda Barrientes, Rubio's mother, testified that she failed to take good care of herself during pregnancy and that she consumed alcohol while pregnant with Rubio. 65 RR 155–56. Barrientes testified that Rubio's biological father was "violent" toward her "all the time" and that Rubio would witness these beatings. *Id.* at 158. Rubio was in special education classes growing up, starting in third grade. *Id.* at 159. And when he was young, he would complain to her that he could see shadows and hear voices. *Id.* at 165. Because Rubio qualified for Social Security benefits, Barrientes testified that he could go see doctors "whenever he needed." *Id.* at 160. Still, although Barrientes had been taking Rubio to see a psychiatrist in Harlingen, she eventually stopped. When asked why, she testified that when she did not receive a notice of evaluation from the doctor, it just "slipped her mind." *Id.* at 170–71. She testified that for a time, she and Rubio lived with her mother. While living there, Rubio—then under eighteen, told her several times that he "heard voices" and that God was

telling him that he was the "chosen one." *Id.* at 172–73. While he was still in high school, Rubio moved out of the house to live with Georgina Castillo, who was about seven years older than him. *Id.* at 175. Eventually Georgina broke up with Rubio, and he moved back with Barrientes. Barrientes testified that Rubio was depressed and that she thought he had been inhaling "spray" at this time. *Id.* at 176. Rubio's mother testified that she told him to prostitute himself, and that most of the time, the clients were men. *Id.* at 177. She also testified that she would "get" marijuana for Rubio whenever he requested it. *Id.* at 180. She testified that while Rubio would hear voices and see shadows while he was under the effects of huffing spray paint, he had also said these things when he was a child, before he was on drugs. *Id.* at 180–81.

Dr. William Valverde, the court-appointed psychiatrist during Rubio's competency proceedings, testified that Rubio's symptoms were consistent with paranoid schizophrenia. 66 RR 30. Part of this mental illness can make it difficult for people to express appropriate emotions. *Id.* at 31. Valverde also testified that the particular category of schizophrenia Rubio suffers from is the least responsive to medication. *Id.* at 38. Dr. Valverde testified that, based on a reasonable psychiatric probability, that Rubio was suffering from a mental disease or defect at the time of the crime. *Id.* at 43.

Dr. Raphael Morris testified that from early on, Rubio was unable to form essential, healthy attachments because of immense domestic violence and

the tenuous nature of his upbringing. 66 RR 113. He testified that he diagnosed Rubio with schizophrenia, paranoid type. *Id.* at 128. Rubio also suffered from delusions. *Id.* at 130. Dr. Morris testified that Rubio never received adequate treatment for this illness growing up, and that at the time of the murders he was suffering from a severe mental disease, namely, a psychotic disorder. *Id.* at 138.

Manuel Rubio, Jr., and Rodrigo Barrientes, Rubio's brothers, testified that their mother was always on drugs or otherwise "passed out," and unable to help Rubio get dressed for school or help him with homework. 67 RR 40–43, 92. They also testified that growing up, their family never celebrated any birthdays or Christmases. *Id.* at 45–45, 93–94.

At punishment, Dr. Jolie Brams, a clinical and forensic psychologist, testified that Rubio was born into a set of life circumstances that hampered his ability to live a normal healthy life. 73 RR 173. Dr. Brams introduced the jury to the concept within psychology known as the toxic parent, elaborating that a toxic parent is one whose negative behavior impacts a child. Dr. Brams testified that Rubio was born to parents who would be labeled toxic parents— "parents whose negativity and their behavior and their dysfunction in their daily lives hampered [Rubio's] ability to be a normal healthy individual." Id. at 184.

Dr. Brams attributed this unhealthy upbringing, in part, to the neglect and inattentiveness of Rubio's mother, describing Rubio's relationship with her as lacking "reciprocity." *Id.* Based on her review of Rubio's social history, Dr. Brams observed that Rubio's mother was "unable and unwilling to respond to" Rubio, "not just as an infant. . . but also later in life." *Id.* at 185. Dr. Brams also learned that Rubio's mother would be "unable, either drunk, [or] high on crack. . ." to respond to Rubio as an infant. *Id.* Rubio would "cry and whine" and at one or two years old he "started to cling to his mother. And the more he clung to her, the more she rejected him." *Id.*

Additionally, Dr. Brams testified that Rubio was born into "immense domestic violence," which routinely involved "screaming, yelling, [and] fighting." *Id.* at 186. During an interview, Rubio told Dr. Brams that before his father left the family, "[he] was so violent and strong" he could knock out Rubio's mother "with one punch." *Id.* From this social history, Dr. Brams elaborated that "instead of having a safe, secure, quiet, loving type of environment, it was one that was punctuated on a daily basis with nasty words and threads and a very unpredictable unsafe type of ambience to his early life." *Id.* Dr. Brams also testified that Rubio lived in "substantial" poverty and there he received little to no comfort in terms of regular meals or a mother who loved him. *Id.* at 188.

Testifying as to Rubio's early childhood years, Dr. Brams testified that Rubio "was not a normal preschooler in terms of almost every aspect of his development." *Id.* at 189. According to Dr. Brams, it was during this time in Rubio's life that he began suffering from hallucinations and displaying signs of a budding psychotic disorder. *Id.* at 189–90. She testified that during Rubio's early childhood years, he began to develop his own language. She explained that this is characteristic of children experiencing a budding psychotic disorder. *Id.* at 191.

Dr. Brams discussed Rubio's delusional obsession with Dragon Ball Z, a popular Japanese cartoon character, who, although weak in statute, possessed superpowers and had the ability to overcome evil. *Id.* at 198. She testified that Rubio basically "became Dragon Ball Z," to the point where it was a delusion. *Id.* According to Dr. Brams, this was significant from a clinical psychology perspective because Rubio emulated that cartoon character as an adult, producing the sounds Dragon Ball Z would make during certain parts of her interviews with him. *Id.* at 199.

Dr. Brams also learned that during Rubio's early years, he had problems with impulse control and problem solving—traits that she testified were brought on by possible genetic loading for substance abuse in his family. *Id.* at 190. Dr. Brams explained that the presence of these early developmental

difficulties were precursors to the substance abuse problems Rubio would experience later in life. *Id.*

Dr. Brams also testified that Rubio was developmentally delayed for his age during preschool years in terms of speech and movement. *Id.* at 192. She testified that Rubio's younger siblings stated that Rubio was functioning less adequately than them, even though they were several years younger than him. *Id.*

According to Dr. Brams, due to the negative family and social environment of Rubio's youth, the "seeds of psychosis" were sown very early in his development. *Id.* at 193. During his early childhood years, Rubio began having constant nightmares about demons and witchcraft. *Id.* Rubio's mother, in an effort to manipulate him, intensified these nightmares by convincing him that witchcraft and demons were real. *Id.* at 194.

Dr. Brams testified that during Rubio's elementary school years, his thoughts became irrational and he lacked the tools to cope with his emotional life. *Id.* Rubio "couldn't get tools from his parents because they had none." *Id.* Both of his parents were alcoholics and there was "tremendous" domestic violence. *Id.* According to Dr. Brams, faced with these problems, and already showing a precursor to psychosis, Rubio "retreated to a fantasy world" over which he felt he had more control. *Id.*

Dr. Brams testified about the multitude of factors during Rubio's early years that put him at risk for mental illness. *Id.* at 195. For instance, he was subjected to a tremendous degree of verbal abuse by both parents, such as being called "retardo." *Id.* Additionally, school was not a "safe haven" for Rubio; he required special education for many years, which embarrassed him. *Id.* at 196–98. She also testified that Rubio's ability to learn at an age and grade appropriate level was impaired, he was deemed emotionally disabled, and his psychological mental health problems were noticed by professionals from first grade onward. *Id.*

Regarding Rubio's teenage years, Dr. Brams testified that Rubio's father abandoned the family, and that during this time his mother took to the streets to smoke crack and prostitute. *Id.* at 200. Rubio would get into fights with some of the men who were paying his mother for sex when they would come over, because they would get violent with her. *Id.* at 201.

Dr. Brams also told the jury how, at age twelve, Rubio's own mother prostituted him. *Id.* at 201. And that nothing could have been more developmentally damaging than to be "farmed out" for prostitution by his own mother. *Id.* at 203.

Additionally, Dr. Brams and other witnesses demonstrated that despite the developmentally damaging social influences and mental health problems Rubio endured throughout his life, he was still a loving and compassionate

person. Dr Brams testified that Rubio loved his children, and that when she spoke to him, he shared with her "how much he cared for them, how he physically cared for them." *Id.* at 205.

None of Rubio's family members showed up to testify at the punishment phase, 74 RR 42, however, during guilt/innocence, Rubio's family members further confirmed that Rubio deeply cared for his children. For example, Rubio's sister testified that he was a good father who took care of his kids and fed them. 67 RR 57. Rubi's brother testified that Rubio loved his children and observed that, even when Rubio did not have money for rent, he would use whatever money he had to buy them Pampers or toys. *Id.* Rubio's brother explained that on one occasion, Rubio asked for money to buy a ten-dollar Polaroid camera so that his children could take pictures. *Id.* at 115. According to his brother, Rubio always prioritized the needs of his children before anyone else. *Id.*

## ARGUMENT

A party moving for summary judgment bears the burden of informing the Court of the basis for the motion and identifying pleadings and other evidence demonstrating the absence of any genuine issues of material fact. *Howell Hydrocarbons, Inc. v. Adams*, 897 F.2d 183, 191 (5th Cir. 1990) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). If the moving party makes the required showing, the burden shifts to the nonmoving party to show

summary judgment is not appropriate. *Fields v. City of S. Hous.*, 922 F.2d 1183, 1187 (5th Cir. 1991). While summary judgment rules apply with equal force in a federal habeas proceeding, the rule only applies to the extent that it does not conflict with the rules governing habeas review.

> Therefore, § 2254(e)(1)—which mandates that findings of fact made by a state court are "presumed to be correct"—overrides the ordinary rule that, in a summary judgment proceeding, all disputed facts must be construed in the light most favorable to the nonmoving party. Unless [the petitioner] can "rebut [ ] the presumption of correctness by clear and convincing evidence" as to the state court's findings of fact, they must be accepted as correct.

*Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir. 2002) (quoting 28 U.S.C. § 2254(e)(1)), *overruled on other grounds by Tennard v. Dretke*, 542 U.S. 274 (2004); *Austin v. Davis*, 647 F. App'x 477, 483 (5th Cir. 2016) (unpublished); *Torres v. Thaler*, 395 F. App'x 101, 106 n.17 (5th Cir. 2010) (unpublished).

Further, "[t]he statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)." *Harrington v. Richter*, 562 U.S. 86, 97 (2011). AEDPA "requires a state prisoner seeking federal habeas relief first to 'exhaus[t] the remedies available in the courts of the State.'" *Kernan v. Hinojosa*, 136 S. Ct. 1603, 1604 (2016) (per curiam) (alteration in original). State court adjudication, in turn, requires review under § 2254(d). *Richter*, 562 U.S. at 98–99. This section "imposes a highly deferential standard of review for evaluating state court

rulings and demands that state court decisions be given the benefit of the doubt," *Hardy v. Cross*, 565 U.S. 65, 66 (2011) (per curiam) (quotation omitted), and "is limited to the record that was before the state court." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

Under § 2254(d), relief may not be granted unless the state court adjudication (1) "'was contrary to' federal law then clearly established in the holdings of" the Supreme Court, (2) "'involved an unreasonable application of' such law," or (3) "'was based on an unreasonable determination of the facts' in light of the record before the state court." *Richter*, 562 U.S. at 100 (quoting § 2254(d)(1)–(2)) (citing *(Terry) Williams v. Taylor*, 529 U.S. 362, 412 (2000)).

A state court decision is contrary to clearly established federal law if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or confronts facts that are "materially indistinguishable" from relevant Supreme Court precedent yet reaches an opposite result. *(Terry) Williams*, 529 U.S. at 405–06. A state court unreasonably applies clearly established federal law if it correctly identifies the governing Supreme Court precedent but unreasonably applies it to the facts of a particular case. *Id.* at 407–09. To analyze unreasonable application, a federal court "must determine what arguments or theories supported or . . . could have supported[] the state court's decision[] and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the

holding in a prior decision of [the Supreme] Court." *Richter*, 562 U.S. at 102.

Thus, "a state court's determination that a claim lacks merit precludes federal

habeas relief so long as fairminded jurists could disagree" on the correctness of

the state court's decision. *Id.* at 101 (quotation omitted).

Further, it is the state court's "ultimate decision" that is to be tested for

unreasonableness and not every jot of its reasoning. *Neal v. Puckett*, 286 F.3d

230, 246 (5th Cir. 2002) (en banc). Indeed, state courts are presumed to "know

and follow the law." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). And, even if

the state court's decision lacks reasoning, § 2254(d) applies and must be

overcome by the inmate. *Richter*, 562 U.S. at 98.

AEDPA also provides that state court factual findings "shall be

presumed to be correct" unless an inmate carries "the burden of rebutting the

presumption of correctness by clear and convincing evidence." § 2254(e)(1).

This presumption is "especially strong" where, as here, the state trial judge

and the state habeas judge are one and the same. 60 RR 1; 2nd Supp. SHCR

at 15; *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000). "The presumption

of [factual] correctness not only applies to explicit findings of fact, but it also

applies to those unarticulated findings which are necessary to the state court's

conclusions of mixed law and fact." *Valdez v. Cockrell*, 274 F.3d 941, 948 n.11

(5th Cir. 2001).

## I. Rubio Fails to Excuse the Default of Any Unexhausted Claim, and His Newly-Presented Evidence Cannot Be Considered.

As an initial matter, some of Rubio's claims, evidence, and arguments were not presented in state court. Pet. at 28, 89, 103, 117, 128, 139, 145, 153, 158 (Claims 1, 3–10). The unraised claims are unexhausted. *See* § 2254(b) (petitioner must exhaust remedies in state court). Moreover, the normal rule that a state court must explicitly apply a procedural bar to preclude federal review of these claim does not apply to those cases where the state court would now find the newly-presented claims to be procedurally barred. *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991). Here, the CCA would find Rubio's new claims procedurally barred under the Texas abuse-of-the-writ doctrine if he returned to state court. *See* Tex. Code of Crim. Proc., Art. 11.071, § 5; *Nobles v. Johnson*, 127 F.3d 409, 423 (5th Cir. 1997) (finding an unexhausted claim defaulted because it would be barred by Article 11.071, Section 5, if raised in a subsequent writ). Indeed, one of the claims he presents in this petition has already been barred by the CCA as subsequent. *Infra* at 132 (Claim 5). As such, Rubio is precluded from federal habeas review unless he can show cause for the default and resulting prejudice, or demonstrate that the court's failure to consider his claim will result in a "fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750.

Beyond attempting to excuse his defaulted claims under the principles of *Coleman*, Rubio's other excuse is the alleged ineffective assistance of his state habeas counsel. Pet. at 52 (Claim 1), 103 (Claim 3), 144 (Claim 7), 159 (Claim 10). He cites *Martinez v. Ryan*, which holds that "inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of [Ineffective assistance of trial counsel (IATC) claims]." 556 U.S. 1, 9 (2012). *Martinez*'s "narrow exception" applies to Texas's postconviction system. *Trevino v. Thaler*, 569 U.S. 413, 428 (2013). However, *Martinez* does not apply in several of Rubio's cited circumstances.

First, and contrary to Rubio's assertions, *Martinez* does not excuse the default of any claims that do not allege IATC. *Davila v. Davis*, 137 S. Ct. 2058, 2063 (2017) (declining to extend the *Martinez* exception to ineffective assistance of appellate counsel claims); *Murphy v. Davis*, 732 F. App'x 249, 257 (5th Cir. 2018) (unpublished); *Vasquez v. Stephens,* 597 F. App'x 775, 778 (5th Cir. 2015) (unpublished); *Reed v. Stephens*, 739 F.3d 753, 778 n.16 (5th Cir. 2014); *In re Sepulvado,* 707 F.3d 550, 554 & n.8 (5th Cir. 2013); Pet. at 116 n.80 (Claim 4), 127 n.97 (Claim 5).

Second, *Martinez* does not apply to claims that were adjudicated in state court. *See Escamilla v. Stephens*, 749 F.3d 380, 395 (5th Cir. 2014); *Brown v. Thaler*, 684 F.3d 482, 489 n.4 (5th Cir. 2012). Instead, those claims are subject to the limitations of § 2254(d) and *Pinholster*. *Id*. "Th[e] backward-looking

language [of § 2254(d)] requires an examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record in existence at the same time *i.e.*, the record before the state court. . . . Our cases emphasize that review under § 2254(d)(1) focuses on what a state court knew and did." *Pinholster*, 563 U.S. at 182. To this end, Rubio cannot prove that the state court unreasonably adjudicated exhausted claims with arguments and evidence that were not presented in state court.[15] *Id.*

For unexhausted IATC claims to which *Martinez* does apply, Rubio fails to meet its requirements. Under *Martinez*, "to succeed in establishing cause, the [inmate] must show (1) that his claim of ineffective assistance of counsel at trial is substantial—i.e., has some merit—and (2) that habeas counsel was ineffective in failing to present those claims in his first state habeas proceeding." *Garza v. Stephens*, 738 F.3d 669, 676 (5th Cir. 2013). To prove a claim "substantial," a "prisoner must demonstrate that the claim has some merit." *Id.* Further, state habeas counsel cannot be ineffective for failing to raise a meritless claim. *Id.*

---

[15] The Director has attempted to note which pieces of evidence are barred under *Pinholster* when addressing Rubio's arguments. However, to the extent this list is not exhaustive of all the newly presented evidence contained in Rubio's pleadings, the Director asserts that any and all evidence not presented in state court is foreclosed from consideration in this proceeding and reserves the right to argue as much in future pleadings.

Rubio's claims are insubstantial and meritless, which is dispositive of both prongs of *Martinez*. And Rubio's assertions that his state habeas counsel were inadequate find no support in the record. In this regard, his state habeas counsel performed an extensive investigation and—with the combined effort of two attorneys and a mitigation expert—drafted a 109-page, six-claim, state habeas application. SHCR at 2–124. Additionally, they requested, and received, $13,000 in funds to complete an investigation into Fetal Alcohol Spectrum Disorder (FASD). SHCR at 495–96, 628–32. They also consulted with four experts—a psychologist, Dr. Natalie Brown, a psychiatrist, Dr. Richard S. Adler, an Assistant Professor of Neurology and Psychiatry at New York University, Dr. Siddhartha Nadkarni, and a psychologist specializing in neuropsychology, Dr. Paul D. Connor. SHCR at 528, 544, 583. They also obtained affidavits from same. *Id*. Counsel sought and were granted a state habeas hearing where these affidavits were stipulated to. 2nd Supp. SHCR (Stipulation). Additionally, they thoroughly questioned Rubio's second-chair trial counsel who had organized and directed the defense's team of experts, as well as an expert in jury selection. SHRR at 25–160. State habeas counsel also questioned two attorneys experienced in capital litigation and mitigation, as well as their own mitigation investigator. *Id*. Furthermore, they filed a subsequent application after the hearing, alleging four additional grounds for relief. 1st Supp. SHCR at 72–109. Moreover, for the reasons that follow,

Rubio's claims are also meritless and therefore he fails to show a substantial claim under *Martinez*,[16] nor can he show prejudice or a miscarriage of justice under *Coleman*.

In addition, Rubio's new evidence is barred from consideration by § 2254(e)(2), which imposes strict statutory limitations on evidentiary development that "[continue] to have force" even when a claim was not adjudicated on the merits in state court. *See Pinholster*, 563 U.S. at 185. The requirements apply to all forms of new evidence not just evidentiary hearings. *Holland v. Jackson*, 542 U.S. 649, 653 (2004).

Under § 2254(e)(2), where a habeas petitioner has failed to fully develop the factual basis of his claims in state court, he is precluded from further factual development in federal court unless (1) his claims rely on a new rule of constitutional law or a factual predicate previously undiscoverable through the exercise of due diligence; and (2) he establishes by clear and convincing evidence that, but for constitutional error, no reasonable fact finder would have found him guilty. The Supreme Court has held that a petitioner has failed to develop the factual basis of his claim if the evidence was not presented due to a "lack of diligence, or some greater fault, attributable to the prisoner *or the*

---

[16] Additionally, Rubio fails to show any "actual prejudice to excuse the procedural default." *Hernandez v. Stephens*, 537 F. App'x 531, 542 (5th Cir. 2013); *see also Reynoso v. Davis*, No. H-09-2103, 2020 WL 2596785, at *4 & n.23 (S.D. Tex. May 21, 2020).

prisoner's counsel." (*Michael*) *Williams v. Taylor*, 529 U.S. 420, 432 (2000) (emphasis added). Because Rubio does not rely on any new rule of constitutional law, and he fails to show requisite diligence or actual innocence, his new evidence cannot be considered.[17]

## II. Rubio's Claim That Trial Counsel Were Ineffective for Failing to Include a Mental Health Expert as Part of the Defense Team Is Procedurally Defaulted and Unsupported by the Record. (Claim 1)

Rubio claims that trial counsel were deficient for failing to include a mental health expert as part of the defense team, Pet. at 28–36, and that this failure prejudiced him "at the competency trial, and at both the guilt/innocence and punishment phases of the trial on the merits." Pet. at 37. However, as shown below, not only is this claim unexhausted and procedurally defaulted, it is belied by the record. It therefore fails even under de novo review.

### A. The IATC standard

The familiar two-prong standard by which an IATC claim is weighed is set forth in *Strickland*. That is, to establish that counsel performed ineffectively, Rubio must show both that his attorneys' performance was deficient, and the deficient performance prejudiced his defense. 466 U.S. at

---

[17] The Director has attempted to note which pieces of evidence are precluded under § 2254(e)(2) when addressing Rubio's arguments. However, to the extent this list is not exhaustive of all the newly presented evidence contained in Rubio's pleadings, the Director asserts that any and all new evidence is foreclosed from consideration in this proceeding and reserves the right to argue as much in future pleadings.

687. Furthermore, because a convicted defendant must satisfy both prongs of the *Strickland* test, a failure to establish either deficient performance or prejudice makes it unnecessary to examine the other prong. *Id.* at 697.

To establish that counsel's performance was constitutionally deficient, a convicted defendant must show that trial counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Strickland*, 466 U.S. at 687. In so doing, a convicted defendant must overcome a strong presumption that trial counsel's conduct fell within a wide range of reasonable professional assistance, and every effort must be made to eliminate the "distorting effect of hindsight." *Id.* at 689.

Nevertheless, "any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution." *Strickland*, 466 U.S. at 692. To establish that he has sustained prejudice, Rubio "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 694. A reasonable probability is a probability sufficient to undermine the confidence in the outcome." *Id.* That requires a "substantial," not just "conceivable," likelihood of a different result. *Richter*, 562 U.S. at 112.

While the double deference usually applicable in federal habeas review is not available with respect to this claim because of Rubio's failure to exhaust,

it is still the case that "[s]urmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010).

### B. This claim and supporting affidavits are barred from consideration on federal habeas review.

Rubio concedes that this claim is unexhausted, but urges he can use *Martinez* to overcome any default. Pet. at 52–56. But state habeas counsel were not ineffective. *See supra* Section I. Moreover, as shown below, because this IATC claim is insubstantial and meritless, *Martinez* cannot save it from being defaulted. *See id.* Also, Rubio proffers several affidavits in support of this claim. *See* Supplemental Appendix (Supp. App.) at 99 (Dr. Agharkar), 63 (Dr. Lisak), 104 (Dr. Ouaou). This new evidence is barred from consideration by § 2254(e)(2). *See supra* Section I. In fact, according to Rubio, state habeas counsel should have been aware of the facts supporting this argument, but failed to include this "obvious" claim in the state application. Pet. at 55. Accordingly, Rubio failed to develop the factual basis of this claim. *See (Michael) Williams*, 529 U.S. at 432. Thus, because he does not rely on a new rule of constitutional law, and he fails to show requisite diligence or allege actual innocence, he cannot overcome the statutory bar to expansion of the record. *See supra* Section I. What is more, to the extent these affidavits support Rubio's exhausted and adjudicated claim concerning trial counsel's failure to

investigate FASD, they are barred by *Pinholster. See supra* Section I; *see also infra* Section III.

### C. Trial counsel adequately investigated, developed, and presented evidence of trauma, impaired neurocognitive functioning, and psychiatric issues.[18]

Outside of a cursory reference to *Strickland*, Rubio cites no case law in support of his proposition that trial counsel were ineffective for not including a mental health expert as part of the defense team. Pet. at 30–36. Rather, Rubio relies almost exclusively on ABA and Texas guidelines in support of this point *Id.* But the Supreme Court has rejected the notion that the American Bar Association (ABA) Guidelines are an "inexorable command with which all capital defense counsel must fully comply" to be constitutionally effective. *Bobby v. Van Hook*, 558 U.S. 4, 17 (2009) (per curiam) (internal quotation marks omitted). The same is true of all state and private organization rules. Indeed, they are "free to impose whatever specific rules they see fit to ensure that criminal defendants are well represented," but "the Federal Constitution imposes one general requirement: that counsel make objectively reasonable choices." *Id.* (quotation omitted).[19]

---

[18] As a corollary to this claim, Rubio includes his argument that trial counsel were ineffective for failing to investigate evidence of FASD. Pet. at 52. This claim is addressed below in full. *See infra* Section II.

[19] To be sure, the Supreme Court's decisions in *Strickland*, (*Terry*) *Williams*, *Wiggins*, and *Rompilla v. Beard*, 545 U.S. 374 (2005), all refer approvingly to the ABA

Additionally, Rubio points to a portion of the state habeas hearing involving second-chair counsel Ed Stapleton discussing his selection of Carmen Fisher as the defense team's mitigation specialist. Pet. at 33; *see* 1 SHRR 166.[20] Namely, Rubio points to Stapleton's testimony that, in his opinion, Fisher was not qualified to serve as the defense team's source of mental health expertise. Pet. at 34; 1 SHRR 171. Rubio implies in his petition that it is on this point that both Rubio's trial counsel claimed they were deficient during cross-examination by the State. Pet. at 35–36. But the record reveals that Stapleton testified he felt his conduct was "inefficient" because of funding strictures. *See* 1 SHRR 187 ("I think my conduct was completely inefficient because I didn't have the resources to do what I needed to do."). What is more, Stapleton

Guidelines as a source for prevailing norms of practice. But these guidelines are not law. *Wiggins v. Smith*, 539 U.S. 510, 524 (2003). As the Court explained in *Strickland*:

> In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. Prevailing norms of practice as reflected in American Bar Association standards and the like [] are guides to determining what is reasonable, but they are only guides. No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.

*Strickland*, 466 U.S. at 488–89 (citations omitted).

[20] This hearing —and thus this line of questioning— was primarily concerned with whether or not trial counsel were ineffective for failing to investigate and discover evidence Rubio suffered from FASD. This point is discussed in greater detail below. *See infra* Section II.

testified that choosing Ms. Fisher for the defense team was a strategic decision, and that he did not "have any regrets about picking her or using her." 1 SHRR 192–93. Also, Stapleton testified that while he talked to a number of other people, that it was especially hard to get people to help on Rubio's case. *See* 1 SHRR 196 (" I got declined more than I got accepted on Mr. Rubio's case.").

But above all, Rubio's claim that trial counsel were deficient on this point is undercut by trial counsel's retention of nine medical and mental health experts, 6 CR 1369–70, 10 CR 2261–66, as well as calling dozens of witnesses, a variety of whom testified at all three phases of Rubio's trial. Indeed, these witnesses testified to topics including Rubio's impoverished and abusive childhood, his slow learning, his inability to care for himself or perform basic tasks, and his debilitating psychiatric issues. Put plainly—and as shown below, every point pressed by Rubio was either investigated by trial counsel, presented at trial, or both.

### 1. Testimony concerning trauma was presented at trial.

Rubio claims that had trial counsel included a mental health expert on the defense team, that person would "flagged the need for a trauma expert." Pet. at 39. And that a trauma expert, such as Dr. David Lisak, could have testified that Rubio witnessed domestic violence, that he was physically and sexually abused, experienced extreme poverty and neglect, and that Rubio's childhood generally lacked "the environmental ingredients for the cognitive

41

and emotional development upon which moral blame is predicated." Pet. at 39–46; Supp. App. 85. "[T]o prevail on an ineffective assistance claim based on counsel's failure to call a witness, the petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense." *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009) (citing *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 2008). Dr. Lisak's witness statement contains no statement that he would have testified if asked. Supp. App. 63–85. Accordingly, this statement fails to support a claim of IATC.

Further evidence of Rubio's various childhood traumas were presented at every complained-of phase of his trial.

### a. Competency proceedings[21]

For instance, during Rubio's competency proceedings, Dr. Brams testified for the defense about the importance of understanding an individual's development and that difficulties in an individual can start in utero and then go all the way into adulthood. 24 RR 43. She further testified that Rubio's

---

[21] The competency jury was different than the jury for guilt/innocence and punishment. To that end, what was presented in the competency trial is relevant to showing the extent of trial counsel's overall investigation. However, the evidence shown during competency is not relevant when evaluating prejudice at guilt/innocence or punishment.

childhood environment could best be characterized by the terms "chaos" and "abuse." *Id.* at 103. Dr. Brams stated that his mother had a long history of prostitution, even pimping him out as a homosexual prostitute at age fifteen. *Id.* at 103. She testified that Rubio was a vulnerable child in a chaotic environment, with no normal sense of perception concerning the world around him. *Id.* at 104–05. Additionally, Dr.Morris, a psychiatrist, 24 RR 209, testified that Rubio suffered from "quite a bit of physical abuse, sexual abuse, [and] that he was raised by a mother who was with a severe substance abuse problem." 25 RR 26–27.

Juan Barrientes, Jr., Rubio's uncle, 25 RR 132–33, testified that Rubio's mother did not celebrate birthdays or Christmases with the children. *Id.* at 146. He also testified that even though Rubio's mom was not working, Rubio received no help with homework or getting dressed for school in the mornings, and that he wore dirty clothes to school because nobody would wash them for him. *Id.* at 147. Further, he testified that Rubio's father was not around, and that his stepfather abused him when he was a little kid. *Id.* at 149, 151.

Rubio's older brother, Manuel Rubio, Jr., 25 RR 160, testified that their mother would use derogatory language towards Rubio—calling him "retarded" and saying that he "wasn't worth shit." *Id.* at 166. He also testified that he would help Rubio do his homework and get him ready for school because their

mom was passed out drunk, sleeping. *Id.* at 167. And that their mom would "drink a lot" and do "crack cocaine." *Id.*

### b. Guilt/innocence

The defense called Hilda Barrientes, Rubio's mother, during their case-in-chief. 65 RR 153. She testified that after Rubio was born, she got back with his biological father—Gilberto Lopez. *Id.* at 154. She further testified that Lopez was "violent" toward her "all the time," adding that he would beat her up. *Id.* at 157. Rubio would witness her getting beat up by Lopez and would even try to protect her from him. *Id.* at 158. Because of this, Barrientes recalled that when Rubio was fourteen or fifteen years old, Lopez wanted to hit him too. *Id.* at 159. She recalled telling Rubio to prostitute himself and indicated that the people who would want to pick him up were men. *Id.* at 177. She also testified that she would get marijuana for Rubio after he asked her. *Id.* at 180.

Dr. Morris testified again during the guilt phase. 66 RR 101. He testified that healthy attachments are formed early in life, and that Rubio had an inconsistent and uprooted childhood. *Id.* at 113. He also testified that there were reports of some inappropriate sexual contact from siblings involving Rubio. *Id.* at 113. Further, Morris testified that there was evidence— corroborated by Rubio's siblings—that Rubio's father would beat Rubio's

mother frequently in front of Rubio and suggested that Rubio may have had a post-traumatic stress disorder from witnessing these beatings. *Id.* at 114.

Georgina Castillo was in a relationship with Rubio while he was in high school. 67 RR 184. She testified that Rubio's mother treated him "real bad." *Id.* at 191 She would fight with him and call him names like "bastard" and "mongoloid." *Id.* at 191–92.

### c. Punishment

Dr. Brams was brought back to testify at punishment. 73 RR 172. Regarding Rubio's childhood traumas, she testified that a toxic parent is one whose own negative behavior impacts the child. *Id.* at 173. Relatedly, she testified that Rubio's parents would be considered toxic parents because the negativity and dysfunction they displayed in their daily lives hampered Rubio's ability to be a normal, healthy individual. *Id.* at 184.

Further, Dr. Brams testified Rubio's home during his adolescence was indicative of the poverty that he lived in, as well as reflective of the complete lack of resources he had growing up as a child. *Id.* at 180. She stressed that Rubio was helpless in this regard, because a child has no choice concerning the family he is born into. *Id.* at 183–84. Dr. Brams also testified that from infancy onward, Rubio was lacking reciprocity. *Id.* at 185. Namely, Rubio's mother was

unable and unwilling to respond to Rubio as an infant, either because she was drunk or high. *Id.*

Dr. Brams went on to testify that Rubio was born into immense domestic violence. *Id.* at 186–87. And that instead of having a "safe, secure, quiet, loving type environment, it was one that was punctuated on a daily basis with nasty words, and threats, and a very unpredictable unsafe type of ambience to his early life." *Id.* at 186–87. What is more, Dr. Brams testified about critical periods of a childhood, including infancy, which is the most critical period. *Id.* at 187. She testified that an infant needs a parent who is there on a consistent basis, and that this is how one learns to trust the world around, as well as develop problem solving. *Id.* This "cycle of trust and comfort," she testified, were absent in Rubio's infancy. *Id.* at 189. Additionally, Dr. Brams testified that Rubio was exposed to a "tremendous" degree of verbal abuse by both his father and his mother—including being called "retardo." *Id.* at 195. Rubio's brothers told her that Rubio received the "brunt of everything." *Id.* at 195–96.

Dr. Brams also testified that Rubio's father, a violent alcoholic, left Rubio and his mother in poverty. *Id.* at 200. Rubio's mother would bring men home who would pay her to have sex. *Id.* Dr. Brams testified that on a certain occasion, Rubio tried to stop one of these men from attacking his mother, but that he was not successful. *Id.* She testified that being surrounded by so much violence and so many strangers proved to be a "very traumatic time" for Rubio.

*Id.* at 200–01. Further, Dr. Brams testified that Rubio was put into prostitution at the age of twelve, *Id.* at 201–02, and that this would have been a very "developmentally damaging" issue for him. *Id.* at 203.

Even putting aside that Rubio's proffered affidavit on this point is barred, Supp. App. 63–85, it offers nothing but cumulative testimony since significant testimony concerning Rubio's childhood trauma was presented at trial. Thus, Rubio's claim fails. *See Belmontes*, 558 U.S. at 22 (holding that adding cumulative evidence to "what was already there would have made little difference"); *Coble v. Quarterman*, 496 F.3d 430, 436–37 (5th Cir. 2007) (counsel not ineffective for failing to present witnesses that "would have presented testimony already provided by other witnesses").

## 2. Trial counsel investigated impaired neurocognitive functioning.

Next, Rubio claims that a retained mental health expert would have told trial counsel to retain a neuropsychologist. Pet. at 46. Rubio provides an affidavit from Dr. Robert Ouaou, Supp. App. 87–94,[22] whom he claims could have "administered a complete neuropsychological battery to determine whether Rubio has brain damage." Pet. at 46. Rubio asserts that testing reveals acquired brain damage related to "trauma, anoxic brain injury related

---

[22] Dr. Ouaou's witness statement contains no statement that he would have testified if asked. Supp. App. 87–94. Accordingly, this statement fails to support a claim of IATC. *Day*, 566 F.3d at 538.

to inhalant abuse, possible PTSD related to childhood abuse and neglect," as well as possible fetal alcohol effects. Supp. App. 93. This affidavit is barred by § 2254(e)(2). *See supra* Section I. Nevertheless, Rubio has not shown that trial counsel were deficient in this regard.

Rubio's trial counsel received a report from neurologist Dr. Jim Owens before trial in which he stated that the MRI and EEG he reviewed for Rubio were each "within the normal range of variation." 4 CR 1031. The MRI revealed no evidence of "trauma" 4 CR 1031–32. Further, Dr. Owens's report revealed "no evidence of organic neurological disease." 4 CR 1032, 1033.

Additionally, trial counsel retained neuropsychologist Gilbert Martinez and had him administer a comprehensive battery of psychological testing on Rubio. 5 CR 1230; 6 CR 1370; 28 RR 103–104; Supp. App. 134. Rubio's WAIS-IV scores rendered from Dr. Martinez's testing differ in no discernible way from the WAIS-IV scores provided in Dr. Ouaou's report. *Compare* Supp. App. 134 and 28 RR 123, 126, 148 , *with* Supp. App. 93. Still, trial counsel were able to elicit testimony at trial that even if there is no MRI finding, brain damage can be present. 66 RR 65–66.

Further, it is clear from the record that from the outset, trial counsel were setting the stage for Rubio's insanity defense. Indeed, trial counsel sought to present the defensive theory that Rubio's troubled and traumatic childhood and early life forced him to retreat into his own head and that his subsequent

dissociation from reality was a defense mechanism to the  trauma, with stressors in his life eventually culminating in a psychotic break causing him to murder his three children. *See generally* Statement of Facts. The trial attorney's selection of witnesses that would testify to support this theory is the kind of  "paradigmatic example" of strategic choice that the case law counsels against second-guessing. *See Hinton v. Alabama*, 571 U.S. 263, 275 (2014) ("The selection of an expert witness is a paradigmatic example of the type of 'strategic choic[e]' that, when made 'after thorough investigation of the law and facts' is 'virtually unchallengeable.'") (citation omitted)); *see also Turner v. Epps*, 412 F. App'x 696, 704 (5th Cir. 2011). This is especially true considering that the one common diagnosis among defense experts who evaluated Rubio was some form of psychotic disorder. *See* 3 CR 667–69 (Dr. Brams :"delusional disorder with psychotic features"), 652, 659 (Dr. Morris: "schizophrenia, paranoid type"); SHCR at 135, 147 (Dr. John Fabian:"schizophrenia, paranoid type"), 170 (Dr. John Pinkerman and Dr. Vittorio Puente:"the results support the presence of a mood disorder with psychotic features during childhood").

To the extent Rubio now argues that trial counsel should have investigated more to find an expert who would testify specifically to Rubio having a "neurocognitive impairment," stemming from something other than a psychotic disorder, "the duty to investigate does not force defense lawyers to

scour the globe on the off chance something will turn up." *Rompilla*, 545 U.S. at 383; *see also Segundo v. Davis*, 831 F.3d 345, 352 (5th Cir. 2016) (counsel "should be permitted to rely upon the objectively reasonable evaluations and opinions of expert witnesses"); *Dowthitt v. Johnson*, 230 F.3d 733, 748 (5th Cir. 2000) (counsel is not required to "canvass[] the field to find a more favorable defense expert").

To that end, trial counsel walked a nuanced line of introducing testimony that Rubio suffered from learning impairments, and had the inability to perform simple day-to-day tasks as a functioning adult, without opening the door to potentially harmful future dangerousness evidence or cutting against their theory that Rubio was insane at the time of the murders because he was suffering from schizophrenia or some other psychotic episode. *See* 25 RR 31 (competency trial) (Dr. Morris: "Well, certainly, you have a lot of deficits that got in the way of his being more productive; to start with, his schizophrenia, but also how the *schizophrenia affected his. . . executive functioning*.") (emphasis added).

During competency proceedings, Georgina Castillo testified that while she and Rubio were in a relationship, she refused to let Rubio cook because she was afraid he would burn himself. 25 RR 288; 67 RR 193–94. She also testified that Rubio had no driver's license, bank account, or credit cards. 25 RR 289–90. And during guilt/innocence, the defense elicited testimony that Rubio was

in special education classes starting in the third grade. 65 RR 159; 67 RR 41. Rubio also had several jobs but failed to last long at any of them. 65 RR 184–85. At punishment, the defense presented testimony that Rubio has "profound" learning disabilities, that at age twelve he was reading at a third-grade level, and that at age eighteen he was reading at a fourth-grade level. 73 RR 174; *see also id.* at 128.

In other words, not only does Rubio disregard the defense's entire theory, but he also ignores the significantly damaging portions of Dr. Ouaou's report— information that would have bolstered the State's future dangerousness case instead of rebutting it. This information impacts the assessment of both deficient performance and prejudice. *See Strickland,* 466 U.S. at 699 (counsel made reasonable to strategic choice in "[r]estricting testimony on respondent's character to what had come in at the plea colloquy ensured that contrary character and psychological evidence . . . not come in"); *Belmontes,* 558 U.S. at 20 (in considering prejudice a court must "consider all the relevant evidence that the jury would have had before it if [the inmate] had pursued a different path—not just the . . . evidence [the inmate] could have presented, but also the . . . evidence that almost certainly would have come in with it.").

For instance, even if trial counsel uncovered evidence suggesting that Rubio possibly suffered from brain damage and secured results similar to those reached by Dr. Ouaou, Rubio has not necessarily shown that a reasonable

attorney would have presented that information to the jury. Indeed, Dr. Ouaou relays that "youth who experience chronic stress secrete high levels of glucocorticoid cortisol that can cause damage, *sometimes permanent*, to the development of the central nervous system." Supp. App. 93 (emphasis added). Rubio's likely CNS damage is to his frontal lobes and limbic system. Supp. App. 93; *see also* Supp. App. 104–105 (Dr. Agharkar describing Dr. Ouaou's findings as reflecting damage to Rubio's "frontal lobes" which, among other things, are responsible for "effective weighing and deliberating, impulse inhibition, organized sequencing of thoughts and behaviors. . . and mood regulation." With that in mind, testimony about a brain injury may be a "'double-edged' sword," *Martinez v. Dretke*, 404 F.3d 878, 889 (5th Cir. 2005), because jurors could fear that the defendant will never be able to control his violent behavior. "Presenting evidence of 'organic (i.e., permanent) brain damage,' which is associated with poor impulse control and a violent propensity, would have substantiated the [S]tate's evidence and increased the likelihood of a future dangerousness finding." *Martinez*, 404 F.3d at 890; *cf. Foster v. Schomig*, 223 F.3d 626, 637 (7th Cir. 2000) (quotation omitted) (noting sentencers "may not be impressed with the idea that to know the cause of viciousness is to excuse it; they may conclude instead that when violent behavior appears to be outside the defendant's power of control, capital punishment is appropriate to

incapacitate."). In the end, Rubio has not shown that trial counsel were ineffective on this point.

### 3. Psychiatric issues

Next, Rubio contends that if the defense team had included a mental health expert on the team, they would have helped deliver evidence of Rubio's psychiatric issues to the jury. Pet. at 49. Rubio claims that had a psychiatrist, such as Dr. Agharkar,[23] evaluated Rubio, the jury would have learned that Rubio "suffers from serious psychiatric issues, including schizoaffective disorder." Pet. at 49; Supp. App. 104. But beyond being barred, § 2254(e)(2), Rubio's proffered affidavit adds nothing to Rubio's case. Instead, it ignores the substantial amount of psychiatric evidence presented in all three phases of Rubio's proceedings. Indeed, as discussed previously, *supra* Section II(C)(2), eliciting evidence of Rubio's psychiatric issues was an integral part of trial counsel's strategy, especially given that Rubio pleaded not guilty by reason of insanity. Put plainly, as shown below, presenting Rubio's psychiatric issues were a prevalent part of trial counsel's strategy in Rubio's case, permeating all phases of trial.

---

[23] Dr.Agharkar's witness statement contains no statement that he would have testified if asked. Supp. App. 99–105. Accordingly, this statement fails to support a claim of IATC. *Day,* 566 F.3d at 538.

### a. Competency proceedings

During the competency proceedings, Dr. Brams testified Rubio's delusions, among other things, served as a barrier to competence. 24 RR 129. She described Rubio as having a delusional disorder, and that this is characterized by an individual having long-standing, pervasive beliefs that inhibit his ability to adequately perceive the world around them. *Id.* at 60–61. Dr. Morris took it a step further than Dr. Brams and testified that Rubio suffered from schizophrenia, paranoid type, that is manifested by both paranoid and grandiose delusions and hallucinations. 25 RR 31–32. Additionally, several of Rubio's relatives, testified that Rubio would report seeing things when he was a young boy. *Id.* at 135, 138, 168, 172, 174. Rubio would say their grandmother would talk to him in dreams telling him he was the "chosen one." *Id.* at 200, 284.

### b. Guilt/innocence

Rubio's mother testified that because Rubio qualified for Social Security benefits, he could go see doctors whenever he needed. 65 RR 160. She recalled taking him to see one of these doctors and that Rubio reported that he would hear voices and see shadows that were not there. *Id.* at 165. She testified that Rubio told her several times that he "heard voices" and that God was telling him that he was the "chosen one." *Id.* at 172.

Dr. Valverde—who served as the court-appointed psychiatrist during the competency proceedings—testified that Rubio exhibited symptoms consisted with "paranoid schizophrenia." 66 RR 30, 37.

Further, Dr. Morris testified that he had diagnosed Rubio has having schizophrenia, paranoid type. *Id.* at 128. Close to the time of the murders, Rubio was starting to deteriorate in his overall functioning due to various stressors in his life. *Id.* at 131–34. He described Rubio's "primary symptoms" as being delusions, or "fixed false beliefs," along with intermittently seeing and hearing things. *Id.* at 130. Dr. Morris also testified that during the commission of the crimes, Rubio was suffering from this psychotic disorder, and that—in his opinion—the brutality of the murders reflected Rubio having a state of active delusions that caused him "intense fear and terror" resulting in the "incredible over-kill" reflected at the crime scene. *Id.* at 139.

Rubio's younger brother, Rodrigo Barrientes, testified that Rubio was afraid of witchcraft and that he would hear voices. 67 RR 98. Georgina Castillo testified that when she and Rubio were living together, he would have nightmares about his grandmother and hear her calling him. *Id.* at 186.

### c. Punishment

At punishment, Dr. Brams described psychosis as a "pervasive severe mental disorder in which someone loses contact with reality." 73 RR 177. Delusions are a key characteristic of Rubio's case. *Id.* at 178. She testified that

Rubio's history indicated evidence of a psychotic disorder when he was only four years old. *Id.* at 189–90. But neither his mother nor his brothers got him help for it. Rather they would just "tell him he was hallucinating." *Id.* at 189–90. Dr. Brams testified how Rubio's mother helped sow the seeds of psychosis in him from an early age. Namely, she testified how Rubio's mother would reject him, but also manipulate him by convincing him that witchcraft and demons were real, and that these kinds of spirits might really exist. *Id.* at 193. Rather than helping and supporting Rubio during this turbulent time, his mother encouraged him to "believe that those apparitions, those delusions, had some substance." *Id.* Dr. Brams described this as the "beginning of the developmental psychotic disorder later on in life." *Id.* Dr. Brams explained the psychiatric significance of Rubio's perception that he was the "chosen one." Specifically, she noted how Rubio receded into his own head to feel comfortable and powerful—and to gain some semblance of control over his world. *Id.* at 205. She referred to Dr. Morris's testimony during the guilt phase in which he testified about Rubio's general "prodromal period"—or decline—leading up to the murders. *Id.* at 210–11. On this point, Dr. Brams testified that it was "very clear" that Rubio was under a period of stress and worsening psychiatric functioning leading up to "the event." *Id.* at 210–11. And that, insanity aside, Rubio "without a doubt" was mentally ill at the time of the offense. *Id.* at 210.

To be sure some of the information contained in Rubio's attached affidavits may provide greater detail in some respects than the evidence present from the trial record. Still, as shown above, and contrary to Rubio's assertions, the evidence presented at trial travels much the same pathways and reaches the same end—giving context to the circumstances leading to Rubio's brutal beheading of his three children. And Rubio's contention that there was other evidence that could have been presented—or that counsel should have focused more on Rubio's trauma, neurocognitive impairment, and psychiatric issues—fails to establish deficient performance. *See Coble*, 496 F.3d at 436–37 (holding that a "desire to have a specific defense theory presented does not amount to ineffective assistance on federal habeas review"); *Dowthitt*, 230 F.3d at 743 ("We must be particularly wary of argument[s] [that] essentially come[ ] down to a matter of degrees."). Moreover, because most—if not all—of the evidence Rubio provides now was presented at his trial his claim on this point fails. *See Belmontes*, 558 U.S. at 22; *Coble*, 496 F.3d at 436–37.

Above all—and as evidenced throughout his petition—Rubio's assertions of deficiency on the part of trial counsel ring hollow when faced with the fact that his case differs fundamentally from those in which the Supreme Court has found deficient performance. *See Porter v. McCollum*, 558 U.S. 30, 39 (2009) (with a month to prepare before sentencing the attorney "had only one short meeting with [the defendant] regarding the penalty phase. He did not obtain

any of [his] school, medical, or military service records or interview any members of [his] family."); *Rompilla*, 545 U.S. at 389 (finding deficient performance when defense lawyers failed to "to look at a file he kn[ew] the prosecution w[ould] cull for aggravating evidence ... when the file [was] sitting in the trial courthouse, open for the asking"); *Wiggins*, 539 U.S. at 516–19 (trial counsel wholly failed to prepare a social history and ignored serious issues that required further investigation); *Williams*, 529 U.S. at 395 ("[T]rial counsel did not begin to prepare for [the punishment] phase of the proceeding until a week before the trial[,] ... failed to conduct an investigation that would have uncovered extensive records graphically describing [the defendant's] nightmarish childhood, *not because of any strategic calculation* . . . [ failed to] introduce available evidence that [he] was 'borderline mentally retarded" and otherwise ignored readily available evidence) (emphasis added); *see also* SHRR 193 (Rubio's trial counsel testifying that "[e]verything [he] did, [he] thought it was the right decision at the time, even if it was wrong").

As a result, Rubio fails to prove deficiency on the part of trial counsel for failing to investigate trauma, neurocognitive impairments, and psychiatric issues. And as discussed below, even if trial counsel were deficient on this point, Rubio is unable to prove prejudice.

**D. Even assuming trial counsel were deficient on this point, Rubio is unable to prove prejudice given the overwhelming evidence of his guilt, along with all the aggravating evidence before the jury.**

Beyond being cumulative of testimony already presented at his trial, Rubio is unable to prove prejudice stemming from these alleged deficiencies during guilt/innocence given the overwhelming evidence of his guilt.[24] *See, e.g.*, *Henderson v. Cockrell*, 333 F.3d 592, 603 (5th Cir. 2003); *Riddle v. Cockrell*, 288 F.3d 713, 718–19 (5th Cir. 2002); Statement of Facts. Indeed, it was never disputed during trial that Rubio committed the murders, and he gave two statements indicating such. SX 258, SX 262A.

Likewise, because of all the aggravating evidence before the jury, Rubio is unable to prove prejudice related to the alleged deficiencies of trial counsel at the punishment phase. *See Riley v. Cockrell*, 339 F.3d 308, 315 (5th Cir. 2003) ("If the petitioner brings a claim of ineffective assistance with regard to the sentencing phase, he has the difficult burden of showing a reasonable probability that the jury would not have imposed the death sentence in the absence of errors by counsel." (internal quotation marks omitted)). Here, the

---

[24] Similarly—to the extent he complains of such—Rubio fails to show prejudice stemming from the alleged deficiencies of trial counsel during competency. *Cf. Felde v. Butler*, 817 F.2d 281, 282 (5th Cir.1987) (noting that a petitioner would satisfy *Strickland's* prejudice prong "only if he demonstrates that there is a reasonable probability that but for[his counsel's] failure to seek a competency hearing, he would have been found incompetent to stand trial" (internal quotation omitted)).

jury heard how Rubio brutally beheaded his three children and how they likely suffered. They also heard that Rubio ripped the head of off his two-month-old daughter and that his three-year-old daughter pleaded for her life. Additionally, the jury heard of Rubio's general lack of remorse for the crime, his prior criminal record and criminal conduct, as well as his disruptive behavior during his first stay on death row—where despite the security strictures, he possessed drugs, set multiple fires, and took over the slot of his cell door. *See generally* Facts Relating to Punishment (A)(1)–(6); Statement of. Facts; 10 CR 2360 (jury charge indicating that in determining answers to the Special Issues the jury "shall consider evidence submitted to you in this whole trial," including the guilt/innocence phase).[25]

All in all, there is no reasonable probability that, but for counsel's alleged unprofessional errors, the result of Rubio's proceeding would have been different. *Strickland*, 466 U.S. at 694. And even if Rubio's defaulted claim and

---

[25] Rubio argues that prejudice should be evaluated cumulatively. Pet. at 38. However, a federal habeas court may only grant relief on a cumulative error claim when the petitioner identifies individual errors of a constitutional magnitude, establishes the alleged errors are not procedurally defaulted, and shows the errors resulted in a due process violation. *Murphy v. Davis*, 901 F.3d 578, 599 (5th Cir. 2018); *Coble v. Quarterman*, 496 F.3d 430, 440 (5th Cir. 2007); *Moore v. Quarterman*, 526 F. Supp. 2d 654, 710 (W.D. Tex. 2007). As discussed above, all of Rubio's purported errors are meritless, procedurally defaulted, or both. Consequently, there are no errors to cumulate. Finally, while this Circuit has announced a rule espousing a cumulative-error analysis, the court of appeals has previously acknowledged that the Supreme Court has not recognized such a claim. *Derden v. McNeel*, 978 F.2d 1453, 1456 (5th Cir. 1992).

new evidence are reviewed de novo, Rubio is not entitled to relief under the deferential *Strickland* standard. Thus, this Court should deny relief on the merits in addition to finding this claim procedurally defaulted.

III. **The CCA Reasonably Rejected Rubio's Claim That Trial Counsel Were Ineffective for Failing to Investigate FASD, and His New Evidence in Support Is Barred by *Pinholster*. (Claim 2)**

Rubio complains that his trial counsel were ineffective for failing to investigate "red flags" for FASD and that Rubio was prejudiced as a result. Pet. at 56. But this is the same claim Rubio brought in his state application. *See* SHCR at 18–46. And he has failed to show that the CCA's presumptively valid disposition of this claim was unreasonable. Not only is Rubio unable to show that a further investigation into FASD was reasonably available at the time of trial, he overlooks the record evidence that trial counsel investigated FASD, but were dissuaded by their experts from pursuing it any further. Moreover, the new evidence Rubio adds in support of this adjudicated claim is foreclosed from this federal forum by *Pinholster*. And even considering Rubio's new evidence, he fails to meet the strictures of *Strickland* since the double-edged nature of the evidence he proffers pales in comparison to the aggravating evidence in his case.

"Mitigating evidence that illustrates a defendant's character or personal history embodies a constitutionally important role in the process of

individualized sentencing, and in the ultimate determination of whether the death penalty is an appropriate punishment." *Riley*, 339 F.3d at 316 (citation omitted). But "*Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing." *Wiggins*, 539 U.S. at 533. "[R]easonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla*, 545 U.S. 374. To establish prejudice Rubio must that "there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695.

## A. The newly-presented affidavits are barred by *Pinholster*.

As an initial matter, Rubio attaches several affidavits in support of this claim that were not presented to the state court. *See* SHCR at 18–46; Pet. at 38 (Report of Dr. Connor) (Supp. App. 39), (Report of Dr. Lyons) (Supp. App. 60), (Declaration of Dr. Natalie Brown) (Supp. App. 110–188). Additionally, several of Rubio's attached affidavits opine on the effects of, or otherwise mention, FASD. *See* Supp. App. 99 (Dr. Agharkar), 063 (Dr. Lisak), 104 (Dr. Ouaou). And he cites to several of them in his prejudice argument. Pet. at 64–71. To the extent Rubio is attempting to use these affidavits in support of this

adjudicated claim, they are barred from consideration in this forum. *See Pinholster*, 563 U.S. at 182; *supra* Section I.

**B.    The CCA reasonably rejected this claim.**

Rubio raised this claim on state habeas, and it resulted in an evidentiary hearing where habeas counsel elicited testimony from several attorneys experienced in capital litigation and mitigation, as well as from one of Rubio's trial counsel, Ed Stapleton. *See generally* SHRR. Additionally, state habeas counsel obtained affidavits from three experts in support of a motion filed for funds to "complete" an investigation into FASD. SHCR at 628. These affidavits were stipulated to as evidence and taken into consideration by the trial court in determining the merits of Rubio's claim. SHCR (Stipulation); 2nd Supp. SHCR at 3 (findings of fact ¶¶ 12–14).

Rubio's prime contention on state habeas mirrors his current complaint—that despite the record being replete with evidence indicating the possibility—Rubio suffered from FASD, trial counsel failed to investigate accordingly. *See* SHCR at 18–46; Pet. at 56–89. Ultimately the trial court concluded that Rubio's trial counsel were not constitutionally ineffective on this point and that Rubio had not shown deficiency or prejudice. 2nd Supp. SHCR at 10–12 (conclusions of law ¶¶ 1–13). The CCA agreed. *Ex parte Rubio*, 2018 WL 2329302, at *3.

In coming to this conclusion, the trial court reasoned that trial counsel investigated to determine if there was a causal connection between Rubio's mother's abuse of alcohol during her pregnancy and Rubio's subsequent bizarre behavior. 2nd Supp. SHCR at 4 (¶¶ 16–17). Beyond that, the trial court noted that there was insufficient evidence to find that a full-scale FASD-based defense would have even been reasonably available to trial counsel. SHCR at 5 (¶23). Finally, in addition to the double-edged nature of such evidence, the trial court recognized that multiple medical experts retained by trial counsel relayed information indicating that Rubio did not suffer from FASD, at which point trial counsel made a strategic decision not to investigate the matter further. SHCR at 5–6 (¶¶ 16–31). Rubio fails to show this decision was unreasonable.

Because these IATC claims raised by the Rubio were adjudicated on the merits by the state court, they must be reviewed under the "doubly deferential" standards of both *Strickland* and Section 2254(d). *Woods v. Etherton*, 136 S. Ct. 1149, 1151 (2016) (citing *Pinholster*, 563 U.S. at 190); *Knowles*, 556 U.S. at 123 (same). Such claims are considered mixed questions of law and fact and are analyzed under the "unreasonable application" standard of 28 U.S.C. § 2254(d)(1). *Gregory v. Thaler*, 601 F.3d 347, 351 (5th Cir. 2010). In reviewing these claims, the "pivotal question" is not "whether defense counsel's performance fell below *Strickland*'s standards, but whether "the state court's

application of the *Strickland* standard was unreasonable." *Richter*, 562 U.S at 101. In other words, the question to be asked in this case is not whether counsel's actions were reasonable, but whether "there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id.* at 105.

Rubio contends that § 2254(d) "does not bar relitigation because the state post-conviction proceedings violated due process." Pet. at 73. Namely, Rubio claims he was denied a meaningful opportunity to be heard in the state postconviction proceedings when the state court "refused to respond to timely requests for expert funding necessary to develop evidence of FASD in this case." Pet. at 75. But a "full and fair hearing in state court is not a prerequisite to applying AEDPA's deferential scheme." *Wiley v. Epps*, 625 F.3d 199, 207 (5th Cir. 2010), as revised (Nov. 17, 2010); *see also Valdez*, 274 F.3d at 946. Even still, Rubio has not shown a due process violation.

During state postconviction proceedings, Rubio's state habeas counsel filed a motion requesting funding to retain experts to investigate the possibility that Rubio has FAS or a FASD. SHCR at 628–32. The trial court granted up to $13,000 in funding for this purpose. SHCR at 495–96. Rubio's state habeas counsel asked the CCA three times for more time to file the state application, partly to obtain an additional $37,000 from the trial court to further investigate FASD. SHCR at 911–12. The CCA granted the first two motions, but denied the third, giving him thirty days to file an application. *See Ex parte*

*Rubio*, No. WR-65,784-02 (Tex. Crim. App. Sep. 26, 2012); *Ex parte Rubio*, No. WR-65,784-02 (Tex. Crim. App. Apr. 17, 2013); *Ex parte Rubio*, No. WR-65,784-02 (Tex. Crim. App. Sep. 11, 2013) (all not designated for publication). What is more, Rubio raised this claim in his state application, arguing that the trial court failed to timely and completely fund his habeas investigation into FASD. But the CCA denied it. *See Ex parte Rubio*, 2018 WL 2329302, at *4 ("Even assuming [Rubio] could show that he has a constitutional right to expert witness funding on habeas, he has not adequately supported his claim that the failure to authorize additional funds presented a due process violation."). And Rubio points to no clearly established Supreme Court precedent to the contrary. *Cf. Panetti v. Quarterman*, 551 U.S. 930, 976 (2007) (Thomas, J., Scalia, J., and Alito, J., dissenting) ("This Court has never recognized a constitutional right to state funding for counsel in state habeas proceedings—much less for experts. . . .").

Likewise, Rubio's claim that he can escape AEDPA deference of the state court's adjudication of the prejudice prong of *Strickland* is unavailing. Rubio posits that the CCA used the wrong standard for evaluating prejudice because it omitted *Strickland*'s "reasonable probability" language when addressing the claim. *See* Pet. at 80; *Ex parte Rubio*, 2018 WL 2329302, at *4 ("[R]ubio has not demonstrated that the result of his trial would have been different but for counsel's decision not to further investigate FAS/FASD. . . . "). But this,

standing alone, is not enough to show the state court's decision was unreasonable.

Indeed, the Seventh Circuit's decision *in Sussman v. Jenkins* frames a similar fact pattern. 636 F.3d 329 (7th Cir. 2011). In *Sussman*, a state court omitted the "reasonable probability" language from its *Strickland* prejudice determination. *Id.* at 359. In concluding that the state court's decision was nevertheless entitled to deference under AEDPA, the Seventh Circuit reasoned that (1) the state-court decision correctly cited another case that incorporated the correct ineffective assistance standard under *Strickland* and (2) it was "clear from the [state] court's analysis that it did not believe that the [undiscovered evidence] had a reasonable probability of altering the jury's verdict." *Id.* at 359–60. [26]

Here, similar to *Sussman*, the state habeas court cited Supreme Court case law applying the correct *Strickland* prejudice standard, namely, *Strickland* itself.[27] *See Ex parte Rubio*, 2018 WL 2329302, at *4 (citing

---

[26] The Supreme Court has dealt with similar fact patterns. In *Woodford v. Visciotti*, for example, the Supreme Court concluded that a state court's use of the term "probable" in describing the petitioner's burden under *Strickland*, as opposed to the correct standard of a "reasonable probability," did not render the decision contrary to federal law where the state previously recited the correct *Strickland* standard. 537 U.S. 19, 23–24 (2002); *see also Holland*, 542 U.S. at 654–55 (citing *Woodford*).

[27] Although the facts of *Sussman* are most comparable to this case, other circuits have addressed similar situations. *See, e.g.*; *Bledsoe v. Bruce*, 569 F.3d 1223, 1232–33 (10th Cir. 2009) (stating that "despite its 'may is not good enough' language, the Kansas Supreme Court applied the correct [*Strickland* ] standard"); *Parker v. Sec'y for Dep't*

*Strickland*, 466 U.S. at 694). "This indicates that the state habeas court omitted the 'reasonable probability' modifier not due to its incorrect understanding of the prejudice standard, but as a shorthand method to refer to the correct standard." *Charles v. Stephens*, 736 F.3d 380, 393 (5th Cir. 2013); *see also Woodford*, 537 U.S. at 24 ("[R]eadiness to attribute error is inconsistent with the presumption that state courts know and follow the law.").[28] As such, Rubio fails to show the state court's prejudice analysis was legally unreasonable because of this omission.

### 1. Trial counsel were not deficient

At the outset, trial counsel were aware that Rubio's mother drank while she was pregnant with him. John Fabian, Psy.D, was retained by trial counsel

---

*of Corr.*, 331 F.3d 764, 786 (11th Cir. 2003) ("Despite the imprecise language used by the Florida Supreme Court, we conclude the court understood and applied the correct prejudice standard from *Strickland*. This deferential approach is consistent with our view that if a state court denies a prisoner's claim without any reasoning at all, it is still entitled to AEDPA deference."). *But see Gray v. Branker*, 529 F.3d 220, 234–35 (4th Cir. 2008) ("The MAR court required certainty that the jury would have reached a different result at sentencing. This standard is more onerous than either the preponderance of the evidence standard rejected as too demanding by the Supreme Court in Strickland or the one actually adopted there."); *Martin v. Grosshans*, 424 F.3d 588, 592 (7th Cir. 2005) (holding that a state court's use of "but for defense counsel's unprofessional errors, the result of the proceeding would have been different" was contrary to federal law). While certain circuits have come to different conclusions, *Charles,* 736 F.3d at 393, and *Woodford*, 537 U.S. at 23–24, are controlling in the present case.

[28] Additionally, the trial court rendered the correct formulation of the law in its findings and conclusions, which were adopted by the CCA. *See* 2nd Supp. SHCR at 12 (¶12); *Ex parte Rubio*, 2018 WL 2329302, at *4.

to conduct a forensic psychological evaluation on Rubio for purposes of gathering mitigation evidence. SHCR at 130. In his report, Fabian details Barrientes's abuse of alcohol during her pregnancy with Rubio. SHCR at 135.[29] Armed with this knowledge, and knowing that Rubio had a history of reported auditory and visual hallucinations, trial counsel undertook a thorough and detailed investigation into the cause of Rubio's bizarre behavior by retaining numerous medical and mental health professionals. All of these experts provided several diagnoses that would explain the root cause of Rubio's behavior, with the common theme among these being that Rubio suffered from some sort of psychotic ailment. None of these experts—whether court appointed or retained by trial counsel—opined that Rubio's bizarre behavior was caused by FASD. *See* 2 CR 535 (Dr. Troy Martinez (court appointed));3 CR 667–69 (Dr. Jolie Brams), 652, 659 (Dr. Raphael Morris); 4 CR 1028 (Dr. Jim Owens); SHCR at 135, 147 (Dr. John Fabian) 170 (Dr. John Pinkerman and Dr. Vittorio Puente).

---

[29] Indeed, trial counsel would go on to elicit testimony to this effect at various points in Rubio's trial, including from Barrientes herself. 65 RR 155–56. And at punishment, trial counsel further emphasized this point by asking Dr. Brams to explain from a developmental-psychology perspective whether Rubio was at risk for behavioral impairment before birth. 73 RR 173. Trial counsel reinforced this clear point, by eliciting testimony at punishment from Dr. Brams about what she called "substance abuse genetics" or "genetic loading" for substance abuse. 73 RR 193.

In fact, evidence showed that two of Rubio's retained doctors dissuaded trial counsel from pursuing FASD further. Prior to Rubio's second trial, trial counsel had him examined by medical doctor Jim Owens, who found no evidence of facial dysmorphia, a classic indicator of FAS or FASD. *See* 4 CR 1030; SHRR at 145–46 (facial dysmorphia is indicator of FASD). Additionally, the MRI and EEG Dr. Owens conducted on Rubio reflected no evidence of "organic neurological disease." 4 CR 1033. Rubio's trial counsel, Ed Stapleton, testified at the state habeas hearing that this report by Dr. Owens is what turned his focus away from FASD. *See* SHRR at 168 ("And then when I got Dr. Owens' report on Fetal Alcohol Syndrome or lack of Fetal Alcohol Syndrome, then I didn't–I didn't focus on it."); *see also Murphy v. Davis*, 737 Fed. App'x. 693, 708 (5th Cir. 2018) (unpublished), *cert. denied*, 139 S. Ct. 568 (2018) ("[I]t is too much to insist that counsel second-guess her experts' conclusions.").

Further, during Rubio's competency proceedings, Dr. Morris testified about the consequences of Rubio's mother drinking while pregnant with him, and that FAS was a possible risk of such behavior. 24 RR 228. Still, he testified that he had not diagnosed Rubio with FAS. 25 RR 71. Trial counsel further testified at the hearing the he had Dr. Morris look over Dr. Owens's report and that Dr. Morris did not notify trial counsel that there was any problem with it. SHRR at 170.

As explained above, trial counsel retained and consulted nine medical and mental health experts. None of them suggested raising FASD as part of the defense. Two of them all but ruled it out. Trial counsel were not required to consult with more experts to obtain a FASD diagnosis. *See Segundo*, 831 F.3d at 352; *see also Turner*, 412 F. App'x at 704; *cf. Hinton*, 134 S. Ct. at 1089.[30]

Moreover, the Supreme Court has stressed that the "investigation into mitigating evidence should comprise efforts to discover all *reasonably available* mitigating evidence." *Wiggins*, 539 U.S. at 524 (emphasis added). Rubio's contention that a full-scale FASD investigation was reasonably available to trial counsel flies in the face of the record. Pet. at 57–64. Indeed, Rubio's state

---

[30] Clearly, and unlike in *Williams v. Stirling*, 914 F.3d 302, 314 (4th Cir. 2019), as amended (Feb. 5, 2019), *cert. denied*, 140 S. Ct. 105 (2019), cited by Rubio, Pet. at 64, this is not a case in which trial counsel "did not even consider" whether the defendant had FAS. *Williams*, 914 F.3d at 314. And contrary to Rubio's assertion, Pet. at 71–72, trial counsel's investigation into FASD would not have produced results substantively different from their investigation into other mental illnesses and behavioral issues— as evidence of Rubio's traumatic childhood, physical and sexual abuse, impaired functioning, and deteriorating psychological state in the presence of extreme stressors, established both a cause and effect for his criminal act. *See Williams,* 914 F.3d at 315 (finding trial counsel deficient for not investigating FAS, in part because the new evidence would have established cause and effect for petitioner's criminal conduct, rather than just establishing the effect it had on his behavior). *Williams* is further distinguishable due to the significant aggravating evidence against Rubio. *See Floyd v. Filson*, 949 F.3d 1128, 1140–41 (9th Cir. 2020) ("In short, the petitioner in *Williams* was prejudiced because his lawyers presented a much weaker-than-available mitigation argument that was insufficient to overcome an also weak aggravating argument that clearly troubled some jurors. That was not the situation here.").

habeas counsel—David Schulman—learned this firsthand. More than two years after Rubio's second trial, in a letter sent to the habeas judge regarding funding for an FASD evaluation, Schulman notes:

> As I mentioned to you, I inquired as to possibilities from psychologists in Texas and habeas lawyers across the country, *but I located non*e, within or without Texas, other than Dr. Brown and her team previously presented to the Court, who will undertake this type of evaluation. *I simply could not find anyone else.*

> Subsequent to our last conversation, I undertook additional inquiries, this time contacting several Texas physicians known for conducting FASD evaluations. I asked whether the evaluation of Mr. Rubio was something within their expertise and practice. Alternatively, I requested referrals to experts who might be able to conduct the evaluation *There was nobody who indicated they could undertake an evaluation of MR. Rubio, and nobody who provided a referral to a qualified expert.*

> Additionally, among other groups, I made contact with the Department of Health and Human Services of the State of Texas. The reality is that, *even the State group was unable to recommend someone we could use.*

SHCR at 824–25 (emphasis added). And when questioned at the hearing, habeas counsel's mitigation investigator was unable to point to a specific expert—outside of those already retained for trial—that she would have referred to trial counsel to conduct an FASD investigation. SHRR. 155–56.[31]

---

[31] Specifically, the state habeas mitigation investigator testified that she would have "started" with Dr. Fabian. SHRR at 156. Further—and importantly—while Rubio posits that the DSM-IV was used by professionals prior to 2013 to diagnose the mental defect in FASD as "Cognitive Disorder Not Otherwise Specified," Pet at 59, n.32 (citing Dr. Brown's report) (Supp. App. 179), Dr. John Fabian *ruled out* "Cognitive Disorder Not Otherwise Specified" as a diagnosis of Rubio. SHCR at 47

### 2. Any alleged deficiency was not prejudicial, even when considering Rubio's newly-presented *Pinholster*-barred evidence.

During state habeas proceedings, Rubio attached affidavits from Dr. Natalie Brown, Dr. Richard Adler, and Dr. Paul Connor to his application, in support of his claim that trial counsel were ineffective for failing to investigate FASD. SHCR at 38–43. Dr. Brown provided two different affidavits to the trial court, stating in one that Rubio's had a history typical of someone with FAS or FASD. SHCR at 520–26, 528–31. Dr. Adler stated that he had diagnosed Rubio with partial fetal alcohol syndrome (PFAS). SHCR at 544–54. And Dr. Connor indicated that Rubio had deficits present in four domains of neuropsychological functioning: academic attention; verbal learning and memory; and executive functions. SHCR at 583–86.

To prove prejudice under *Strickland*, "[t]he likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112 (citation omitted). However, none of Rubio's state habeas experts definitively diagnosed him with a FASD. For instance, in one of her affidavits, Dr. Brown states that Rubio's history is "typical" of a person with a FASD, then clarifies that she would need to review Rubio's records from birth to present to determine

---

(emphasis added). This further indicates that there was investigation conducted into FASD.

whether the offense behavior was consistent with the kinds of illegal conduct typically seen in cases of FASD. SHCR at 530.

Next, Dr. Connor states that Rubio's neuropsychological functioning is "consistent" with the diagnostic guidelines for FASD, but then goes on to recommend a list of twelve additional neuropsychological tests that would have to be performed on Rubio. SHCR at 585.

Finally, while Dr. Adler's affidavit purports to diagnose Rubio with PFAS, he clarifies that Dr. Brown would have to do additional work to "confirm the diagnosis from a functional perspective." SHCR at 547. He also notes that, to determine whether Rubio has displayed lifelong behavioral characteristics of such a disorder, Dr. Brown would have to rule out the possibility of substance abuse or other head traumas, which—according to Dr. Adler—have been found to "mimic" FASD-associated difficulties. SHCR at 547–58; *see Sells v. Thaler*, No. SA-08-CA-465-OG, 2012 WL 2562666, at *57 (W.D. Tex. June 28, 2012), *COA denied sub. nom. Sells v. Stephens*, 536 F. App'x 483, 495 (5th Cir. 2013) (declining to find ineffectiveness, in part, because none of the post-conviction experts "definitively" diagnosed petitioner with fetal alcohol syndrome or the effects of that disorder).

Further, each of the affidavits and reports contain damaging double-edged evidence, the kind which trial counsel cannot be faulted for attempting to avoid. *See Strickland*, 466 U.S. at 699-700; *Belmontes*, 558 U.S. at 20. And

the Fifth Circuit has refused to find prejudice if the new evidence is double-edged or introduces new aggravating circumstances into the calculus of sentencing. *See Ransom v. Johnson*, 126 F.3d 716, 724 (5th Cir. 1997) (refusing to find prejudice where the unpresented evidence "also contained evidence that, if disclosed, would have been detrimental to [the defense] case.").

Indeed, the evidence Rubio provided on state habeas, is at best, double-edged in nature because it could necessarily lead to the conclusion that Rubio— who the jury had already found guilty of decapitating his three small children—would forever be unable to control his aggressive, anti-social impulses, and would never be able to learn from his mistakes. For this reason, the Fifth Circuit has held that "evidence of fetal alcohol syndrome-related deficiencies is not necessarily beneficial to a criminal defendant." *Sells,* 536 F. App'x at 495; *see also Brown*, 684 F.3d at 499 ("The [fetal alcohol disability] evidence that [petitioner] claims his counsel should have presented is 'double-edged' because, although it might permit an inference that he is not as morally culpable for his behavior, it also might suggest that he, as a product of his environment, is likely to continue to be dangerous in the future.").

For example, in one of her attached affidavits, Dr. Brown notes that lack of "impulse control" is one of the "hallmark" behavioral symptoms of individuals with fetal alcohol syndrome. SHCR at 511. Similarly, Dr. Adler's affidavit relayed that it is "widely understood in the professional community

that persons with FASDs have problems with judgment and impulsivity," leading to "markedly increased lifetime incidence of [p]roblems with the [l]aw."). SHCR at 545. Further, while a fetal alcohol syndrome-based defense might have furnished Rubio's jury with a possible explanation for his inability to express remorse over his very serious crimes, it would also have conceded to the jury that no amount of medication or control exercised by state prison officials was ever going to render Rubio capable of experiencing remorse for his criminal conduct. *See* SHCR at 511 (Dr. Brown noting that compromised executive functioning due to fetal alcohol syndrome can lead to, among other things, the inability to "experience or display remorse").

And even assuming Rubio's *Pinholster*-barred evidence could be considered in this forum, the affidavits he provides present the same—if not more of—the kinds of double-edged evidence the state court found precluded Rubio from showing deficiency or proving prejudice.

Rubio claims that a FASD diagnosis would have "explained and cohered otherwise disjointed evidence—of impaired functioning, brain damage, and mental health problems—that was in the record." Pet. at 71. But even if it might have helped in that regard, that is not all it would have done. Indeed, Rubio's attached affidavits confirm that "appropriate experts," Pet. at 65, in the field of FASD would have revealed extremely damaging information. Both in assessing counsel's strategy and prejudice, this Court must consider this

evidence that counsel sought to avoid and that surely would have been elicited by the State during cross-examination. *See Strickland*, 466 U.S. at 699; *Belmontes*, 558 U.S. at 20; Supp. App. 61 (Dr. Lyons noting Rubio has "demonstrated neurobehavioral deficits that are consistent with prenatal alcohol exposure" and that those deficits are "often in the areas of poor impulse control, poor executive functioning/inability to anticipate consequences of behavior, and poor attention skills leading to. . . trouble with the law"), 105 (Dr. Agharkar stating that "crucially, prenatal alcohol exposure rendered [Rubio] unable to self-regulate his behavior" and that at the time of the offense Rubio was "unable to meaningfully regulate his conduct"), 186 (Dr. Brown explaining one of the executive control impairments concerning FASD is a "tendency toward explosive episodes").

Especially damaging to Rubio would have been testimony from Dr. Brown indicating that Rubio was "biologically 'hard-wired' prior to birth to be hyper-reactive to stress." Supp. App. 185. Rubio performs at his highest level when he is in a structured environment, but when he is in the chaotic and unstructured "real world" he "performs at the lowest level of his cognitive capacity." Supp. App. 185.; Pet. at 72. This testimony would have hurt Rubio since the State, during punishment, elicited testimony that unlike the structured setting of death row, general population is full of stressors. *See* 73 RR 110–14. In fact, the jury could have reasonably inferred that if Rubio sawed

the heads off of three children whom he purportedly "loved" because of an "adaptive collapse" brought on by stressors, Supp. App. 186, nothing would stop him from acting violent toward strangers in the stressful and unstructured environment of general population—especially given that the evidence showed Rubio was already behaving dangerously in the more "structured" death row. Indeed, in the words of Dr. Brown, "[i]mpaired executive control in unstructured situations. . . is emblematic of FASD." Supp. App. 184. Ultimately, it is unlikely that the jury, who had already heard extensively about Rubio's poor reaction to stress, would have acted favorably to hearing that such susceptibility to stressors was a permanent part of his being.

Put plainly, while Rubio might suggest that his counsel's examination of his proposed experts would have been cabined to showing that "Rubio meets the diagnostic criteria for a disorder under the FASD umbrella"—thus diminishing his blameworthiness for the crimes—the State's cross-examination certainly would not have been so limited.

What is more, Rubio fails to balance his purportedly new evidence against all the aggravating evidence, including the brutal nature of the crime he committed. *See Belmontes,* 558 U.S. at 20; *Strickland*, 466 U.S. at 695. While, by their nature, all capital murder cases involve terrible circumstances, Supreme Court precedent plainly anticipates that the severity of the crime is

a relevant factor in *Strickland* prejudice. *See Smith v. Spisak*, 558 U.S. 139, 154–55 (2010); *Strickland*, 466 U.S. at 699; *see also Vasquez v. Thaler*, 389 F. App'x 419, 428 (5th Cir. 2010) ("Naturally, the power of the newly amplified case to mitigate a jury's selected punishment will be contingent on other factors in the case, such as the circumstances of the crime."); *Carty v. Thaler*, 583 F.3d 244, 263 (5th Cir. 2009) ("In this re-weighing, the brutality of the crime is relevant but does not automatically trump additional mitigating evidence.").

Likewise, the Fifth Circuit has routinely found that the "horrific facts of the crime," *Martinez v. Quarterman*, 481 F.3d 249, 259 (5th Cir. 2007), the "brutal and senseless nature of the crime," *Smith v. Quarterman*, 471 F.3d 565, 576 (5th Cir. 2006), or the "cruel manner in which he killed," *Miniel v. Cockrell*, 339 F.3d 331, 347 (5th Cir. 2003), may preclude a finding of *Strickland* prejudice. *See also Strickland*, 466 U.S. at 700; *Knight v. Quarterman*, 186 F. App'x 518, 535 (5th Cir. 2006); *Andrews v. Collins*, 21 F.3d 612, 624 n.23 (5th Cir. 1994); *Russell v. Lynaugh*, 892 F.2d 1205, 1213 (5th Cir. 1989). Additionally, if the "evidence of. . . future dangerousness was overwhelming. . . it is virtually impossible to establish prejudice." *Ladd v. Cockrell*, 311 F.3d 349, 360 (5th Cir. 2002) (citing *Strickland*, 466 U.S. at 698); *see also Busby v. Davis,* 925 F.3d 699, 726 (5th Cir. 2019); *Clark v. Thaler*, 673 F.3d 410, 424 (5th Cir. 2012).

As discussed previously, the aggravating evidence in this case is powerful, revealing Rubio brutally decapitated three young children, showed no remorse, and continued to engage in dangerous activities while on death row, such as using and abusing drugs, and setting fires. Indeed, the idea that Rubio lacked control over his life choices and acted at the whim of his neurological deficits due to FASD ignores all the evidence before the jury that the brutal beheadings of his children were a cruel, calculated, and concerted effort. But even assuming a FASD defense was presented, Rubio is unable to show he would have avoided a sentence of death, due to the aggravating factors present.[32]

In the end, even though the jury heard an abundant amount of mitigating evidence—including that Rubio's mother used alcohol and drugs while pregnant with him,[33] it simply did not find the evidence sufficiently mitigating. Rubio fails to show expert testimony would have changed that

---

[32] And while habeas counsel called several witnesses who testified that evidence of FASD would have been sufficiently mitigating in Rubio's case, the trial court disagreed, finding their testimony lacked credibility in light of the heinousness of the crime and aggravating factors presented to the jury. *See* 2nd Supp. SHCR at 7 (¶¶35–37); *see also Pippin v. Dretke*, 434 F.3d 782, 792 (5th Cir. 2005) ("A trial court's credibility determinations made on the basis of conflicting evidence are entitled to a strong presumption of correctness and are 'virtually unreviewable' by the federal courts.") (quoting *Moore v. Johnson*, 194 F.3d 586, 605 (5th Cir. 1999)); *see also Young v. Dretke*, 356 F.3d 616, 629 (5th Cir. 2004) (explaining that, "[a]s a federal court, we are bound by the state habeas court's factual findings, both implicit and explicit.").

[33] *See, e.g., supra* n.29; *see also* Facts Relating to Punishment.

assessment. In other words, there is not a reasonable probability that the jury would have assessed a life sentence had they heard Rubio suffered from a FASD. *See Sells*, 536 F. App'x at 495 (unpublished*)* ("While Sells argues that the blameless nature of fetal alcohol impairment could have had a 'powerful mitigating effect,' he ignores the fact that the trial evidence already established that Sells suffered from serious personality and adaptive impairments for which he bore no blame. . . and so it is doubtful that Sells would have derived any mitigating benefit merely by linking that diagnosis to fetal alcohol syndrome.'"). In the end, Rubio has not shown that the state court's decision regarding his claims was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court. Nor has he shown that the state court decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. 28 U.S.C. § 2254(d)(1)–(2)). Further, he has failed to rebut the presumptively correct factual determinations underlying the adjudication by clear and convicting evidence. 28 U.S.C. § 2254(e)(1). And even considering Rubio's new *Pinholster*-barred evidence, he fails to establish that his counsel were constitutionally ineffective.

**IV.  Rubio's Claim That Trial Counsel Were Ineffective for Failing to Prepare for and Investigate Rubio's Insanity Defense Is Unexhausted, Procedurally Defaulted, and Refuted by the Record. (Claim 3 & 7)**

Rubio asserts that trial counsel were ineffective because they failed to investigate and prepare for Rubio's insanity defense during the guilt/innocence phase of trial, and that it prejudiced him at guilt and punishment. Pet. at 90, 142. Rubio's claim on this point is two-fold. First, he faults counsel for failing to prepare two defense witnesses because they applied the "wrong legal standard in assessing Rubio's sanity." Pet. at 90. Second, he claims that trial counsel failed to investigate and present entries from Rubio's TDCJ records documenting Rubio's symptoms of severe mental illness in the time between his two trials. Pet. at 90, 138–44.

These claims are unexhausted and procedurally defaulted. As a result, Rubio's attached evidence in support of this unexhausted claim cannot be used in this forum. But beyond that, Rubio's claims fail when faced with the record evidence. Not only did trial counsel put on an extensive insanity defense—consisting of two experts and eleven lay witnesses—Rubio is unable to prove prejudice. Indeed, despite arguably applying the wrong legal standard in assessing Rubio's sanity, each of the complained-of experts maintained that Rubio was insane at the time of the offense. Further, the substantial evidence of Rubio's sanity in this case—coupled with the overwhelming evidence of his

guilt—and all the aggravating factors present, precludes proof of prejudice. For the following reasons, Rubio's claims in this regard should be denied on the merits in addition to being procedurally defaulted.

### A.    This claim and supporting evidence are barred from consideration on federal habeas review.

Rubio concedes that this claim is unexhausted but urges he can use *Martinez* to overcome any default. Pet. at 103, 144. But state habeas counsel were not ineffective. *See supra* Section I. Moreover, as shown below, because this IATC claim is insubstantial and meritless, *Martinez* cannot save it from being defaulted. *See supra* Section I. Also, Rubio proffers TDCJ records in support of this claim. Supp. App. 209–95; ECF No. 17-1 at 47–90. This new evidence is barred from consideration by § 2254(e)(2). *See supra* Section I. In fact, the TDCJ business records affidavit Rubio attaches shows that trial counsel were in possession of these records, and they were obtained by trial counsel in 2010, prior to Rubio's competency proceedings. *See* Supp. App.  209 (indicating records are marked with a "defendant's exhibit"[34] sticker); Pet. at 140. Accordingly, Rubio failed to develop the factual basis of this claim. *See (Michael) Williams*, 529 U.S. at 432. Thus, because he does not rely on a new rule of constitutional law, and he fails to show requisite diligence or actual

---

[34] This exhibit does not appear to have been admitted during any of Rubio's proceedings.

innocence, he cannot overcome the statutory bar to expansion of the record. *See supra* Section I.

> **B. Trial counsel adequately investigated and presented Rubio's insanity defense, and even assuming they were deficient on this point, Rubio is unable to prove prejudice.**
>
> **1. Relevant facts**
>
> ### a. Testimony of Dr. Valverde and Dr. Morris

Rubio's claim that trial counsel were ineffective in preparing two defense experts stems from the testimony of Dr. Valverde and Dr. Morris during the guilt/innocence phase of trial.

> Dr. William Mark Valverde, a psychiatrist, testified that he first interviewed [Rubio] in April 2003. [66 RR 13.] He conducted an evaluation, including an investigation into Rubio's life history and the chain of events that led up to the offense. [66 RR 24] He also evaluated [Rubio's] demeanor and behavior during the interview. Dr. Valverde did not interview any other witnesses, but he reviewed [Rubio's] school records, psychological test results, and the videotaped confession. [66 RR 24–29, 50].
>
> [Dr.] Valverde testified that paranoid schizophrenia is harder to identify than other types of schizophrenia because a person with this disorder may appear rational and engage in normal conversations until the topic of discussion touches on his area of delusion. [66 RR 31–33]. Paranoid schizophrenia does not cause the level of deterioration of the personality that is generally observed with other types of schizophrenia. [66 RR 33]. Individuals with paranoid schizophrenia generally appear much more intact and organized than individuals with other types of schizophrenia. [66 RR 33].

Although paranoid schizophrenia is chronic, the symptoms may be better or worse at different times. Some factors that have been found to exacerbate the symptoms include sleep deprivation, stress, substance abuse, and medical illness involving fever. [66 RR 37–39]. On the other hand, if exacerbating factors are not present, the mental illness might appear to be in remission. [66 RR 37–39]. Therefore, the fact that [Rubio] did not continually report delusions and hallucinations while he was in custody was not necessarily inconsistent with a diagnosis of paranoid schizophrenia. [66 RR 37–39].

[Dr.] Valverde testified that a person who is malingering or fabricating a story typically has difficulty keeping all the details in order, but [Rubio's] repeated accounts of the offense varied little over the course of multiple interviews. [66 RR 90]. He opined that, at the time of the offense, [Rubio] was so engrossed in his beliefs that he was engaged in a battle between good and evil and that evil spirits had possessed the children that he did not know that his conduct was wrong. [66 RR 56]. However, he acknowledged that, even though Rubio felt compelled to act regardless of the consequences, he might have known that others would view his conduct as wrong or illegal. [66 RR 44–45].

[Dr.] Valverde stated that [Rubio's] prognosis was poor even with treatment because paranoid schizophrenia is a chronic mental illness. [66 RR 38–39]. People with this illness typically lack insight into their condition and do not recognize that they are mentally ill. [66 RR 38]. They refuse medication because they are suspicious that others are trying to hurt them or take away their special powers. [66 RR 38]. In addition, paranoid schizophrenia is less responsive to medication than other types of schizophrenia. [66 RR 38]. In [Rubio's case], it was also likely that he had sustained brain damage from repeated inhalant abuse. [66 RR 62].

[Dr.] Valverde acknowledged that he had not seen [Rubio] since 2003. [66 RR 34]. He also acknowledged that a substance-induced psychosis could cause symptoms similar to those of paranoid schizophrenia, including disorganized thinking, paranoid delusions, and hallucinations. [66 RR 62]. He recalled that [Rubio's] family members had testified in prior proceedings that, when [Rubio] inhaled spray paint, he would not sleep or eat and would become suspicious and paranoid. [66 RR 62–63]. However,

he did not believe that Rubio's psychotic delusions at the time of the offense were the result of substance abuse because [Rubio] continued to maintain those delusions six months after his arrest. [66 RR 36, 63–64].

[Dr.] Valverde testified that the most common reasons for fathers to kill their children are jealousy, financial difficulties, marital discord, and substance abuse. He acknowledged that these reasons are separate and distinct from psychosis. Fathers kill their stepchildren more often than they kill their natural children. [66 RR 81].

Dr. Raphael Morris, a forensic psychiatrist, first interviewed [Rubio] in 2008. [66 RR 107]. He interviewed [Rubio] seven or eight times and he also interviewed many people who knew [Rubio]. [66 RR 108–09]. He reviewed psychological test results and the reports of previous mental health experts. [66 RR 109–10]. [Dr.] Morris compiled a social history, a family history, and a medical history. [66 RR 110]. He noted [Rubio's] history of delusional thoughts, the unrealistic way in which [Rubio] misinterpreted and attached undue significance to things that he saw, and [Rubio's] history of intense nightmares and sleep disturbances. [66 RR 113–14].

[Dr.] Morris diagnosed [Rubio] with inhalant dependence and marijuana dependence as well as paranoid schizophrenia. [66 RR 128–29]. He acknowledged the importance of knowing [Rubio's] substance abuse history, especially the timing of his last spray paint inhalation before the offense. [66 RR 130–31]. However, [Dr.] Morris had been unable to pinpoint the timing of [Rubio's] last spray paint abuse because [Rubio's] records contained conflicting reports. [66 RR 130–31]. Therefore, [Dr. Morris] was not sure what role, if any, substance abuse might have played in [Rubio's] symptoms and in the commission of the offense. [66 RR 130–31]. Nevertheless, he was of the opinion that [Rubio's] primary condition was schizophrenia. [66 RR 131].

[Dr.] Morris described a pattern of psychological deterioration that began a couple of years before the offense, in which [Rubio's] ability to function declined as his mental illness developed. [Rubio] was the only one of his brothers who graduated from high school, but since then he had become unable to hold a job or take care of a house. [66 RR 131–34]. In the weeks leading up to the offense,

[Rubio] misinterpreted other people's conduct and imagined that ordinary things signified danger and witchcraft. [66 RR 133].

[Dr.] Morris also described the stressors that confronted [Rubio] in the days leading up to the offense, including: the prospect of probation revocation based on his positive drug test results; Camacho's threat to leave him if he did not stop inhaling spray paint and seeing Moreno; his ongoing difficulties in paying the rent; his anger toward his mother, who failed to pay her share of the rent and often came home intoxicated; Julissa's illness; [Rubio's] and Camacho's general difficulties in taking care of three small children; his lack of sleep immediately before the offense; and the general chaos in his day-to-day life. [Dr.] Morris opined that these stressors, combined with the onset of acute mental illness, factored into [Rubio's] commission of the offense. [66 RR 131–34, 215, 244].

In [Dr.] Morris's opinion, at the time [Rubio] committed the offense, he was terrified of the demons that he believed had invaded his home and possessed his children. [66 RR 137]. He was completely caught up in his own terror and focused on freeing the children from the demons. [66 RR 139]. Because of his psychotic delusion, [Rubio] was not thinking about the wrongfulness of murdering his children, and he did not understand the consequences of his actions. [66 RR 139]. After he killed the children and believed that the demonic possession was gone, [Rubio] would have felt some relief and might have begun considering whether he should have acted differently, but at the time he was actually committing the offense, [Rubio] was so consumed by his delusion that he was not able to think about right and wrong. [66 RR 141].

On cross-examination, [Dr.] Morris acknowledged that, in his report he discussed whether [Rubio] knew that his conduct was morally wrong rather than whether he knew it was illegal. [66 RR 171]. [Dr.] Morris also admitted that he was unaware that, shortly before the offense, [Rubio] had told Moreno that a person could get away with murder by claiming to be insane and that this information, if true, might have affected his opinion. [66 RR 183]. [Dr.] Morris was also unaware of Camacho's testimony that [Rubio] once asked her what she would do if he killed the children.

[66 RR 184]. He acknowledged that he would have wanted to know that information in forming his opinion. [66 RR 184].

However, [Dr.] Morris maintained his opinion that [Rubio] was insane and did not know that his conduct was wrong at the time of the offense. He pointed out that [Rubio] had repeatedly provided consistent, detailed accounts of his delusions over a two-year period. [66 RR 201]. Also, [Rubio] had not exaggerated his mental illness symptoms or exhibited odd behaviors while in jail and prison, although such exaggeration would be expected of someone who was trying to appear to be mentally ill. [66 RR 204–05]. In addition, [Rubio] refused to take his anti-psychotic medication, which was not consistent with trying to appear to be mentally ill. [66 RR 204–05].

[Dr.] Morris testified that [Rubio]'s recent statement that he no longer believed that he was the 'chosen one' did not undermine his opinion that [Rubio] is schizophrenic and that, as a result of this disease, he experienced psychotic delusions at the time of the offense. [66 RR 219–20]. A psychotic delusion is a fixed, false belief, in the sense that a person with a psychosis will remain convinced of his delusion even in the face of evidence to the contrary. [66 RR 221]. However, a person who suffers from schizophrenia may have different delusions at different times in his life and may hold those delusions with varying levels of intensity. [66 RR 222]. In this case, the structured setting of prison might have moderated [Rubio]'s symptoms. [66 RR 247]. Even if [Rubio] no longer expressed the particular grandiose delusion of being the 'chosen one,' he continued to hold many of the same paranoid delusions that he held at the time of the offense, and he still had the same unrealistic, paranoid way of interpreting ordinary things around him. [66 RR 220].

*Rubio,* 2012 WL 4833809, at *8–11.

### b. Testimony of Dr. Welner

The State presented rebuttal testimony from forensic psychiatrist Dr.

Michael Welner.

He testified that he interviewed [Rubio] for fourteen hours on June 23rd and 24th of 2010, about a month before the retrial. 69 RR 60, 64, 69. He also interviewed many people who knew [Rubio]. Additionally, he reviewed witness statements, transcripts of testimony, [Rubio]'s statements, mental health evaluations, and institutional records. [69 RR 50–51].

[Dr.] Welner identified several instances in which [Rubio]'s professed delusions were contradicted by other things that [Rubio] had said or done. For example, in [Rubio]'s first statement following his arrest, [Rubio] did not claim that he committed the murders because he was the 'chosen one'— instead, he asserted that he killed the children after Camacho instructed him to do it. [69 RR 93]. [Rubio] also told officers that he had considered calling the police right after the offense, reasoning that 'everyone makes mistakes.' [69 RR 124]. [Dr.] Welner testified that [Rubio]'s deflection of responsibility onto Camacho and his description of the offense as a 'mistake' were indications that [Rubio] was aware that his conduct was wrong. [69 RR 124–25]. In addition, [Rubio]'s actions immediately after the offense further indicated that he knew his conduct was wrong. For example, he cleaned up the crime scene, concealed the children's bodies in trash bags, asked Camacho to forgive him, and had sexual intercourse with Camacho after telling her that they were going to jail and would not see each other again. [69 RR 120–23].

[Dr.] Welner further noted that [Rubio] told investigators that, while he was committing the offense, Julissa asked her mother to tell him to stop. [Dr.] Welner opined that [Rubio]'s statement indicated that he recognized Julissa when he killed her; it was not consistent with his professed delusion that his deceased grandmother had possessed Julissa and was speaking to him through her body. [69 RR 126–27]. [Rubio] also admitted that, when he killed Mary Jane, Camacho cried and said, 'Please, not my daughter.' This was inconsistent with his statement that Camacho had instructed him to kill the children. [69 RR 101–02].

[Dr.] Welner also pointed out that, although [Rubio] stated to investigators that he believed that José Lopez and the responding officer were possessed, [Rubio] did not act aggressively toward them. [69 RR 105]. He opined that, if [Rubio]'s act of killing the

children really was driven by a psychotic delusion that prevented him from knowing that his conduct was wrong, then [Rubio] would have been similarly driven to act when confronted by adults who were possessed; he would not have modified his conduct based on the possessed person's relative size and strength. [69 RR 105].

[Dr.] Welner added that, although [Rubio] asserted that he tried to commit suicide after the offense, the superficial scratch wound on [Rubio]'s wrist was not consistent with a suicide attempt. [69 RR 94–96]. [Rubio] had sharp kitchen knives and a cleaver that he had just used to stab and decapitate three children. [69 RR 94–96]. This fact belied his assertion that he could not kill himself because the knife was not sharp enough. He concluded that [Rubio]'s representations about his delusions at the time of the offense were misleading and self-serving. [69 RR 98, 103–05].

[Dr.] Welner opined that [Rubio] did not suffer from a severe mental disease at the time he committed the offense. [69 RR 135]. When he interviewed [Rubio], [Rubio]'s thought patterns were organized and coherent, his demeanor was open and personable, and he was able to think abstractly and use humor and idioms appropriately. [69 RR 65–69, 76]. [Dr.] Welner stated that this presentation was not consistent with schizophrenia. [69 RR 64, 132–33].

[Dr.] Welner testified that] during the interviews, [Rubio] spoke freely and in excessive detail about his sexual experiences with women, but he was guarded about his homosexual activity. [69 RR 69, 73]. [Rubio] also tended to deflect responsibility for his bad conduct onto others. For example, when asked about an incident in which he beat up his girlfriend's father in her presence, [Rubio] justified his conduct by explaining that the victim had provoked him by insulting his mother. [69 RR 71]. [Rubio] also discounted the parts of his history that might cast him in a negative light. For instance, he denied and minimized his history of substance abuse, even though his records showed a history of responding to social disappointment by abusing substances. [69 RR 83]. [Rubio] became defensive when confronted with such inconsistencies between his self-report and his records, but he quickly regained his composure when the conversation shifted to other subjects. [69 RR 69–71]. [Rubio]'s conduct of being open about some topics but evasive and

defensive about others indicated a level of social awareness and responsiveness that was not typical of someone suffering from schizophrenia. [69 RR 70–71].

[Dr.] Welner also testified that [Rubio]'s pre-arrest history of delusions and hallucinations coincided with his history of substance abuse. [69 RR 134]. Except for his sleep disturbances, [Rubio]'s family members indicated that he seemed normal when he was not abusing substances. [69 RR 134]. In the days leading up to the offense, people who interacted with [Rubio] did not observe bizarre behaviors, and [Rubio] engaged in social behaviors such as taking the bus and visiting with friends and relatives. This conduct was not consistent with the social withdrawal typically associated with the onset of a severe mental disease. [69 RR 129–30].

In addition, [Dr.] Welner testified that a severe mental disease would not switch on and off, but would be continuous. [Rubio] took anti-psychotic medications for only a brief part of the time that he was in custody, but he did not generally exhibit psychotic symptoms. [69 RR 131–32]. Psychotic delusions are fixed beliefs that do not change over time. However, [Rubio]'s descriptions of his delusions, and the strength of his professed belief in them, had evolved. [Dr.] Welner opined that this evolution corresponded to changes in [Rubio]'s understanding of the insanity defense. [69 RR 103–04].

*Rubio*, 2012 WL 4833809, at *11–13.

> ## 2. Rubio has not shown trial counsel were constitutionally ineffective for failing to prepare Dr. Valverde and Dr. Morris or that he was prejudiced by such.

As shown above, both Dr. Valverde and Dr. Morris opined that Rubio was insane at the time of the offense. They diagnosed Rubio with paranoid schizophrenia and testified that, as a result of his psychotic delusions, Rubio felt compelled to act and was not able to think about the consequences of his

conduct at the time of the offense. But while each testified generally that Rubio did not know that his conduct was wrong, they did not expressly testify that Rubio did not know that his conduct was illegal. Because of this, Rubio claims his trial counsel were ineffective for failing to prepare these witnesses. Pet. at 90–93. But Rubio has not shown deficiency or prejudice on this point. *Cf. Earp v. Cullen*, 623 F.3d 1065, 1077 (9th Cir. 2010) (holding that even if the mental-health professionals who evaluated the petitioner at the time of trial failed to diagnose the petitioner properly, their failure "does not constitute ineffective assistance of counsel").

Put plainly, when pressed, each expert maintained that at the time that he murdered the three children, Rubio did not know his conduct was wrong and that he was suffering from a severe mental disease or defect—paranoid schizophrenia, made worse by acute stressors. Further, this portion of Rubio's petition seems to overlook that fact that trial counsel elicited testimony from Dr. Valverde, Dr. Morris, and others, that attempted to explain the seemingly boundless brutality of the crimes, diminish Rubio's blame, and persuade the jury Rubio's condition was real and that he was not malingering. Not only that, Rubio also ignores the substantial evidence presented that he was sane when he committed the murders—an inquiry relevant to whether he was prejudiced under *Strickland*. 466 U.S. at 694.

The insanity defense focuses on whether the accused understood the nature of his action and whether he knew he should not do it. *Bigby v. State*, 892 S.W.2d 864, 878 (Tex. Crim. App. 1994). In the context of the insanity defense, the word "wrong" means illegal. *Ruffin v. State*, 270 S.W.3d 586, 592 (Tex. Crim. App. 2008). If the accused knows that his conduct is "illegal" by societal standards, then he understands that his conduct is wrong, even if, due to a mental disease or defect, he thinks his conduct is morally justified. *Id.* at 592; *see also Rubio,* 2012 WL 4833809, at *1.

Contrary to Rubio's assertion, unlike Dr. Morris, Dr. Valverde never explicitly testified the he assessed Rubio under the wrong standard for insanity. For instance, the exchange between trial counsel, Ed Stapleton, and Dr. Valverde was as follows:

> Q: Okay. Now, the other portion of that affirmative defense, as far as beyond the fact of the severe mental disease or defect, is that at the time of the commission of the murders, when the conduct charged, which is the murder of the three children, at the time that the three children were murdered, did John Rubio know that his conduct was wrong?
>
> A: In my opinion, no.
>
> Q: Why?
>
> A: Why? Because the nature of the illness is such that at the time of—in this particular case, at the time of the commission of the murder [Rubio] was totally engrossed in his belief system that, one, the end of the world was imminent; two, that he was satisfied

93

that the end of the world was imminent, a battle was being engaged between the forces of good and evil, that he represented the side of good, that the apartment was inhabited by evil spirts, and that it had taken possession of his children, and it was his job to dispossess them, and the only way to do that was by severing the heads and bodies from some distance from each other. And that was the overriding thought at the time of the commission of the murder.

Q: All right. Now, there is going to be an issue -- I would like you to assume -- we don't have the law yet from the judge, but I would ask you to assume that there is some Texas case law that says, all right, knowledge of "wrong" means knowledge of "illegal. And I will ask you to further assume that when the police came that— well, even before the police came, there is going to be, from confessions and statements, some testimony that—and I believe part of the history given to you is that John says to Angela Camacho , we are not going to see each other for a long time, so let's have sex. When the police came, there will be testimony that he puts his hands out to be arrested and says "Arrest me," and he makes statements that say, "What more do you want to know, I killed the kids." All of those indicate a knowledge that he would be arrested and that his conduct was contrary to law, that the police would come and get him, that his conduct was illegal. How does that reconcile with your opinion and belief that at the time he committed the murders, he did not know that his conduct was wrong?

A: Okay. Mr. Stapleton, my response was that based on his delusion, he did not believe at the time that his conduct was wrong. Did he know that others would view it as wrong? Did he know that others might view it as illegal? Perhaps. But that doesn't address the issue of the state of mind of John Allen Rubio at that moment in time. It is what he felt had to be done regardless of the consequences.

94

66 RR 43–45. And on cross-examination, Dr. Valverde reiterated that even if Rubio knew *others* might view his conduct as wrong or illegal, that did not mean that Rubio himself would know that his conduct was illegal. *Id.* at 45–46.

And while Rubio correctly points out that Dr. Morris applied the wrong standard for insanity in his report, *id.* at 171; Pet. at 91–92, he fails to consider the fact that when pressed by the State, Dr. Morris maintained that he believed Rubio was suffering from paranoid schizophrenia and that he was insane when he committed the crimes—meaning that he did not know that his conduct was illegal.[35] For example, on cross, Dr. Morris disagreed with Dr. Valverde's assertion that Rubio understood the consequences of his actions when he was committing the murders. 66 RR at 172. Dr. Morris also testified that he would have amended his report to reflect this testimony weeks before trial, but it was his understanding that it was too late to make such an amendment. *Id.* at 174.

Rubio also claims that Dr. Valverde was unaware of the testimony of Moreno, where he claimed that Rubio told him he knew how to commit the "perfect crime" by feigning insanity. Pet. at 92. But the record reveals that

---

[35] Dr. Morris put the correct definition of insanity in his report, but in the opinion portion of his report, he used the words "morally wrong" instead of "legally wrong." 66 RR 173–74.

while Dr. Valverde was not aware of Moreno's testimony in 2003 when he examined Rubio, he was aware of the portion of it pertaining to Rubio committing the "perfect crime" during the present trial. 66 RR 71–72. And while Dr. Valverde was not familiar with the part of Moreno's testimony regarding Rubio feigning insanity, Dr. Valverde maintained that Moreno's testimony did not change his diagnosis of Rubio. *Id.* at 72–73. Also, Rubio asserts that Dr. Valverde had not "reviewed certain statements made by Angela Camacho regarding the night of the crime." Pet. at 92. Again, while not aware of Camacho's statements in 2003, Dr. Valverde testified that he had read her statements before the present trial, and that the statements "assisted [him] to confirm [his] diagnosis" of Rubio. 66 RR 76.

In like fashion, Rubio's claims that Dr. Morris (1) was not aware Camacho claimed Rubio talked about killing the children months before the incident, (2) never interviewed Moreno, and (3) did not review Dr. Welner's interview with Rubio, are unable to surmount *Strickland's* strictures. Pet. at 92. While Dr. Morris testified that knowing about Moreno's testimony "might have" affected his opinion, he maintained that Rubio was insane at the time of the crimes. 66 RR 201, 204–05. The same is true regarding Dr. Morris's testimony concerning Camacho's statements. *Id.* at 186, 201, 204–05. And while Dr. Morris testified that he was not "able to open up" Dr. Welner's

interview with Rubio, he also testified that he read Dr. Welner's report "carefully." *Id.* at 217, 225.

In addition to testimony elicited from Dr. Valverde and Dr. Morris supporting Rubio's insanity defense, the jury heard testimony and prior statements of Rubio's co-defendant, Angela Camacho (*see generally* Statement of Facts), as well as Rubio's statements to police that indicated Rubio believed the children to be possessed through witchcraft or demonic presence:

> Det. Lucio has asked me what happened to [Julissa}, John and Mary Jane. Last night the children started to act like they were possessed. Julissa grabbed some scissors and she was going to place the scissors in the electrical plug. My daughter started to speak like my grandmother who had passed away. Julissa was telling me that she came from limbo. She was acting like my grandmother, so I asked her if she wanted me to call her Julissa or grandma. She told me that she had taken Julissa's soul
>
> Julissa started to laugh in an evil way and started making growling sounds at me. The other two babies started to do the same thing. They started to talk saying things like three witches. They were talking to each other. My wife and I got scared. My wife told me to kill the children because they were evil. I told her no that I did not want to kill them even though my grandmother took over her body. I had told my wife that I didn't want to kill her because I felt that I could control her.

SX 258 (Rubio's statement to police on March 11, 2003); *see also* SX 262A.

Additionally, trial counsel presented the testimony of Rubio's relatives and close friends, as well as other witnesses who had observed Rubio interacting with Camacho and the children. For example, Rubio's relatives and friends testified about his history of hallucinations and delusions. *See* 65 RR

172; 67 RR 98, 188; *see also supra* Section II(C)(3)(b). Further, Rubio's brothers and mother testified that Rubio's grandmother had practiced witchcraft and that Rubio was very disturbed by an altar or shrine they discovered in her bedroom closet while they were living in her house after she died. 65 RR 166, 168; 67 RR 95–97, 103.

Because Rubio has not shown deficiency on the part of trial counsel in failing to investigate an insanity defense—and specifically, for failing to prepare Dr. Valverde and Dr. Morris to testify—his claim fails.

But beyond failing to show deficiency on this point, Rubio cannot show he was prejudiced given the substantial evidence presented that showed he was not insane when he beheaded his three children. In addition to Welner's testimony detailed above, there was evidence of calculation and acknowledgment of wrongdoing on the part of Rubio. *See supra* Facts Relating to Punishment (A)(2). Additionally, Efrain Cervantes, the first officer to respond to the scene of the murders, testified that, when he saw one of the children's decapitated bodies in the bedroom and asked what happened, Rubio held his hands out as if he expected to be handcuffed and told the officer to arrest him. 60 RR 74–76. Detective Thomas Clipper, the first detective to speak with Rubio after the murders, testified that after Rubio had given his signature waiving his rights, he pushed the form back towards the detective and said, "I killed the kids. What else do you want?". 64 RR 170–71. Another detective that

took one of Rubio's statements testified that during the interview Rubio appeared to be "in his right mind," was very eager to talk, and showed no remorse. *Id.* at 13, 22.

What is more, the jury heard testimony from guards and administrators who came into contact with Rubio after his arrest and testified that Rubio did not seem agitated or exhibit strange behavior. Dean Garza, an Infirmary Administrator with the Cameron County Sheriff's Department, saw Rubio when he first came to the Cameron County jail after his arrest in 2003. He testified that Rubio was placed in the infirmary on his arrival, not because he had been diagnosed with a mental illness, but for his own protection, because of the nature of his crime against children. 68 RR 27. He also testified that Rubio's appearance was neat, he was cordial, and he communicated well. *Id.* at 25. He testified that Rubio was "very meticulous" about how he cleaned his cell and that he was articulate, well-groomed, and concerned with his appearance—evidenced by him doing pushups in his cell at one point. *Id.* at 33–37. Garza never saw Rubio act "bizarrely" despite seeing him on a daily basis until he was sentenced in his first trial. *Id.* at 26, 39. In fact, Garza testified that Rubio even became the "spokesperson" for other inmates voicing complaints. *Id.* at 48. Rubio would use sign language and various other means of communicating with other inmates in the infirmary. *Id.* at 49. Garza also observed Rubio for a period of months in 2007 and testified that Rubio's

attitude and demeanor was no different than what it had been back in 2003. *Id.* at 46. Garza testified that just like in 2003, when he observed Rubio in 2007, he never witnessed Rubio express remorse for his crimes. *Id.*

Gilbert Flores, a lieutenant at the Cameron County detention center, testified that Rubio's cell was clean and orderly, and that Rubio was clean-cut. 68 RR 70, 71–73. Flores observed Rubio starting in 2007, going into his second trial. *Id.* at 75. During this time, he did not witness any deterioration with Rubio in appearance or behavior, and Rubio made no complaints to him about hallucinations or delusions. *Id.*

Even more, Rolando Garza was housed in the infirmary near Rubio before Rubio's retrial. 68 RR 139. He testified that he overheard Rubio saying that he was going to fake mental retardation and raise an insanity defense. *Id.* at 143. Garza testified that when he told Rubio that Rubio was not mentally retarded or crazy, Rubio "shushed" him and gestured for him to be quiet saying "yeah, but they don't know that." *Id.*

Beyond all this, Rubio's insanity defense has been rejected twice by two separate juries, with the CCA finding the evidence sufficient to support the jury's decision the second time. *Rubio*, 2012 WL 4833809, at *1–13.

For the reasons listed above, Rubio fails to show *Strickland* deficiency or prejudice regarding his allegation that trial counsel were ineffective for failing to adequately prepare their expert witnesses, Dr. Valverde and Dr. Morris.

100

### 3. Trial counsel investigated Rubio's TDCJ records.

Next, Rubio claims that trial counsel's "failure to uncover a trove of medical and mental health records documenting Rubio's symptoms of mental illness over a seven-year period also prejudiced Rubio." Pet. at 94.[36] Notwithstanding the fact that the records Rubio proffers in support of this claim are barred from being used in this forum, § 2254(e)(2),even considering such, Rubio fails to show he is entitled to relief on this claim.

As an initial matter, the TDCJ business records affidavit and attendant entries attached by Rubio is incomplete. For instance, the attached business records affidavit indicates that it contains "415 pages of records from the medical records of John Rubio." Supp. App. 209. But Rubio only includes 86 pages of the records with his petition. *See* Supp. App. 209–86. The incomplete nature of the provided records alone calls into question the veracity of this claim. What is more, while Rubio claims in one part of his petition that trial counsel failed to "uncover" these records, Pet. at 94, in another portion, he faults trial counsel for not obtaining the records fast enough. Pet. at 140.[37] Thus, Rubio appears to want it both ways. Either trial counsel were ineffective

---

[36] Again, as mentioned above, this claim is unexhausted and procedurally defaulted. *See supra* Section IV(A).

[37] The document is marked with a "Defendant's Exhibit" sticker and sworn to the day before the start of Rubio's competency trial. *See* Supp. App. 209; Pet. at 140; 24 RR 1.

for not obtaining the records at all, or they did not obtain them "swiftly" enough for Rubio's liking. Either way, his claim fails.[38] *See Coble*, 496 F.3d at 436 (assertion that counsel would have been "'more effective'" if they had been better prepared, does not come close to suggesting that but for counsel's errors, the result of the proceeding would have been different.") (citations omitted).

Beyond that, as is evident from Rubio's attached records, trial counsel were in possession of the TDCJ medical records in question. And it is presumed that, having been in possession of the records, trial counsel decided to use them strategically as they saw fit. That kind of strategic decision is "virtually unchallengeable." *See Strickland*, 466 U.S. at 689–90.

What is more, Rubio's claim that this deficiency prejudiced him seems to be centered around the fact that he feels these records would have completely discredited Dr. Welner's testimony regarding Rubio's lack of anti-psychotic medication, coupled with a lack of persistent psychotic symptoms while in prison between his first and second trials. Pet. at 94–103, 140–44. But Rubio overlooks several pieces of record evidence supporting Dr. Welner's testimony.

In fact, several experts noted in their reports that Rubio was not taking his anti-psychotic medications, even though they were prescribed to him. Troy

---

[38] Additionally, the competency trial preceded the guilt/innocence proceedings by around five months. 24 RR 1; 60 RR 1. So, it is unclear how trial counsel obtaining these records right before the competency portion of trial impacted any other portion of the proceedings—including guilt/innocence and punishment.

Martinez, a court-appointed licensed psychologist who testified during Rubio's competency proceedings, 26 RR 135, noted in his 2008 report that Rubio reported to him that "he currently takes no psychotropic medications though he is 'suppose to be taking' Thorazine-200mg, Cogentin 'for the side effects for the Thorazine,' and Wellbutrin.'" 2 CR 511. Dr. Martinez went on to note that Rubio told him "[w]ith the exception of taking an anti-depressant until he stopped it about 8 months ago, [Rubio] reports having refused all other psychotropics for the past *few years* with the possible exception of one day about 18 months ago." 2 CR 511 (emphasis added). According to the report, Rubio went on to say that while "Wellbutrin was helpful. . . the antipsychotic Thorazine was not," claiming "[i]t just knocked [him] out." In a subsequent 2010 report, Dr. Martinez noted that Rubio was now taking the anti-depressant Wellbutrin "nightly." But he mentioned nothing about any other medications. 10 CR 1239–40.

Also, defense expert Dr. Raphael Morris put in his 2009 report that Rubio "has refused anti-psychotic medications, mostly due to the sedating effects and given poor insight into the existence of a mental illness." 3 CR 657. Moreover, during trial, Dr. Morris testified to this effect. *See* 66 RR 20 (Q: "[Rubio] is not taking any anti-psychotic medications right now? A: That's true.").

Even taking Rubio's attached—albeit piecemeal—TDCJ records at their

face value, it is not clear they would have helped Rubio. Nor is it clear they "discredit" Welner's testimony. Especially considering Rubio's own admission that he had been refusing all psychotropics during most of his time in custody. 2 CR 511. In fact, even in the excerpts provided by Rubio, several show the same kind of evidence the State presented to support their arguments that Rubio was not insane.

For example, Dr. Welner testified that in Rubio's "medical notes[39] they have described him as hallucinating, or other symptoms that have been attached to schizophrenia or peculiar ideas he has, and at the same time he has been documented as smiling, laughing, interacting with others and not showing any distress." 69 RR 132–33. And that many times, Rubio's presentation and demeanor did not reveal the disorganization that would be expected of someone suffering from his complained-of symptoms. 69 RR 133.

Indeed, while several entries reveal Rubio appears to be suffering from psychotic symptoms, in the same breath, the entries reveal Rubio clean-cut, neat, well-groomed—and in some instances, laughing and interacting with others. *See* Supp. App. 215 (Rubio reporting seeing "shadow people and ghosts" but his appearance is "neat and clean"), 219 (complaining of "occasional visual

---

[39] Among other things, some of the sources of information for Dr. Welner's report consisted of records from TDCJ and TDCJ medical records. SX 276 at 2 (¶¶31–32) (not admitted at trial)).

hallucinations" but appearing "neat and clean"), 220 (reporting "seeing little children daily as well as spiders and other things" but showing "clear" cognition and a "neat and clean" appearance"), 232 (noting Rubio's cell and personal hygiene as "clean," 235 (same), 239 (Rubio complaining that his "antidepressant isn't working" but noting that he "did not appear to be depressed" and that he "was laughing and joking with staff"), 245 (Rubio reporting seeing and hearing "things that are not there" but appearing "alert and smiling" with "fair" hygiene), 256 (Rubio reporting seeing "a vision last night" and dreaming "of demons" but appearing "relaxed and calm" with a "neat" appearance and "normal" grooming), 265 (Rubio claiming he "does a lot of crying" in the afternoons but having "fair" hygiene and grooming while being "alert" and "cooperative"), 267 (Rubio reporting "hearing voices and having dreams" but appearing "neat, clean, and cooperative"), 285–86 (Rubio complaining of having "dreams about demons" and getting "little sleep" but appearing "neatly dressed" with his "hair combed" and "teeth brushed"), 289 (Rubio complaining about being depressed but being observed as "joking and laughing with" staff). And some of the attached records even report Rubio as suffering from no symptoms of psychosis at all. *See* Supp. App. 224 (noting hallucinations as "not present"), 240 (same), 229 (reporting no "observed or reported psychosis"), 265 (observing "no evidence of psychosis").

Not only that, but several portions of Rubio's attached TDCJ medical records support some of the other reasons Dr. Welner gave for his opinion that Rubio did not suffer from schizophrenia. Particularly, Dr. Welner testified that in their interview, Rubio complained of hallucinating or hearing voices during sleep or right after waking. 69 RR 129.[40] Dr. Welner explained that if these kinds of "phenomena" are not sustained in the course of the day, but only happen in the course of a dream, it is a "parasomnia,"[41] not a delusion, and thus not "consistent with symptoms of schizophrenia." 69 RR 129. Even the piecemeal records Rubio presents are replete with this exact kind of evidence. *See* Supp. App. 219 (Rubio reporting "having *dreams which come to life* with an example being dreaming about Freddie Krueger and waking up with scratches on his body), 247 (Rubio "having a hard time sleeping at night due to n*ightmares*"), 248 (Rubio "afraid to sleep at night" because he "gets night sweats" and "*bad dreams*"), 252 (Rubio noting "*terrible dreams*" where "demons" try to get him), 256 (Rubio reporting "*having dreams*" about demons and his wife dying), 259 (reporting that Rubio "does not appear[] too distressed

---

[40] Gina Castillo also testified as to Rubio's reported sleep disturbances. *See* 67 RR 186 (Gina testifying Rubio had nightmares about his grandmother).

[41] Dr. Welner explained that "where most people, when they sleep, they sleep; when they wake, they wake. Some individuals, their sleep experience carries over to wakeful experiences. And it is very disturbing to them." 69 RR 80. This "very active sleep life" that can include "disturbing dreams" are phenomena called "parasomnias." 60 RR 79–80.

over [his dreams] but each time he is interview[ed] he brings them up"), 263 (Rubio reporting "lots of terrible *nightmares*"), 267 (relaying that Rubio "was vague about the voices he is hearing, *but they appear to be related to his dreams and his belief that God has a plan for him*"), 285 (noting Rubio "has continued to have *dreams* about demons" and that the dreams can be "very active"), 287 (reporting Rubio is "still having *dreams* about his family that cause him to '[freak] out,' and it takes him a while to realize they aren't happening'"), 289 (Rubio reporting he has "*bad dreams*" and "wake[s] up scared"), 293 (Rubio reporting having "flashbacks, *especially in dreams*") (emphasis added).

Moreover, Rubio's attached records support Dr. Welner's testimony that Rubio's delusions have evolved over time—further feeding the State's theory at trial that Rubio was feigning and adjusting his complained-of delusions to his understanding of the insanity defense. Specifically, Dr. Welner explained that Rubio's shifting narrative from "witchcraft" to him being the "chosen one" coincided with Rubio gaining a better understanding of the insanity defense. According to Dr. Welner, the "fine points of the insanity defense relate more directly to the 'chosen one' story than they do to the witchcraft story.'" 69 RR 104; *see also* 69 RR 103–04 ("After [Rubio] came into custody, he was giving far more emphasis to the idea of witches and witchcraft. And only in recent years. . . the emphasis [is that] he thought he was the 'chosen one'"), 104 ("At the time this happened and the information derived and presented, [Rubio]

wasn't talking about saving the world. Only in recent reports by expert witnesses. . . is he being represented as thinking that he was saving the world at the time."). For example, even the excerpts attached by Rubio provide a glimpse into this changing narrative and support Dr. Welner's testimony. *Compare* Supp. App. 215 (TDCJ medical record from 2004) (Rubio stating "His family is into witch craft and *he feels that is what is wrong with him, witch craft* spells"), Supp. App. 219 (TDCJ medical record from 2004) (Rubio reporting feeling that "he was under a *witch craft spell* of some form when he committed his crime"), *and* Supp. App. 243 (TDCJ medical record from 2004) (Rubio reporting he "feels he committed the crime due to *witch craft*"), *with* 2 CR 521 (Dr. Martinez 2008 report) (noting Rubio saying "I always thought I'd *save the world, the chosen one.* I know it sounds crazy. I felt that way my whole life") *and* 3 CR 660 (Dr. Morris 2009 report) (reporting Rubio "expressed grandiose delusions regarding *his being 'The Chosen One'*. . . .'") (emphasis added).

Even more, at least one of the TDCJ medical records excerpts provided by Rubio shows support for one of the State's future dangerousness arguments—Rubio's disruptive behavior while incarcerated. Indeed, one of the record excerpts references Rubio "creating a disturbance," while on his first stay on death row, seemingly, so he could "stay on f-pod" next to his "friend." Supp. App. 264. In assessing Rubio's conduct, the report indicates that it is

believed Rubio's "act [of creating a disturbance] was premeditated and enacted with a clear purpose and plan." Supp. App. 264. Trial counsel's failure to present evidence that is more harmful than helpful to the defense does not constitute ineffective assistance. *Gardner v. Davis*, 779 Fed. App'x. 187, 193 (5th Cir. 2019) (unpublished), *cert. denied*, 140 S. Ct. 842 (2020); *see also Mitchell v. Epps*, 641 F.3d 134, 143 (5th Cir. 2011) (citing *Richter*, 568 U.S. at 108).

But even putting aside the portion of Welner's testimony indicating Rubio was not experiencing psychotic symptoms while unmedicated—which Rubio claims is "discredited" by the TDCJ medical records, Pet. at 102—as shown above, the jury heard ample evidence that Rubio was sane when he decapitated his three children. This included evidence that Rubio pre-planned the brutal killings of his children, knew his conduct was wrong, had symptoms and an appearance inconsistent with a psychotic disorder, and even bragged about being able to feign insanity. Indeed, that is not all Rubio bragged about. During an interview with one of the defense team examiners, Rubio noted that when he and Camacho had sex—after, by certain accounts, he had cut the heads off of at least two children, one of which he ripped off with his hands—

he "not only ejaculated, but. . . he had an intense explosive orgasm." 69 RR 137.[42]

All this to say, Rubio cannot show a reasonable probability that the jury would have found Rubio insane had trial counsel used the TDCJ records to challenge Welner's testimony about Rubio's unmedicated status during incarceration. Instead, after hearing all the evidence of Rubio's inhuman crime that involved him savagely hacking the heads off of three small children, the jury soundly rejected the defense's theory in this regard. That is entirely within the jury's province. *See Graham v. State*, 566 S.W.2d 941, 952 (Tex. Crim. App. 1978). And Rubio has failed to demonstrate a reasonable probability that but for counsel's deficiencies, the result of the proceeding would have been different.

What is more, in addition to the substantial evidence Rubio was sane at the time he cut the heads off of his three children, he cannot prove prejudice with respect to punishment given the overwhelming evidence of his guilt, along with all the aggravating factors. Indeed, beyond being presented with the brutality of Rubio's crime, the jury heard of Rubio's general lack of remorse for the crime, his prior criminal record and criminal conduct, as well as his

---

[42] As Dr. Welner testified, ["p]hysiologically, a person who is terrified, as [Rubio asserted he was] would not be capable of ejaculating in that way. It is Physiologically—the nervous system that is involved, it is not compatible." 69 RR 137–38.

disruptive behavior during his first stay on death row—where despite the security strictures, he possessed drugs and set multiple fires. *See generally* Facts Relating to Punishment (A)(1)–(6); Statement of Facts.

In the end, even if Rubio's defaulted claim and new evidence are reviewed de novo, Rubio is not entitled to relief under the deferential *Strickland* standard. Thus, this Court should deny relief on the merits in addition to finding this claim procedurally defaulted.

## V. Rubio Fails to Show Dr. Welner's Testimony Was False. (Claim 6)

Relatedly, Rubio also complains that the State sponsored false testimony from Dr. Welner when it had him testify that Rubio's lack of psychotic symptoms while unmedicated in prison meant that Rubio "did not have an authentic mental health disorder." Pet. at 128. But Rubio has not shown he is entitled to relief on this claim.

First, as Rubio concedes, this claim is unexhausted. Pet. at 138. As a result, this claim is also procedurally defaulted because—as discussed below—Rubio is unable to show a miscarriage of justice or that he was prejudiced by any alleged false testimony.

Second, beyond being unexhausted and procedurally defaulted, Rubio's false evidence claim is not supported by the record. Not only is he unable to show that Dr. Welner's testimony was actually false and the State knew it, he

cannot show any reasonable likelihood that—even if false—the testimony could have affected the jury's verdict in this case. As such, for the following reasons, Rubio's false evidence claim concerning Dr. Welner's testimony should be denied.

## A. This claim and supporting evidence are barred from consideration on federal habeas review.

To overcome a procedural bar, a habeas petitioner must show cause for the default and actual prejudice, or that a miscarriage of justice will occur if the federal court does not consider the claim. *Coleman*, 501 U.S. at 750. A fundamental miscarriage of justice occurs when the petitioner is 'actually innocent' of the offense underlying his conviction or 'actually innocent' of the death penalty.'" *Roberts v. Thaler*, 681 F.3d 597, 605 (5th Cir. 2012). Rubio asserts that he can excuse any default of this claim under the miscarriage-of-justice exception because, but for Dr. Welner's testimony, no reasonable juror would have found him sane, and thus, guilty. Nor would he have been sentenced to death. Pet. at 138. But as discussed below, Dr. Welner's testimony was not false. And even putting aside Dr. Welner's alleged misrepresentations, Rubio is unable to show that he is actually innocent of murdering and decapitating three children, nor can he show that he would not have received

a death sentence in this case. *See* Statement of Facts; Facts Relating to Punishment.[43] Thus, this claim is unexhausted and procedurally defaulted.

What is more, Rubio again relies on the TDCJ medical records in support of this claim. Supp. App. 209–95; ECF No. 17-1 at 47–90. This new evidence is barred from consideration by § 2254(e)(2) for the same reasons mentioned above. *See supra* IV(A); *supra* Section I. Thus, because he does not rely on a new rule of constitutional law, and he fails to show requisite diligence or actual innocence, he cannot overcome the statutory bar to expansion of the record. *See supra* Section I.

### B. Even still, Rubio's *Napue* claim fails on the merits because he fails to show falsity, knowledge, and materiality.

Rubio complains that Dr. Welner's testimony concerning Rubio not taking anti-psychotic medication for a "great majority" of his time in prison while simultaneously not showing signs of psychosis was false. Pet. at 129. In *Napue*, the Supreme Court held that it is a violation of the Fourteenth Amendment for the prosecution to knowingly use perjured testimony. A conviction must be set aside where the petitioner has demonstrated that: (1) a witness gave false testimony; (2) the falsity was material; and (3) the

---

[43] Indeed, as illustrated by the CCA's state habeas opinion and the punishment facts presented previously, *supra*, Rubio cannot make this showing with respect to any of his claims.

prosecution used the testimony knowing it was false. *Reed v. Quarterman*, 504 F.3d 465, 473 (5th Cir. 2007). False evidence is deemed material for this analysis "if there is any reasonable likelihood that [it] could have affected the jury's verdict." *Giglio v. United States*, 405 U.S. 150, 153–54 (1972); *Westley v. Johnson*, 83 F.3d 714, 726 (5th Cir. 1996). The Fifth Circuit has held that "[t]o obtain relief on his claim that the [S]tate knowingly introduced false testimony, [the petitioner] bears the burden of establishing that the evidence was false, that the false testimony was material, and that the prosecution offered the testimony knowing it to be false." *Chambers v. Johnson*, 218 F.3d 360, 363–64 (5th Cir. 2000) (as modified on rehearing); *Carter v. Johnson*, 131 F.3d 452, 458 (5th Cir. 1997) ("We have consistently stated that this requirement imposes a strict burden of proof on a federal habeas petitioner.").

Rubio points to the following portion of the trial record for support of his claim that Dr. Welner testified falsely concerning Rubio's unmedicated status and lack of psychotic symptoms while in prison:

> [A:] Furthermore, in custody, socially, there has been no evidence for further decline. And he would decline, as would be the course of a chronic disease condition, such that the defense psychiatrist correctly pointed out. He is as integrated socially in custody as anybody else might be.
>
> Q: And that's without the aid of anti-psychotic medication?
>
> A: That's right. And he is not on anti-psychotics. . . .

114

A:    He has not been on medication. There is a brief period
      in which he was on anti-psychotic medications which
      Doctor Valverde prescribed. But we are talking seven
      years, and the great majority of the time he has not
      been on anti-psychotic medications. . . . And for
      schizophrenia, chronic schizophrenia, an unmedicated
      chronic schizophrenic would not be able to maintain
      that intact presentation for such a sustained period of
      time. . . . In other words, if they are brittle, that's a
      setting in which they crumble unless they are
      medicated. He has been unmedicated in these settings
      and  he hasn't crumbled. Furthermore, this violent
      episode hasn't been replicated in custody to this degree
      or to any remote degree.

Pet. at 130 (quoting 69 RR 130–33). But Rubio presents no evidence that this testimony was false, and the State knew it. Rather, the record reflects the opposite. As noted above, *see supra* Section IV(B)(3), the record evidence corresponds with Dr. Welner's testimony regarding Rubio's lack of anti-psychotic medication. This includes the reports and testimony of other experts who commented on Rubio's unmedicated status while incarcerated. *See* 2 CR 511; 3 CR 657; 10 CR 1239–40; 66 RR 20.

Additionally, the record does not reveal that Dr. Welner testified falsely about Rubio's lack of psychotic symptoms. Instead, Dr. Welner acknowledged that "medical records" revealed Rubio to be suffering from psychotic symptoms, but that—in his opinion—Rubio's behavior contradicted such assessments. Indeed, as mentioned above Dr. Welner's opinion in this regard is not contradicted by the piecemeal portions of the TDCJ records Rubio has

attached. To the contrary, it is supported by such. 69 RR 132–33; *see also supra* Section IV(B)(3). Thus, Rubio has not shown that Dr. Welner's testimony regarding Rubio's lack of anti-psychotic medication and subsequent lack of psychotic symptoms was actually false, and that the State knew it.

Even if Dr. Welner's testimony in this regard was false, Rubio fails to prove materiality. As explained above in greater detail, the particular portion of Dr. Welner's testimony reflecting on Rubio's unmedicated status and lack of psychotic symptoms while in custody was dwarfed by other information he provided that was damaging to Rubio's defense and indicated that Rubio was sane at the time of the offense. Indeed, even disregarding Dr. Welner's testimony about Rubio's unmedicated status and lack of psychotic symptoms, the jury still had his testimony concerning, among other things: (1) the contradicting, inconsistent, and self-serving elements of Rubio's purported delusions, 69 RR 93–102; (2) Rubio's changing narrative and how the evolution of his delusions corresponded with his understanding of the insanity defense, 69 RR 103–04, 105–07; (3) Rubio's appreciation of the wrongfulness of his actions, 69 RR 120–25; (4) Rubio's capacity to form intent, 69 RR 126–28; (5) Rubio's symptoms lining up more with parasomnia than schizophrenia, 69 RR 128–29; (6) the lack of evidence that Rubio suffered from the kind of "prodromal" decline described in schizophrenia, 69 RR 129–30; (7) Rubio's lack of documented and reported psychotic symptoms in the weeks leading up to

the offense, 69 RR 134–35; and (8) Rubio's overall lack of remorse. 69 RR 137–38.

In the end, the jury heard ample evidence—from Dr. Welner and others—that Rubio was sane at the time he hacked the heads off of his children. Not the least of which included evidence that Rubio pre-planned the brutal killings of his children, knew his conduct was wrong, had symptoms and an appearance inconsistent with a psychotic disorder, and even bragged about being able to feign insanity. *See supra* Section IV(B).

Because of this— along with the overwhelming evidence of Rubio's guilt, the cruelty of the crime, and all the other aggravating factors—Rubio is unable to make any meaningful materiality argument concerning either guilt-innocence or punishment. *See* Statement of Facts; Facts Relating to Punishment (A)(1)–(6). That is, Rubio is unable to show "any reasonable likelihood" that Dr. Welner's testimony concerning his lack of anti-psychotic medication while incarcerated, coupled with the testimony that Rubio was not exhibiting any psychotic symptoms, "could have affected the jury's verdict." *Giglio*, 405 U.S. at 153–54. Nor can Rubio show prejudice or a miscarriage of justice under *Coleman*. Thus, his claim fails on the merits in addition to being unexhausted and procedurally defaulted.

## VI. Rubio's Claim That the Prosecution Engaged in Misconduct by Repeatedly Interfering With His Ability to Present a Defense Is Unexhausted and Procedurally Defaulted, and Also Refuted by the Record. (Claim 4)

Rubio asserts that the prosecution in his case engaged in "repeated misconduct" that "resulted in a fundamentally unfair trial." Pet. at 104. But this claim is unexhausted and procedurally defaulted, and cannot be brought in this forum. Even if this Court considers this claim, Rubio is not entitled to relief. Rubio correctly asserts that to obtain relief, he must show that prosecutorial misconduct occurred and that it rendered *his* proceedings fundamentally unfair. Pet. at 104. However, for the most part, Rubio does no more than point to a laundry list of general misdeeds committed by the District Attorney for Cameron County at the time of Rubio's trial, Armando Villalobos, while only tenuously—if at all—tying that conduct to Rubio's proceedings. What is more, many of the claims Rubio brings were brought to the trial court's attention during the course of Rubio's trial, with no harm to Rubio or his legal representation being found.

### A. This claim and supporting evidence are barred from consideration on federal habeas review.

As he admits in his petition, Rubio failed to raise this claim in state court. Pet. at 116. He asserts, in part, that any default of this prosecutorial misconduct claim is excused by the ineffective assistance of his state habeas counsel. Pet. at 116, n.80. However, as explained above, this argument is

misplaced because *Martinez* can only excuse the default of IATC claims. *See supra* Section I. What is more, Rubio claims that the State's "flagrant misconduct" provides cause for failing to raise this claim previously. Pet. at 116. But Rubio has failed to show "active governmental interference or the reasonable unavailability of the factual or legal basis for the claim." *Rodriguez v. Johnson*, 104 F.3d 694, 697 (5th Cir.1997); Pet. at 116. Even assuming that his default could be excused, as shown below, this claim is refuted by the record. Accordingly, Rubio fails to show prejudice or a miscarriage of justice under *Coleman*. 501 U.S. at 750; *supra* Section I.

In addition, the Forensic Panel Payment sheet and Asset Forfeiture Fund list Rubio has attached to his petition in support of parts of this claim, Supp. App. 3–5, are barred from consideration by § 2254(e)(2). *See supra* Section I. Rubio provides no argument why this federal factual development should be permitted. *See* Pet. at 104–16. In fact, he concedes that state habeas counsel should have been aware of the facts supporting this argument. Pet. at 116–17, n.80. Accordingly, Rubio failed to develop the factual basis of this claim. *See* (*Michael*) *Williams*, 529 U.S. at 432. Thus, because he does not rely on a new rule of constitutional law, and he fails to show requisite diligence or actual innocence, he cannot overcome the statutory bar to expansion of the record. *See supra* Section I.

**B. Rubio fails to show that any alleged misconduct rendered his trial fundamentally unfair**

In habeas, the appropriate standard of review of a claim of prosecutorial misconduct is "the narrow one of due process, and not the broad exercise of supervisory power." *Darden v. Wainwright*, 477 U.S. 168, 180 (1986) (citing *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974)); *Ortega v. McCotter*, 808 F.2d 406, 410 (5th Cir. 1987). The relevant question, therefore, is whether the alleged misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181. In other words, the prosecutorial misconduct must be so prejudicial that it renders the trial fundamentally unfair. *Bagley v. Collins*, 1 F.3d 378, 380 (5th Cir. 1993). It is not enough that the prosecutor's conduct was "undesirable or even universally condemned." *Jackson v. Johnson*, 194 F.3d 641, 653 (5th Cir. 1999). The trial is rendered fundamentally unfair only if, in the context of the entire trial, the complained of conduct was a "crucial, critical, highly significant" factor. *Lowery v. Estelle*, 696 F.2d 333, 342 (5th Cir. 1983); *Ortega*, 808 F.2d at 411. That is, Rubio must show "'a reasonable probability that the verdict might have been different had the trial been properly conducted.'" *Barrientes v. Johnson*, 221 F.3d 741, 753 (5th Cir. 2000) (quoting *Foy v. Donnelly*, 959 F.2d 1307, 1317 (5th Cir. 1992)).

As an initial matter, the Cameron County District Attorney during Rubio's trial—Armando Villalobos—is currently serving a thirteen-year federal prison sentence for his role in a bribery and extortion scheme taking place between October 2006 and May 2012.[44] To be sure, Villalobos's documented behavior is troubling to say the least. That said, outside of noting Villalobos's general misconduct in other instances, Rubio provides no compelling proof that any of this kind of misconduct occurred in his case or that it harmed him. Pet. at 104–09.

Even in instances where the alleged misconduct is relevant to Rubio's case, practically every complaint Rubio now brings was addressed by the trial court, with no harm to Rubio being found.

### 1. Rubio provides no proof that his attorneys were "blacklisted." (Claim 4(A)(2))

Rubio claims that Villalobos and the District Attorney's Office "blacklisted Rubio's attorneys" after they intervened as part of a lawsuit against the DA's office concerning indigent defense program funding. Pet. at 109. Before the start of Rubio's trial, Rubio's trial counsel filed a series of motions to disqualify the District Attorney's Office alleging various acts of

---

[44] *See* The United States Attorney's Office for the Western District of Texas, *Former Cameron County District Attorney Armando Villalobos Sentenced To Federal Prison In Connection With South Texas Bribery Scheme* (February 11, 2014), https://www.justice.gov/usao-wdtx/pr/former-cameron-county-district-attorney-armando-villalobos-sentenced-federal-prison.

misconduct. 5 CR 1115–21 (misuse of subpoena power), 1140–43 (dissemination of the oral and written statements of Mr. Rubio while the case is pending), 1147–50 (violation of the gag order); 8 CR 1903–17 (omnibus motion to disqualify with all the claims compiled together). Ultimately, these motions resulted in a hearing. *See* 40 RR. At that hearing, Rubio's trial counsel alleged the same claim Rubio brings now. Namely, that several area defense attorneys had been "black listed" by the DA's office as retaliation for their intervention in a lawsuit concerning the funding of an indigent defense program. *See generally* 40 RR. In support of their argument, Rubio's trial counsel called three members of the defense bar who alleged they had been blacklisted because of their intervention. 40 RR 3–36 (Angela Nix), 36–61 (Star Jones), 109–142 (Moises Salas, Jr.). They also called then-District Attorney Armando Villalobos. 40 RR 61–108. However, none of the called witnessed testified to having direct knowledge that such a "black list" ever existed. *See* 40 RR 65 (Villalobos) ("I have no personal knowledge of the making of a list.")), 49–50 (Star Jones) (being asked if she has any personal knowledge of a black list existing and replying "[n]o, I guess not")), 124 (Moises Salas) ("Q: "You have no personal knowledge who generated [the "black list"], do you? A: No.")).

Beyond that, all of the witnesses testified that they continued to get plea offers from the District Attorney's office and were otherwise able to carry on their defense practice as usual, even after the alleged black list had been made.

*See* 40 RR 24 (Angela Nix) ("Q: So you continue to get plea bargains and plea negotiations, pretrial diversion is offered to you, and probation recommendation is offered to you and to your clients; is that correct? A: I do, yes, sir."), 50–51 (Star Jones) (testifying that she still gets plea bargains, pretrial diversions, and is able to conduct discovery), 118 (Moises Salas) (testifying that he had obtained plea bargains for his clients after the purported black list). As a result of this testimony, along with the trial court's own observations of the proceedings to that point, the trial court denied the motion to disqualify, noting that Rubio had not shown any harm stemming from the alleged misconduct. 40 RR 169–72.

In like manner, Rubio's present petition does no more than reiterate a point that has already been pressed. And he provides no additional proof that a black list ever existed, that it impacted Rubio's representation,[45] or that

---

[45] To the contrary, Judge Noe Gonzalez remarked at the hearing on the motion to disqualify that Rubio's trial counsel had done "an exceptional job" and that he did not think anything done by the CCDA's office had affected their representation of Rubio. 40 RR 170–71. The Court went on:

> Specifically, about the Sixth Amendment, I will say this: This case, if it ends up on appeal again, it will go up. And I think that whoever takes it up will be hard-pressed to argue ineffective assistance of counsel. And to me, that is because you have, at least since I have taken over this case, been afforded every right that I think that Mr. Rubio deserves to have in order to have his defense put on in a fair and just manner.

40 RR 172.

Rubio's trial was fundamentally unfair as a result. Pet. at 109–10.[46]

## 2. Rubio provides no evidence the DA's office prevented the defense team from being funded. (Claim 4(A)(3))

Next, Rubio contends that the State "repeatedly interfered with Rubio's defense funding." Pet. at 110. Essentially, Rubio claims that the State engaged in misconduct when it "objected to the use of county funds for neutral court-appointed experts" as well as for the defense's experts. Pet. at 110–11. Also, he claims that the State "vehemently objected" to the judge holding ex parte hearings on the defense's funding requests. Pet. at 111; *see also* 5 CR 1087–90; 17 RR 26–28; 18 RR 58–64. Rubio appears to intimate that the State's repeated objections to the defense's funding requests caused Rubio's initial judge, Judge Nelson, to recuse himself. Pet. at 111; *see also* 5 CR 1112 (order of recusal), 1113–14 (replacing Judge Nelson with Judge Noe Gonzalez). However, Rubio does not allege that these repeated objections by the State prevented him from having funding for neutral court-appointed experts or defense experts. Pet. at 110–11. Nor can he. As mentioned previously throughout this pleading, Rubio had at his disposal at least nine medical and mental health experts. *See* 6 CR

---

[46] Rubio cites to *Salas, et al. v. Cameron County*, 1:10-CV-037 (S.D. Tex. Feb. 22, 2010), where several of these same members of the Cameron County defense bar filed a complaint in federal court against Villalobos. Pet. at 110; *see Salas,* 1:10-CV-037 (S.D. Tex. Feb. 22, 2010) (ECF No. 1). Villalobos filed a motion for summary judgment, among other things, alleging that none of the plaintiffs had presented any direct knowledge of a black list existing. *Id.* (ECF No. 71-1 at 7–14). Ultimately, the Court granted Villalobos's MSJ. *Id.* (ECF No. 95).

1369–70; 10 CR 2261–66. As a result, Rubio fails to show how the State's repeated objections in this regard rendered his trial fundamentally unfair.

### 3. Rubio provides no proof of harm from Padilla's employment with the Cameron County DA's Office. Claim 4(A)(4))

Additionally, Rubio asserts that the Cameron County DA's (CCDA) hiring of Alfredo Padilla—Rubio's second chair trial counsel in his first trial was part of an ongoing pattern of misconduct. Pet. at 111–13.[47] But Rubio points to no specific way in which the hiring of Padilla harmed him. Instead, the only issue he appears to take with the hiring is that "Padilla regularly attended Rubio's pretrial hearings." Pet. at 112. Again, this issue was vetted out during pre-trial proceedings. Indeed, the nature of Padilla's employment was a prominent part of the omnibus motion to disqualify filed by Rubio's trial counsel and subsequent hearing.[48] *See* 8 CR 1903–07 (attempting to disqualify the CCDA because of Padilla's employment); 40 RR 71. After noting that he had "never had that much of a concern about Mr. Padilla being hired," the trial court allowed Rubio's trial counsel to question District Attorney Villalobos about the nature of Padilla's employment. *See* 40 RR 75, 76–78. And in their

---

[47] Padilla also handled Rubio's subsequent—winning—appeal after his first trial.

[48] This issue had also been presented to Judge Nelson—and denied— before he recused himself. 3 CR 728–32; *see also* 1 RR 16; 19 RR 18. As Judge Gonzalez noted, at the time of the hearing on the motion to disqualify, the issue of Padilla had "already been addressed. . . on more than one occasion, by different judges." 40 RR 74.

responsive pleadings, the State maintained that Padilla had been "screened from participation" in Rubio's case. 3 CR 763. And that Padilla had never "helped, or participated, or gave advice in the prosecution of John Allen Rubio." 9 CR 2184. Rubio's assertion now that Padilla "regularly attended Rubio's pretrial hearings," adds nothing to a claim that has already been brought—and denied—multiple times in front of two different judges during Rubio's trial proceedings. 40 RR 169–72. Put plainly, Rubio fails to show how Padilla's attendance at pretrial hearings rendered his trial fundamentally unfair.

### 4. Rubio shows no harm stemming from the use of subpoenas by the State. (Claim 4(A)(5))

Rubio asserts that through the trial proceedings, the State "abused its subpoena power to seize attorney-client privileged information and to interfere with the defense's ability to prepare the case." Pet. at 113. Again, this issue was litigated during Rubio's trial proceedings. In fact, Rubio's claim on this point mirrors one of the points pressed in trial counsel's omnibus motion to disqualify concerning the State's "Misuse of Subpoena Power." *See* 8 CR 1908–11. In that motion, like in Rubio's present petition, trial counsel complained that the CCDA had issued a subpoena, rather than a search warrant, to procure items from Rubio's jail cell, and that "some of the items seized included attorney work product." 8 CR 1908; *see also* Pet. at 113. Rubio's trial counsel also asserted that after his first conviction was overturned and the case

remanded for a new trial, the CCDA issued a subpoena to TDCJ's Polunsky Unit for the confiscation of the contents of the cell that had been occupied by Rubio. 8 CR 1909; *see* Pet. at 113. Similar to other points Rubio presses now, this allegation was also brought before the court multiple times as part of a motion to disqualify the CCDA, as well as a motion for sanctions against the State. *See generally* 19 RR; 5 CR 1115–18.

At the first hearing regarding the defense's motion for sanctions, the State argued that they were allowed to subpoena the property in the cell, rather than obtain a search warrant, because the property was not owned by Rubio. 19 RR 32; 2 CR 438–40. Additionally, they claimed that the subpoena did not issue until around six months after Rubio had vacated the cell. Thus, he had abandoned the property. They also argued that they sent a letter to defense counsel sometime after the subpoena issued notifying them of the collection and asking them to come review it. 19 RR 32–33.[49] The CCDA maintained that they never viewed or read any letters between Rubio and his attorneys. 1 CR 225–26; 2 CR 441. The trial court ordered everything seized from Rubio's cell to be turned over to the defense and to be videotaped while an accounting and inventory was made of the items. 19 RR 64–65, 74–75, 81–

---

[49] According to the State, the collection of the cell materials occurred in March 2008, and a letter was sent to defense counsel in June 2008. 19 RR 33; *see also* 1 CR 231–32 (letter sent from CCDA to defense counsel).

82. Additionally, the trial court ordered that the CCDA would be prohibited from the use of any of the seized items at Rubio's trial. 2 CR 409–10.

Ultimately, this argument was considered again, and denied, at the hearing on trial counsel's combined motion to disqualify the CCDA. 40 RR 71–72; *see also* 40 RR 73 ("The issue of the subpoenas has already been addressed by this Court. The Court has knowledge of it. The Court has reviewed it. I am taking those actions into account when I rule on the Motion to Disqualify."), 169–72. Given the foregoing—namely the fact that the State was prevented from using any of the seized materials at trial—Rubio has not shown any harm resulting from the alleged improper use of subpoenas by the State or that such action was a "crucial, critical, highly significant" factor in his trial, rendering it fundamentally unfair. *Lowery*, 696 F.2d at 342. This is especially true considering the overwhelming evidence of Rubio's guilt. *See* Statement of Facts; Facts Relating to Punishment (A) (1)–(6).

### 5. Rubio has not shown the State violated the trial court's gag order or that it harmed him, resulting in fundamental unfairness. (Claim 4(A)(6))

Rubio complains that the prosecution "violated the trial court's gag order to drum up publicity for Rubio's trial." Pet. at 114. In March 2008, the Judge Nelson issued an "Order Restricting Publicity" (gag order) preventing the parties from making any extrajudicial statements or otherwise discussing the "*case*" with the media. 1 CR 134–36 (emphasis added). Again, Rubio's trial

counsel included this same complaint in both their motion for sanctions and their combined motion to disqualify the CCDA. 5 CR 1147–49; 8 CR 1911–13. Specifically, they complained that on separate occasions Villalobos had talked to the news media and expressed disappointment that the media had not been giving the case more attention and that the case had been moved from Cameron to Hidalgo County. 5 CR 1148 (containing only the complaint regarding Villalobos's expressed disappointment in the lack of news coverage); 8 CR 1912 (containing both complaints); *see* Pet. at 114–15. Judge Gonzalez held a hearing on the motion for sanctions concerning the violation of the gag order. *See generally* 19 RR. The trial court ultimately concluded Villalobos's comment requesting more media coverage was not sanctionable. 19 RR 29. Namely, the court reasoned that the gag order prevented the parties from discussing the case and disclosing information that could be damaging. Here however, Villalobos's comments about the lack of coverage were his personal opinions and did not relay any information detrimental to Rubio's case. 19 RR 28–29. Additionally, there was no evidence that there was any more media coverage as a result of Villalobos's statement. 19 RR 29. And Rubio presents no such evidence now. Pet. at 114–15.

Also, while Villalobos was not present during the first hearing, 19 RR 29, Rubio's trial counsel questioned him about the gag order at the hearing on the

motion to disqualify. 40 RR 82. When asked by Ed Stapleton what he understood the gag order to mean, Villalobos answered:

> It means that we are not to try Mr. Rubio's case in the media, that we are not supposed to comment on his guilt or innocence in the media or reveal our evidence as to his guilt in the media.

40 RR 82. After a full hearing, the court subsequently denied the motion to disqualify. 40 RR 172. Thus, similar to Rubio's other arguments regarding prosecutorial misconduct, this issue was "ferreted" out during pre-trial proceedings. 19 RR 171. And Rubio presents no evidence now that Villalobos's purported violations of the gag order were a "crucial, critical, highly significant" factor in his trial. *Lowery*, 696 F.2d at 342.

In short, Rubio's generalized outline of Villalobos's misconduct in other cases is insufficient to show Rubio's trial was fundamentally unfair. *Cf. Clark*, 202 F.3d at 767 ("[W]hile Clark refers to evidence that Dr. Erdmann was accused of misconduct in other cases, he has presented no evidence that Dr. Erdmann did so in this case."); *Carmon v. U.S.,* No. 4:12-CR-99-FL-1, 2015 WL 5838634, at *3 (E.D.N.C. Oct. 7, 2015) ("While the criminal conduct by [the case agent in this case] is undisputed, petitioner makes no allegations as to any connection between such criminal conduct and the prosecution of this case. . . [the] suggestion that [the case agent's] criminal conduct and improper conduct in other cases must have somehow tainted his case is speculative and lacks factual details necessary to allow the claim to proceed further."). And, as

mentioned above, all the instances of alleged misconduct in the present case were vetted out during pre-trial proceedings with no harm to Rubio being found. But above all, Rubio fails to show how these alleged acts of misconduct were "crucial, critical, highly significant" factors in his conviction and subsequent sentence. *Lowery*, 696 F.2d at 342. Nor can he.

Indeed, the jury heard Rubio remorselessly describe the horrific nature of the crime that involved asphyxiating, stabbing, cutting, and decapitating three young children while at least one of them begged him to stop. Amongst other things, the jury also heard how sometime during or after these sadistic slayings, Rubio engaged in sexual intercourse with Camacho. Moreover, they heard how Rubio and Camacho threw the bodies of the children in trash bags, purchased materials to clean the crime scene, and had talked about fleeing.

Simply put, even if such misconduct occurred, Rubio is unable to make any meaningful argument that he was harmed or prejudiced by it. In other words, given the overwhelming evidence of his guilt as well as all the aggravating factors, Rubio is unable to show a "'reasonable probability that the verdict might have been different had the trial been properly conducted,'" thereby rendering his trial fundamentally unfair. *Barrientes*, 221 F.3d at 753 (quoting *Foy*, 959 F.2d at 1317). On that basis, this claim fails on the merits in addition to being unexhausted and procedurally defaulted.

## VII. Rubio Fails to Show He Was Selectively Prosecuted. (Claim 4)(A)(7)), (Claim 5)

Rubio asserts that his equal protection rights were violated when he was selectively prosecuted because of his indigent status, and also, that he was prosecuted based on the results of a community survey. Pet. at 117–24. But this claim cannot be heard in this forum because Rubio raised a selective prosecution claim in a subsequent state application that was dismissed as an abuse-of-the-writ by the CCA. And Rubio's arguments to the contrary run counter to the case law. Further, even if this claim could be heard in this forum, Rubio fails to show he is entitled to relief. For instance, he claims he was prosecuted in bad faith on the basis of his indigency. But he cites no case law indicating a defendant's indigency, standing alone, is enough to warrant a finding of selective prosecution. Likewise, Rubio's claim that he was treated differently than similarly situated defendants fails when faced with the objective, record evidence of the heinous, brutal, and depraved nature of his crime where he decapitated three small children.

### A. This claim is barred from consideration on federal habeas review.

Like the claim brought in the present petition, Rubio brought an equal protection claim in his subsequent state application. 1st Supp. SHCR at 86–89. There, he claimed that he was selectively prosecuted based on the "arbitrary classification" of his indigence and that the State refused to discuss

a plea bargain. 1st Supp. SHCR at 89–90. The CCA dismissed Rubio's subsequent application containing this claim as an abuse of the writ, without reviewing the merits of the claim. *Ex parte Rubio*, 2018 WL 2329302, at *4–5. Namely, the CCA noted:

> In his first claim in his subsequent application, [Rubio] argues that he was denied Equal Protection by the State's refusal to discuss the possibility of a plea bargain. He contends that the State's attorney's refusal to offer a plea bargain for a life sentence was part of an illegal, ongoing bribery scheme perpetrated by the local district attorney. The record shows that the information forming the basis for this argument was known to [Rubio's] trial attorney since the time of [Rubio's] trial. Thus, the factual basis for the claim was ascertainable through the exercise of reasonable diligence on or before the date [Rubio] filed his initial application. *See* Art. 11.071 §§ 5(a)(1), 5(e). Further, trial counsel's theories about the impact of the bribery scheme were speculative and [Rubio] has not shown by clear and convincing evidence that, but for a violation of the United States Constitution, no rational juror would have answered in the State's favor one or more of the Article 37.071 special issues. *See* Art. 11.071 § 5(a)(3).

*Id.* at 4.

It is well established that "[Texas' abuse-of-the-writ] doctrine is a valid state procedural bar foreclosing federal habeas review." *Moore v. Quarterman*, 534 F.3d 454, 463 (5th Cir. 2008) (quoting *Coleman v. Quarterman*, 456 F.3d 537, 542 (5th Cir. 2006)); *see also Hughes v. Quarterman*, 530 F.3d 336, 342 (5th Cir. 2008) ("[The Fifth Circuit] has held that, since 1994, the Texas [abuse-of-the-writ] doctrine has been consistently applied as a procedural bar, and that it is an independent and adequate state ground for the purpose of

imposing a procedural bar.") (citations omitted). Thus, the CCA's decision was independent of federal law. *See Stewart v. Smith*, 536 U.S. 856, 860 (2002).

Rubio disagrees.[50] He argues that because the CCA discussed the equal protection claim as being "speculative" it considered the merits of the claim. Pet. at 126. But this argument is not supported by the case law. To be sure, the CCA noted the theories supporting Rubio's equal protection claim were "speculative." *Ex parte Rubio*, 2018 WL 2329302, at *4. But it did so as part of analyzing Rubio's claim under Texas Code of Criminal Procedure Article 11.071 Section 5(a)(3). *See Ex parte Rubio*, 2018 WL 2329302, at *4.

Section 5(a)(3) provides that when a Texas prisoner files a successive habeas application after having previously filed an initial application,

> a court may not consider the merits of or grant relief based on the subsequent application unless the application contains sufficient specific facts establishing that: ... (3) by clear and convincing evidence, but for a violation of the United States Constitution no rational juror would have answered in the state's favor one or more of the special issues that were submitted to the jury in the applicant's trial under Article 37.071, 37.0711, or 37.072.[20]

---

[50] Rubio cites *to In re Davila*, 888 F.3d 179, 188 (5th Cir. 2018), in support of this point. Pet. at 126. But this citation does not help Rubio. For instance, *Davila* addressed the CCA's dismissal of a claim under Section 5(a)(1). *In re Davila*, 888 F.3d at 188. But the word "speculative" Rubio takes issue with in the CCA's dismissal of his application was used when dismissing his claim under Section 5(a)(3). *See Ex parte Rubio*, 2018 WL 2329302, at *4. Also, here, unlike in *Davila*, the CCA did not use merits-based prima-facie language when addressing Rubio's equal protection claim. *See In re Davila*, 888 F.3d at 188 (noting that the CCA stated that Davila failed to make a "prima facie" showing of a constitutional violation, but then stated that it did not review the merits of the claims raised). Lastly, unlike *Davila*, here, the CCA was not "silent as to which subsection" of Section 5 it relied on. *In re Davila*, 888 F.3d at 188; *Cf. Ex parte Rubio*, 2018 WL 2329302, at *4.

Tex. Code. Crim. Proc. Ann. art. 11.071 § 5(a)(3). The CCA has held that § 5(a)(3) necessitates "a threshold showing of evidence that would be at least sufficient to support an ultimate conclusion, by clear and convincing evidence, that no rational factfinder would fail to find" that "the applicant is ineligible for the death penalty." *Ex parte Blue*, 230 S.W.3d 151, 163 (Tex. Crim. App. 2007). In other words, the CCA makes a threshold determination of whether the facts and evidence contained in the subsequent habeas application, if true, would make a clear and convincing showing that the applicant is actually innocent of the death penalty. *Id.* The CCA notes that performing this kind of threshold review is consistent with the fact that, in enacting § 5(a)(3), the Texas "Legislature apparently intended to codify, more or less, the doctrine found in *Sawyer v. Whitley*."[51] *Id.* at 160; *see also id.* ("Section 5(a)(3) of Article 11.071 represents the Legislature's attempt to codify something very much like this federal doctrine of 'actual innocence of the death penalty' for purposes of subsequent state writs."). And a "state court does not undermine the independent state-law character of its procedural-default doctrine by using a federal standard to determine whether an otherwise defaulted successive

---

[51] *Sawyer v. Whitley*, 505 U.S. 333 (1992). Indeed, "[t]he [Texas] Legislature quite obviously intended [§ 5(a)(3)], at least in some measure, to mimic the federal doctrine of 'fundamental miscarriage of justice'" espoused in *Sawyer*. *Ex parte Blue*, 230 S.W.3d at 159.

habeas application should be permitted to bypass a procedural bar." *Rocha v. Thaler*, 626 F.3d 815, 824 (5th Cir. 2010). Indeed, here, as in *Rocha*, "[t]he CCA did not have to reach the merits of [Rubio's]. . . claim to conclude that he is not actually innocent of the death penalty." *Rocha*, 626 F.3d at 823.[52]

Rubio also asserts that any default of this prosecutorial misconduct claim is excused by the ineffective assistance of his state habeas counsel. Pet. at 127–28, n.97. However, as explained above, this argument is misplaced because *Martinez* can only excuse the default of IATC claims. *See supra* Section I.

Thus, this claim is procedurally barred, and Rubio fails to show prejudice or a miscarriage of justice under *Coleman*, 501 U.S. at 750;[53] *see also supra* Section I; Statement of Facts.[54]

---

[52] That said, even if the CCA's decision was somehow a merits determination, this claim would be analyzed under AEDPA's deferential scheme.

[53] Rubio claims that the "State's misconduct" was an "external impediment" to previously raising this claim. Pet. at 127. But as shown below, he has failed to show "active governmental interference or the reasonable unavailability of the factual or legal basis for the claim." *Rodriguez,* 104 F.3d at 697; Pet. at 116.

[54] Rubio also argues that this claim was not adjudicated in state court because it has been "fundamentally altered" by new information he claims shows that the death penalty was pursued against Rubio on the basis of a survey. Pet. at 125. But, as discussed, this claim is procedurally barred and was not adjudicated on the merits. Even assuming that it had been, however, Rubio's argument in this regard is a non-starter. "[T]he exhaustion requirement of § 2254(b) is a reinforcement of, rather than an escape hatch from, the rule that a federal habeas court's review is limited to the state court record." *Lewis v. Thaler*, 701 F.3d 783, 789–91 (5th Cir. 2012). Thus, "[i]n light of the teachings in *Pinholster*," this Court is no longer "tasked with determining

In addition, Rubio's reference and use of Laura Tillman's book,[55] Pet. at 123, is barred from consideration by § 2254(e)(2). *See supra* Section I. Rubio provides no argument why this federal factual development should be permitted. *See* Pet. at 117–28. In fact, he concedes that state habeas counsel should have been aware of the facts supporting his selective prosecution argument. Pet. at 127–28, n.97. Accordingly, Rubio failed to develop the factual basis of this claim. *See (Michael)Williams*, 529 U.S. at 432. Thus, because he does not rely on a new rule of constitutional law, and he fails to show requisite diligence or actual innocence, he cannot overcome the statutory bar to expansion of the record.

> **B. Rubio fails to show he was selectively prosecuted. The State sought the death penalty for Rubio because of the brutality of his crime, not on the sole basis of a survey, or because he was indigent. (Claim 4)(A)(7), (Claim 5))**

To demonstrate selective prosecution, Rubio must show that the prosecution "'had a discriminatory effect and that it was motivated by a discriminatory purpose.'" *United States v. Armstrong*, 517 U.S. 456, 465 (1996) (quoting *Wayte v. United States*, 470 U.S. 598, 608 (1985)). This requires a

---

whether all the new evidence that [a petitioner presents] was exhausted. [It] consider[s] only the record that was before the state habeas court." *Clark v. Thaler*, 673 F.3d 410, 417 (5th Cir. 2012) (footnote omitted). For good reason, *Pinholster* read § 2254(d)(1) as barring new evidence; it makes no sense to allow a petitioner to overcome that bar on new evidence by introducing new evidence.

[55] Laura Tillman, *The Long Shadow of Small Ghosts: Murder and Memory in an American City* (2016).

showing (1) that "similarly situated individuals" outside the protected group were not prosecuted, and (2) that the decision to prosecute was "invidious or in bad faith, in that it rests on such impermissible considerations as race, religion, or the desire to prevent his exercise of his constitutional rights." *United States v. Webster*, 162 F.3d 308, 333–34 (1998) (citing *United States v. Sparks*, 2 F.3d 574, 580 (5th Cir. 1993)).

Further, "the defendant must rebut the presumption that the government made its decision to prosecute in good faith and in a nondiscriminatory manner." *Webster*, 162 F.3d at 334. Indeed, "[t]he decision to prosecute one person instead of another is a proper exercise of executive discretion . . . and [the courts are] 'both reluctant and restricted in any review of prosecutorial decisions.'" *United States v. Hoover*, 727 F.2d 387, 389 (5th Cir. 1984) (citations omitted). "Thus, a defendant 'bear[s] a very heavy burden in demonstrating invidious purpose which invades or overrides that prosecutorial discretion.'" *Hoover*, 727 F.2d at 389 (quoting *United States v. Greene*, 697 F.2d 1229, 1235 (5th Cir. 1983)).

Rubio's claim is rooted in the criminal conduct of Cameron County District Attorney Armando Villalobos discussed previously. *See supra* Section VI(B), n.32. Rubio asserts that other defendants in Cameron County who were "wealthy" enough to bribe Villalobos were given "favorable plea bargains, dismissals, or the opportunity to abscond." Pet. at 118. Essentially, he argues

that he was selectively prosecuted based on his indigency because he "could not pay" or bribe Villalobos the way other "wealthier" defendants did. In support of this claim, he points to evidence elicited during the federal prosecution of Villalobos that favorable plea bargains were given to defendants charged with violent crimes because their attorneys gave Villalobos cash. Pet. at 119; *see also United States v. Villalobos*, No. 1:12-cr-00374 (S.D. Tex. 2014) (ECF No. 356) (Volume 11 of the Reporter's Record in Villalobos's criminal trial, cause no. B-12-374).[56] But Rubio's claim that he was selectively prosecuted based on his indigence fails.

First, Rubio offers no compelling support for the proposition that his indigent status alone can serve as the basis for a selective prosecution claim. *See* Pet. at 118–24. To the contrary, the Supreme Court "has held repeatedly that poverty, standing alone, is not a suspect classification." *Harris v. McRae*,

---

[56] Specifically, Rubio points to several defendants represented by Oscar De Le Fuente, who on numerous occasions, gave payments to Villalobos in exchange for better bargains for his clients. Pet. at 119, n.82–84 (citing *United States v. Villalobos*, No. 1:12-cr-00374 (S.D. Tex. 2014) (ECF No. 356 at 117, 133–34.) One of the defendants Rubio points to is "Pepe" Villareal. Pet. at 119–20. Villareal was charged with murdering his son-in-law, but the charges were eventually dismissed. *United States v. Villalobos*, No. 1:12-cr-00374 (S.D. Tex. 2014) (ECF No. 356 at 52). Another one of the defendants Rubio points to is Hervey Roel. Pet. at 120. Roel was charged with aggravated assault with a deadly weapon, but the case was reduced to a misdemeanor and he was placed on probation instead. *United States v. Villalobos*, No. 1:12-cr-00374 (S.D. Tex. 2014) (ECF No. 356 at 137–38). Additionally, Rubio points to Daniel Juarez, whom had a family violence case that involved strangling his wife. *Id.* at 144–45; Pet. at 120–21. Juarez was given misdemeanor probation. *United States v. Villalobos*, No. 1:12-cr-00374 (S.D. Tex. 2014) (ECF No. 356 at 145–47).

448 U.S. 297, 323 (1980); *see also San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 19 (1973) (noting that "wealth discrimination alone [does not] provid[e] an adequate basis for invoking strict scrutiny"). By extension, the creation of the rule proffered by Rubio—that indigency alone can serve as the basis for a selective prosecution claim—would violate federal habeas non-retroactivity principles under *Teague v. Lane*, 489 U.S. 288 (1989).[57]

Second, even assuming indigency alone makes Rubio's argument amenable to a selective prosecution claim, Rubio is still not entitled to relief because Rubio's reference to cases where the prosecutor gave plea bargains to others charged with violent crimes fails to show that "the decisionmakers in *his* case acted with discriminatory purpose." *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987) (emphasis in original); *see also White v. Thaler*, 522 F. App'x 226, 235 (5th Cir. 2013) (explaining that a defendant could not prevail in an equal protection claim challenging the imposition of the death penalty because he could not show evidence of racial discrimination in his particular case); *Hughes*

---

[57] Again, even if the CCA's decision was somehow a merits determination, this claim would be analyzed under AEDPA's deferential scheme. And Rubio fails to satisfy either § 2254 (d)(1) or (d)(2). In fact, Rubio's requested relief would require this Court to extend Supreme Court case law to include indigency, standing alone, as being a suspect classification for purposes of a selective prosecution claim. That is something AEDPA forbids. *See, e.g., Woods v. Donald,* 575 U.S. 312, 317 (2015) (per curiam) ("Because none of our cases confront the specific question presented by this case, the state court's decision could not be 'contrary to' any holding from this Court," nor an "unreasonable application" thereof. (quotation omitted)); *accord Teague*, 489 U.S. at 299–310.

*v. Dretke*, 160 F. App'x 431, 436 (5th Cir. 2006) (petitioner presented no direct evidence that conviction obtained as a result of racially discriminatory practice). This is true even where some of the defendants Rubio points to were charged with murder because "sharing a charge alone does not make defendants 'similarly situated' for purposes of a selective prosecution claim." *In re U.S.*, 397 F.3d 274, 285 (5th Cir. 2005). Indeed, Rubio points to no evidence in the present record, or in the trial transcripts from Villalobos's federal case, where the criminal behavior of Villalobos permeated Rubio's trial or otherwise affected the CCDA's decision to pursue the death penalty against him instead of offering him a plea bargain.[58] Rather, the record reflects that Villalobos pursued the death penalty against Rubio because of the striking senselessness and brutality of the crime he committed:

> Q:     Mr. Villalobos, very briefly, let's put an end to this. Why are you seeking the death penalty against John Allen Rubio?
>
> A:     He has been tried and convicted before. He received the death penalty at the previous trial. Our office

---

[58] Rubio asserts that his court-appointed lawyers were "singled out" by Villalobos and that he "especially ensured" Rubio's attorneys would not receive favorable plea negotiations. Pet. at 121–22. But Rubio's reference to the supposed "blacklist" is again, unavailing, for the same reasons noted above. Pet. at 121; *see supra* Section VI(B)(1). And at the hearing on the motion to disqualify the CCDA—which was denied—Villalobos testified that "there was never an instruction" from him precluding plea negotiations to Rubio's trial counsel—Ed Stapleton and Nathan Perez. 40 RR 63–64. Also, Villalobos testified that Rubio's trial counsel had "absolutely nothing to do" with whether or not the death penalty was sought in Rubio's case. 40 RR 84–85.

> believes that the majority of the citizens of Cameron County want me to proceed on the death penalty for John Allen Rubio. *And the very nature of the offense, he held down and strangled his babies. Held them down, stabbed them, cut their heads off. The last one, he couldn't even cut the head off completely. He had to yank the head off. Because of that and that alone, we are seeking the death penalty.*

40 RR 90–91 (emphasis added). Even Rubio's barred evidence bears this out. Rubio relies on Laura Tillman's book for the proposition that Villalobos made the decision to seek the death penalty against Rubio solely by "relying on a community survey."[59] Pet. at 123; *see also* Tillman, *supra* at 153. But when taken in total, Villalobos's purported statement to Tillman reiterates the previous reasons given by Villalobos for why he pursued the death penalty against Rubio:

> All these factors [community polling], *plus the unsettling, shocking, and unescapable images of the babies that were murdered, led me to conclude that at the very least, a jury should decide [Rubio's] fate.*

Tillman, supra, at 153 (emphasis added). For that reason, Rubio's fundamental fairness argument stemming from Villalobos's purported use of the survey also fails. Pet. at 115; *Barrientes*, 221 F.3d at 753 (quoting *Foy*, 959 F.2d at 1317).

The decision to prosecute capitally is a complex decision involving many factors, including the manner and circumstances of the crime, and the nature

---

[59] The author, Laura Tillman, claims to have corresponded by letter to Villalobos during his incarceration. Tillman, *supra,* at 153.

of aggravating and mitigating evidence. *Cf. McCleskey*, 481 U.S. at 294 ("[T]he Constitution requires that [a jury's] decision [to impose the death penalty] rest on consideration of innumerable factors that vary according to the characteristics of the individual defendant and the facts of the particular capital offense.").

Here, the fact of the matter is simple. When he murdered three children under the age of six during the same criminal transaction, "[Rubio] committed and act for which the United States Constitution and [Texas] laws permit imposition of the death penalty." *McCleskey*, 481 U.S. at 297; *see also Gregg v. Georgia*, 428 U.S. 153, 226 (1976) (White, J., concurring) ("[O]ne of society's most basic tasks is that of protecting the lives of its citizens and one of the most basic ways in which it achieves the task is through criminal laws against murder."). To that end, Rubio's reference to cases where some non-indigent defendants did not receive the death penalty fails to provide the "exceptionally clear proof" of discrimination required by *McCleskey*. *McCleskey*, 481 U.S. at 297. That is especially true in Rubio's case, which presents a particularly dreadful display of depravity. For instance, Rubio points to no wealthier defendant who confessed to ripping the head off of their two-month-old daughter. Nor does he present evidence that any of the defendants he cites to held down their three-year-old daughter so that they could stab her twenty-one times in the chest as she pleaded for her life.

Indeed, Rubio fails to cite to any non-indigent defendant Villalobos plea bargained with who asphyxiated, stabbed, and decapitated three young children—and remorselessly confessed to such—who did not receive the death penalty or did not have the death penalty pursued against them. *See* Pet. at 118–21; *supra* n.56. Put plainly, to say that the boundless brutality of Rubio's crime serves to set him apart from any other purportedly "similarly situated" non-indigent defendant is an understatement. As such, Rubio has failed to show that he was selectively prosecuted based only on his indigency, or solely on the basis of the results of a community survey.

Thus, in addition to this claim being procedurally barred, Rubio should be denied any and all relief on the merits, even under de novo review.

## VIII. Rubio Fails to Show That the Testimony of A.P. Merillat in His Case Was False or That the State Suppressed Such Evidence, and That It Was Material to the Outcome of His Trial. (Claims 8, 9). Also, Because of This, He Cannot Show Trial Counsel Were Ineffective for Not Challenging Merillat's Testimony. (Claim 10)

Rubio asserts that State punishment phase witness, A.P. Merillat, testified falsely in several regards, and that these alleged misrepresentations merit relief under *Napue*, *Brady,* and *Giglio*. Pet. at 145–57. Further, he claims that trial counsel were ineffective for failing to challenge this false testimony. Pet at 158–60. But Rubio's claims and new evidence supporting this claim are barred from federal habeas review. What is more, because Rubio's claims on

this point are refuted by the record, immaterial in light of all the other future dangerousness evidence, or both, he fails to show that this argument entitles him to any relief.

## A. These claims and any supporting affidavits are barred from federal habeas review.

As he admits in his petition, Rubio failed to raise his *Napue* claim in state court. Pet. at 152. Rubio claims that the State's "knowing reliance on. . . false testimony" provides cause for failing to raise this claim previously. Pet. at 152. He offers no further argument. But as shown below, Rubio fails to show this testimony was false. *See infra* Section VIII(B)(3). Rubio also asserts that he can excuse any default through the miscarriage-of-justice exception. Pet. at 153 (citing *Sawyer*, 505 U.S. at 336. But Rubio provides no support for this argument. Pet. at 153. Rather, Rubio is unable to show that he is actually innocent of murdering and decapitating three children, nor can he show that he would not have received a death sentence in this case. *See* Statement of Facts; Facts Relating to Punishment; *supra* n.43. Accordingly, Rubio fails to show prejudice or a miscarriage of justice under *Coleman*. 501 U.S. at 750; *supra* Section I. Thus, his *Napue* claim is unexhausted and procedurally defaulted. Pet. at 145–53.

In addition, the affidavit from Frank AuBuchon, Supp. App. 36, and the TDCJ Unit Classification Procedure sheet, ECF No. 17-1 at 13–19, Rubio has

attached to his petition in support of parts of this claim, is barred from consideration by § 2254(e)(2). *See supra* Section I. Rubio provides no argument why this federal factual development should be permitted. *See* Pet. at 145–53. In fact, he concedes that state habeas counsel should have been aware of the facts supporting this false testimony argument. Pet. at 159–60. Accordingly, Rubio failed to develop the factual basis of this claim. *See* (*Michael*) *Williams*, 529 U.S. at 432. Thus, because he does not rely on a new rule of constitutional law, and he fails to show requisite diligence or actual innocence, he cannot overcome the statutory bar to expansion of the record. *See supra* Section I.

Rubio's *Brady* claim is also unexhausted and procedurally defaulted because he did not raise it in state court. Pet. at 153–57. He claims that he can overcome any default of this claim based on the State's failure to disclose "this impeachment evidence." Pet. at 157. "For claims alleging a failure to disclose exculpatory or impeachment evidence, cause and prejudice parallel the suppression and materiality components of the alleged *Brady* violation." *Barnes v. Vannoy*, 697 F. App'x 799, 803 (5th Cir. 2017) (citing *Strickler v. Greene*, 527 U.S. 263, 280 (1999)). "Showing interference by officials that made compliance with procedural rules impracticable is one accepted way of showing cause." *Barnes*, 697 F. App'x at 803. In other words, cause may be established if suppression is proven. *See Strickler*, 527 U.S. at 282–89. And prejudice may be shown if materiality is met. *See Canales v. Stephens*, 765 F.3d 551, 574–75

(5th Cir. 2014) (citing *Banks v. Dretke*, 540 U.S. 668, 691 (2004)). But as shown below, Rubio fails to show suppression or materiality. *See infra* Section VIII(B)(4).

Lastly, Rubio concedes that his IATC claim is unexhausted, but urges he can use *Martinez* to overcome any default. Pet. at 159–60. But state habeas counsel were not ineffective. *See supra* Section I. Moreover, as shown below, because this IATC claim is insubstantial and meritless, *Martinez* cannot save it from being defaulted.

Accordingly, all of Rubio's claims on this point are unexhausted and procedurally defaulted.

### B. Rubio fails to show that the State suppressed favorable, material evidence, or knowingly presented materially false or misleading testimony.

### 1. Testimony of A.P. Merillat at Rubio's trial

The State called A.P. Merillat, a senior criminal investigator for the Texas Special Prosecution Unit (SPU), as a witness during the punishment phase of Rubio's trial. 72 RR 182. Merillat testified that the SPU was responsible for prosecuting crimes involving the TDCJ; specifically, crimes occurring within prisons. *Id.* Merillat noted that he had no opinion about whether or not Rubio would be a future danger and was only to testify regarding his expertise with the prison system, specifically as it pertained to

the opportunities that existed within the prison system to commit crimes or acts of violence. *Id.* at 196–97.

Merillat began his testimony by talking about the structure of prison, generally. He testified that general population is a place where many inmates are able to go to and from their cells for various reasons—such as appointments or work—throughout the day. *Id.* at 199. And that in general population, inmates going to these various "appointments" are not escorted. *Id.* He testified that, while death row is the most secure prison facility in the state of Texas, in general population, an inmate is not observed "twenty-four hours a day, seven days a week." *Id.* at 200–01, 203. An inmate in general population will have a cellmate and be able to "recreate on a yard with. . . many other inmates at the same time." *Id.* at 203–04. He testified that crimes occur in the prison from the wardens' office all the way to the most secure areas. *Id.* at 199–200. He told the jury that a person convicted of capital murder who received less than a death sentence would be classified into a custody level inside general population. *Id.* at 205.

Merillat told the jury about the prison classification system, indicating that the inmate's level of security and number of benefits or freedoms within prison was determined by classification. He testified that the classification system is the "heart" of how an inmate will serve his prison time. *Id.* He testified that classification can go up or down depending on behavior. *Id.* at

205–06. Inmates in general population are categorized on a scale from G-1 to G-5. *Id.* G-1 is the least-restrictive classification, where inmates are "trustees" and receive special privileges; a convicted capital murderer will never reach G-1. *Id.* at 206. An inmate who is a convicted murderer could be a G-2 status, but that inmate would not be allowed to work outside the fences of the prison without supervision. *Id.* at 206–07.

Merillat testified that a person convicted of capital murder, but receiving less than a death sentence, would enter general population at a G-3 status. *Id.* at 209. That inmate would not wear a special uniform identifying them as a capital murderer, nor would they be locked away in "special place" away from other inmates. *Id.* at 223–24. Rather, a G-3 inmate lives in general population with a cellmate, like any other inmate, but his cellmate might be convicted of something less severe than capital murder; he can come and go from his cell; he will not be handcuffed or escorted by guards; and he can work, go to school, have access to medical care, and have visitation—including eligibility for contact visits with family members. *Id.* at 209–11.

Merillat also talked about the proliferation of weapons, drugs, and alcohol in the prison system. Regarding weapons, Merillat testified that he has seen them made from pencils, pens, plexiglass, metal, with the "most common" kind of weapon being one made from the disposable razors that inmates receive. *Id.* at 215. He also testified that bones from pork chops, steaks, and

chickens have been fashioned into weapons. *Id.* at 215. In addition to other weapons, *Id.* at 215–20, inmates have made "zip guns" which he described as being a "one-shot" firearm that can "shoot. . . one time before it destroys itself." *Id.* Similarly, inmates can also make "blow guns" and slingshots. *Id.* at 220–22. These kinds of projectile weapons are used through opening the "bean slot" in the cell door, which is, in part, why taking over the "bean slot" creates a danger. *Id.* There have been instances of offender-on-offender attacks through the bean slot. *Id.* at 222.

Merillat also testified that drugs such as methamphetamine, cocaine, heroin, marijuana, and pills are present in the prison system. *Id.* Drugs are desired by inmates, so they will do certain things to obtain them, including committing acts of violence against other inmates. *Id.* at 223. Also, alcohol is present in prison—in both general population and death row. *Id.* at 224. And so are cell phones. *Id.* at 225. Cell phones are problematic because an inmate can order drugs and other items, as well as plot escapes. *Id.* He testified that he has worked cases where inmates have taken cell phone pictures of guard towers and cell blocks, in an attempt to devise an escape plan. *Id.*

Merillat testified that there were abundant opportunities to commit crimes of violence in prison. *Id.* at 227. Merillat testified that from 2000–2008, he had seen over 6,000 violent prison crimes—including prison assaults. *Id.* at 226.

On cross-examination, Merillat testified that the prison system had psychologists, and that they have the power to make regulations stricter if they think it is necessary. *Id.* at 235.

## 2. *Brady* and *Napue* case law

Again, the State denies a criminal defendant due process when it knowingly uses false evidence at trial or allows untrue testimony to go uncorrected. *See Giglio*, 405 U.S. at 153; *Napue*, 360 U.S. at 269. "To establish a due process violation based on the government's use of false or misleading testimony, the defendant must show (1) that the witness's testimony was actually false, (2) that the testimony was material, and (3) that the prosecution knew the witness's testimony was false." *Fuller v. Johnson*, 114 F.3d 491, 496 (5th Cir. 1997) (citing *Giglio*, 405 U.S. at 153–54). An "any reasonable likelihood" standard applies to determine materiality. *Giglio*, 405 U.S. at 153–54.

Further, to establish a *Brady* violation, a petitioner must demonstrate that (1) the prosecution suppressed evidence (2) the evidence was favorable to the defense, either as exculpatory or impeaching evidence, and (3) the evidence was material to either guilt or punishment. *Banks*, 540 U.S. at 691. The evidence is material only if there is a reasonable probability that, had it been disclosed to the defense, the result of the proceeding would have been different. *United States v. Bagley*, 473 U.S. 667, 684 (1985). A "reasonable probability" is

a probability sufficient to undermine confidence in the outcome of the trial. *Id.* at 678, 684. Further, a violation does not arise where the material evidence was discoverable through the exercise of due diligence. *Kutzner v. Cockerell*, 303 F.3d 333, 336 (5th Cir. 2002).

### 3. Rubio's *Napue* and IATC claims fails because he has not shown falsity or materiality. (Claim 8), (Claim 10)

First Rubio claims that Merillat testified falsely because he "overstated the privileges an inmate like Rubio would have if he were sentenced to life" and "understated the restrictions" that would be placed on him. Pet. at 149. In making this argument, Rubio initially posits that "Merillat is now notorious for falsely testifying in Texas death penalty cases" and that he has a "history of providing false testimony regarding TDCJ's classification system." Pet. at 145. He cites no authority supporting such notoriety, but relies on two CCA decision in which he asserts Merillat testified falsely. Pet. at 145 (citing *Velez v. State*, No. AP-76,051, 2012 WL 2130890 (Tex. Crim. App. Jun. 13, 2012) (not designated for publication); *Estrada v. State*, 313 S.W.3d 274, 286 (Tex. Crim. App. 2010)). To be sure, Merillat unintentionally testified inaccurately in both of those cases on the subject of prison classification. However, there was no finding that Merillat lied in either case. In fact, in *Estrada,* the CCA specifically noted that "both parties seem to agree that Merillat's incorrect testimony was not intentional." 313 S.W.3d at 287; *see Gobert v. State,* No. AP-

76,345, 2011 WL 5881601, at *6 (Tex. Crim. App. Nov. 23, 2011) (not designated for publication) (referring to Merillat's testimony in *Estrada* as "unintentionally inaccurate").[60] In that case, Merillat mistakenly testified that a life-without-parole (LWOP) capital murderer would initially be classified as G-3, but after ten years and good behavior his classification could be reduced below G-3. *Estrada,* 313 S.W.3d at 286. At one time, G-3 inmates, including capital murderers, could indeed receive a reduced classification; but in accordance with a 2005 TDCJ regulation, any LWOP capital murderer will never be classified less than G-3. *Id.* at 287. Given the jury's documented reliance on this inaccurate testimony,[61] the State agreed that Merillat's testimony may have contributed to the jury's decision and recommended that the CCA grant Estrada a new punishment hearing. *Id.* at 287.

Merillat provided similarly inaccurate testimony in *Velez*; in that case the CCA concluded, based upon the State's circumstantial case, Velez's non-violent criminal record, and his clean disciplinary record while in jail awaiting trial, that it could "not find beyond a reasonable doubt that Merillat's false

---

[60] Even Rubio's trial counsel acknowledged that Merillat's incorrect testimony in *Estrada* was not intentional. 72 RR 179. And Merillat himself testified to this fact on the stand. 72 RR 198.

[61] During the punishment phase deliberations, the jury sent out two separate notes, the first indicating they had difficulty reaching a decision on the future danger special issue, and the second asking, "Based on the testimony of Fitzgerald and Merillat is there a possibility that the defendant would be eligible for a less restrictive status after 10 years (or some other period of time)." *Estrada,* 313 S.W.3d at 286-87.

testimony 'did not contribute to the conviction or punishment.'" 2012 WL 2130890, at *31–33 (citing Tex. R. App. Proc. 44.2(a)).

But the errors that occurred in *Estrada* and *Velez* did not occur in Rubio's trial. To the contrary, Merillat accurately testified that a person convicted of capital murder, but receiving less than a death sentence, would enter general population at a G-3 status. 72 RR 209. And unlike his testimony in *Estrada* and *Velez*, Merillat never testified that Rubio could receive any kind of reduced classification. *See id.* at 162–240. In short, Rubio's present claim is an effort to take advantage of Merillat's unintentionally inaccurate testimony in *Estrada* and *Velez* and suggest that Merillat's reputation is now synonymous with being a liar. But Merillat's testimony in those cases was not intentionally false; his testimony involved an outdated provision—one he arguably should have known about—but was not deliberately deceptive.

In fact, prior to *Estrada* and *Velez*,the CCA has repeatedly upheld convictions involving the use of Merillat's expert testimony, without questioning his reliability or reputation. *See Coble v. State,* 330 S.W.3d 253, 287 (Tex. Crim. App. 2010) (finding Merillat's testimony admissible as rebuttal "educator expert" testimony); *Threadgill v. State,* 146 S.W.3d 654, 670–71 (Tex. Crim. App. 2004) (Merillat's testimony that violence prevalent within prison system and describing weapons made by inmates, with photographs depicting weapons, relevant and admissible); *Espada v. State,* No. AP–75,219, 2008 WL

4809235, *9-10 (Tex. Crim. App. 2008) (approving the use of Merillat as an expert on classification); *Sprouse v. State,* No. AP–74,933, 2007 WL 283152, at *4–5 (Tex. Crim. App. 2007) (approving the use of Merillat as an expert). And after *Estrada* and *Velez*, the CCA has declined to grant relief where Merillat did not give inaccurate testimony similar to that given in those cases. *See Ex parte Swain,* No. WR-64,437-02, 2012 WL 5452217, *1 (Tex. Crim. App. Nov. 2, 2012) (not designated for publication) (offense and trial occurred prior to effective date of regulation that was subject of Merillat's testimony in *Estrada* and *Velez*); *Ex parte Norman,* Nos. WR-74,743-01, WR-74,743-02, 2012 WL 3600318, at *1 (Tex. Crim. App. Aug. 22, 2012) (not designated for publication) (finding that Merillat did not lie to or mislead the jury in any way); *Gobert,* 2011 WL 5881601, at *6 (concluding no abuse of discretion in overruling Tex. R. Evid. 702 objections because Merillat did not repeat factual inaccuracy; the CCA noted it upheld Merillat's testimony "in several previous cases as reliable and relevant to the future-dangerousness issue concerning the opportunities for violence in prison society.").

Put plainly—and contrary to Rubio's claim, Merillat's unintentional errors in previous trials are irrelevant to the accuracy of his testimony in Rubio's trial. Nor or they sufficient to show that the State knowingly elicited false testimony in *his* trial. Pet. at 150–51; *see also Devoe v. Davis,* No. A-14-CA-151-SS, 2016 WL 5408169, at *18 (W.D. Tex. Sept. 27, 2016) ( "[T]his Court

independently concludes Petitioner has failed to allege any specific facts showing the prosecution knowingly elicited any factually inaccurate or misleading testimony from Merillat during Petitioner's 2009 capital murder trial. The fact Merillat may have testified erroneously in other cases regarding the details of the TDCJ's inmate classification system does not in any way establish a *Giglio* or *Napue* violation where there is no showing Merillat testified erroneously during Petitioner's 2009 trial."); *cf. Clark*, 202 F.3d at 767 ("[W]hile Clark refers to evidence that Dr. Erdmann was accused of misconduct in other cases, he has presented no evidence that Dr. Erdmann did so in this case."). For the following reasons, Rubio fails to refute the record evidence that reveals Merillat's testimony at *his* trial was not false, or material.

The crux of Rubio's claim that Merillat's testimony was false centers solely around an affidavit he presents from Frank AuBuchon.[62] Pet. at 146, Supp. App. 36, where he claims that Merillat's testimony "grossly misled the jury" about how a capital murderer sentence to life would be "classified and managed" while incarcerated. Pet. at 149; Supp. App. 36. But beyond being barred, this evidence fails to show Merillat's testimony was false. That is because attempts to prove that evidence was false based on the dueling

---

[62] AuBuchon's witness statement contains no statement that he would have testified if asked. Supp. App. 35–37. Accordingly, this statement fails to support a claim of IATC. *Day*, 566 F.3d at 538.

testimony of experts is generally not sufficient to show a due process violation. *See Boyle v. Johnson*, 93 F.3d 180, 186 (5th Cir. 1996) (holding that "the fact that other experts disagreed" was insufficient to show the state's expert testimony to be false or misleading); *Campbell v. Gregory*, 867 F.2d 1146, 1148 (8th Cir. 1989) (presenting differing testimony from new expert in motion for new trial did not establish falsity of prior expert's opinion offered at trial). Rubio also attaches a TDCJ Unit Classification Procedure sheet, ECF No. 17-1 at 13–19, in support of the general proposition that Merillat overstated the privileges Rubio would have if he received a life sentence. Pet. at 149. Even considering this evidence, Rubio's claims are refuted by the record.

Indeed, the information on the classification procedure sheet Rubio attaches differs in no meaningful way from Merillat's testimony. For instance, the classification sheet states that G-3 status will be conveyed upon an offender convicted of capital murder and sentenced to life without parole. ECF No. 17-1 at 17. Merillat testified that a person convicted of capital murder, but receiving less than a death sentence, would enter general population at a G-3 status. 72 RR 209. What is more, the classification procedure sheet shows that a G-3 inmate will be eligible for (1) contact visits with immediate family members; (2) recreation time; (3) jobs; and (4) education programs—among other things. ECF No. 17-1 at 17. This mirrors Merillat's testimony. *See* 72 RR 209–211.

Above all, even assuming the portions of Merillat's testimony Rubio points to were false and the State knew it, Rubio fails to show a reasonable likelihood that the testimony affected the jury's verdict. *United States v. Agurs*, 427 U.S. 97, 103 (1976), *holding modified by Bagley*, 473 U.S at 667. Indeed, Rubio does not appear to challenge the parts of Merillat's testimony stating generally that murders and assaults occur in prison, that inmates have access to weapons in prison, that inmates have access to drugs, and alcohol in prison, and that G-3 classified inmates will have an opportunity to commit violent acts and have access to victims. Pet. at 149–50. Still, even setting aside all of Merillat's testimony, as mentioned previously in this pleading, the State's future dangerousness evidence was compelling.

For instance, at this point in the proceedings, the jury had heard extensively about the brutality of Rubio's crime—rejecting his insanity defense and finding him guilty of four counts of capital murder for asphyxiating, stabbing, and decapitating three young children. *See Miller v. Johnson*, 200 F.3d 274, 286 (5th Cir. 2000) (Under Texas law, "the facts of the crime alone, if severe enough, can be sufficient to support the affirmative finding to the special issue."). Beyond that, all Rubio's attached evidence challenging Merillat's testimony pales in comparison to—and fails to rebut—the abundant punishment evidence the jury heard, which included: Rubio's general lack of remorse for the crime, his prior criminal record and criminal conduct, as well

as his disruptive behavior during his first stay on death row—where despite the security strictures, he possessed drugs, set multiple fires, and took over the slot in his cell door. *See generally* Facts Relating to Punishment (A)(1)–(6); Statement of Facts.

Thus, even if Merillat's testimony was false, Rubio fails to make the requisite showing of materiality. *Giglio*, 405 U.S. at 153–54. In like manner, Rubio's claim that trial counsel were ineffective for failing to challenge Merillat's false testimony does not entitle him to relief. Pet. at 158–59. Trial counsel were not deficient for failing to challenge testimony that was not false. And even assuming they were deficient in that regard, Rubio is unable to show he was prejudiced by such, given all the aggravating factors, and punishment evidence presented.

On that basis, these claims fail on the merits in addition to being unexhausted and procedurally defaulted.

### 4. Rubio's *Brady* claim fails because he cannot show suppression or materiality. (Claim 9)

Relatedly, Rubio claims that the State "suppressed" Merillat's "false" testimony in *Velez*. Pet. at 155. Specifically, he claims that even though the CCA had not issued its opinion in *Velez* at the time Merillat testified at Rubio's trial, the State should have disclosed to Rubio that Merillat's testimony in that case was incorrect because the CCDA's office were the prosecutors in *Velez*.

159

Pet. at 155–56. "'*Brady* and its progeny permit the government to make information *within its control* available for inspection by the defense, and impose no additional duty on the prosecution team members to ferret out any potentially defense-favorable information from materials that are so disclosed.'" *Megas v. Quarterman*, 281 F. App'x 330, 334 (5th Cir. 2008) (unpublished) (quoting *United States v. Pelullo*, 399 F.3d 197, 212 (3d Cir. 2005)). The State did just that when they disclosed to Rubio's trial counsel that Merillat's incorrect testimony in *Estrada* might be impeachment evidence. ECF No. 17-1 at 20–24; 72 RR 178–81.[63] *See Dvorin*, 817 F.3d at 450 ("[E]vidence is not suppressed if the defendant knows or should know of the essential facts that would enable him to take advantage of it.") (quoting *United States v. Skilling*, 554 F.3d 529, 575 (5th Cir. 2009)).

Here, Rubio does no more than speculate that the State actually knew about Merillat's incorrect testimony in *Velez*, and actively suppressed such information. For instance, Rubio's trial occurred before the CCA concluded Merillat's testimony in *Velez* was false, a fact Rubio acknowledges. Pet. at 150–51; *see also United States v. Tadros*, 310 F.3d 999, 1005 (7th Cir. 2002) (holding that while the *Brady* rule requires the government to turn over favorable

---

[63] This was despite the fact that *Estrada* was a published decision and equally accessible to trial counsel.

information that it knows about, it does not require the government to seek out such information like a "private investigator and valet. . . gathering evidence and delivering it to opposing counsel."). Even more, the testimony from Merillat that Rubio complains of was not hidden, but in a publicly-available trial transcript, obtainable with due diligence.[64] *See Kutzner*, 303 F.3d 333, 336; *cf. U.S. v. Delgado*, 350 F.3d 520, 527 (6th Cir. 2003) (since "records of public court proceedings" and "transcripts of . . . trial testimony" were available to the defense from "sources other than the prosecution," *Brady* does not apply). And even in noting the incorrect nature of Merillat's testimony in *Velez*, the CCA did not definitively conclude that the State actively knew about it but that they "knew *or should have known*" that Merillat's testimony was wrong. *Velez*, 2012 WL 2130890, at *32 (emphasis added); *see also Kutzner*, 303 F.3d at 336 ("*Brady* applies only to 'the discovery, after trial[,] of information which *had been known* to the prosecution but unknown to the defense.'") (quoting *Agurs*, 427 U.S. at 103) (emphasis added). Thus, Rubio fails to definitively show that the State suppressed impeachment evidence relating to Merillat's false testimony in *Velez*. *See Medellin v. Dretke*, 371 F.3d 270, 281

---

[64] *Velez* was convicted in 2008, two years before Rubio was convicted and sentenced in the present case. *Velez*, 2012 WL 2130890, at *1.

(5th Cir. 2004) ("An applicant's speculation about the suppression of exculpatory evidence is an insufficient basis to support a *Brady* claim.").

Additionally, Rubio claims that such evidence would have had material impeachment value because had the jury learned of Merillat's incorrect testimony in *Velez*, it would have shown a "pattern that would have significantly degraded Merillat's credibility." Pet. at 146. But even assuming Merillat's testimony in *Velez* was suppressed by the State, Rubio fails to show a "reasonable probability" that, had this evidence been disclosed to the defense, the result of the proceeding would have been different. *Bagley*, 473 U.S. at 684.

"The materiality of *Brady* material depends almost entirely on the value of the evidence relative to the other evidence mustered by the [S]tate." *Rocha v. Thaler*, 619 F.3d 387, 396 (5th Cir.), *clarified on denial of reconsideration,* 626 F.3d 815 (5th Cir. 2010) (quoting *United States v. Sipe*, 388 F.3d 471, 478 (5th Cir. 2004)). "If the evidence provides only incremental impeachment value, it does not rise to the level of *Brady* materiality." *Miller v. Dretke*, 431 F.3d 241, 251 (5th Cir. 2005); *see also Murphy v. Davis*, 901 F.3d 578, 598 (5th Cir. 2018), *cert. denied*, 139 S. Ct. 1263 (2019).

Here, Merillat's testimony in *Velez* would have been of marginal value to the defense, and cumulative of what was already presented. *See Miller*, 431 F.3d at 251. Indeed, as mentioned above, Merillat's incorrect testimony in *Estrada* was disclosed to the defense. ECF No. 17-1 at 20–24; 72 RR 178–81

Further, the State elicited testimony from Merillat regarding the "bad information" he gave in that case. 72 RR 198. And on cross-examination, Merillat admitted that his descriptions of the classification system in *Estrada* was "absolutely wrong," and that he had described the classifications as "being more lenient" than they were. 72 RR 235. Thus, even if trial counsel "could have used [Merillat's false testimony in *Velez*] in its cross-examination . . . it would not have significantly added to the impeachment ammunition that [Rubio's] counsel already had." *Cobb v. Thaler*, 682 F.3d 364, 380 (5th Cir. 2012). Even more, it would not have proven to be very potent impeachment material, as when asked about it, Merillat likely would have testified—as he did when asked about *Estrada*—that any incorrect testimony in *Velez* was not done so intentionally. 72 RR 198.

Finally, as explained above, and throughout this pleading, the State put on significant evidence outside of Merillat's testimony that Rubio was a future danger.[65] *See generally* Facts Relating to Punishment (A)(1)–(6); Statement of. Facts. In the end, just as Rubio fails to prove materiality under *Napue*, so too

---

[65] Indeed, even assuming Merillat's testimony was false, the amount of future dangerous evidence presented in Rubio's trial provides perhaps the clearest contrast between *Velez* and Rubio's case regarding materiality. Unlike the evidence presented in Rubio's trial, in *Velez*, the State's case was "circumstantial." *Velez*, 2012 WL 2130890, at *33. Further, the State "presented no psychiatric evidence that [Velez presented] a future danger, nor did it attempt to rebut the defense's psychiatric evidence that [Velez] would not be a danger in the future."). *Velez*, 2012 WL 2130890, at *33; *cf.* 73 RR 93–116.

does he fail to prove it under *Brady*. *Bagley*, 473 U.S. at 682; *Coulson v. Johnson*, 273 F.3d 393, 2001 WL 1013186, at *13 (5th Cir. 2001) (unpublished per curium opinion) ("Because we have already determined that [Petitioner's] false-evidence claim does not meet the less onerous *Giglio* materiality standard, it 'necessarily follows' that his *Brady* claim is similarly doomed.") (quoting *United States v. Anderson*, 574 F.2d 1347, 1356 (5th Cir. 1978)).

All in all, in addition to being unexhausted and procedurally defaulted, this claim should be denied on the merits.

## CONCLUSION

Based on the foregoing, the Director respectfully requests that this Court deny Rubio's petition for a writ of habeas corpus and all other relief requested therein. Furthermore, because the resolution of Rubio's claims is not debatable among jurists of reason, the Court should deny a certificate of appealability. *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000) (explaining that the district court has the power to sua sponte deny a certificate of appealability without prior briefing and argument by counsel).

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

MARK PENLEY
Deputy Attorney General for Criminal
Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

/s/ Garrett Greene
GARRETT GREENE*
Assistant Attorney General
State Bar No. 24096217
Southern District ID No. 3241871

P. O. Box 12548, Capitol Station
Austin, Texas 78711
(512) 936-1400
(512) 936-1280 (Facsimile)
Email: garrett.greene@oag.texas.gov

ATTORNEYS FOR RESPONDENT

* Counsel of Record

# CERTIFICATE OF SERVICE

I hereby certify that, June 17, 2020, I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Southern District of Texas, using the electronic case filing system. The electronic case filing system sent a "Notice of Electronic Filing" to the following counsel of record

Jessica Graf
Assistant Federal Public Defender
Office of the Federal Public Defender
Northern District of Texas
525 S. Griffin St., Ste. 629
Dallas, TX 75202
jessica_graf@fd.org

&

Lee Kovarsky
Phillips Black, Inc.
P.O. Box 8745
Saint Louis, MO 63101
l.kovarsky@phillipsblack.org

/s/ Garrett Greene
GARRETT GREENE
Assistant Attorney General