## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

**JOHN ALLEN RUBIO,**
     Petitioner,

    *v.*

**BOBBY LUMPKIN, Director,**
Texas Department of
Criminal Justice,
Correctional Institutions Division,
     Respondent.

Case No. 1:18-CV-00088

District Judge Rolando Olvera

## REPLY IN SUPPORT OF
## AMENDED PETITION FOR WRIT OF HABEAS CORPUS
## PURSUANT TO 28 U.S.C. § 2254

Lee B. Kovarsky
*Principal*
Phillips Black, Inc.
Texas Bar No. 24053310
727 East Dean Keeton St, Jon 6.222
Austin, TX 78705
434-466-8257 (tel.)
l.kovarsky@phillipsblack.org

Kristin Swain
*Associate*
Phillips Black, Inc.
PO Box 8745
Saint Louis, MO 63101
(888) 532-0897
k.swain@phillipsblack.org

JASON D. HAWKINS
Federal Public Defender

JEREMY SCHEPERS
Supervisor, Capital Habeas Unit

Jessica Graf (TX 24080615)
Derek VerHagen (TX 24090535)
Assistant Federal Defenders

Office of the Federal Public Defender
Northern District of Texas
525 S. Griffin St., Ste. 629
Dallas, TX 75202
214-767-2746 (phone) 214-767-2886 (fax)
jessica_graf@fd.org
derek_verhagen@fd.org

## THIS IS A CAPITAL CASE

# TABLE OF CONTENTS

TABLE OF CONTENTS...................................................................................ii

TABLE OF AUTHORITIES .......................................................................vii

INTRODUCTORY STATEMENT ............................................................. 1

     A.  Summary judgment is improper at this stage of the proceeding.............................................................................. 1

     B.  The Director's argument that the brutality of the crime forecloses habeas relief, regardless of the offending conduct, is legally unsupported............................. 3

ARGUMENT IN SUPPORT OF CLAIMS FOR RELIEF........................... 8

Claim 1  Rubio is entitled to relief on his claim that his Sixth Amendment right to counsel was violated because the trial attorneys failed to include a person with qualifying mental health expertise as a member of the defense team. .................... 8

     A.  Trial counsel's performance was prejudicially deficient, violating the Sixth Amendment............................................... 9

         1.  Trial counsel's performance was deficient under prevailing professional norms at the time of trial, and counsel offers no strategic reason for their deficiency......................................................................... 9

         2.  The deficiency was prejudicial. ..................................... 14

     B.  This Court can decide this claim on the merits. .................. 21

         1.  Any default is excused by state habeas counsel's failure to raise this substantial claim............................ 21

         2.  Section 2254(e)(2) does not preclude the introduction of new evidence to prove Rubio's disputed factual allegations on a defaulted IATC claim............................................................................ 23

Claim 2  Rubio is entitled to relief on his Sixth Amendment claim that trial counsel deficiently investigated Fetal Alcohol Spectrum Disorders (FASD)........................................................ 33

    A.  On the merits, trial counsel's performance was prejudicially deficient, violating the Sixth Amendment...... 36

        1.  Trial counsel's performance was deficient..................... 36

        2.  Rubio was prejudiced by counsel's failure to investigate FASD............................................ 43

    B.  This claim can be considered on the merits because 28 U.S.C. § 2254(d) does not preclude relitigation. ................. 48

        1.  Section 2254(d) does not bar relitigation because Rubio was denied a meaningful opportunity to be heard in state post-conviction proceedings................... 51

        2.  Section 2254(d) permits relitigation because Rubio satisfies § 2254(d)(1)...................................... 54

        3.  Section 2254(d) permits relitigation because Rubio satisfies § 2254(d)(2)...................................... 58

Claim 3    Rubio is entitled to relief because his Sixth Amendment right to counsel was violated when counsel failed to investigate and prepare for his guilt/innocence phase defense.......................................................................... 59

    A.  Trial counsel's performance was prejudicially deficient, violating the Sixth Amendment............................................ 62

        1.  Trial counsel's performance was deficient..................... 62

        2.  The deficiency was prejudicial. ...................... 66

    B.  This court can decide the substantial claim on the merits because any default is excused by state habeas counsel's failure to raise it. .................................................. 74

Claim 4    Rubio is entitled to relief because the State violated his Fourteenth Amendment right to due process by engaging in a flagrant and ongoing pattern of misconduct. ..................... 75

    A.  The State engaged in extensive prosecutorial misconduct, which rendered Rubio's trial fundamentally unfair............................................ 76

        1.  State misconduct permeated Rubio's trial.................... 79

        2.    The State's misconduct in this case rendered
Rubio's trial fundamentally unfair. ............................... 86

    B.  This Court may decide this claim on the merits. ................. 89

**Claim 5**    Rubio is entitled to relief because the State violated his
Fourteenth Amendment right to equal protection when it
pursued the death penalty against him because of his
indigent status and based on a public survey............................ 92

    A.  Rubio was selectively prosecuted in bad faith and on
the basis of his indigence. ...................................... 92

        1.    Because Rubio is indigent, Villalobos used Rubio's
case to deflect scrutiny of the deals he gave to
wealthy defendants in exchange for illegal bribes
and kickbacks. ............................................... 93

        2.    Significant evidence demonstrates that Villalobos
acted with discriminatory intent. .................................. 96

        3.    Rubio need not point to identical defendants to
establish selective prosecution....................................... 98

    B.  This Court may decide this claim on the merits. ............... 100

        1.    Rubio has fundamentally altered this claim and
seeks a *Rhines* stay to exhaust. ................................... 101

        2.    If this Court determines Rubio has not
fundamentally altered this claim, it may review it
on the merits.................................................. 103

**Claim 6**    Rubio is entitled to relief on his due process claim under
*Napue v. Illinois*....................................................... 108

    A.  The State committed a *Napue* violation............................ 109

        1.    Dr. Welner's testimony was false and misleading. ..... 109

        2.    The State knew or should have known that the
testimony was false. ................................................. 114

        3.    There is a reasonable likelihood that the false
testimony affected the jury. ........................................ 114

B. This claim is unexhausted, but Rubio can overcome any potential default. ........................................................... 115

Claim 7    Rubio is entitled to relief on his Sixth Amendment claim that trial counsel failed to investigate and use evidence related to Rubio's mental health during his prior incarceration. ............................................................. 116

A. Trial counsel's performance was prejudicially deficient, violating the Sixth Amendment. ......................................... 117

1. Trial counsel failed to investigate and present evidence related to Rubio's mental health during his prior incarceration. .................................................. 118

2. The deficiency was prejudicial. .................................... 119

B. This court may consider this substantial claim on the merits because any default is excused by state habeas counsel's failure to raise it. .................................................. 123

Claim 8    Rubio is entitled to relief on his due process claim under *Napue v. Illinois* because the State elicited testimony that it knew, or should have known, to be false and misleading from A.P. Merillat. ....................................................... 125

A. The State committed a *Napue* violation. ............................. 125

B. This Claim can be considered on the merits because Rubio can overcome any potential default. ........................ 128

Claim 9    Rubio is entitled to relief under *Brady v. Maryland* because the State failed to disclose Merillat's false testimony in *Velez*. ....................................................... 130

A. The State committed a *Brady* violation. ............................. 130

B. This claim can be considered on the merits because Rubio can overcome any potential default. ........................ 131

Claim 10   Rubio is entitled to relief on his Sixth Amendment claim that defense counsel failed to prepare for, and rebut, Merillat's false testimony during the punishment phase. ....... 132

    A.   Trial counsel's performance was prejudicially deficient, violating the Sixth Amendment............................................ 132

    B.   Any default is excused by state habeas counsel's failure to raise this substantial claim. ............................... 133

PRAYER FOR RELIEF ...................................................................... 135

CERTIFICATE OF SERVICE .............................................................. 137

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Addicks Servs., Inc. v. GGP-Bridgeland, LP,*
  596 F.3d 286 (5th Cir. 2010) .................................................................. 2

*Andrus v. Texas,*
  140 S. Ct. 1875 (2020) .................................................................*passim*

*Bailey v. Alabama,*
  219 U.S. 219 (1911) ............................................................................ 32

*Balentine v. Stephens,*
  No. 2:03-CV-00039, 2016 WL 1322435 (N.D. Tex. Apr. 1, 2016)........................ 25

*Bandini Petroleum Co. v. Superior Court of State of Cal. in & for Los*
  *Angeles Cty.,*
  284 U.S. 8 (1931) ................................................................................ 32

*Banks v. Dretke,*
  540 U.S. 668 (2004) ............................................................................ 90

*Barrientes v. Johnson,*
  221 F.3d 741 (5th Cir. 2000) ................................................... 25, 26, 91

*Bracy v. Gramley,*
  520 U.S. 899 (1997) ............................................................................ 98

*Brady v. Maryland,*
  373 U.S. 83 (1963) .................................................................*passim*

*Broderick v. Rosner,*
  294 U.S. 629 (1935) ............................................................................ 33

*Brosseau v. Haugen,*
  543 U.S. 194 (2004) .............................................................................. 2

*Brown v. Estelle,*
  701 F.2d 494 (5th Cir. 1983) ............................................................ 103

*Brumfield v. Cain,*
  576 U.S. 305 (2015) ............................................................................ 34

*Buck v. Davis,*
137 S. Ct. 759 (2017) .......................................................................... 5

*Canales v. Stephens,*
765 F.3d 551 (5th Cir. 2014) ........................................................... 25

*Carpenter v. Davis,*
No. 3:02-CV-1145-B-BK, 2017 WL 2021415 (N.D. Tex. May 12, 2017) .............. 25

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) ...................................................................... 2, 3

*Charles v. Stephens,*
736 F.3d 380 (5th Cir. 2013) ...................................................... 56, 57

*Clark v. Johnson,*
202 F.3d 760 (5th Cir. 2000) ...................................................... 2, 87

*Clark v. Martinez,*
543 U.S. 371 (2005) ....................................................................... 30

*Coble v. Quarterman,*
496 F.3d 430 (5th Cir. 2007) ...................................................... 20, 21

*Coleman v. Thompson,*
501 U.S. 722 (1991) ....................................................... 28, 104, 105

*Conner v. Quarterman,*
477 F.3d 287 (5th Cir. 2007) ......................................................... 102

*Cty. Court of Ulster Cty., N. Y. v. Allen,*
442 U.S. 140 (1979) ....................................................................... 33

*Cullen v. Pinholster,*
563 U.S. 170 (2011) ....................................................... 35, 50, 102

*Davila v. Davis,*
137 S. Ct. 2058 (2017) ........................................................... 28, 105

*Day v. Quarterman,*
566 F.3d 527 (5th Cir. 2009) .......................................................... 15

*Donnelly v. DeChristoforo,*
416 U.S. 637 (1974) ............................................................ 76, 88, 89

*Earp v. Cullen,*
623 F.3d 1065 (9th Cir. 2010) ........................................................ 64

*Eaton v. Wilson,*
  No. 09-CV-261-J, 2014 WL 6622512 (D. Wyo. Nov. 20, 2014)...................... 11, 12

*Graham v. Johnson,*
  94 F.3d 958 (5th Cir. 1996) ............................................................................. 102

*Greer v. Miller,*
  483 U.S. 756 (1987) ........................................................................................... 76

*Guidry v. Dretke,*
  397 F.3d 306 (5th Cir. 2005) ............................................................................. 50

*Hansberry v. Lee,*
  311 U.S. 32 (1940) ............................................................................................. 52

*Harrington v. Richter,*
  562 U.S. 86 (2011) ............................................................................................. 34

*Harris v. McRae,*
  448 U.S. 297 (1980) ........................................................................................... 94

*Harris v. Quarterman,*
  496 F.3d 419 (5th Cir. 2007) ............................................................................. 91

*Heiner v. Donnan,*
  285 U.S. 312 (1932) ........................................................................................... 33

*Hinton v. Alabama,*
  571 U.S. 263 (2014) ..................................................................................... 60, 62

*Holland v. Jackson,*
  542 U.S. 649 (2004) ........................................................................................... 30

*House v. Bell,*
  547 U.S. 518 (2006) ................................................................................. 115, 116

*Hughes v. Quarterman,*
  530 F.3d 336 (5th Cir. 2008) ..................................................................... 104, 105

*In re Johnson,*
  935 F.3d 284 (5th Cir. 2019) ............................................................................. 34

*Jones v. Shinn,*
  943 F.3d 1211 (9th Cir. 2019) ........................................................................... 26

*Keeney v. Tamayo-Reyes,*
  504 U.S. 1 (1992) ............................................................................................... 27

*Kremer v. Chem. Const. Corp.,*
   456 U.S. 461 (1982) ........................................................... 52

*Kyles v. Whitley,*
   514 U.S. 419 (1995) ............................................................ 4

*LaVallee v. Delle Rose,*
   410 U.S. 690 (1973) ........................................................... 51

*Lindquist v. City of Pasadena,*
   669 F.3d 225 (5th Cir. 2012) ............................................. 99

*Lindsley v. Nat. Carbonic Gas Co.,*
   220 U.S. 61 (1911) ............................................................ 32

*Lowery v. Estelle,*
   696 F.2d 333 (5th Cir. 1983) ....................................... 88, 89

*Manley v. Georgia,*
   279 U.S. 1 (1929) ............................................................. 32

*Marshall v. Lonberger,*
   459 U.S. 422 (1983) ........................................................... 51

*Martinez v. Ryan,*
   566 U.S. 1 (2012) ....................................................*passim*

*Mathews v. Eldridge,*
   424 U.S. 319 (1976) ........................................................... 77

*McCleskey v. Kemp,*
   481 U.S. 279 (1987) ........................................................... 96

*Mobile, Jackson & Kansas City R. Co. v. Turnipseed,*
   219 U.S. 35 (1910) ...................................................... 31, 32

*Mooney v. Holohan,*
   294 U.S. 103 (1935) ..................................................... 77, 78

*Moore v. Quarterman,*
   526 F. Supp. 2d 654 (W.D. Tex. 2007) ............................... 21

*Murphy v. Davis,*
   901 F.3d 578 (5th Cir. 2018) ............................................. 20

*Murphy v. Stephens,*
   No. 3:09-CV-1368-L-BN, 2014 WL 4771859 (N.D. Tex. Sept. 25, 2014) ............. 25

*Murray v. Carrier,*
   477 U.S. 478 (1986) ...................................................................*passim*

*Napue v. Illinois,*
   360 U.S. 264 (1959) ...................................................................*passim*

*Neal v. Puckett,*
   286 F.3d 230 (5th Cir. 2002) (en banc) ............................................... 49

*Nelson v. Davis,*
   952 F.3d 651 (5th Cir. 2020) ............................................................ 102

*Oyler v. Boles,*
   368 U.S. 448 (1962) ................................................................... 93, 99

*Panetti v. Quarterman,*
   551 U.S. 930 (2007) ......................................................................... 34

*Pickney v. Cain,*
   337 F.3d 542 (5th Cir. 2003) ............................................................ 108

*Roberts v. Comm'r, Alabama Dep't of Corr.,*
   677 F.3d 1086 (11th Cir. 2012) .......................................................... 19

*Rodriguez v. Johnson,*
   104 F.3d 694 (5th Cir. 1997) ............................................................. 90

*Rompilla v. Beard,*
   545 U.S. 374 (2005) ...................................................................*passim*

*Ruiz v. Dretke,*
   No. SA-03-CA-303-OG, 2005 WL 2146119 (W.D. Tex. Aug. 29, 2005) ................ 95

*Salas, et al., v. Cameron County,*
   1:10-CV-037 (S.D. Tex. Aug. 6, 2010) ................................................... 81

*Salas, et al. v. Cameron County,*
   1:10-CV-037 (S.D. Tex. Feb. 22, 2010) .................................................. 80

*Salas, et. al., v. Cameron County,*
   1:10-CV-037 (S.D. Tex. Feb 8, 2011) .................................................... 81

*San Antonio Indep. Sch. Dist. v. Rodriguez,*
   411 U.S. 1 (1973) .......................................................................... 94

*Sasser v. Hobbs,*
   735 F.3d 833 (8th Cir. 2013) ............................................................. 26

*Sawyer v. Whitley,*
    505 U.S. 333 (1992) ................................................................ 115, 129

*Schlup v. Delo,*
    513 U.S. 298 (1995) ......................................................................... 116

*Sears v. Upton,*
    561 U.S. 945 (2010) .............................................................................. 5

*Sells v. Stephens,*
    536 F. App'x 483 (5th Cir. 2013) .......................................................... 48

*Sells v. Thaler,*
    No. SA-08-CA-465-OG, 2012 WL 2562666 (W.D. Tex. June 28, 2012) ......... 44, 47

*Strickland v. Washington,*
    466 U.S. 668 (1984) .................................................................*passim*

*Strickler v. Greene,*
    527 U.S. 263 (1999) ................................................................ 107, 132

*Tot v. United States,*
    319 U.S. 463 (1943) .......................................................................... 32

*Trevino v. Thaler,*
    569 U.S. 413 (2013) ........................................................ 21, 29, 30, 134

*United States v. Armstrong,*
    517 U.S. 456 (1996) .......................................................................... 93

*United States v. Barham,*
    595 F.2d 231 (5th Cir. 1979) ............................................................ 115

*United States v. Frady,*
    456 U.S. 152 (1982) .......................................................................... 91

*United States v. Greene,*
    697 F.2d 1229 (5th Cir. 1983) ............................................................ 93

*United States v. Hayes,*
    589 F.2d 811 (5th Cir. 1978) ............................................................. 92

*United States v. Lewis,*
    517 F.3d 20 (1st Cir. 2008).................................................................. 99

*United States v. Mills,*
    817 F. Supp. 1546 (N.D. Fla. Mar. 31, 1993)........................................ 108

*United States v. Venable,*
  666 F.3d 893 (4th Cir. 2012) .............................................................. 99

*United States v. Villalobos,*
  1:12-CR-374 (S.D. Tex. 2014) ............................................. 83, 86, 97, 98

*United States v. Villalobos,*
  No. 1:12-CR-374 (S.D. Tex. May 15, 2013) ................................. 80, 100

*United States v. Webster,*
  162 F.3d 308 (5th Cir. 1998) ......................................................... 98, 99

*Usery v. Turner Elkhorn Mining Co.,*
  428 U.S. 1 (1976) ................................................................................ 32

*Valdez v. Cockrell,*
  274 F.3d 941 (5th Cir. 2001) ......................................................... 50, 51

*Vasquez v. Hillery,*
  474 U.S. 254 (1986) .......................................................................... 103

*Wainwright v. Greenfield,*
  474 U.S. 284 (1986) ............................................................................ 76

*Ward v. Stephens,*
  777 F.3d 250 (5th Cir. 2015) ............................................................ 102

*Wayte v. United States,*
  470 U.S. 598 (1985) ....................................................................... 93, 94

*Welsh v. Holt,*
  No. 94-7351, 1996 WL 84487 (4th Cir. 1996) ................................. 108

*Wiggins v. Smith,*
  539 U.S. 510 (2003) .....................................................................*passim*

*Williams v. Taylor,*
  529 U.S. 362 (2000) ................................................................. 5, 10, 56

*Williams v. Taylor,*
  529 U.S. 420 (2000) ............................................................. 27, 28, 90

*Wilson v. Beard,*
  426 F.3d 653 (3d Cir. 2005) ............................................................... 26

*Wilson v. Sellers,*
  138 S. Ct. 1188 (2018) ........................................................................ 49

*Wood v. Allen,*
    558 U.S. 290 (2010) .................................................................. 51

*Woodford v. Viscotti,*
    537 U.S. 19 (2002) .................................................................... 57

*Zeigler v. Jackson,*
    638 F.2d 776 (5th Cir. 1981) ................................................... 94

**State Cases**

*Bigby v. State,*
    892 S.W.2d 864 (Tex. Crim. App. 1994)................................. 62

*Chatman v. Walker,*
    773 S.E.2d 192 (Ga. S. Ct. 2015) ........................................... 11

*Estrada v. State,*
    313 S.W.3d 274 (Tex. Crim. App. 2010)............................*passim*

*Ex parte Rubio,*
    No. WR-65,784-02, 2018 WL 2329302 (Tex. Crim. App. 2018) ...................*passim*

*Ruffin v. State,*
    270 S.W.3d 586 (Tex. Crim. App. 2008).................................. 19, 64, 67

*Velez v. State,*
    No. AP-76,051, 2012 WL 2130890 (Tex. Crim. App. 2012)................................ 125

**Statutes**

28 U.S.C. § 2254...............................................................*passim*

TEX. CODE CRIM. PROC. ANN., art. 37.071 § 2(e)(1) ....................................... 4

TEX. CODE CRIM. PROC. art. 11.071 § 5(a)....................................... 104, 105

**Other Authorities**

Fed. R. Civ. P. 56 ..................................................................... 1, 2

Fed. R. Civ. P. 81(a)(4)(A)........................................................ 2

Mitch Mitchell, *Convicted Child Killer Gets Life in Prison*, Fort Worth
    Star-Telegram, March 13, 2015 at A5,
    *available at* https://www.newspapers.com/image/ 651406432. .............................. 6

Mitch Mitchell, *Man Gets Life Term in Death of Infant*, Fort Worth Star-Telegram, August 16, 2013 at B1, B7, *available at* https://www.newspapers.com/image/651288582/. .................................................... 7

Noelle Phillips & Jordan Steffen, *Juror Says One Said No to Death*, Denver Post, Aug. 8, 2015, at A4 ............................................................................. 6

Russel Stetler, *The Past, Present, and Future of the Mitigation Profession: Fulfilling the Constitutional Requirement of Individualized Sentencing In Capital Cases*, 46 Hofstra L. Rev. 1161 (2018) .................................................. 7

Sarah Reeve, et. al, *The Role of Sleep Dysfunction in the Occurrence of Delusions and Hallucinations: A Systematic Review,* Clin. Psychol. Rev. 96 (2015), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4786636 ............................. 73, 74

*Schizophrenia and Sleep Disorders: Links, Risks, and Management Challenges*, 9 Nat. Sci. Sleep 227 (2017) ............................................................. 73

Tasha Tsiasperas, *Is the Death Penalty Dying in Dallas County?*, Dallas Morning News, June 3, 2017, *available at* 2017 WLNR 17158104. ....................... 7

## INTRODUCTORY STATEMENT

John Allen Rubio submits this Reply in support of his Amended Petition for Habeas Corpus, which also functions as a Response to what the Director has denominated a Motion for Summary Judgment under Federal Rule of Civil Procedure ("FRCP") 56. The structure of this Reply tracks the structure of the Amended Petition, and arguments regarding each claim of ineffective assistance and prosecutor misconduct are set forth in distinct sections. Before delving into the claim-by-claim analysis, however, two global observations about this case are in order—one regarding the summary-judgment posture of this litigation, and another regarding the Director's suggestion that behavior that otherwise violates the Constitution is nonprejudicial when murders are brutal.

### A. Summary judgment is improper at this stage of the proceeding.

First, the Director is asking for summary judgment under FRCP 56, but this Court's analysis at the summary judgment stage requires that it resolve all facts and draw all inferences in Rubio's favor. That requirement notwithstanding, the Director urges this Court to enter summary judgment based on detailed, in-the-weeds disputes over facts; the Director's tactic is common in habeas litigation to which he is a party. That the Director engages in this practice persistently, however, makes it no less offensive to the FRCP. Regardless of how this Court ultimately expects the case to resolve, summary judgment is inappropriate at this juncture. For the purposes of resolving the Director's motion, the Court may not indulge the Director's relentless requests to have it find facts.

Because Rubio is confined pursuant to a state-court judgment, his federal habeas litigation proceeds under, among other things, the Rules Governing Section 2254 Cases In The United States District Courts ("Section 2254 Rules"). Although the Section 2254 Rules set forth some specific constraints on Rubio's case, the FRCP apply "to the extent that they are not inconsistent with any statutory provision or [Section 2254 Rules]." Section 2254 Rule 12; *see also* FRCP 81(a)(4)(A) (explaining that FRCP apply in "proceedings for habeas corpus … to the extent that the practice in those proceedings[] is not specified in … the [Section 2254 Rules]"). There is nothing in the Section 2254 Rules that interrupts the ordinary application of FRCP 56 (summary judgment).

The problem for the Director is that the FRCP 56 summary judgment framework forecloses his request to have this Court resolve the habeas case by finding facts in this posture. Summary judgment procedure in habeas corpus cases works the same way it does in any other litigation: it is a way for the court to end the litigation when there is no genuine issue of material fact. *See* FRCP 56 (c) (phrasing availability of relief in familiar terms of whether a material fact can be "genuinely disputed"); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (leading modern statement of rule). In so doing, the Court must "view all facts and draw all reasonable inferences in favor of the nonmoving party[.]" *Brosseau v. Haugen*, 543 U.S. 194, 195 (2004); *see also Addicks Servs., Inc. v. GGP-Bridgeland, LP*, 596 F.3d 286, 293 (5th Cir. 2010) (citing *Celotex*); *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000) (explaining that, as a general principle, FRCP 56 "applies with equal force in the context of habeas corpus

cases"). That the Director asks for summary judgment on fact-bound questions and before any fact development is especially puzzling because summary judgment may be entered against a federal habeas claimant only "after adequate time for discovery[.]" *Celotex*, 477 U.S. at 322. After all, a party cannot be expected to show that a genuine issue of fact exists without an opportunity to actually develop facts.

The Director may move for summary judgment, but has to carry a summary judgment burden in order to prevail on that motion. On issue after issue, however, the Director asks for relief requiring that contested factual questions and inferences be resolved in *his* favor, rather than Rubio's. Although an exhaustive list is beyond the scope of this introductory material, it suffices to say that fact-bound disputes addressed throughout this Reply cannot be resolved in this posture.

**B.    The Director's argument that the brutality of the crime forecloses habeas relief, regardless of the offending conduct, is legally unsupported.**

Second, in conjunction with his responses to virtually all of the claims in the Amended Petition, the Director asserts that there can be no prejudice to the outcome because of the crime's brutality. The misbehavior of prosecutors and ineffectiveness of defense counsel do not rise to the level of constitutional violations, the Director's theory goes, because such conduct made no difference to the outcome. *See*, *e.g.*, MSJ (Doc. 30) at 65[1] ("because of all the aggravating evidence before the jury, Rubio is

_____

[1] Citations to the Director's Motion for Summary Judgment, ECF Doc. No. 30, are styled as "MSJ at [page number]." The page number cited is the ECF page number listed at the top right corner of the document.

unable to prove [IATC prejudice] at the punishment phase"); MSJ at 123 ("Because of this—along with the overwhelming evidence of Rubio's guilt, the cruelty of the crime, and all the other aggravating factors—Rubio is unable to make any meaningful materiality argument concerning either guilt-innocence or punishment.").

He maintains the "brutality trumps" position even though Rubio only needs to show, by a preponderance of the evidence, that the offending conduct had a reasonable probability of affecting a single juror's vote. *See Andrus v. Texas*, 140 S. Ct. 1875, 1886 (2020) ("And because Andrus' death sentence required a unanimous jury recommendation, prejudice here requires only a reasonable probability that at least one juror would have struck a different balance regarding Andrus' moral culpability[.]") (internal quotation marks and citations omitted); *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (equating prejudice standards for *Strickland* and *Brady*). And the Director takes the brutality-trumps position even though—unlike jurisdictions requiring death sentencers to conclude that aggravation outweighs mitigation—Texas permits a jury to find that mitigation warrants a life sentence without any comparison to aggravation required. *See* Tex. Code Crim. Proc. Ann., Art. 37.071 § 2(e)(1). Finally, he insists that brutality trumps even though the trial judge already commented, *on the record*, that the jury would have been reasonably likely to return a life verdict had life-without-parole been an available sentence. 1 SHRR at 191.

Binding Supreme Court precedent forecloses the Director's argument. As the Supreme Court recently reiterated, a petitioner may show IATC prejudice even when the state "emphasized the brutality of [the] crime and [the petitioner's] lack of

remorse." *Buck v. Davis*, 137 S. Ct. 759, 776 (2017); *see also id.* ("[S]everal considerations convince us that it is reasonably probable—notwithstanding the nature of [petitioner's] crime and his behavior in its aftermath—that the proceeding would have ended differently had counsel rendered competent representation."). The suggestion that sufficient brutality avoids the need to analyze the possible impact of further mitigation evidence also contradicts other Supreme Court precedents recognizing Sixth Amendment violations in highly aggravated cases. *See, e.g., Sears v. Upton*, 561 U.S. 945 (2010) (summarily reversing finding of no prejudice in case where defendant had kidnapped, raped, and murdered his 59-year-old victim after punching her in the face with brass knuckles and handcuffing her in the backseat of a car); *Rompilla v. Beard*, 545 U.S. 374, 378, 393 (2005) (finding prejudice when "murder was committed by torture" because "[i]t goes without saying that the undiscovered mitigating evidence … might well have influenced" the culpability determination); *Williams v. Taylor*, 529 U.S. 362, 368, 398 (2000) (finding the state court "failed to accord appropriate weight" to mitigation evidence when it did not "entertain [the] possibility" of prejudice, even though the prisoner had a record of "brutally" assaulting elderly people and killed an elderly victim with a mattock over two dollars). *Buck, Williams, Rompilla*, and *Sears* all involved brutal, senseless murders, and all are appropriately characterized as depraved and highly aggravated. Yet in each case, the Supreme Court never so much as mentioned a brutality-trumps position; instead, in each case, the Court determined that the strength of the undiscovered mitigation was sufficient to find prejudice under the Sixth Amendment.

That prejudice and materiality inquiries require careful analysis without respect to the brutality of the offense is vindicated by experience. The worst crimes do not invariably produce capital sentences, especially when trial lawyers provide persuasive evidence of reduced culpability. Take James Holmes, who killed twelve and injured seventy others in the Aurora theater massacre but was spared death after expert witnesses testified to his serious mental illness, offering diagnoses of schizotypal personality disorder and schizoaffective disorder. Even though the jury had rejected his insanity defense, it did not unanimously support a sentence of death, and Holmes was sentenced to life without the possibility of parole. *See* Noelle Phillips & Jordan Steffen, *Juror Says One Said No to Death*, Denver Post, Aug. 8, 2015, at A4.

Texas juries have given life sentences in highly aggravated cases involving violence toward, and murder of, young children. For instance, in 2015, Gabriel Armandariz received a life sentence after strangling his eight-month and two-year old children.[2] After Armandariz hanged his infant son from the closet ceiling, he sent a picture of the hanging body to the baby's mother. In a 2013 case, Austin Crawford was sentenced to life after killing his girlfriend's ten-month-old baby by violently shaking and hitting the baby's head at least four times because it would not stop

---

[2] Mitch Mitchell, *Convicted Child Killer Gets Life in Prison*, Fort Worth Star-Telegram, March 13, 2015 at A5, available at https://www.newspapers.com/image/651406432.

crying.[3] In a recent Dallas County, Texas case involving four murder victims and four severely injured children, the jury did not impose death after trial attorneys presented significant mitigating evidence regarding the defendant's mental illness, mismanagement of his medication at the time of the offense, and subsequent good behavior while awaiting trial.[4] These Texas sentencing outcomes track a larger national pattern, spanning decades, in which mitigation produces life sentences, even in highly aggravated cases of child murder. *See* Russel Stetler, *The Past, Present, and Future of the Mitigation Profession: Fulfilling the Constitutional Requirement of Individualized Sentencing In Capital Cases*, 46 HOFSTRA L. REV. 1161, 1229 App'x 2 (2018) (listing highly aggravated child-victim cases for which juries refused death sentences, from 1979 to 2017).

In short, this Court must evaluate whether there is a reasonable probability that omitted evidence or information would have affected the vote of a single juror, and with respect to each question that would independently preclude a death sentence. It should reject the Director's invitation to instead resolve individual questions of prejudice and materiality by abstract references to the severity of the offense conduct. That the offense conduct was horrifying does not resolve questions, for example, about whether the omitted FASD evidence would have influenced the

---

[3] Mitch Mitchell, *Man Gets Life Term in Death of Infant*, Fort Worth Star-Telegram, August 16, 2013 at B1, B7, available at: https://www.newspapers.com/image/651288582/.

[4] *See* Tasha Tsiasperas, *Is the Death Penalty Dying in Dallas County?*, Dallas Morning News, June 3, 2017, available at 2017 WLNR 17158104.

vote of a single juror deciding whether mitigating evidence lowered Rubio's culpability below a level warranting death.

*     *     *

With both of these matters in mind, Rubio turns to the arguments specific to his claims raised in the Petition.

## ARGUMENT IN SUPPORT OF CLAIMS FOR RELIEF

**Claim 1**      **Rubio is entitled to relief on his claim that his Sixth Amendment right to counsel was violated because the trial attorneys failed to include a person with qualifying mental health expertise as a member of the defense team.**

Rubio's trial counsel failed to take the basic step of constructing a capital defense team that included an individual with qualifying mental health expertise. This failure fell below the professional norms at the time of trial, as reflected in the ABA Guidelines, and trial counsel flatly conceded such at the state habeas hearing. Due to this failure, Rubio's jury was deprived of a lifetime's worth of evidence about his complex trauma, organic brain damage, and severe mental illness.

The Director argues that trial counsel's failures should not be measured against the ABA Guidelines, disputes that trial counsel conceded ineffectiveness at the state habeas hearing, and claims that the new evidence Rubio presents in his petition should be written off as either cumulative or "double-edged." Each of these arguments is contradicted by either the record or controlling case law. Moreover, the Director fails to meaningfully engage with Rubio's argument that any procedural

default is excused because state habeas counsel was ineffective in failing to raise this substantial claim in state court.[5]

For all of these reasons, as well as those laid out in the Amended Petition, this Court should find that Rubio is entitled to relief on this claim.

**A.    Trial counsel's performance was prejudicially deficient, violating the Sixth Amendment.**

Throughout the Director's response to Claim One, he conflates the deficient performance and prejudice prongs of the *Strickland* analysis. While a court may dispose of an ineffective-assistance-of-trial-counsel ("IATC") claim by finding that either prong has not been met, each represents a distinct requirement and must be addressed separately.

**1.    Trial counsel's performance was deficient under prevailing professional norms at the time of trial, and counsel offers no strategic reason for their deficiency.**

Claim One addresses trial counsel's deficient performance in failing to include an individual with qualifying mental health expertise as a core member of the defense team. In response, the Director argues that (a) the ABA Guidelines are not binding, (b) trial counsel had a strategic reason for not retaining a team member with qualifying mental health expertise, and (c) counsel were not deficient because they presented several testifying experts at trial. Rubio responds to the first and second arguments in this Section because they are properly labeled as deficiency positions.

---

[5] Rubio maintains that the claim is not procedurally defaulted because a state remedy remains, and he has requested this Court's leave to return to state court in the contemporaneously-filed motion for a *Rhines* stay.

The third argument, that counsel's presentation of certain experts at trial proved they were not deficient, is actually a prejudice position. As such, Rubio will address that argument in the prejudice discussion appearing in Section 2, *infra*.

### a. The ABA Guidelines reflect professional norms ordinarily used to identify deficient performance.

The first question for the Court is whether counsel's performance fell below professional norms at the time of trial. *Strickland*, 466 U.S. at 688. The Director downplays the significance of the ABA Guidelines in measuring deficient performance, arguing that they are not "inexorable command" and that trial counsel must be given the latitude to make case-specific decisions. MSJ at 45–46.

Although the Supreme Court has been careful to note that the Guidelines do not apply of their own force, it generally identifies them as the authoritative benchmark for professional, "well-defined norms" at the time of a capital trial—the markers for deficient performance. *Wiggins v. Smith*, 539 U.S. 510, 524 (2003); *see also Rompilla v. Beard*, 545 U.S. 374, 387 (2005) (explaining that the ABA guidelines "describe[] the obligation" of trial counsel to investigate); *Williams v. Taylor,* 529 U.S. 362, 396 (2000) (citing ABA guidelines in addressing deficient performance for failing to conduct thorough investigation); *Strickland v. Washington,* 466 U.S. 668, 688 (1984) (identifying the ABA guidelines as reflecting the "prevailing norms of practice"). Rubio's legal position simply reflects this well-established precedent that the Guidelines are highly probative of the norm that forms the basis of a Sixth Amendment analysis.

The Director could argue that the Guidelines fail to accurately capture a specific norm, or that the norm should not have been followed at trial for some specific reason. He has done neither. Of course, there is no evidence to suggest that what ABA Guideline 4.1 describes is something other than a professional norm; nothing about ABA Guideline 4.1 is out of step with other indicia of reasonable professional practice. Other courts recognize that the norms embedded in ABA Guideline 4.1 require trial counsel to include an individual with qualifying mental health expertise as a *core* member of the defense team. For example, *Chatman v. Walker*, 773 S.E.2d 192 (Ga. S. Ct. 2015), involved trial counsel's decision to retain only a mitigation specialist, who proved to be unqualified to serve as the mental health expert on the defense team. Instead of locating someone with qualifying expertise, trial counsel relied on what they believed to be their own. *Id.* at 194. The Georgia Supreme Court required that ABA Guideline 4.1 be used to evaluate deficient performance in such a scenario, also rejecting any suggestion that some difficulty in locating a qualifying team member justified the omission. *Id.* at 197, 200.

In *Eaton v. Wilson*, No. 09-CV-261-J, 2014 WL 6622512 (D. Wyo. Nov. 20, 2014), a federal district court found trial counsel ineffective based, in part, on the fact that they did not retain an individual with sufficient mental health expertise. Notably, the court explained the importance of having that person as a core member of the defense team, and distinguished the role from that of testifying experts:

> Petitioner's trial team did employ . . . a neuropsychologist, who [trial counsel] believes was qualified to screen for mental or psychological impairments. It appears from the record before the Court, however, [the neuropsychologist] was not a member of the defense team in the sense

11

contemplated by the ABA Guidelines, and thus did not have the opportunity to observe Petitioner over an extended period of time as the trial counsel did. She was primarily an expert witness who evaluated Petitioner and testified at trial.

*Id.* at *33–36.

The Court should reject the Director's attempt to argue, from the premise that the ABA Guidelines do not operate of their own force, that there was no Sixth Amendment norm that specified reasonable trial representation. There is no indication that ABA Guideline 4.1 deviates from standard norms of professional practice. The Guideline, and all of the norms captured in the decisional literature, require that the core defense team in a capital case include at least one person with qualifying mental health expertise.

> **b. Trial counsel did not have a strategic reason for deviating from the well-defined norm of including an individual with qualifying mental health expertise as a core member of the defense team.**

The Director argues that trial counsel's failure to include an individual with qualifying mental health expertise as a core member of the defense team was a strategic decision. MSJ at 47. In support, he points to trial counsel's testimony from the state habeas hearing, where attorney Ed Stapleton discussed the team's mitigation specialist, Carmen Fischer. When asked by the State whether adding Fischer to the team was a "strategic decision," Stapleton responded by saying that he appreciated her presence on the team, but that she lacked qualifying mental health expertise: "Yeah. I don't have any regrets about picking her or using her. What I regret is that I didn't have anybody that met the—meets the standard of having a mental health professional." 1 SHRR at 192–93. The Director misrepresents this

testimony. Stapleton was indicating that, although Fischer was a fine fit for the role of mitigation specialist, she lacked qualifying mental health expertise. Counsel unmistakably testified that his decision to forego the inclusion of a qualified mental health expert, *in addition to Fischer*, was not strategic. In fact, Stapleton testified at several other points that Fischer simply did not have the Guideline-compliant expertise. *Id.* at 170, 171, 177, 178, 179.

The Director's gloss on trial counsel's decision-making was so outlandish that even trial counsel, against a professional incentive to protect his reputation, was unwilling to endorse it in his sworn testimony. The Director's spin is exactly the type of "*post hoc* rationalization" that, according to the Supreme Court, will not show adequate performance.[6] *See Wiggins*, 539 U.S. at 526–27 ("the 'strategic decision' the state courts and respondents all invoke to justify counsel's limited pursuit of mitigating evidence resembles more a *post hoc* rationalization of counsel's conduct than an accurate description of their deliberations prior to sentencing"); *see also Andrus*, 140 S. Ct. at 1883 (refusing to find a "tactical rationale" for trial counsel's actions when counsel has not provided one).

The Director also disputes that Stapleton admitted to providing ineffective representation by failing to include an individual with qualifying mental health

---

[6] The Director similarly suggests that trial counsel made strategic decisions about which witnesses to present at the trial in order to walk a "nuanced line" before the jury. *See* MSJ at 56. Not only is this a misunderstanding of the allegations in Claim One, but the Director is also unable to point to a single citation from trial counsel's testimony at the state habeas hearing to support these alleged strategies. *Id.*

expertise on the team. MSJ at 46. Instead, he argues, Stapleton claimed "he felt his conduct was 'inefficient' because of funding strictures." *Id.* In support, the Director points to a single line from the testimony where the State asked Stapleton whether his "conduct was inefficient in any manner" and he responded, "I think my conduct was completely inefficient because I didn't have the resources to do what I needed to do." *Id.*; 1 SHRR at 187. The Director ignores the next few lines where both Stapleton and lead counsel Nat Perez admit to being "ineffective," as well as the pages of testimony where Stapleton referred to his failure to include an individual with qualifying mental health expertise as a "mistake" and an "error," and discussed specific instances where the team would have benefited from having such a person. 1 SHRR at 187; *id* at 171, 177, 178, 179.

Trial counsel's impression of their own representation is not dispositive of the deficient performance inquiry, but it is certainly a material fact in assessing their reasons, if any, for deviating from professional norms. In this case, even trial counsel agreed that they performed deficiently. Summary judgment is not appropriate.

## 2. The deficiency was prejudicial.

Had trial counsel retained an individual with qualifying mental health expertise as a core member of the defense team, there is a reasonable likelihood that the outcome of Rubio's trial would have been different. Even as the case was presented—flawed as it was—the state habeas court acknowledged that it was a close call for the jurors. 1 SHRR at 191. Trial counsel recognized at the state habeas hearing that, with a properly constructed defense team, they would have uncovered critical additional evidence regarding Rubio's neurocognitive functioning and would

have avoided the mistake of concluding that Rubio did not suffer from FASD. *See id.* at 170. Add in the wealth of new evidence regarding trauma and psychiatric issues, and there is little doubt that Rubio could show a reasonably probable effect on the outcome.[7]

### a. The new evidence Rubio presents is fundamentally different from that presented at trial.

The Director largely ignores the central argument that the evidence would have been meaningfully mitigating had trial counsel constructed the defense team properly. Instead, the Director argues that, however unstructured, "most—if not all— of the evidence Rubio provides now was presented at his trial." MSJ at 63; *see also id.*

---

[7] The Director argues that this Court cannot consider the information in the expert reports that Rubio attached to the Petition because the experts did not explicitly state they were able and willing to testify to such information at Rubio's 2010 trial. MSJ at 48, 53, 59 (citing *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009)). The Director misunderstands *Day*. There, the Fifth Circuit held that, when raising a claim that trial counsel were ineffective for failing to call a witness to testify, the petitioner must establish that the witness in question was available to testify and would have done so if asked. *Day*, 566 F.3d at 538. Despite the Director's protestations to the contrary, Rubio is not raising an ineffectiveness claim based on trial counsel's failure to call a witness to testify. Instead, he argues that trial counsel's deficiency was failing to include an individual with qualifying mental health expertise as a core member of the defense team. Rubio's discussion of the trauma, neurocognitive deficits, and psychiatric issues merely illustrates the prejudice that flows from counsel's failure to properly construct a defense team. Regardless, to avoid any confusion, Rubio submits supplemental declarations from his experts establishing that they were able and willing to testify at his trial in 2010. *See* 2d Supp. App. at 419 (declaration of Dr. Bhushan Agharkar); *id.* at 420 (declaration of Dr. David Lisak); *id.* at 422 (declaration of Dr. Robert Ouaou); *id.* at 423 (declaration of Dr. Natalie Novick Brown); *id.* at 424 (declaration of Dr. Paul Connor); *id.* at 425 (declaration of Frank AuBuchon).

at 48, 53. The record belies this contention; below are just a handful of examples of the new evidence that was never presented to the jury.

*Trauma.* Rubio's jury never learned that he was forced to perform oral sex on his older stepbrother when Rubio was eight years old, that Rubio's special education teacher repeatedly abused him sexually when Rubio was in grade school, or that Rubio frequently "re-experiences" a memory of being orally and anally raped by a group of four men when he was 11 or 12 years old. Supp. App. (Doc. 24-1) at 77–80.

The jury was unaware of the fact that, as a child, Rubio would sit outside his mother's door and listen to his father beat her mercilessly:

> It was the sounds of the beatings and his mother's screams that terrified Mr. Rubio. He recalled vividly the sound of his father's screams as they escalated; his mother crying out, "stop, stop;" the sounds of struggle in their bedroom; and then the sounds of the blows as they landed on his mother's body.

Supp. App. at 72. The jury did not know that, as Rubio listened to the beatings, he would shake with terror, curl into a ball on the floor, and go into a "zone" to try to block out the sounds of the screams. *Id.* at 73. This is a "textbook description of dissociation, whereby a terrified child protects himself from the overwhelming terror by separating himself from the experience." *Id.* The long-term effects of such dissociative experiences are well-documented. "Elements of these terrifying experiences are still being encoded in memory, and they often plague the child in nightmares, flashbacks, and they may do so for months, years, or decades." *Id.* at 74. Indeed, Rubio is still haunted by the sounds of his mother's screams. *Id.* at 72.

Nor did the jury learn that Rubio's Fetal Alcohol Spectrum Disorder ("FASD") left him particularly ill-equipped to navigate this extreme childhood trauma. Supp. App. at 71. "This combination—multiple traumas and developmental deficits—is one that few children are able to overcome." *Id.* at 86.

*Neurocognitive Functioning.* Likewise, the jury did not learn about Rubio's profound neurocognitive deficits. At the state habeas hearing, trial counsel testified that they retained a neuropsychologist as an outside expert. This expert conducted a neuropsychological evaluation of Rubio but there was no core member of the defense team with the qualifying mental health expertise necessary to make use of the information. Indeed, at the state habeas hearing, Rubio's trial lawyer openly stated as much. 1 SHRR at 170.

Given that counsel did not present a neuropsychologist at trial, none of the neuropsychological evidence Rubio presents in his Amended Petition is cumulative. For example, due to trial counsel's deficient performance, the jury did not know that the chronic stress Rubio suffered throughout his traumatic childhood would have caused him to secrete high levels of glucocorticoid cortisol, a steroid hormone that can cause permanent damage to the central nervous system. This effect—along with those caused by Rubio's head trauma and inhalant use, as well as his pregnant mother's drinking—manifests in significant damage to the frontal limbic system of his brain. Supp. App. at 94. This evidence would have provided mitigating context and explanation for behavior otherwise attributed to non-mitigating accounts of Rubio's neurocognitive functioning.

*Psychiatric Issues.* Contrary to the Director's assertion, the jury was not presented with evidence that Rubio suffers from Schizoaffective Disorder, which includes elements of both schizophrenia and a mood disorder. Nor were they privy to a psychiatrist's interpretation of how Rubio's slew of mental health and neurocognitive issues compounded to render him unable to self-regulate his behavior under extreme stress, such as the stress he experienced in the days leading up to the crime. *See* Supp. App. at 106 ("Mr. Rubio's longstanding, extensive psychiatric disease, coupled with a gravely compromised limbic system and severe brain damage due to a range of factors . . . rendered him unable to self-regulate his behavior at the acutely stressful and unstructured period leading into these offenses.").

*Fetal Alcohol Spectrum Disorder.* The jury did not hear *any* evidence about Rubio's FASD diagnosis, or the myriad ways it affects an individual—particularly when combined with other mental health and neurocognitive impairments. At the state habeas hearing, trial counsel again openly admitted that his failure to include an individual with qualifying mental health expertise on the defense team led to his failure to pursue this mitigating information. 1 SHRR at 170–71. For a complete discussion of the new information related to FASD, *see* Claim Two in the Amended Petition. *See* Am. Pet. (Doc. 24) at 69–102; *see also* Supp. App. at 39–239.

As trial counsel has acknowledged, this evidence would have been impactful at every stage of trial. *See* 1 SHRR at 180. The Director argues that Rubio's evidence would have had no effect at the guilt/innocence phase "given the overwhelming evidence of his guilt." MSJ at 65. However, Rubio pled not guilty by reason of insanity

at the guilt/innocence phase. The proper measure for prejudice in this scenario is not the effect on findings about whether Rubio committed the offense conduct, but the effect on the determination that Rubio was legally insane at the time that conduct took place. *See Ruffin v. State*, 270 S.W.3d 586 (Tex. Crim. App. 2008) (stating that when a defendant proves the insanity affirmative defense by a preponderance of the evidence, "[t]his defense excuses the person from criminal responsibility even though the State has proven every element of the offense, including the *mens rea*, beyond a reasonable doubt"); *see also Roberts v. Comm'r, Alabama Dep't of Corr.*, 677 F.3d 1086, 1092 (11th Cir. 2012) ("The appropriate prejudice analysis for this claim would require the state court to consider whether there is a reasonable probability that Roberts' trial would have resulted in his being found not guilty by reason of insanity had his trial counsel properly investigated and presented an insanity defense."). The "overwhelming evidence" of actus reus does not preclude a finding that he did not understand his actions were illegal at the time. And the array of new mental health evidence Rubio presents in his Amended Petition likely would have swung at least one juror, given how close the decision was.

The Director similarly argues that, given the aggravating evidence that was before the jury, Rubio is unable to prove the new evidence would have had an effect at the punishment phase of trial. MSJ at 65. But a death sentence was far from a foregone conclusion. 1 SHRR 191. As explained in Section B of the Introductory Statement, *supra*, jurors have given life sentences in any number of exceptionally aggravated cases. Studies and case law show that jurors find the type of evidence that

Rubio now presents—evidence of trauma and mental impairment—as the most mitigating. Am. Pet. at 58–59, 61–62, 64; *see also* Introductory Statement (B), *supra*.

### b. The prejudice flowing from trial counsel's deficient performance should be viewed cumulatively.

The prejudice resulting from trial counsel's failure to include an individual with qualifying mental health expertise as a core member of the defense team is vast, spanning every phase of trial and encompassing multiple areas of expertise. For ease of reference, Rubio separated out each area of expertise into different sections in his Amended Petition: trauma, neurocognitive functioning, psychiatric issues, and FASD. *See* Am. Pet. at 52, 59, 62, 65. Rubio has done the same in this Reply. Because all of the evidence from those sections flows from the same deficient performance by trial counsel, Rubio reminded the Court that it should be considered as a whole when this Court does its prejudice inquiry for each phase. *Id.* at 51 (citing *Strickland*, 466 U.S. at 695).

The Director disagrees, and argues that it would be improper for this Court to cumulate the prejudice resulting from trial counsel's failure. MSJ at 66, n. 25. In support, he cites a series of cases that do not appear to have anything to do with courts cumulating all prejudice flowing from trial counsel's deficient performance; these cases are about cumulating IATC prejudice *on top of* other types of claims. In *Murphy v. Davis*, 901 F.3d 578 (5th Cir. 2018), which the Director cites at footnote 25 of the summary judgment motion (MSJ at 66), the Fifth Circuit rejected the petitioner's argument that the court should view the prejudice from an ineffective assistance of counsel claim *and* a *Brady* claim cumulatively. *See id.* at 599. *Murphy*

does not control here, however, because Rubio is not asking the court to cumulate IATC prejudice on top of other claims. Similarly, in *Coble v. Quarterman*, 496 F.3d 430 (5th Cir. 2007), which the Director also cites in footnote 25 of the summary judgment motion (MSJ at 66), the Fifth Circuit rejected the petitioner's request to cumulate trial counsel's deficient performance that spanned multiple IATC claims. *See id.* at 440. A federal district court rejected the same claim in *Moore v. Quarterman*, 526 F. Supp. 2d 654, 709–10 (W.D. Tex. 2007). Contrary to *Coble* and *Moore*, Rubio is not asking this Court to cumulate prejudice across multiple IATC claims.

## B. This Court can decide this claim on the merits.

### 1. Any default is excused by state habeas counsel's failure to raise this substantial claim.

Claim One is unexhausted and, along with almost all other claims presented in the Amended Petition, is the subject of a *Rhines* stay sought at the same time as this Reply is filed. Although this substantial claim is unexhausted, if this Court were to determine otherwise, then any default is excused by state habeas counsel's ineffectiveness in failing to raise it. *See Martinez v. Ryan*, 566 U.S. 1, 13–14 (2012) (announcing general rule); *Trevino v. Thaler*, 569 U.S. 413, 429 (2013) (specifically applying *Martinez* to Texas convictions).[8] The substantiality of the underlying claim

---

[8] In light of the issues in this case, this Reply is exceedingly precise in how it describes the procedural status of each claim. A claim for which state remedies remain is "unexhausted," and a claim for which no such remedies exist is "exhausted." If a claim is unexhausted, it is *not* procedurally defaulted—a state court has not rejected the claim on an adequate and independent state ground, and the potential availability of a state remedy means that a federal court may not conclude that such a rejection is inevitable. This Court must first determine whether each claim is exhausted or not. If the claim is not exhausted, then it should grant the *Rhines* stay. Only if the claim

is discussed above (in the subsections on deficiency and prejudice), and the Director's motion for summary judgment only briefly discusses state habeas counsel's representation—but does not analyze it in any way specific to Claim One. MSJ at 40–41.

As far as the nonspecific material is concerned, the Director notes that state habeas counsel filed a state application that included six claims for relief, requested funding for and conducted an investigation into FASD, participated in the state habeas hearing where he questioned trial counsel on the stand, and filed a subsequent state habeas application based on information learned during the hearing. MSJ at 40. But the fact that state habeas counsel engaged in *some* investigation, and presented *some* claims, does not mean he provided effective representation. *See, e.g., Rompilla v. Beard*, 545 U.S. 374, 392 (2005) (finding counsel deficient for missing "red flags" despite presenting mitigating evidence at trial). The Director fails to mention that trial counsel testified that state habeas counsel had never spoken to him before the state habeas hearing (much less before filing the initial application), that trial counsel conceded ineffectiveness on a claim that state habeas counsel did not raise in the initial application (now Claim One in Rubio's Amended Petition), and that state

---

is exhausted may the Court reach the question of procedural default, which involves scrutiny of the basis on which a claim was in fact, or would inevitably be, denied. The Director confuses the relationship between exhaustion and procedural default when he describes claims as "unexhausted and procedurally defaulted." *See, e.g.*, MSJ at 42 (Claim One), 88 (Claims 3 & 7), 118 (Claim 6), 124 (Claim 4). Based on the substance of the Director's argument, he appears to mean that these claims are *exhausted* and also that they are *procedurally defaulted*.

habeas counsel's subsequent state habeas application (filed after the hearing) *again omitted this IATC claim.*

State habeas counsel has signed a declaration discussing his representation of Rubio. 2d Supp. App. at 414–18. In the declaration, he acknowledges that he failed to speak with trial counsel before filing the state habeas application, despite the ABA Guideline requiring him to do so. *See id.* at 416–17. He further acknowledges that, had he met with trial counsel and thereby learned that trial counsel believed that they deficiently staffed the defense team, state habeas counsel would have considered the claim substantial enough to raise in the initial application. *Id.* at 417. State habeas counsel offers no strategic reason for failing to investigate or raise this substantial claim. The claim certainly cannot be dismissed on the pleadings based on the Director's abstract characterizations about habeas counsel's overall performance.

In short, this Court is faced with a meritorious claim where trial counsel has conceded ineffectiveness, where state habeas counsel has conceded no strategic reason for failing to raise it, and where the Director does not meaningfully address the specific deficiency at issue. This Court should find that any default is excused under *Martinez.*

> **2. Section 2254(e)(2) does not preclude the introduction of new evidence to prove Rubio's disputed factual allegations on a defaulted IATC claim.**

The Director argues that, even if this Court may consider Rubio's IATC claim on the merits, he may not *introduce evidence* to support it. *See* MSJ at 41–42; *see also*

*id.* at 44 (assertion as to Claim 1). The provision at issue, 28 U.S.C. § 2254(e)(2), provides:

> If the applicant has *failed to develop* the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—(A) the claim relies on—(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

(Emphasis added.) The Director observes that there can be no new federal evidence because Rubio has not satisfied an exception to the rule that state prisoners who "failed to develop" a claim in state court cannot then develop predicate facts in their federal proceeding. MSJ at 41–42.

The Director's argument that Rubio "failed to develop" claims for which he can excuse default is foreclosed by precedent, would unnecessarily create a circuit split, is at odds with the provision's legislative history, is inconsistent with the interpretation assumed by *Martinez* and *Trevino*, would effectively nullify those decisions, and violates the fundamental guarantee of due process. The appropriate interpretation of the provision is the rule that has prevailed for decades: a prisoner does not "fail to develop" the factual basis of a claim when there is cause for the procedural default.

### a. Fifth Circuit precedent forecloses the Director's interpretation of § 2254(e)(2), the acceptance of which would create a new circuit split.

In *Barrientes v. Johnson*, 221 F.3d 741 (5th Cir. 2000), the Fifth Circuit held that a state prisoner who "establishes cause for overcoming his procedural default" may introduce new evidence to support his claim for relief because the prisoner "did not 'fail to develop' the record" under § 2254(e)(2). *Id.* at 771 (quoting statute). Under *Barrientes*, if a "district court determines that [the state prisoner] has established cause and prejudice for his procedural default, it should proceed to conduct an evidentiary hearing on any claim for which cause and prejudice exists [and] then revisit the merits of any such claim anew." *Id.*; *see also Canales v. Stephens*, 765 F.3d 551, 571 n.2 (5th Cir. 2014) ("Texas argues that if we decide to remand any claims to the district court, we should deny Canales the opportunity to have an evidentiary hearing. We decline to take this step . . . .").[9]

There is no real dissent in this or any other circuit from the general rule that a prisoner did not "fail to develop" a claim's factual predicate within the meaning of

---

[9] Federal district courts in Texas regularly authorize hearings on the merits of claims for which excusing cause exists, including *Martinez*-postured claims. *See, e.g.*, *Carpenter v. Davis*, No. 3:02-CV-1145-B-BK, 2017 WL 2021415, at *3 (N.D. Tex. May 12, 2017) ("In other words, this hearing should be considered the parties' one and only opportunity to prove or disprove both the exceptions to procedural bar and the merits of each of these claims."); *Balentine v. Stephens*, No. 2:03-CV-00039, 2016 WL 1322435, at *4 (N.D. Tex. Apr. 1, 2016) (same in substance); *Murphy v. Stephens*, No. 3:09-CV-1368-L-BN, 2014 WL 4771859, at *2 (N.D. Tex. Sept. 25, 2014) (rejecting Director's argument and ordering a hearing because "to construe the *Martinez* exception as limited to a review of an undeveloped record that is insufficient to properly consider these claims would defeat these stated purposes").

§ 2254(e)(2) when he shows cause to excuse default. *See*, *e.g.*, *Wilson v. Beard*, 426 F.3d 653, 665–66 (3d Cir. 2005) (holding that, because procedural default and § 2254(e)(2) are "analytically linked," a prisoner who does not procedurally default a claim is not barred by § 2254(e)(2) from introducing new evidence). To the extent that other jurisdictions have more specifically weighed in on the Director's suggestion that *Martinez*-excused claims should be an exception to the general rule, the authority unanimously rejects the Director's position. *See*, *e.g.*, *Jones v. Shinn*, 943 F.3d 1211, 1221 (9th Cir. 2019) ("As we have previously recognized and now explicitly hold, *Martinez*'s procedural-default exception applies to merits review, allowing federal habeas courts to consider evidence not previously presented to the state court."); *Sasser v. Hobbs*, 735 F.3d 833, 853–54 (8th Cir. 2013) (holding explicitly that § 2254(e)(2) does not bar new evidence in support of a claim whose default by deficient state habeas counsel is excused). This Court should decline the Director's invitation to overrule *Barrientes* and create a circuit split.

### b. The Director's reading of § 2254(e)(2) is inconsistent with clear legislative intent.

*Barrientes* reflects the decades-old rule that state prisoners "fail to develop" facts within the meaning of § 2254(e)(2) only when they are *at fault* for the failure. Indeed, the history of § 2254(e)(2) demonstrates that, when enacting the provision, Congress intended attribution of fault in the evidentiary hearing context to mirror how it worked in the procedural default context. Both *Martinez* and *Trevino*, in turn, recognize that a prisoner who has never had adequate state representation is not "at

fault" for any failure to develop the factual basis of his claim within the meaning of § 2254(e)(2).

Prior to AEDPA's passage, an evidentiary hearing was *required* if a prisoner satisfied the cause-and-prejudice rule announced by *Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992). *Tamayo-Reyes* held that a prisoner who showed cause for excusing procedural default had not "failed to adequately develop" the factual basis of the defaulted claim. *Id.* at 5, 8. The absence of fault both excused procedural default and compelled the federal court to hear new evidence on the claim. *See id.* at 9. AEDPA incorporated the "failed to develop" language from *Tamayo-Reyes* into § 2254(e)(2), and modified the rule from one in which hearings were *required* into one in which they are *permitted*. *Compare* 28 U.S.C. § 2254(e)(2) (hearings permitted) *with Tamayo-Reyes*, 504 U.S. at 10 (hearings required).

In *Williams v. Taylor*, 529 U.S. 420 (2000), the leading post-AEDPA case interpreting § 2254(e)(2), the Supreme Court rejected a "no-fault" view of § 2254(e)(2), under which a prisoner "failed to develop" a claim whenever the claim was not pursued in state court, *see id.* at 431, 444, concluding "there is no basis in the text of § 2254(e)(2) to believe Congress used 'fail' in a different sense than the Court did in [*Tamayo-Reyes*]." *Id.* at 433. *Williams* therefore reaffirmed the longstanding alignment between the standards for excusing procedural default and the conditions necessary to obtain an opportunity to prove factual allegations at a hearing on the merits in federal court: each turns on the absence of fault attributable to the state prisoner.

The salient question in both the procedural-default and evidentiary-hearing contexts, then, is whether fault is attributable to the state prisoner. When *Williams* was decided, federal courts applied the rule of fault announced in *Coleman v. Thompson*, 501 U.S. 722 (1991), under which habeas claimants were vicariously faulted for all deficiencies of state post-conviction counsel, *see id.* at 754; *see also Williams*, 529 U.S. at 432 (setting forth rule of post-conviction counsel attribution). Relying on *Coleman*, the *Williams* Court generated the language upon which the Director now relies to argue that § 2254(e)(2) precludes the introduction of evidence to support Rubio's claims.

But the Director ignores the critical fact that *Martinez* abrogated *Coleman's* vicarious fault rule when the petitioner demonstrates that state post-conviction counsel ineffectively litigated, or failed to litigate, a substantial IATC claim. *See Martinez*, 566 U.S. at 94; *see also Davila v. Davis*, 137 S. Ct. 2058, 2065 (2017) (explaining *Martinez* as a revision to *Coleman's* rule of agency attribution). Because a prisoner with a *Martinez*-postured claim is no longer considered to be *at fault* for forfeiting the claim, he has not "failed to develop" his claim for purposes of § 2254(e)(2). To hold otherwise would subvert Congress's clear intent to preserve the alignment between evidentiary and procedural default rules.

### c. *Martinez* and *Trevino* plainly contemplate factual development of claims defaulted by ineffective state post-conviction counsel.

The Director's interpretation of § 2254(e)(2) would effectively nullify the Supreme Court's rulings in *Martinez* and *Trevino*. *Martinez* reflects the Supreme Court's concern that, if the underlying issue is an IATC claim, prisoners deprived of

adequate state post-conviction counsel would be "in no position to *develop the evidentiary basis* for [the claim], which often turns on evidence outside the trial record." 566 U.S. at 12 (emphasis added). And the *Martinez* claimant himself needed to assert new evidence in the federal proceeding, because the underlying IATC claim required him to show what the testimony of a rebuttal expert would have been. *Id.* at 7.

*Trevino* is even clearer as to the role of new evidence in federal court, as it involved a forfeited *Wiggins* claim that will *always* require presentation of evidence to prove the merits of the underlying claim. *See Trevino*, 569 U.S. at 418. Any doubt that *Trevino* contemplates the presentation of new evidence in federal court is dispelled by the Court's decision to list, expressly, the new evidence that would have to be considered if the claim were not treated as defaulted. *See id.* at 419. *Trevino* also explicitly recognizes that the central task of federal *Wiggins* litigation is to "investigate [a claimant's] background, determine whether trial counsel had adequately done so, and then *develop evidence* about additional mitigating background circumstances." *Id.* at 425 (emphasis added). The Director's reading of § 2254(e)(2), by contrast, would hold that the very same circumstances that activate *Martinez* and *Trevino*—state habeas counsel's deficient failure to develop the record on an IATC claim—would preclude federal habeas counsel from proving that issue in federal court.

Indeed, the Director's interpretation would effectively nullify *Martinez* and *Trevino*, which were premised on the especially important need to ensure that the

Sixth Amendment is meaningfully enforced. Both of those cases recognize that a state prisoner whose state post-conviction lawyer inadequately litigates a Sixth Amendment right-to-counsel claim has never been afforded his "opportunity to present a [Sixth Amendment] claim of ineffective assistance of trial counsel." *Trevino*, 569 U.S. at 428; *see Martinez*, 566 U.S. at 12. For prisoners like Rubio—those whose IATC claims were forfeited by ineffective state post-conviction lawyers—federal habeas proceedings are the *only* opportunity to enforce the "bedrock" Sixth Amendment right counsel, which is the "foundation for our adversary system." *Martinez*, 566 U.S. at 12. A rule that permits a prisoner to assert a claim, but withholds the ability to support it with evidence, mocks the commitment to the Sixth Amendment enforcement expressed in *Martinez* and *Trevino*.

### d. The Director's § 2254(e)(2) interpretation triggers the rule of constitutional avoidance.

Finally, this Court should reject the Director's interpretation of § 2254(e)(2) because, as applied to state prisoners not at fault for having failed to develop IATC claims, it raises serious constitutional questions. *See Clark v. Martinez*, 543 U.S. 371, 381 (2005) ("[Constitutional avoidance] is a tool for choosing between competing plausible interpretations of a statutory text, resting on the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts.").

Section 2254(e)(2) precludes federal courts—with some exceptions—from hearing evidence to support a federal habeas claim *if* a state prisoner is "at fault" for the failure to develop it in state court. *See Holland v. Jackson*, 542 U.S. 649, 653

(2004) (interpreting § 2254(e)(2) as a constraint on all forms of evidence). By definition, virtually every prisoner asserting a *Martinez*-eligible IATC claim will be asserting a claim that was unlitigated—and therefore unsupported by evidence—in state court. And under the Director's interpretation, an Article III court must entertain these claims but may not consider evidence to adjudicate the claims' allegations. Where factual allegations material to the claim's disposition are disputed, the Director's interpretation violates due process.

The Fifth Amendment's Due Process Clause limits legislative power to impose restrictions on the consideration of evidence in cases and controversies that are justiciable in Article III courts. The leading case on the constitutionality of evidence rules explains that an evidentiary rule violates due process when it creates a presumption and then unfairly precludes a party from introducing evidence capable of disproving the fact(s) presumed:

> [A legislative presumption] must not, under guise of regulating the presentation of evidence, operate to preclude the party from the right to present his defense to the main fact thus presumed. If a legislative provision not unreasonable in itself, prescribing a rule of evidence, in either criminal or civil cases, does not shut out from the party affected a reasonable opportunity to submit to the jury in his defense all of the facts bearing upon the issue, there is no ground for holding that due process of law has been denied him.

*Mobile, Jackson & Kansas City R. Co. v. Turnipseed*, 219 U.S. 35, 43 (1910). The *Turnipseed* rule barring evidence-processing rules like those at issue here—those

permitting a court to decide the merits of a question but denying one side the opportunity to produce evidence on it—has been affirmed repeatedly.[10]

Under *Turnipseed* and its progeny, Congress may use evidentiary rules to constrain merits adjudication as long as it "neither prevents the presentation of other evidence to overcome [a presumption] nor cuts off the right to make a full defense," *Lindsley v. Nat. Carbonic Gas Co.*, 220 U.S. 61, 82 (1911), but "a statute creating a presumption that . . . operates to deny a fair opportunity to repel it violates [due process]," *Manley v. Georgia*, 279 U.S. 1, 6 (1929). The *Turnipseed* standard applies without respect to whether the proceeding is denominated as civil or criminal. *See Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 28 (1976). "The value of these evidentiary devices, and their validity under the Due Process Clause, vary from case to case, . . . depending on the . . . degree to which the device curtails the factfinder's

---

[10] *See, e.g.*, *Bandini Petroleum Co. v. Superior Court of State of Cal. in & for Los Angeles Cty.*, 284 U.S. 8, 18–19 (1931) ("The state, in the exercise of its general power to prescribe rules of evidence, may provide that proof of a particular fact, or of several facts taken collectively, shall be prima facie evidence of another fact when there is some rational connection between the fact proved and the ultimate fact presumed. The legislative presumption is invalid when it . . . operates to deprive a party of a reasonable opportunity to present the pertinent facts in his defense."); *Bailey v. Alabama*, 219 U.S. 219, 238 (1911) ("In the exercise of this power numerous statutes have been enacted providing that proof of one fact shall be prima facie evidence of the main fact in issue; and where . . . the accused is not deprived of a proper opportunity to submit all the facts bearing upon the issue, it has been held that such statutes do not violate the requirements of due process of law."). *Cf., also Tot v. United States*, 319 U.S. 463, 467 (1943) ("But the due process clauses of the Fifth and Fourteenth Amendments set limits upon the power of Congress . . . to make the proof of one fact or group of facts evidence of the existence of the ultimate fact on which guilt is predicated.") .

freedom to assess the evidence independently." *Cty. Court of Ulster Cty., N. Y. v. Allen*, 442 U.S. 140, 156 (1979).

The principle that § 2254(e)(2) cannot be interpreted to foreclose consideration of evidence on a claim a federal court must adjudicate reflects a broader principle that a legislature "may not, under the guise of merely affecting the remedy, deny the enforcement of claims [that otherwise must be entertained], when its courts have general jurisdiction of the subject-matter and the parties." *Broderick v. Rosner*, 294 U.S. 629, 643 (1935). If § 2254(e)(2) were interpreted to forbid the presentation of *any* evidence to support a claim subject to merits adjudication—i.e., a claim not procedurally foreclosed by § 2244(b), § 2254(d), or forfeiture rules—then it is an unconstitutional imposition on the habeas petitioner (who must prove the claim without presenting any evidence to support it) and the court (which must decide the merits of the claim on the basis of potentially disputed allegations alone). *See Heiner v. Donnan*, 285 U.S. 312, 329 (1932) (premising a related holding on the constitutional rule that a "legislative body is without power to enact as a rule of evidence a statute denying a litigant the right to prove the facts of his case").

| Claim 2 | **Rubio is entitled to relief on his Sixth Amendment claim that trial counsel deficiently investigated Fetal Alcohol Spectrum Disorders (FASD).** |

Rubio has now been diagnosed with Partial Fetal Alcohol Syndrome ("pFAS"), one of three Fetal Alcohol Spectrum Disorders ("FASD"), and he meets the DSM-5 criteria for Neurodevelopmental Disorder Associated with Prenatal Alcohol Exposure

(ND-PAE).[11] Supp. App. at 39–56 (Report by Paul Connor, Ph. D.); Supp. App. at 61–63 (Report of Kenneth Lyons Jones, MD); Supp. App. at 111–89 (Declaration of Natalie Novick Brown, Ph. D.). Rubio is entitled to federal habeas relief because trial counsel deficiently and prejudicially failed to explore red flags for FASD, ultimately relying on lay assumptions that the absence of visually observable facial dysmorphia excluded it.

In responding, the Director blends two distinct steps in the federal habeas analysis, which accounts for his misplaced complaints about how Rubio relies on evidence outside the state record. At the first step, a federal court must ask whether Rubio avoids the federal relitigation bar because he shows (by reference to the state record) that the state decision was legally or factually unreasonable under 28 U.S.C § 2254(d)(1) or (d)(2), respectively. If Rubio avoids the relitigation bar at the first step because he satisfies one of those subsections, then the court simply evaluates, at the second step, whether Rubio can show that a constitutional violation occurred (using any admissible evidence).[12] In his Amended Petition, Rubio sequenced his argument

---

[11] Rubio also meets the criteria under the DSM-IV-TR for Cognitive Disorder Not Otherwise Specified, which was routinely used at the time of his trial to diagnose the mental defect in FASD. Supp. App. 180.

[12] Although courts sometimes speak of it as a "standard of review," 28 U.S.C. § 2254(d) is a relitigation bar; a prisoner does not get federal habeas relief by satisfying one of its two exceptions. *See Harrington v. Richter*, 562 U.S. 86, 98 (2011); *In re Johnson*, 935 F.3d 284, 295 (5th Cir. 2019). If a prisoner avoids § 2254(d), all that happens is that the claim of constitutional error is considered de novo. *See Brumfield v. Cain*, 576 U.S. 305, 314 (2015) (reviewing Atkins claim after finding state court factual determinations were unreasonable); *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007) (explaining that when requirements under § 2254(d)(1) are satisfied "a federal court must then resolve the claim without the deference AEDPA otherwise requires").

on the underlying claim before his argument about § 2254(d), and he preserves that order here. In other words, Section II.A starts with the underlying claim, the consideration of which *is not limited* to the state record. Section II.B shows why Rubio disables the § 2254(d) relitigation bar, and that inquiry *is limited* to the state record.

An appropriate inquiry requires that the two steps remain disentangled, but some general observations apply to both. The Director repeatedly fails to address trial counsel's basic deficiency: they did not conduct the mitigation investigation that followed reasonably from the red flags in the case. That failure of diligence caused them to confuse FAS and FASD, and the Director reproduces this error throughout his summary judgment motion. FASD is an umbrella term that encompasses three conditions with identical mitigating dimensions, and FAS is just one such condition under that umbrella. Supp. App. at 41–42 (Report of Paul D. Connor, Ph.D.). Because facial dysmorphia is indicative of *FAS*, laypeople wrongly assume that the absence of facial dysmorphia excludes all conditions under the *FASD* umbrella—even though all conditions under the FASD umbrella entail the same neurocognitive impairments and would therefore have the same mitigating effect. Had trial counsel reasonably

---

Under § 2254(d) and *Pinholster*, the first step of the analysis—determining whether the claimant satisfies a subsection and avoids the relitigation bar—is limited to the state record. *See* 28 U.S.C. § 2254(d)(2) (limiting factual unreasonableness inquiry to state record); *Cullen v. Pinholster*, 563 U.S. 170, 181–82 (2011) (interpreting § 2254(d)(1) to limit legal unreasonableness inquiry to state record). Neither 2254(d) nor *Pinholster* restricts evidence at the second step of the analysis—when this court decides whether a prisoner is entitled to relief on the underlying constitutional claim.

investigated, the jury would have learned that Rubio's behavior was indicative of a condition beyond his control, rather than a signifier of evil.

### A. On the merits, trial counsel's performance was prejudicially deficient, violating the Sixth Amendment.

#### 1. Trial counsel's performance was deficient.

Trial counsel performed deficiently by failing to further investigate the red flags for FASD, resulting in a decision to end the investigation based on a layperson mistake about the relationship between FAS and FASD. The Director makes two primary arguments. First, he argues that trial counsel were effective because multiple experts evaluated Rubio after trial counsel learned about Rubio's in utero exposure to intoxicants, and none of them returned an FASD diagnosis. MSJ at 74–77. Second, he argues (somewhat inconsistently) that there were no experts available to assist trial counsel in conducting a full-scale investigation. MSJ at 77–78. Neither assertion is supported by the record.

The Director's first argument—that none of trial counsel's multiple experts returned an FASD diagnosis—sidesteps the fact that none of them were equipped or tasked to conduct an FASD evaluation. In other words, despite the red flags, trial counsel failed to seek out FASD experts, or to ask their existing experts to conduct an FASD work-up. Am. Pet. at 74–77. Several of the trial experts were asked only to make an assessment of Rubio's sanity at the moment of the offense, or his competence at the moment of trial. The fact that they did not diagnose FASD one way or the other is unremarkable and gave trial counsel no license to ignore it. Identifying FASD requires a multi-disciplinary approach and is not part of a standard competency

evaluation. *See* SHCR 521–25 (explaining the role and steps that have to be taken by three separate experts "as recommended under federal guidelines for clinically-consistent FASD diagnosis"). A medical doctor must ultimately diagnose an individual as suffering from an FASD. *See* SHCR 524; Supp. App. at 188 (Declaration of Natalie Novick Brown, Ph.D.).

The Director's numerical emphasis on trial experts not retained to consider FASD overstates trial counsel's diligence. The trial court appointed Troy Martinez for the limited purpose of ascertaining Rubio's competence to stand trial. 2 CR 508. There is no indication, however, that Dr. Martinez knew about Rubio's in utero alcohol exposure, or that he took it into account when providing his opinion. *See* 2 CR 508–37, 543–47.[13] Similarly, trial counsel asked Dr. Jolie Brams to assess Rubio's competence to stand trial, 2 CR 667—not to evaluate FASD.[14] In keeping with the same pattern, Drs. John Pinkerman and Vittorio Puente were not retained to perform the testing and observation necessary to evaluate FASD, but only to opine on Rubio's

---

[13] According to his report, he was unsuccessful in an attempt to speak with Hilda Barrientes, Rubio's mother. 2 CR 509.

[14] In fact, Dr. Brams' activity severely undercuts the Director's argument because, despite the limits of her referral question, she flagged FASD as a possible issue. SHCR 177 (noting the risk prior to birth from Rubio's mother smoking and drinking and how this could implicate genetic and medical factors). The notes she provided in conjunction with her PowerPoint slides disclosed that she intended to testify that "in utero insult…smoking and drinking, drugs," was one of the issues impacting Rubio. SHCR 177. She testified during the penalty phase that she diagnosed Rubio with among other things, hyperactivity, ADHD, a learning disability, an emotional disorder, and psychosis. 73 RR 173–79. Dr. Brams did not exclude FASD; she provided information suggesting that an appropriately informed expert diagnosis was in order. No such diagnosis ever happened.

social and emotional development prior to the offense—in other words, the thrust of their assessment entailed no FASD screening or other neurocognitive assessment. SHCR 161.

The Director's argument about Dr. John Fabian is particularly illustrative of the Director's failure to grapple meaningfully with the underlying deficiency. Trial counsel retained Dr. Fabian to evaluate Rubio and address issues relevant to mitigation and future dangerousness. SHCR 130. Dr. Fabian flagged for counsel that Rubio's prenatal exposure to alcohol was a risk factor for developmental issues, (SHCR 151–52), which provided counsel with a red flag that would have caused reasonably diligent counsel to consult with an expert in prenatal alcohol exposure and FASD. Dr. Fabian, whose doctorate is not in medicine, was not asked to diagnose or exclude FASD, nor could he. An FASD diagnosis must be made by a medical doctor working in conjunction with a neuropsychologist and forensically trained psychologist. Supp. App. at 188 (Declaration of Natalie Novick Brown, Ph.D.). The Director also seems to make a significant mistake, misunderstanding the meaning of a "rule out" diagnosis. Dr. Fabian's findings did not say that he "*ruled out*" Cognitive Disorder Not Otherwise Specified—the pre-2013 diagnosis for FASD, MSJ at 72, Fn. 31.[15] The report says "*rule out* Cognitive Disorder Not Otherwise Specified." The "rule out"

---

[15] The Director cites to SHCR 47 for this proposition, but that page is part of Rubio's state habeas petition that does not mention Dr. Fabian or his findings. The correct citation that Rubio is responding to is SHCR 147, which is a page in Dr. Fabian's report.

language signals that FASD was a possibility that needed further scrutiny and analysis before it could be excluded.

In short, the Director's discussion of Drs. Brams, Pinkerman, Puente, and Fabian manages to do Rubio's work for him. None of these professionals were tasked with diagnosing FASD, and none was a medical doctor qualified to do so—yet each raised a red flag, highlighting the issue of maternal alcohol consumption as a risk factor relevant to Rubio's development. SHCR 151, 170. These experts did not extinguish trial counsel's obligation to appropriately explore the red flags for FASD; quite to the contrary, their feedback underscored the need for investigation.

With respect to two other experts, the Director ups the ante. He argues that trial counsel not only received feedback from Drs. Jim Owens and Raphael Morris that failed to include an FASD diagnosis, but also that the feedback tended to exclude it. MSJ at 76. But neither doctor was asked to conduct an evaluation for FASD, neither doctor "all but ruled it out," Am. Pet at 92–93, and neither doctor sought to "dissuade[]" trial counsel from investigating it, MSJ at 76.

Dr. Owens was not asked to evaluate Rubio for FASD, and there is no evidence that he knew of, or that trial counsel provided him information about, Rubio's in utero exposure to intoxicants.[16] Dr. Owens was asked simply to conduct a neurological exam, during which he observed that there was no facial dysmorphia.[17] At this point,

_____

[16] The Owens Report included a description of Rubio's family history, but makes no mention of Rubio's mother's abuse of alcohol while pregnant.

[17] Dr. Owens was actually incorrect in his assessment of facial dysmorphia—Rubio has it. Supp. App. at 62.

the Director describes facial dysmorphia as a "classic indicator of FAS or FASD." MSJ at 76. That is not true. It is classic indicator of *FAS*, the condition specifically associated with facial dysmorphia that does not require confirmation of in utero alcohol exposure. But it is *absolutely not* a "classic indicator" of other conditions under the FASD umbrella, which are diagnostically distinguished from FAS precisely because they do not present with facial dysmorphia.[18] Supp. App. at 40–42.

The claim that trial counsel reasonably discontinued an FASD investigation because of feedback from Dr. Morris is even more farfetched. Dr. Morris was asked solely to conduct a pre-trial evaluation of criminal responsibility, SHCR 217, and his report does not mention Rubio's in utero alcohol exposure as a factor that Dr. Morris considered in his competency determination. Despite not including it in his report, Dr. Morris did testify at Rubio's competency hearing that in utero exposure could be related to Rubio's psychotic symptoms. 24 RR 228. Dr. Morris also testified that low birthweight and FAS are two risks of consuming alcohol while pregnant. *Id*. This information was a red flag that would have led reasonable counsel to further investigate the role that Rubio's in utero alcohol exposure played in his development—not discontinue investigation. The Director observes that Dr. Morris "had not diagnosed Rubio with FAS" and that "Dr. Morris did not notify trial counsel

---

[18] *American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders*; DSM-5 at 799 (5th ed. 2014) (Distinguishing that neurobehavioral disorder associated with prenatal alcohol exposure (ND-PAE) encompasses the full range of developmental disabilities associated with exposure to alcohol in utero, whereas fetal alcohol syndrome specifically requires facial dysmorphology for diagnosis.)

that there was any problem with [Dr. Owens' report]." MSJ at 76. These observations assume that, without conducting his own neurological exam, Dr. Morris was in a position to critique the evaluation of another expert, who was asked to do a different type of evaluation.

With respect to deficiency, the Director also argues that trial counsel's performance was adequate because there were no available experts who, at the time of trial, could conduct a full FASD evaluation. MSJ at 77–78. This argument does not actually speak to trial counsel's deficiency, because they failed to undertake the investigation necessitated by the red flags. Trial counsel failed to try and locate FASD experts to evaluate and diagnose Rubio. Deficiency is not determined by whether there was a particular expert with open availability at the time. The Director's language here—about the unavailability of sufficient experts—instead appears to be an argument on *prejudice*. And it is not a good one.

The Director supports the no-expert-available argument with several pieces of what he believes to be supportive evidence. First, he points to a letter from Rubio's state habeas counsel requesting state-court funding for out-of-state FASD experts. *Id*. The letter is plainly about the absence of *in state* experts with sufficient availability, and it specifically identifies an available, out-of-state expert. SHCR 824–25. Nothing in the letter suggests that trial counsel had no recourse to obtain qualified experts; it indicates quite the opposite. *See id*.

To further support the notion that trial counsel had no recourse to experts, the Director also emphasizes the testimony of the mitigation specialist from the state

habeas proceeding. MSJ at 78. The mitigation specialist's testimony, however, controverts the Director's argument. After conducting a search for a qualified *post-conviction* expert in 2011, the mitigation specialist pointed state habeas counsel to qualified professionals who were in fact used to conduct a preliminary work-up for FASD. 1 SHRR 157. Second, when questioned by the state habeas court, the mitigation specialist confirmed that, if she had been on the trial team, then she would have contacted the organizations mentioned or otherwise sought an appropriate expert. 1 SHRR 155–56. Finally, she testified that, if she had been on an appropriately directed trial team, then her investigation into FASD would have started with the material in Dr. Fabian's report. 1 SHRR 156. And she made clear that if Dr. Fabian had been asked to conduct this type of evaluation, then he would have been able to instruct the team regarding the testing and expert requirements for a full FASD workup. 1 SHRR 156. Dr. Fabian, however, could not diagnose an FASD; that diagnosis required a medical doctor.

In short, trial counsel ignored the red flags for FASD, never learned the relationship between FAS and FASD, and relied on the layperson assumption that all FASDs were accompanied by facial dysmorphia. The Director's responses, moreover, continue to conflate FAS and FASD in order to mask the underlying deficiency. In light of what they knew, trial counsel unreasonably canceled the FASD inquiry—believing (incorrectly) that, because Drs. Owens and Morris did not diagnose FAS, Rubio did not have another FASD. Even though the related question is actually about prejudice, it is also clear that a full FASD evaluation was available

to trial counsel in 2010, had they conducted the necessary investigation and sought out qualified experts.[19]

## 2. Rubio was prejudiced by counsel's failure to investigate FASD.

For the reasons set forth in the Amended Petition, the deficient FASD investigation had a reasonably probable effect on the sentencing-phase outcome. The arbitrary denial of Rubio's opportunity to be heard in state court notwithstanding, prejudice is evident on the face of the state record, the federal record, and any combination thereof.[20]

The Director's primary response is not that the diagnostic conclusion that Rubio has pFAS was wrong, but that it was merely "preliminary." To be clear, pFAS was not a tentative diagnosis, and what the Director describes as information necessary to confirm that diagnosis is simply additional evidence that the experts identified as corroborative of lifelong functioning deficits that the condition entails.[21]

_____

[19] *See* 2d Supp. App. at 423–24 (declarations of Drs. Novick Brown and Connor stating that they were able and willing to testify to Rubio's FASDs at the time of his trial in 2010).

[20] As explained above, this Court considers the new federal evidence if it determines that § 2254(d) does not restrict relief—that is, if it accepts that Rubio satisfies § 2254(d)(1) or (d)(2), or that the arbitrary denial of state fact development otherwise disables the relitigation bar.

[21] At one point, the Director suggests that the state post-conviction experts failed to "definitively diagnose[]" Rubio with an FASD. MSJ at 79. However, the Director admits that Dr. Adler *did* diagnose Rubio with pFAS; Dr. Adler's affidavit simply stated that additional funding was needed in order for Dr. Brown to work up Rubio's functional deficits and further corroborate the diagnosis. MSJ at 79. The Director glosses over the fact that Rubio was denied this needed funding and therefore was prevented from further developing this claim. *See* Claim Two, Part (B)(1), *infra*.

The Director cites a single unpublished district court opinion to suggest that a preliminary diagnosis cannot show prejudice. *See Sells v. Thaler*, No. SA-08-CA-465-OG, 2012 WL 2562666, at *57 (W.D. Tex. June 28, 2012), *COA denied sub. nom. Sells v. Stephens*, 536 F. App'x 483, 495 (5th Cir. 2013). *Sells* does not control here, nor is it analogous to the scenario before this Court. *Sells* involves the *deficient performance prong*, finding that counsel performed reasonably because the claimant "furnished … no evidence showing there was any evidence readily available at the time of petitioner's capital murder trial establishing the drinking habits of petitioner's mother." *Id.* at *58. *Sells* brushed aside the IATC claim because there were no "fact-specific allegations, much less any evidence … showing that petitioner … suffer[s] from [FAS]." *Id.* at *57. By contrast, the specific allegations that Rubio's trial counsel encountered red flags for FASD are set forth in the Amended Petition, and above. Am. Pet. 74–77. (The prejudice showing associated with the underlying claim is set forth in the Amended Petition at 77–86.) Unlike Sells, moreover, Rubio has been "definitively" diagnosed with pFAS, and he meets the DSM-5 criteria for ND-PAE. Supp. App. at 39–56 (Report by Paul Connor, Ph. D.); Supp. App. at 61–63 (Report of Kenneth Lyons Jones, MD); Supp. App. at 111–89 (Declaration of Natalie Novick Brown, Ph. D.).

The Director's remaining arguments are surely familiar to this Court, and the Amended Petition addressed them anticipatorily. For example, the Director invokes the idea that the failure to investigate organic neurological impairment was not mitigation, because its "second edge" suggests future danger. MSJ at 80–81. First,

the Amended Petition explains that, even in highly aggravated cases, the Supreme Court has found that the failure to investigate FASDs can be prejudicial. Am. Pet. at 95 (discussing *Rompilla v. Beard*, 545 U.S. 374 (2005)). Second, and refuting the existence of the second edge, the Amended Petition explains that a properly litigated FASD diagnosis is heavily mitigating—because appropriate social and medical supports reduce a person's danger expectancy below that of an unsupervised and unmedicated baseline. Am. Pet. at 85; 95. Third, the Amended Petition underscores that there could be no second edge because an FASD diagnosis would not introduce any new aggravating material in the record; it would simply give a mitigating explanation for observed behavior about which the jury had already heard. Am. Pet. at 84–85; 96–97. Finally, the Amended Petition shows how the argument about double-edgedness elides the basic structure of the Texas capital sentencing statute, which does not require a sentencing jury to weigh evidence of future danger against mitigation. Am. Pet. at 97–98.

Even on its own terms, the Director's double-edgedness arguments are too generic to fit this record. He cherry picks isolated pieces of evidence from Rubio's experts, ignoring their unambiguous conclusions that FASD does not make Rubio a future danger. The Director writes that evidence from Rubio's experts would have led the jury to believe that he was a future danger because he was hyper-reactive to

stress[22] and would respond negatively to the unstructured environment of prison life, MSJ at 83, but the Director simply ignores the testimony of three state habeas experts describing the favorable impact this type of evidence would have had on the jury and what trial counsel should have done in order to get a life sentence. *See* SHCR 2nd Supp. 7.

Start with Robert Swafford, an expert on jury selection. Swafford testified that a full investigation into FASD would have positioned counsel, during voir dire, to select a jury more likely to vote for life. 1 SHRR 44–45. Even on the assumption that trial counsel would have selected the same jury, moreover, Swafford testified that the petit jurors "were really thoughtful people who were really wrestling with this." 1 SHRR 47–48. These jurors were even "talking about the difference between nature and nurture." 1 SHRR 47. Swafford explained that these jurors could have been primed by counsel to interpret the FASD-consistent behavior as the result of a disease rather than of evil. 1 SHRR 47–48.

Next consider Michelle Tuegel, an expert in the presentation of mitigation, who testified at the state habeas hearing. Tuegel explained that FASD evidence would have been net beneficial at the sentencing phase, 1 SHRR 69, and that "one of the edges of the sword is a lot sharper and a lot more damaging," 1 SHRR 58. She further explained that evidence of Rubio's impaired executive functioning "was admitted at

---

[22] In direct contrast to this argument, the Director also argues that Rubio's crime was not a result of his inability to handle stress, but instead was a "cruel, calculated, and concerted effort." MSJ at 86.

trial, it just wasn't explained in the context of what we know that it is now. So that double-edged sword was already there, it just didn't have the explanation. There was a hole." 1 SHRR 70. Another state habeas witness, Carlos Garcia, amplified Tuegel's observation that the second edge was already visible to the jury and that trial counsel missed a crucial opportunity to present the behavior at issue in the most favorable light. *See* 1 SHRR 104–05 (Garcia testifying that failure to investigate FASD was "a hole in the case" and that the record contained "huge" red flags requiring investigation).[23] Evidence of Rubio's problems with decision making, judgement, and impulsivity were already before the jury, without the mitigating lens of FASD.

The Director concludes his prejudice section with the "brutality trumps" proposition discussed in Part B of the Introductory Statement, *supra*—the idea that all deficiencies are nonprejudicial because the crime was simply too aggravated. MSJ at 84–87. The answers to the brutality-trumps position from earlier in this Reply are hereby incorporated by reference, as is the material anticipating this argument from the Amended Petition. Am. Pet. at 84–86, 94–97. Once again, the Director cites to unpublished material, this time the Fifth Circuit opinion in *Sells*. MSJ at 87. However, *Sells* hurts him more than it helps. The very passage in *Sells* that the Director cites remarks that "the trial evidence already established that Sells suffered

---

[23] Additionally, the Director highlights evidence in the declaration of Dr. Natalie Brown as proof that Rubio would have been a future danger in prison. MSJ at 83–84. The Director, however, fails to mention that Dr. Brown explicitly states that FASD is not a predictor of poor behavior in custody because the effect of stressors could be less than they are in an unstructured environment. Supp. App. 188–89.

from serious personality and adaptive impairments for which he bore no blame . . . and so it is doubtful that Sells would have derived any mitigating benefit merely by linking that diagnosis to fetal alcohol syndrome." MSJ at 87 (citing *see Sells v. Stephens*, 536 F. App'x 483, 495 (5th Cir. 2013) (unpublished)). Of course, nothing at the trial here "established" that Rubio's behavior was attributable to blameless impairment; quite the contrary, Dr. Welner led the jury to believe that any impairment was feigned, and that Rubio was simply evil.

This Court should not grant summary judgment on a no-prejudice theory. Indeed, state habeas testimony directly refutes the proposition that the brutality of Rubio's crime preordained a death sentence, no matter what the mitigation.[24] The crimes in this case are tragic, but a life sentence was reasonably probable if trial counsel had properly contextualized Rubio's observed behavior.

**B.    This claim can be considered on the merits because 28 U.S.C. § 2254(d) does not preclude relitigation.**

Even before reaching the merits, however, the first step in the Court's analysis is to determine whether § 2254(d) precludes relitigation. The Amended Petition presents three reasons why it does not. First, due process violations in state post-conviction proceedings disable it. Second, Rubio avoids § 2254(d) because, under § 2254(d)(1), the state decision was an objectively unreasonable application of clearly

---

[24] Garcia testified at Rubio's state habeas evidentiary hearing about other very aggravated murder cases in Texas that have resulted in a life sentence, 1 SHRR 92–95, including a case where the defendant murdered his young children, injured his wife, and killed his mother-in-law, 1 SHRR 102–03.

established Supreme Court law. Third, Rubio avoids § 2254(d) because, under § 2254(d)(2), the state decision was based on an unreasonable factual determination.

Several global observations are in order before engaging the details of the Director's argument, and two of them are brief. First, Rubio is indeed limited to the state record when demonstrating that he satisfies § 2254(d)(1) or § 2254(d)(2); he does not and has not suggested otherwise. Second, in his Motion for Summary Judgment, the Director does not distinguish between his responses to § 2254(d)(1) (legal unreasonableness) and § 2254(d)(2) (factual unreasonableness). Nevertheless, this Reply preserves the distinction so as to facilitate clean consideration by the Court.

Third, the Director remarks that this Court should simply assess the reasonableness of the "ultimate [state] decision," rather than anything about the state court's reasoning of the claim. MSJ at 36. In so doing, he cites *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc). MSJ at 36. But this aspect of *Neal* has been overruled, most expressly by *Wilson v. Sellers*, 138 S. Ct. 1188 (2018):

> Deciding whether a state court's decision involved an unreasonable application of federal law or was based on an unreasonable determination of fact requires the federal habeas court *to train its attention on the particular reasons—both legal and factual—why state courts rejected a state prisoner's federal claims*, and to give appropriate deference to that decision. This is a straightforward inquiry when the last state court to decide a prisoner's federal claim explains its decision on the merits in a reasoned opinion. In that case, a federal habeas court simply *reviews the specific reasons given by the state court and defers to those reasons if they are reasonable*. We have affirmed this approach time and again.

*Id.* at 1192 (emphasis added, internal citations and quotation marks omitted). *Wilson*, in turn, reflected the plain text of the statute, which says that a claimant avoids the

relitigation bar when the state decision either "involves" an unreasonable legal application or when it is "based on" an unreasonable factual determination. Thus, this Court must assess whether the state court's actual reasoning in denying Rubio's claims was reasonable under § 2254(d).

Fourth, the Director argues for a level of factual deference that is not permitted—specifically, for deference to "implied" findings. He observes that "[t]he presumption of factual correctness … applies to those unarticulated findings which are *necessary* to the state courts' conclusions of mixed law and fact." MSJ at 36 (alterations omitted, emphasis added). That observation is true as far as it goes, but it does not go very far. The key word is *necessary*, which means that the presumption attaches to the state court's unarticulated findings only if the explicit finding could not be made without it. If the unarticulated finding is merely consistent or supportive of the express finding, but is not logically "necessary" to it, then no presumption of correctness attaches. *See*, *e.g. Guidry v. Dretke*, 397 F.3d 306, 324 (5th Cir. 2005), *overturned on other grounds by Pinholster*, 563 U.S. 170 (2011) (rejecting Director's request to defer to "implied" determination consistent with but not necessary to express finding). Moreover, the presumption that attaches to unarticulated findings necessary to an explicit finding is precedentially limited to unarticulated findings of *historical* fact—not experts. Indeed, the operative language in *Valdez v. Cockrell*, 274 F.3d 941 (5th Cir. 2001), the case upon which the Director relies for his deference-to-unarticulated-findings proposition, cites primarily to two cases containing false-confession holdings necessarily implying a credibility finding about a historical fact

witness that disputed voluntariness. *See id.* at 948 n.11.[25] Because of the strict limitations on the application of the implied-finding rule, it has no bearing on this case.[26]

### 1. Section 2254(d) does not bar relitigation because Rubio was denied a meaningful opportunity to be heard in state post-conviction proceedings.

The first reason that § 2254(d) does not restrict relief involves a due process violation during state post-conviction proceedings. For the initial reasons set forth in the Amended Petition and for the supplemental ones discussed below, that due

---

[25] In each of these cases, a fact witness testified about historical facts that, if true, would have precluded a finding that the interrogation was noncoercive; the express conclusion of coercion could not coexist with a finding that the fact witnesses testified credibly. In the first cited case, *Marshall v. Lonberger*, 459 U.S. 422, 433–34 (1983), the Supreme Court determined that the state court had implicitly discredited a defendant's testimony that his plea was involuntary because the state court had found the defendant's guilty plea admissible. The Court observed that "[t]he trial court's ruling allowing the record of conviction to be admitted in evidence … is tantamount to a refusal to believe the testimony of respondent." *Id.* at 434. In the second case, *LaVallee v. Delle Rose*, 410 U.S. 690, 691 (1973), the reviewing federal court held that the state court had implicitly found that the defendant's coerced confession testimony was not credible based on the express finding that his "confessions … were, in all respects, voluntary and legally admissible." The Court explained that "[a]lthough it is true that the state trial court did not specifically articulate its credibility findings, it can scarcely be doubted from its written opinion that respondent's factual contentions were resolved against him." *Id.* at 692.

[26] Rubio hereby preserves error on another question of deference. In the Fifth Circuit, a claimant must meet the clear-and-convincing standard from § 2254(e)(1) in order to avoid the relitigation bar under § 2254(d)(2). The Supreme Court, however, has explicitly reserved this question, and Rubio therefore preserves it for the purposes of subsequent review. *See Wood v. Allen*, 558 U.S. 290, 300–01 (2010). In Rubio's view, § 2254(d)(2) does not require a claimant to show factual "unreasonableness" by clear-and-convincing evidence, and the § 2254(e)(1) clear-and-convincing evidence standard only applies when a federal habeas court considers whether new, extrinsic evidence disproves a state court factual finding to which a presumption of correctness attaches.

process violation disables the relitigation bar. As an initial matter, the Director submits that the AEDPA does not require "full-and-fair" state-post-conviction process. MSJ at 71. Rubio, however, does not allege that a full-and-fair post-conviction hearing is a precondition for imposing the relitigation bar. But Supreme Court authority does establish that when the defects in state post-conviction representation *amount to a constitutional violation*, then the relitigation bar does not apply. *See Hansberry v. Lee*, 311 U.S. 32, 41 (1940); *see also Kremer v. Chem. Const. Corp.*, 456 U.S. 461, 482 (1982) (observing that preclusive effect of a judgment does not operate across jurisdictions if the proceedings in the rendering jurisdiction violated due process).

In terms of establishing the due process violation, Rubio largely stands on what appears in the Amended Petition. Despite including in his state application an IATC claim pertaining to FASD, he was arbitrarily prevented from developing it factually. State post-conviction counsel made repeated attempts to secure the expert services necessary to develop the claim, and the trial court stood in the way by repeatedly failing to decide motions in a timely fashion. Am. Pet. at 89–90. In his Motion for Summary Judgment, the Director simply ignores the egregious delay—the trial court failed to respond to state habeas counsel's requests for funding for over a year, as the clock for filing the application was ticking. *See* MSJ at 71 (failing to address the court's role in habeas counsel being unable to complete their FASD investigation).

In parts of his summary judgment motion, the Director seems to shift the blame for delay to Rubio's state post-conviction counsel, given the wording the Director uses to describe how counsel asked the TCCA for extensions on three

separate occasions. MSJ at 71. But state post-conviction counsel was forced to seek the extensions because he was still waiting—in vain—for the trial court to make a timely ruling on the requests for investigative and expert resources. Am. Pet. at 89–90.[27] The Amended Petition sets forth the precise timeline for the funding requests and the state court's arbitrary and inexplicable refusal to rule in time for state post-conviction counsel to finish developing the claim factually.[28] Am. Pet. at 89–90.

Finally, the Director declares that there is no clearly established constitutional right to funding for state post-conviction work, and so Rubio cannot make the argument in federal habeas proceedings. MSJ 71–72. This argument confuses constitutional violations that are claims for relief—i.e., those asserted as grounds why the conviction or sentence is unlawful—with constitutional violations that go to the processing of those claims. Rubio is not asking for relief on the basis of the due process violation and does not need to show that the state adjudication of that claim contravened clearly established precedent; he simply contends that it disables the

---

[27] The Director cites to the trial court's denial of additional funding, which makes no reference to any extensions requested by Rubio.

[28] Much of the history behind state habeas requests for fact development services is recounted in the Amended Petition, but to summarize: State habeas counsel, after significant delay, was able to secure up to $13,000 from the court for his mitigation investigation in January 2013. SHCR 495–96. The order specified that if the funding was insufficient, counsel needed to ask the Court for more. SHCR 495–96. The authorized funding, however, was only half of the amount estimated for a full FASD work-up. SHCR 520–26. After the court provided counsel with half of the funding needed to conduct an FASD work-up, counsel asked for more, supported that request with expert affidavits, and secured donated expert time in order to make that renewed request more attractive to the court. SHCR 520–26, 528–31, 544–54, 583–86.

relitigation bar that would otherwise preclude relief on *other* claims. The Director's aside about whether there is a violation of a clearly established rule is a non sequitur.

### 2. Section 2254(d) permits relitigation because Rubio satisfies § 2254(d)(1).

Rubio disables the relitigation bar because he satisfies 28 U.S.C. § 2254(d)(1). Specifically, the state adjudication of Rubio's FASD claim unreasonably applies clearly established Supreme Court law, with respect to both deficiency and prejudice.

*Deficiency.* The TCAA's determination of counsel's deficient performance—basically, that trial counsel reasonably abandoned investigation because their experts told them to—was legally unreasonable. In 2010, and as explained in the Amended Petition (at 91–93), it was clearly established that professional norms required trial counsel to investigate red flags for FASD. And reasonable strategic decisions can only be predicated on reasonable investigations. The focus of determining deficiency therefore requires "looking at whether the investigati[on] supporting counsel's decisions … itself was reasonable." *Wiggins*, 539 U.S. at 523. Even if trial counsel otherwise did substantial investigation, they are still deficient if they failed to reasonably explore certain investigatory leads. *See, e.g., Andrus*, 140 S. Ct. at 1883–84 (finding deficient performance where "counsel disregarded, rather than explored, the multiple red flags"); *Rompilla*, 545 U.S. at 382 (finding deficient performance for ignoring red flags, even though counsel interviewed five family members and worked with three mental health experts).

The Director argues that the TCAA's adjudication was not legally unreasonable because Rubio's counsel "investigated to determine if there was a

causal connection between Rubio's mother's abuse of alcohol during pregnancy and Rubio's subsequent bizarre behavior," and that counsel made a reasonable strategic decision not to further investigate due to information they got from multiple experts. MSJ at 70 (citing 2nd Supp. SHCR at 4 (¶ 16–17)). As discussed *supra*, as well as in the Amended Petition (at 91–93), trial counsel were not making strategic decisions based on a thorough investigation. The Director alludes to decision-making based on information coming from "multiple experts," MSJ at 75–77, but the "multiple experts" did not *exclude FASD*; they *failed to diagnose FAS*. Am. Pet. at 75–77, 92–93. Even Drs. Owens and Morris, who supposedly ruled out FASD, did not in fact diagnose or exclude it because they were given referral questions that did not cover it. Am. Pet. at 92 (Dr. Morris); *id.* at 93 (Owens); *supra* at 39. Experts other than Drs. Morris and Owens were similarly left without critical information about FASD risk, and were tasked with diagnostic responsibilities that would not have caused them to opine reliably on FASD, one way or the other. *Supra* at 37–40.[29] In short, it was objectively unreasonable for the state court to draw negative inferences from the failure of experts to diagnose FASD, and such negative inferences are not in line with Supreme Court law on counsel's duty to investigate mitigating evidence.

*Prejudice.* The TCAA's determination of prejudice was also an unreasonable application of clearly established Supreme Court law. Instead of the ordinary

---

[29] Specifically, Drs. Martinez and Brams were tasked with conducting competency evaluations, Drs. John Pinkerman and Vittorio Puente were retained to opine on Rubio's social and emotional development, and Dr. Fabian was tasked with reporting on mitigation and evidence of future dangerousness. *Supra* at 37–40.

"reasonable probability" standard, the TCCA required Rubio to "demonstrate[] that the result of his trial *would have been different* but for counsel's decision not to further investigate[.]" *Ex parte Rubio*, No. WR-65,784-02, 2018 WL 2329302, at *7 (Tex. Crim. App. 2018) (emphasis added). The Supreme Court recently held that the failure to include the "reasonable probability" language in a formulation like the one here indicates the imposition of a higher prejudice standard. *See Andrus*, 140 S. Ct. at 1891 n.5.[30]

The Director argues that there is Fifth Circuit authority—*Charles v. Stephens*, 736 F.3d 380, 393 (5th Cir. 2013)—holding that the error is harmless, and that the abridged prejudice formulation is just "shorthand" for the reasonable probability standard. MSJ at 74. *Charles* does no such thing. *Charles* held that the abridged formulation was permissible shorthand because two conditions were satisfied. First, "the state habeas court cited a number of Supreme Court cases applying the correct *Strickland* prejudice standard, including *Wiggins [v. Smith]*, 539 U.S. 510 [(2003)], *Rompilla [v. Beard]*, 545 U.S. 374 [(2005)], and *Williams [v. Taylor]*, 529 U.S. 362 [(2000)]." *Charles*, 736 F.3d at 393. Second, "the state habeas court made clear that it … believed the [records at issue] would have provided no value to" the mitigation case. Here, by contrast, the state court simply stated that "Applicant has failed to

---

[30] The Director argues that the error in the TCCA opinion is saved because it adopted trial court findings, one of which recited the correct standard. MSJ at 74 n.28. Whatever the merit of such an argument when an appellate opinion is *silent* as to a standard, the presence of a correctly-formulated legal standard in a recommendation cannot inoculate the appellate opinion that affirmatively articulates that very standard incorrectly.

meet his burden under *Strickland v. Washington*"—without any of the extensive citation animating the result in *Charles*. *Ex parte Rubio*, 2018 WL 2329302 at *3. Moreover, the TCCA opinion contains no indication that the mitigating value of the FASD evidence was zero.[31]

It is ultimately difficult to disentangle the Director's prejudice arguments on § 2254(d) and his arguments on the merits, which his briefing blends and presents on pages 79–87. In those pages, however, the Director fails to answer two other grounds on which Rubio satisfies § 2254(d)(1). First, he does not respond to the extensive citation to Supreme Court law clearly establishing that mitigating evidence can produce life verdicts even in *highly aggravated* capital prosecutions. Am. Pet. at 94–96. Part B of the Introductory Statement to this Reply sets forth in even greater detail the objective unreasonableness of the proposition that "brutality trumps" any omitted mitigation evidence.[32] Second, and despite spending several pages recounting the

---

[31] The Director includes a lengthy footnote conceding that other circuits have on-point authority finding that language of the sort used in the TCCA opinion is contrary to or an unreasonable application of law within the meaning of 2254(d)(1). MSJ at 73–74 n.27. That footnote concludes by suggesting that *Woodford v. Viscotti*, 537 U.S. 19 (2002), controls the result here. *See id.* But *Woodford* hurts the Director more than it helps him. It was a case where the state court used the "reasonable probability" in multiple places, in addition to the several where it simply used the term "probable." *See id.* at 24. The Supreme Court observed that the state court had "painstakingly describe[d]" the *Strickland* standard, notwithstanding several instances of shorthand. There is nothing like that set of indications that the state court used the "reasonable probability" standard in the TCCA's Rubio opinion.

[32] The Director recites Fifth Circuit authority that he interprets to permit his brutality-trumps position, MSJ at 85, but none of this is responsive to the clearly established Supreme Court authority recited in the Amended Petition and elaborated upon in Part B of the Introductory Statement, *supra*.

"double-edgedness" of FASD evidence, he fails to respond to the basic point that any aggravating elements of an FASD finding would have had no additional aggravating effect on the jury, because the jury *already knew about all of the adaptive limitations and anti-social behavior that went along with the condition. See, e.g.*, SHCR 23–25 (describing Rubio's bizarre behavior surrounding the crime). What the jury lacked was a mitigating explanation for those limitations, and that behavior.

### 3. Section 2254(d) permits relitigation because Rubio satisfies § 2254(d)(2).

Rubio also avoids the relitigation bar because, under § 2254(d)(2), the state decision was also based on unreasonable factual determinations. As set forth in the Amended Petition, the Findings were factually unreasonable insofar as they held that trial counsel permissibly used feedback from Drs. Owens and Morris to draw broad inferences about all conditions under the FASD umbrella. Am. Pet. at 98–102. The Director simply does not respond to the argument that trial counsel's inferences were impermissible in light of the facts that: (1) the FASD diagnosis was outside the scope of the evaluations those two doctors performed; (2) they confuse FAS with FASD because the feedback went only to facial dysmorphia and *could* not exclude FASDs that do not present with that symptom; and (3) the doctors did not have information permitting them to exclude FASDs other than FAS because trial counsel did not give it to them. Am. Pet. at 98–102.

Nor does the Director point to record support for the factually unreasonable finding that trial counsel "conducted an investigation to determine whether there was a causal link" between Rubio's observed impairments and the drinking of his

mother—a finding that, as recounted in the Amended Petition, satisfies § 2254(d)(2). Am. Pet at 98–102. For the reasons set forth in Claim Two, Part (A)(1), *supra*, as well as in the Amended Petition (at 70–77), nothing approaching such an investigation occurred. The Director repeatedly invokes the number of mental health experts that worked on the case, incorrectly implying that one can draw a negative inference about all conditions under the FASD umbrella because experts—not provided with information about prenatal alcohol and referred to diagnose unrelated conditions—did not go outside the scope of their referral questions and diagnose FASD. MSJ 74–77. This Court should reject the invitation to such revisionist defenses of the state Findings.

*     *     *

Rubio is entitled to relief on his IATC-FASD claim. 28 U.S.C. § 2254(d) does not preclude relief for three separate, independently sufficient reasons: because of the due process violation in state post-conviction proceedings, because he satisfies § 2254(d)(1), and because he satisfies § 2254(d)(2). Having disabled the relitigation bar, he is also entitled to relief on the underlying claim that trial counsel's performance was prejudicially deficient, and he is permitted to use new evidence to prove it.

**Claim 3      Rubio is entitled to relief because his Sixth Amendment right to counsel was violated when counsel failed to investigate and prepare for his guilt/innocence phase defense.**

Despite entering a Not Guilty by Reason of Insanity ("NGRI") plea at the guilt/innocence phase of Rubio's trial, trial counsel failed to familiarize themselves

with the controlling law on that affirmative defense, failed to provide their experts with information critical to the insanity determination, and failed to investigate and present hundreds of pages of prison records to substantiate the fact that Rubio suffers from severe mental illness. Given that Rubio needed to prove his insanity only by a preponderance of the evidence, counsel's deficient performance sufficiently undermined confidence in the outcome of that proceeding.

The Director concedes that trial counsel's defense experts did not review certain information essential to the insanity inquiry, that one of the experts applied the wrong legal standard in his assessment, and that Rubio's experts did not even agree with each other on whether Rubio understood the consequences of his actions at the time of the offense. However, the Director disputes that the second expert applied the wrong legal standard and argues that counsel made a strategic decision not to present the prison records at issue. The Director further argues that Rubio was not prejudiced by trial counsel's failures because, the Director alleges, there was "substantial" evidence supporting sanity and the prison records are actually consistent with the State's presentation at trial. Regardless, the Director argues, state habeas counsel was not ineffective in failing to raise this claim.

But both the law and the facts contradict these arguments. The Supreme Court has held that trial counsel's failure to research and understand controlling law that is fundamental to a defense is "quintessential" deficient performance. *Hinton v. Alabama*, 571 U.S. 263, 274 (2014). The Court has likewise held that trial counsel have a duty to investigate red flags of mental illness, like those found in Rubio's TDCJ

records. *See Wiggins*, 539 U.S. at 523–24. Contrary to the Director's assertions, trial counsel has yet to offer any strategic reason for their failures, and it is improper for the Director to attempt to fashion *post hoc* rationalizations. *See id.* at 526–27 ("[T]he 'strategic decision' the state courts and respondents all invoke to justify counsel's limited pursuit of mitigating evidence resembles more a *post hoc* rationalization of counsel's conduct than an accurate description of their deliberations prior to sentencing[.]"). Moreover, Rubio's TDCJ records completely undermine the testimony of Dr. Welner on critical issues. For example, they show that, while in county jail and state prison, Rubio was prescribed and taking powerful antipsychotic medications and experiencing persistent delusions and hallucinations. *See* Claim Six, *infra.*

Finally, any procedural default of this Claim is excused by state habeas counsel's ineffectiveness in failing to raise it in state court.[33] State habeas counsel has acknowledged that he overlooked trial counsel's failures in this regard and that, had he done the investigation required under the ABA Guidelines, he would have raised this substantial claim. *See* 2d Supp. App. at 417.

---

[33] Rubio maintains that the claim is not procedurally defaulted because a state remedy remains, and he has requested this Court's leave to return to state court in the contemporaneously-filed motion for a *Rhines* stay.

**A.    Trial counsel's performance was prejudicially deficient, violating the Sixth Amendment.**

**1.  Trial counsel's performance was deficient.**

**a.  Trial counsel's mistake of law and failure to prepare experts was deficient.**

In *Hinton v. Alabama*, the Supreme Court held that "[a]n attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland*." 571 U.S. at 274.[34] Over 15 years before Rubio's trial, the TCCA held that, to obtain an NGRI verdict, a defendant must show that he did not understand that his conduct was "legally wrong." *Bigby v. State*, 892 S.W.2d 864, 878 (Tex. Crim. App. 1994). Under Supreme Court law, trial counsel's failure to perform the basic research to understand the controlling NGRI standard was deficient.

Trial counsel presented two experts at the guilt/innocence phase of trial: Dr. Raphael Morris and Dr. William Valverde. Both testified that because Rubio did not understand that his actions were morally wrong at the time of the crime, he was legally insane. *See* Am. Pet. at 104–05. However, to prove insanity under Texas law, a defendant must show that he did not understand that his actions were "legally wrong" at the time of the crime. *Id.* at 104. Thus, the experts did not provide testimony to adequately support Rubio's NGRI defense. Moreover, under cross-

---

[34] To the extent it is disputed that Rubio's trial counsel were aware of the correct legal standard or that they performed the basic research necessary to learn about the standard, those facts should be developed at a live evidentiary hearing.

examination, both experts revealed that trial counsel had not provided them with key pieces of evidence that would have been relevant to their determination of whether Rubio was insane. *Id.* at 104–05.

The Director concedes that Dr. Morris used the wrong legal standard, and also concedes that Dr. Morris told the jury that he did not review evidence that might have affected his professional opinion. *See* MSJ at 101 ("Rubio correctly points out that Dr. Morris applied the wrong standard for insanity in his report"); *id.* at 102 ("Dr. Morris testified that knowing about Moreno's testimony 'might have' affected his opinion"). However, the Director disputes that Dr. Valverde used the wrong legal standard in his assessment. *Id.* at 99. Despite the fact that there are multiple indicators that Dr. Valverde used the wrong legal standard, the Director focuses in on a single exchange between trial counsel and Dr. Valverde during Dr. Valverde's trial testimony. In the exchange, trial counsel asked Dr. Valverde whether Rubio knew "that his conduct was wrong" at the time of the offense. *Id.* (quoting 66 RR 43–45). Dr. Valverde responded in terms of the "morally wrong" standard, stating that Rubio's overriding thought during the crime was that he was engaged in a battle of good versus evil. *Id.* at 99–100. Trial counsel then introduced the idea that Texas law might require a showing that the defendant did not know his actions were illegal:

> All right. Now, there is going to be an issue—I would like you to assume—we don't have the law yet from the judge, but I would ask you to assume that there is some Texas case law that says, all right, knowledge of "wrong" means knowledge of "illegal."

66 RR at 44. Counsel then asked whether the circumstances indicated that Rubio knew his actions were "illegal" at the time of the crime. *Id.* In response, Dr. Valverde

attempted to make a distinction that while Rubio may have known others would view his actions as illegal, "It is what he felt had to be done regardless of the consequences." *Id.* at 45. Ultimately, Dr. Valverde maintained that Rubio was legally insane at the time of the offense.

The Director argues that this is evidence that Dr. Valverde was informed of, and actually applied, the correct insanity standard. *See* MSJ at 101. But the Director ignores two important facts. First, defense counsel's questioning demonstrated that, despite being in the middle of trial, Rubio's legal team was *itself* still unsure of the correct insanity standard. 66 RR at 44 (stating "we don't have the law yet from the judge, but I would ask you to assume that there is some Texas case law that [supports their preferred rule]"). Second, Dr. Valverde's *impromptu* opinion that Rubio may have known others would view his actions as illegal clearly indicated to the jury that Rubio knew his actions were unlawful, and that Rubio was therefore sane under the correct NGRI standard. *See Ruffin v. State*, 270 S.W.3d 586, (Tex. Crim. App. 2008) ("Thus, the question for deciding insanity is this: Does the defendant factually know that society considers this conduct against the law, even though the defendant, due to his mental disease or defect, may think that the conduct is morally justified?").

The Director further argues that trial counsel should not be held accountable for the problems with the two experts, citing a Ninth Circuit opinion for the proposition that "even if the mental-health professionals who evaluated the petitioner at the time of trial failed to diagnose the petitioner properly, their failure does not constitute ineffective assistance of counsel." *See* MSJ at 98 (citing *Earp v. Cullen*, 623

F.3d 1065, 1077 (9th Cir. 2010)). But Rubio does not argue that trial counsel were deficient because either of the experts misdiagnosed him. Rather, he argues that trial counsel were deficient by providing their forensic experts with the wrong legal standard and failing to provide them with information essential to the insanity question. In other words, they were deficient for failing to undertake a reasonable investigation of law and facts, and that deficiency resulted in the expert debacle at the guilt phase.

### b. Trial counsel's failure to investigate and present Rubio's prison records was deficient.

Trial counsel were also deficient in their failure to investigate and present over 400 pages of prison records showing that Rubio exhibited signs of severe mental illness throughout his incarceration between his first and second trials. The Director points out that the business records affidavit attached to the front of the prison records shows that counsel collected them in February 2010—the day before Rubio's competency proceeding began—and argues that this Court should presume that counsel's failure to use the records was a strategic decision.[35] MSJ at 108.

The Director does not cite any authority for his allegation that, when trial counsel fails to utilize records that were formally in their possession at the time of

---

[35] The Director notes that Rubio did not include all 415 pages of prison records as an exhibit to his Amended Petition, and argues that "the incomplete nature of the provided records alone calls into question the veracity of this claim." MSJ at 107. He does not cite any authority for the proposition that Rubio was required to submit all 415 pages; nor does he attempt to invoke the rule of optional completeness. Nevertheless, to avoid any confusion, Rubio has attached the complete set to this filing. 2d Supp. App. at 1–413.

trial, there is a presumption that such a failure was a strategic choice. Nor is Rubio aware of any such authority. To the contrary, the Supreme Court has clearly held that, when counsel is in possession of information that raises a red flag for possible mental health issues, they have a duty to investigate further. *See Wiggins*, 539 U.S. at 523–24. The heretofore undiscovered "presumption of strategy" the Director theorizes cannot coexist with the rule from *Wiggins* and other cases—that trial counsel are deficient for failing to follow up on records that indicate further investigation of value. Moreover, the Director cannot point to any other factual support for a finding that trial counsel made a strategic decision not to present records that clearly support their guilt/innocence phase defense.[36] At the very least, trial counsel should be given the opportunity to respond to this allegation at a live evidentiary hearing, which means that summary judgment is inappropriate.

## 2. The deficiency was prejudicial.

Counsel's errors undermine any confidence in the jury's determination on insanity. Although the Director argues that there was "substantial" evidence of Rubio's sanity presented at trial, MSJ at 88, the reality is that the evidence of Rubio's mental state *at the time of the offense* is actually quite thin. The only direct pieces of

---

[36] The Director claims that the records were actually more harmful than helpful to Rubio and suggests that counsel made a reasonable strategic decision not to use them on that basis. In support, he cites a single entry regarding a time when Rubio was written up for "creating a disturbance" in the prison. MSJ at 114–15. Counsel has never stated that they made that strategic decision, and when the single infraction is weighed against the hundreds of pages of other helpful information, counsel would be unreasonable in making such a decision.

evidence are the statements from Rubio and Angela Camacho regarding their impressions during the killings. The rest of the evidence the Director points to— testimony from family, law enforcement officers, jail staff, and experts—is circumstantial evidence about Rubio's mental health before and after the offense. Given that the case turned on circumstantial evidence of mental health, trial counsel's failure to prepare their experts, to investigate, and to present hundreds of pages of prison records showing signs of severe mental illness in the wake of the offense, undermined confidence in the outcome of the guilt/innocence phase. *See Strickland*, 466 U.S. at 694. This effect on the NGRI determination was especially salient given that Rubio needed only to prove his insanity by a preponderance of the evidence. *See Ruffin*, 270 S.W.3d at 591–92.

### a. Trial counsel's failure to prepare their experts and inform them of the correct legal standard for insanity prejudiced Rubio.

Due to counsel's failures, Rubio did not present a single expert to testify that he was insane under the correct legal standard. The jury was well aware that Rubio's experts were diagnosing Rubio under a standard that was lower than what Texas law required, 66 RR 45, 171; that the experts did not review critical information related to Rubio's state of mind at the time of the crime, *id* at 72, 75–76, 182, 184, 208, 217; that one expert, Dr. Morris, admitted that this critical information "might have" affected his professional opinion had he reviewed it, *id.* at 183; and that the two defense experts did not even agree on whether Rubio understood the consequences of his actions at the time of the offense, *id.* at 172.

67

The Director concedes all of that. MSJ at 101–03. Nevertheless, he argues that Rubio was not prejudiced because both Dr. Morris and Dr. Valverde ultimately maintained that Rubio was insane, after the State seized on counsel's failures to engage in devastating cross-examinations of the experts. MSJ at 98 ("when pressed, each expert maintained that . . . Rubio did not know his conduct was wrong");[37] *id.* at 101 ("when pressed by the State, Dr. Morris maintained that he believed Rubio was . . . insane when he committed the crimes."). No reasonable juror could credit the testimony of either of these experts after learning that the experts neither reviewed essential information nor applied the correct standard, and refused to modify their conclusions when confronted with these problems. Trial counsel's failure to thoroughly evaluate the facts and law in preparation for Rubio's NGRI defense prejudicially undermined the outcome of that proceeding.

> **b. Trial counsel's failure to investigate and present prison records documenting severe mental illness prejudiced Rubio.**

In addition to counsel's failure to prepare the insanity experts, Rubio was further prejudiced at the guilt phase by counsel's failure to timely investigate and present hundreds of pages of prison records documenting, for seven years prior to the second trial, symptoms of severe mental illness and corresponding treatment. At trial, Dr. Welner falsely testified that, for the vast majority of his time between the two

---

[37] As discussed above, Dr. Valverde testified that Rubio may have known others would view his actions as illegal—the exact standard for sanity under Texas law. The fact that he nevertheless "maintained" Rubio was legally insane significantly undermined his credibility before the jury.

trials, Rubio was un-medicated and exhibited no signs of severe mental illness. *See* Am. Pet. at 108. Because Rubio had no symptoms when he was un-medicated, Dr. Welner told the jury, Rubio's claims about mental illness were fraudulent. Dr. Welner's testimony went largely unimpeached, and the jury concluded that it would not deliver a guilt-phase verdict of NGRI. Had defense counsel made timely use of the TDCJ records—which disclosed a striking anti-psychotic regimen and substantial mental-health struggles—there is a reasonable probability that a juror would have made a different NGRI finding.

The Director argues that "it is not clear [the records] would have helped Rubio" or that "they 'discredit' Welner's testimony." MSJ at 110. First, he disputes that Rubio was actually taking the medication that he was prescribed by the correctional staff. In support, he points to the expert reports of Dr. Troy Martinez and Dr. Morris, which indicated that Rubio claimed not to have taken medication in recent years. *Id.* at 108–09. But these reports are contradicted by nearly 40 entries in the prison records at issue. Those records indicate that Rubio was consistently taking the psychotropic medication prescribed by the prison, and they even list "medication compliance" as one of Rubio's strengths on multiple occasions.[38] The Director is free to introduce

---

[38] 2d Supp. App. at 104 (staff did not check box suggesting Rubio had history of poor medication compliance); *id. at* 123 (medication compliance described as "good"); *id.* at 136 (medication compliance described as "100%"); *id.* at 153 (medication compliance described as "good"); *id.* at 159 (medication compliance described as "good"); *id.* at 172 ("Pt. is compliant with medication."); *id.* at 175 (medication compliance described as "good"); *id.* at 217 (medication compliance described as "good"); *id.* at 224 (medication compliance described as "good"); *id.* at 231 (compliance described as "100%"); *id.* at 246 (compliance described as "good"); *id.* at 255 (listing 13/13 compliance for morning

evidence contravening this material fact, and he might win on the merits if he does so, but his motion for summary judgment must be rejected.

The Director also attempts to mitigate the effect these records would have had on the State's NGRI case—the crucial element of which was Dr. Welner's false

---

dose and 6/13 for evening dose of medication); *id.* at 264 (listing 29/30 compliance for anti-depressant Bupropion, 25/30 for anti-psychotic Chlorpromazine, and 25/30 for anti-tremor Benztropine); *id.* at 268 (listing 41/60 compliance, and describing as "good"); *id.* at 278 (listing 44/60 compliance for Bupropion, and 49/60 for Chlorpromazine and Benztropine); *id.* at 279 ("patient strengths" includes "basic compliance"); *id.* at 281 (listing 44/60 compliance for Bupropion, 49/60 for Chlorpromazine); *id.* at 285 (listing 34/60 compliance for Bupropion, 42/60 for Chlorpromazine and Benztropine); *id.* at 291 (listing 54/60 compliance for Bupropion and Chlorpromazine, and 53/60 for Benztropine); *id.* at 292 ("patient strengths" include "strong meds. compliance"); *id.* at 295 (listing 54/60 medication compliance, and describing as "good"); *id.* at 300 (describing medication compliance as "good"); *id.* at 303 (listing 53/60 compliance for Bupropion, 55/60 for Chlorpromazine, and 55/60 for Benztropine); *id.* at 309 (listing 49/60 compliance for Bupropion, 49/60 for Chlorpromazine, and 49/60 for Benztropine); *id.* at 310 ("patient strengths" include "strong meds. compliance"); *id.* at 317 (listing 49/60 compliance for Chlorpromazine, 49/60 for Benztropine, and 49/60 for Bupropion); *id.* at 321 (listing 48/60 compliance for Chlorpromazine, 47/60 for Benztropine, and 47/60 for Bupropion); *id.* at 330 (listing 25/30 compliance, and describing as "good"); *id.* at 335 (listing 50/60 compliance for Bupropion, 57/60 for Chlorpromazine, and 57/60 for Benztropine); p. 343 (listing 46/60 compliance for Bupropion, 58/60 for Chlorpromazine, and 58/60 for Benztropine); *id.* at 350 (listing 52/60 compliance for Bupropion, 57/60 for Chlorpromazine, and 57/60 for Benztropine); *id.* at 353 (listing 57/60 compliance for Bupropion, 57/60 for Chlorpromazine, and 57/60 for Benztropine); *id.* at 358 (listing 56/60 compliance for Bupropion, 59/60 for Chlorpromazine, and 59/60 for Benztropine); *id.* at 362 (listing 55/60 compliance, and describing as "good"); *id.* at 366 (listing 55/60 compliance for Bupropion, 54/60 for Chlorpromazine, 53/60 for Benztropine, and 55/60 for anticonvulsant Carbamazepine); *id.* at 372 (listing 50/60 compliance for Carbamazepine, 45/60 for Chlorpromazine, 45/60 for Benztropine, and 22/30 for anti-depressant Trazodone); *id.* at 378 (listing 50/60 compliance for Carbamazepine, 45/60 for Chlorpromazine, 45/60 for Benztropine, and 22/30 for Trazodone); *id.* at 380 (listing 50/60 compliance for Carbamazepine, 45/60 for Chlorpromazine, 45/60 for Benztropine, and 22/30 for Trazodone); *id.* at 399 (listing 9/10 compliance, and describing as "good").

testimony about how Rubio was faking his mental illness—by identifying select portions that he believes to be consistent with Dr. Welner's testimony. For example, the Director argues that "many times, Rubio's presentation and demeanor did not reveal the disorganization that would be expected of someone suffering from his complained of symptoms." MSJ at 110. The Director then cherry-picks entries from the records where Rubio was "neat and clean" in appearance or his cell and/or hygiene were described as "clean." *Id.* at 110–11.

As an initial matter, there are a significant number of entries in Rubio's prison records that document him as disheveled, dysphoric, and otherwise distressed. [39]

---

[39] 2d Supp. App. at 63 ("grooming poor, cell smelled really bad but was neat"); *id.* at 65 ("hygiene poor, grooming unkempt, cell messy, bad odor from cell"); *id.* at 68 ("hygiene fair, grooming poor"); *id.* at 81 ("mildly depressed with congruent affect"); *id.* at 86 ("His mood reflected excessive worry and distress."); *id.* at 87 ("Cognitively he was not oriented in any of the three spheres."); *id.* at 88 ("appears to be seriously distressed"); *id.* at 98 ("mood reflects worried and seriously distressed individual"); *id.* ("Cognitively he was not oriented in any of the 3 spheres."); *id.* at 130 ("hygiene poor, grooming fair, bad odor from cell"); *id.* ("Mood: apprehensive, scared"); *id.* ("Thought processes: scattered, apprehensive, paranoid"); *id.* at 132 ("slightly anxious with congruent affect"); *id.* at 133 ("hygiene fair, grooming poor"); *id.* at 151 ("hygiene fair, grooming poor"); *id.* at 152 ("hygiene fair, grooming poor"); *id.* at 157 ("hygiene fair, grooming poor"); *id.* at 168 ("Pt. appears mildly depressed"); *id.* at 172 ("Pt. was unshaven and appears to be losing weight"); *id.* ("His mood was dysphoric with a congruent affect (sadness)."); *id.* at 174 ("Hygiene poor, grooming poor, has lost weight, is not shaving . . . impaired thought processes"); *id.* at 184 ("I believe that his current mental condition contributed to his lack of motivation for personal hygiene."); *id.* at 185 ("grooming unkempt"); *id.* ("Personal hygiene: poor, unshaven"); *id.* ("Cell/Room Appearance: messy"); *id.* at 185–86 ("Emotional expression: sad, expresses self appropriately"); *id.* at 222 ("Hygiene fair, grooming poor"); *id.* at 241 ("sloppily dressed . . . slightly dirty, hair messy"); *id.* at 255 ("sloppily dressed, slightly dirty, hair messy"); *id.* at 316 ("Pt. appeared disheveled with dirty hair with groggy attention."); *id.* at 318 ("sloppily dressed" and "sad"); *id.* at 343 (Rubio "cried at times" during the interview); *id.* at 353 ("Pt. did tear up on several occasion's during the session."); *id.* at 360 ("sloppily dressed" and "sad"); *id.* at 367 ("sloppily dressed,

Moreover, the fact that Rubio sometimes presented as smiling, laughing, or interacting positively with others is entirely consistent with his diagnosis of schizoaffective disorder. In fact, on more than one occasion, the prison's mental health staff noted that Rubio tended to cycle from manic to depressive moods, and that such cycling was consistent with his diagnosis. *See* 2d Supp. App. at 234 ("We talked about how his mood tends to cycle and that he appears to be beginning to experience a more depressed mood."); *id.* at 253 ("I have seen him cycle from a mania state to a depressed state. I believe that this Pt.'s Dx is correct, Schizoaffective with bi-polar features.").

Ultimately, to establish prejudice on this claim, Rubio does not need to show that every entry over the course of seven years included signs of psychosis. Instead, Rubio offers the records to show that the impression that Dr. Welner left with the jury—that Rubio did not show signs or symptoms of mental illness in that time period and that he was not medicated—was not accurate. Given that Dr. Welner was the State's star witness, discrediting him sufficiently undermines confidence in the outcome of the proceeding.

The records also include repeated entries related to Rubio's severe sleep disturbances, including persistent nightmares and insomnia. The Director argues that such sleep disturbances are evidence that Rubio was not hallucinating, but

slightly dirty, hair messy"); *id.* at 376 ("Pt. appeared sad and tears came to his eyes several times when talking to the clinician"); *id.* ("Emotional expression: sad, crying"); *id.* at 391 ("sloppily dressed, slightly dirty, hair messy").

simply experiencing confusion "right after waking." MSJ at 112.[40] Therefore, he argues, Rubio's sleep disturbances are "not consistent with symptoms of schizophrenia." *Id.* But the science says quite the opposite.

The DSM-5 specifically lists sleep disturbances as one of the associated features supporting a schizophrenia diagnosis. *American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders*; DSM-5 at 101 (5th ed. 2014). In fact, scientific studies show that sleep disturbances are among the most common symptoms reported by those with schizophrenia and often exacerbate an individual's preexisting psychotic symptoms. *See* Rachel E. Kaskie, et. al, *Schizophrenia and Sleep Disorders: Links, Risks, and Management Challenges*, 9 Nat. Sci. Sleep 227, 236–37 (2017), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5614792 ("the vast majority of patients with schizophrenia report sleep abnormalities"). This link between sleep disturbances and schizophrenia has been documented since schizophrenia was first clinically described over 100 years ago. *See* Sarah Reeve, et. al, *The role of sleep dysfunction in the occurrence of delusions and hallucinations: A systematic review,* 42 Clin. Psychol. Rev. 96–115 (2015), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4786636/. Where data exists, even the most conservative of estimates support the conclusion that the prevalence of sleep disorders are elevated in patients with schizophrenia compared to control groups. *Id.* In particular, parasomnia in the form of weekly distressing nightmares—such as

---

[40] It should also be noted that the records indicate Rubio experienced hallucinations throughout the course of the day and not just "right after waking." *See infra* at 121.

those experienced by Rubio—is present in over half of patients with psychotic disorders, but are highly unusual in the general population. *See id* (finding 55% of those with psychotic disorders experienced parasomnia in comparison to a 0.9–6.8% estimated prevalence in the general population).

If anything, Rubio's extensive history of such disturbances would be even further proof for the jury that Rubio suffers from severe mental illness. Even beyond that fact, there are numerous instances in the prison records where Rubio's hallucinations are described as having been completely independent of his dream states.

**B.   This court can decide the substantial claim on the merits because any default is excused by state habeas counsel's failure to raise it.**

Claim Three is unexhausted and, along with almost all other claims presented in the Amended Petition, is the subject of a *Rhines* stay sought at the same time as this Reply is filed.  If this Court were to determine that this substantial claim was exhausted, however, any procedural default would be excused by state habeas counsel's ineffectiveness in failing to raise it.[41] The Director only briefly discusses state habeas counsel's representation, and does not analyze it in any way specific to Claim Three. MSJ at 40–41.

_____

[41] The Director argues that Section 2254(e)(2) precludes this Court from considering any of the evidence presented in support of Claim Three because "Rubio failed to develop the factual basis for this claim" in state court. MSJ at 89. The Director's position misconstrues the law, as explained in detail in Claim One, Part (B)(2), *supra*.

State habeas counsel has signed a declaration discussing his representation of Rubio. *See* 2d Supp. App. at 414–18. In the declaration, state habeas counsel states that he did not attempt to collect or review Rubio's TDCJ records during his representation, despite his duty to do so under the ABA Guidelines. *Id.* at 417. State habeas counsel further acknowledges that had he been aware of the contents of those records, he would have considered the claim substantial enough to raise in the initial application. *Id.* State habeas counsel offers no strategic reason for failing to raise this claim, which, as discussed at length above and in the Amended Petition, is clearly substantial.

In short, trial counsel did not know the controlling law that was fundamental to their guilt/innocence phase defense, and they failed to investigate and present records that were directly relevant to the NGRI plea. State habeas counsel has conceded that he had no strategic reason for failing to raise this claim in state court, and the Director did not meaningfully address state habeas counsel's failures. Given that Rubio's guilt-phase case depended on a comprehensive presentation of his mental health history, state habeas counsel's failure was unreasonable. This Court should find that, if it believes no state remedy remains, any procedural default is excused by state habeas counsel's ineffectiveness.

**Claim 4**   **Rubio is entitled to relief because the State violated his Fourteenth Amendment right to due process by engaging in a flagrant and ongoing pattern of misconduct.**

The Cameron County District Attorney's Office, headed by elected D.A. Armando Villalobos, engaged in a pattern of misconduct throughout Rubio's trial.

Though trial counsel complained about some misconduct, neither the defense team nor the trial court knew the extent of the corruption in Villalobos's office—which would ultimately land Villalobos in federal prison—or its effect on Rubio's case. As a result, the trial court dismissed all of trial counsel's concerns as unfounded.

While characterizing Villalobos's crimes as "troubling," the Director would have this Court view the pattern of misconduct through the lens of the trial court, ignoring the substantial evidence that emerged after Villalobos's conviction and the new light it shed on the CCDA's conduct during Rubio's trial. MSJ at 127–29. But the Director's head-in-sand approach is erroneous. Rubio has adduced enough evidence to show, for the purposes of overcoming a summary judgment motion, both that prosecutorial misconduct occurred and that it rendered his trial fundamentally unfair. *Cf. Greer v. Miller*, 483 U.S. 756, 765 (1987) ("This Court has recognized that prosecutorial misconduct may 'so infec[t] the trial with unfairness as to make the resulting conviction a violation of due process.'") (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)); *Wainwright v. Greenfield*, 474 U.S. 284, 291 (1986) (recognizing that the Due Process Clause requires fundamental fairness at trial). Moreover, while Rubio asks this Court to stay his proceedings so that he may exhaust this claim in state court, he can demonstrate cause and prejudice to overcome any procedural default.

### A. The State engaged in extensive prosecutorial misconduct, which rendered Rubio's trial fundamentally unfair.

Rubio has pled one prosecutorial misconduct claim predicated on numerous acts by the CCDA's Office, which collectively violated his right to due process. (Am.

Pet. at 117–28). Rubio identified seven forms of misconduct—ranging from Villalobos's ongoing bribery scheme to the prosecution's incessant interference with defense funding—and established that this misconduct, in its totality, rendered his trial fundamentally unfair. The Director raises three global arguments against the allegations in Rubio's due process claim, but each is erroneous.

First, he argues that each instance of misconduct, by itself, had insufficient effect on Rubio's trial outcomes—failing to engage the legally appropriate question about whether the CCDA's pattern of misconduct, *as a cumulative matter*, rendered Rubio's trial fundamentally unfair. MSJ at 124. In so doing, the Director barely references the corruption scheme that infected the CCDA's Office at the time. The Director's attempt to split Rubio's claim for relief into several smaller claims—thereby diluting the appearance of prejudice—is improper. At its core, due process is about the trial's overall fairness. *See Napue v. Illinois*, 360 U.S. 264, 270 (1959) (analyzing whether false testimony rendered entire trial fundamentally unfair). As due process is "flexible" to provide "protections as the particular situation demands," "not a technical conception with a fixed content unrelated to time, place and circumstances[,]" courts consider whether due process violations globally affected the defendant's right to a fair trial. *See Mathews v. Eldridge*, 424 U.S. 319, 334 (1976); *see also Mooney v. Holohan*, 294 U.S. 103, 112 (1935) (rejecting the prosecution's "narrow view" of due process as only guaranteeing the existence, not the implementation, of protective procedures). Thus, the guiding principle of the Supreme Court's due process jurisprudence is "avoidance of an unfair trial[.]" *Brady*

*v. Maryland*, 373 U.S. 83, 87 (1963) (discussing *Mooney*). In this case, the question for the Court is (1) whether the CCDA's Office engaged in misconduct, and (2) whether that misconduct, in its totality, rendered Rubio's trial fundamentally unfair.

Second, the Director asserts that Rubio has failed to "prove" his allegations, and that this failure merits summary judgment against Rubio. MSJ at 129 (Rubio provides no "proof that a black list ever existed"); *id.* at 131 ("Rubio provides no proof of harm from Padilla's employment" with the CCDA); *id.* at 134 ("Rubio has not shown any harm resulting from the alleged improper use of subpoenas" by the CCDA); *id.* ("Rubio has not shown that the State violated the trial court's gag order"). To the contrary, Rubio has provided ample evidence that the CCDA repeatedly engaged in misconduct throughout the trial, the depth of which was unknown to trial counsel. Am. Pet. at 117–28. But the Director wrongly asserts that Rubio has the burden of *proving* his claims at the pleading stage, and he overreaches by asking for summary judgment. As explained in the global introduction to the Argument, the Director misconstrues Rubio's burden at the summary judgment stage. *See* Introductory Statement (A), *supra*. The Amended Petition and the attached appendices have established a genuine issue of material fact and, absent discovery, summary judgment is improper. Moreover, Rubio has sought discovery on this and other claims, identifying the evidence he seeks to fully prove his allegations. (Doc. 28). If anything, the Director's Motion for Summary Judgment highlights that there are disputed issues of material fact that warrant evidentiary development.

And third, the Director repeatedly declares that the trial court wholly addressed all of Rubio's complaints in pretrial proceedings; therefore, none of the allegations could have rendered the trial fundamentally unfair. MSJ at 127. The Director ignores that Rubio's trial counsel and the trial court were unaware of Villalobos's scheme, which would have presented the misconduct raised by counsel in a different light.

### 1. State misconduct permeated Rubio's trial.

#### a. Villalobos unquestionably engaged in an extensive bribery scheme throughout Rubio's trial, granting wealthy defendants favorable results while aggressively prosecuting the indigent to cover for his crimes.

While he was prosecuting Rubio, Villalobos accepted bribes from criminal defendants and defense attorneys, paid bribes to at least one judge, and abused the civil asset forfeiture scheme to line his own pockets and replenish the CCDA's asset forfeiture fund. Am. Pet. at 117–22. The Director glosses over Villalobos's gross and unlawful misconduct as nothing more than "troubling," failing to address its impact on Rubio's trial. MSJ at 127. In doing so, he ignores the root of Rubio's due process argument—that the State's ongoing pattern of abusive tactics and misconduct occurred while Villalobos used Rubio's case to deflect attention from his crimes.

While the CCDA was interfering with Rubio's defense and drumming up publicity for the trial, Villalobos was running an illegal bribery scheme and using dirty money to fund the Rubio prosecution. Villalobos knew seeking death against Rubio was a politically expedient way to cover for his other crimes because he conducted a community survey to gauge public interest in Rubio's punishment.

Nowhere does the Director even acknowledge that Villalobos admitted he would use the guise of prosecutorial discretion to cover for his misdeeds, all while hiding behind the "most sensational" case Brownsville had ever seen: "he would just say it was prosecutorial discretion on the deals he was giving[.]"[42] The CCDA's actions in this case must be viewed through the lens of the corruption that colored the office.

> b. **Ample evidence indicates Villalobos blacklisted Rubio's attorneys for raising suspicion into the county's indigent defense funding.**

A group of defense attorneys, including Rubio's lead counsel, filed a Petition for Intervention in state court requesting that funds provided to the county's indigent defense program be equal to funds provided to the CCDA's Office.[43] After the suit was filed, the attorneys were informed they had been blacklisted by the CCDA's Office, meaning they were banned from the office and would receive negative treatment for interfering with existing funding inequalities. The Director dismisses Rubio's blacklist allegations because Rubio's trial court held a hearing on the issue and the federal lawsuit filed against the CCDA for the blacklist was dismissed on summary judgment. MSJ at 127–29.

The Director points to testimony from Rubio's pretrial hearing regarding the blacklist, including Villalobos's testimony in which he claimed "no personal knowledge" of a list. *Id.* at 128. The Director ignores that the initial evidence of the

---

[42] *United States v. Villalobos*, No. 1:12-CR-374 (S.D. Tex. May 15, 2013) (ECF Doc. 356 at 202); *Id.* (Doc. 362 at 236).

[43] *Salas, et al. v. Cameron County*, 1:10-CV-037 (S.D. Tex. Feb. 22, 2010) (ECF Doc. 1).

blacklist came from within the CCDA's Office—an assistant district attorney told local defense attorney Angela Nix that, because of Nix's involvement in the lawsuit, Nix would no longer be welcome in the office for purposes of discovery, that there would be no plea offers, and that all of her cases would go to trial. 40 RR 16–18. While the prosecutor did not use the word "blacklist," the evidence makes clear that this is what happened. And Villalobos's assertion that he had no personal knowledge of a written and formally maintained "list" is not sufficient to grant summary judgment. Villalobos was in the midst of conducting a prolific corruption scheme, and stood to gain from preventing any scrutiny of his office's funding. His testimony hardly extinguishes the material fact dispute.

The Director further notes that, after the federal lawsuit was filed, many local defense attorneys began to get plea bargains again. In the summary judgment motion it filed in the federal suit, the CCDA's Office listed plea bargains that were offered to many of the defense attorneys that had filed suit.[44] Notably, Nat Perez, Rubio's lead counsel, was not among them. *Id.* Moreover, the Director's reliance on the federal court's dismissal of the suit as evidence that there was no blacklist is erroneous. The suit was dismissed because the court determined the attorney plaintiffs lacked standing and, even if the allegations were proved, could not show the county's indigent defense system rendered them ineffective.[45]

_____

[44] *Salas, et al., v. Cameron County*, 1:10-CV-037 (S.D. Tex. Aug. 6, 2010) (Doc. 71 at 5–6).

[45] *Salas, et. al., v. Cameron County*, 1:10-CV-037 (S.D. Tex. Feb 8, 2011) (Doc. 92 at 11, 17).

Most importantly, the trial court in Rubio's case made its findings regarding the blacklist while ignorant of Villalobos's crimes. The court did not know that Villalobos was offering access and plea deals in exchange for bribes, that he desired to hide the difference between indigent defense funding and prosecution funding because he used his own ill-gotten gains to pay for high-profile prosecutions, and that he used cases against indigent defendants to cover for the exorbitant deals he offered the wealthy. In that light, Villalobos's attacks on attorneys trying to address disparate funding are directly relevant to Rubio's case; this Court should give no deference to the trial court's dismissal of the blacklist while it relied on Villalobos's word. Rubio has presented evidence that Villalobos blacklisted his attorneys. To the extent that the Director disputes these facts, summary judgment is not appropriate.

### c. Villalobos successfully interfered with Rubio's defense funding.

Throughout the time leading up to Rubio's trial, the prosecution repeatedly interfered with defense funding by attempting to invade ex parte proceedings, going so far as to question court staff about defense funding requests. Am. Pet. at 123–24. The Director's argument against the many instances of funding interference by the CCDA's Office appears to be that the interference did not work—Rubio still received some funding. MSJ at 130–31. But the availability of "some funding" does not resolve questions about whether the State dishonestly interfered. On the very day the State falsely denied spending $400,000 on expert Dr. Michael Welner, the trial court denied the defense's request for funding for Dr. Pablo Stewart, a psychiatrist specializing in MRIs and CAT scans. 35 RR 3, 7. In doing so, the trial court noted that the State also

had limited resources and the court knew "of no independent wealth that Mr. Villalobos may have that he intends to spend on his own[.]" *Id.* at 4.

The Director ignores that while the CCDA's Office fought tooth and nail to dissuade the trial court from funding the defense, the State used Villalobos's illicit gains to extravagantly fund the prosecution. The State falsely denied to the court the defense's allegations that Dr. Welner would cost the county $400,000. At least some of that money, moreover, was paid from the CCDA's asset-forfeiture fund—a fund Villalobos used his bribery schemes to replenish. Am. Pet. at 121. Thus, the Director wrongly asserts that the prosecution's bulldog tactics had no effect on Rubio's trial. They successfully prevented Rubio from receiving expert services by giving the trial court false information.

### d. Rubio's attorney for his first capital murder trial worked at the CCDA's Office during his second trial.

Villalobos hired Rubio's second-chair counsel from the first trial, Alfredo Padilla, shortly before Rubio's case was remanded for retrial. Villalobos's office specifically hired Padilla to be the lead prosecutor on death penalty cases, handle the office's civil forfeiture cases, and represent the office in federal court.[46] For instance, Padilla represented the CCDA's Office against the indigent defense attorneys in the blacklist lawsuit. When Rubio's case was remanded for retrial, the Office assured the court that Padilla would be walled off from the prosecution team, although Padilla continued to observe Rubio's proceedings in court. Am. Pet. at 125. Again, the

---

[46] *United States v. Villalobos*, 1:12-cr-374 (S.D. Tex. 2014) (ECF Doc. 358 at 275).

Director alleges the trial court's acceptance of the CCDA's wall procedure was sufficient. MSJ at 131–32. The CCDA's assurances are no longer credible now that Villalobos's criminality has been disclosed and established at a federal trial. At the very least, Villalobos's dishonesty demonstrates that discovery is warranted in this case, and that summary judgment is improper at this time.

### e. The State abused its subpoena power to obstruct attorney-client communication and intimidate the defense.

The State abused its subpoena power to seize privileged attorney-client communications from Rubio's cell, and to attempt to force defense counsel, experts, and court staff to testify about defense funding. Again relying on the trial court's assessment, the Director claims that Rubio suffered no harm from the CCDA's subpoena abuse. MSJ at 132–134. After all, the State promised that it had reviewed none of the privileged material—even though it held privileged material seized from Rubio's cell for three months without notifying counsel. 19 RR 33; 1 CR 225–26; 2 CR 441. According to the Director, the trial court extinguished any constitutional question by taking the State's word and banning the State from introducing the materials at trial. MSJ at 134. But the State's word is not credible in light of Villalobos's deception. The State's abuse of subpoena power to seize privileged materials, intimidate the defense, and intimidate the court—ultimately leading to the initial trial judge's recusal—is but more evidence of the pattern of misconduct that contributed to Rubio receiving a fundamentally unfair trial.

**f. Villalobos violated the trial court's gag order to drum up publicity for Rubio's trial after receiving negative press for favorable plea deals.**

Although the trial court entered a gag order, Villalobos commented to the local newspaper that he was disappointed in the lack of news coverage on Rubio's case, and he counseled the police department to release Rubio's written and videotaped confessions to the media, which were later posted online. 8 CR 1912; 5 CR 1140–41. Shortly before trial, Villalobos again spoke to the press, emailing the local newspaper to convey that he was disappointed that the trial was moved out of the county, that the Office would have to move its entire "war room" to Hidalgo County, and that the Office was sure it could still secure the death penalty. 8 CR 1912. The Director maintains that the trial court appropriately "ferreted" out any gag order issues and chose not to issue sanctions. MSJ at 135–36.

Again, the Director selectively responds to limited facts, making no mention of Villalobos's decision to counsel the police to release confession tapes to the media or Villalobos's need for favorable media attention to cover for his bribery scheme. When the trial court determined that the media entanglements did not merit sanctions and declined to remove the CCDA's Office from the case, the court had no knowledge of Villalobos's need for positive media attention following the negative coverage he received for the Livingston case. Villalobos described Rubio's case as "the most

sensational our county has had,"[47] and he continued to seek media attention for the case for his personal benefit.

> **g. Villalobos sought death against Rubio after determining the prosecution was politically popular via a public survey.**

Years after Rubio's trial, and after Villalobos was sent to federal prison, Villalobos admitted that he polled the county and determined that seeking death against Rubio was politically expedient. Am. Pet. at 128. Rubio is unaware of Villalobos ever using this tactic in another case—certainly not in the cases where he accepted bribes. The Director does not even mention the survey in his Motion for Summary Judgment on this claim. But the survey is critical evidence. It ties Villalobos's bribery and other crimes throughout his tenure as District Attorney to Rubio's case. Villalobos needed to draw scrutiny away from his actions in other high-profile cases and away from his office's funding. As a result, he targeted Rubio for this exceptionally aggressive prosecution, which was littered with repeated acts of misconduct. The Director cannot remain silent on the survey while simultaneously requesting summary judgment.

> **2. The State's misconduct in this case rendered Rubio's trial fundamentally unfair.**

Viewed as a whole, the State's pattern of misconduct in this case resulted in a fundamentally unfair trial for Rubio. The elected D.A. used Rubio's case to cover for his own crimes. Villalobos and his office engaged in abusive tactics to ensure a

---

[47] *United States v. Villalobos*, 1:12-cr-374 (S.D. Tex. 2014) (ECF Doc. 362 at 236).

prosecutorial victory after he used a formal community survey to determine that the move would be politically expedient. Villalobos solicited publicity for the case by commenting to the media and counseling the police to release sensational confession tapes. And the CCDA's Office funded the prosecution with illegal money while simultaneously using bulldog tactics to intimidate the defense and interfere with funding. While the defense team asked the trial court to address some of these tactics, both the attorneys and the court were ignorant of the extent of Villalobos's crimes and corruption and the role they played in Rubio's case. Because of the CCDA's tactics, multiple motions to disqualify were denied based on incomplete information and the defense was left with a funding disparity.

Pointing to *Clark v. Johnson*, 202 F.3d 760 (5th Cir. 2000), the Director claims that any misconduct did not affect Rubio's case. MSJ at 136–37. But *Clark* is not persuasive here. In *Clark*, the Fifth Circuit held that Clark failed to establish that misconduct even occurred in his case when he alleged that a pathologist who testified for the state was accused of misconduct in other cases, particularly when the evidence supported the expert testimony given at Clark's trial. 202 F.3d at 766–67. In Rubio's case, however, there is significant direct evidence that State misconduct actually occurred, and that it actually affected his trial. The State interfered with Rubio's funding while using illegal funds for its own case, seized privileged materials, and sought publicity against court order, all while Villalobos needed a win to cover for his crimes. The allegations are much more than "speculative." *See* MSJ at 136 (quoting *Carmon v. U.S.*, No. 4:12-CR-99-FL-1, 2015 WL 5838634 (E.D.N.C. Oct. 7, 2015)).

For example, Rubio directly tied Villalobos's crimes to the funding of the prosecution's star witness, Dr. Welner. The State's case for sanity rested almost entirely on Dr. Welner's testimony. Am. Pet. at 115. Any suggestion from the Director that Dr. Welner's testimony had no effect on the verdict is not credible. Had Villalobos's crimes come to light at trial, the result would have been different. The CCDA's Office would very likely not have remained on the case—despite assurances from the prosecutors that the defense's concerns about the blacklist, Padilla's employment at the CCDA's Office, numerous violations of the gag order, and abuse of subpoena power were unfounded. The prosecution would not have been able to fund its star witness with illegal money. And the defense would not have been denied funds based on the State's false assertion that it was not paying Dr. Welner $400,000. A fairly conducted trial would "likely … have an important effect on the jury's determination" on both sanity and punishment. *See Donnelly*, 416 U.S. at 647 (holding that isolated prosecutor comments at closing were unlikely to affect the trial in comparison to more egregious forms of prosecutorial misconduct such as hiding evidence).

Likewise, the Director's reliance on cases involving improper prosecutor comments at closing is unpersuasive. MSJ at 137 (citing *Barrientes v. Johnson*, 221 F.3d 741 (5th Cir. 2000) and *Lowery v. Estelle*, 696 F.2d 333 (5th Cir. 1983)). The Supreme Court has cautioned that improper comments at closing are often the result of "improvisation," thus courts "should not lightly infer" that a prosecutor acted intentionally to corrupt the jury. *Donnelly*, 416 U.S. at 647. Moreover, isolated

comments at closing are far less likely to impact the jury than fraudulent or withheld evidence. *See id.* But here, there is clear evidence that Villalobos acted intentionally in his ongoing scheme and that it impacted the entirety of Rubio's proceedings. From the moment Rubio's case was remanded for retrial, Villalobos used it to advance his corrupt agenda and ensured that Rubio did not receive a fair trial.

The Director would have this Court determine that extreme ongoing corruption in the prosecutor's office was not a "crucial, critical, highly significant" factor on the county's most high-profile trial. MSJ at 137 (citing *Lowery*, 696 F.2d at 342). But Rubio has shown how it impacted his case from the very beginning and rendered his trial fundamentally unfair. At the very least, there are contested factual issues that demonstrate discovery is warranted and summary judgment inappropriate.

### B. This Court may decide this claim on the merits.

Claim Four is unexhausted and, along with almost all other claims presented in the Amended Petition, is the subject of a *Rhines* stay sought at the same time as this Reply is filed. Even if this Court were to determine that this claim is exhausted because no state remedies remain, any procedural default would be excused.

Specifically, Rubio can establish cause and prejudice to overcome procedural default based on the State's flagrant misconduct, an external impediment to raising this claim previously. *See Murray v. Carrier*, 477 U.S. 478, 488 (1986). To demonstrate cause, Rubio must show that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Id.* Cause may include "a showing that the factual or legal basis for a claim was not reasonably available" or some form of interference by officials which made compliance

impracticable. *Id.* Rubio has demonstrated ample evidence of state misconduct, most notably Villalobos's failure to reveal that he conducted a public survey before seeking death against Rubio until after Rubio's state habeas application was filed. Am. Pet. at 128. Moreover, Villalobos hid the fact that he used ill-gotten money from his civil-asset forfeiture scheme to fund Rubio's prosecution.

The Director's sole response, without elaboration, is that Rubio failed to show "active government interference or the reasonable availability of the factual or legal basis for the claim." MSJ at 125 (citing *Rodriguez v. Johnson*, 104 F.3d 694, 697 (5th Cir. 1997)). However, Villalobos hid his misconduct and did not admit to his use of a community survey until he spoke to author Laura Tillman, who published her book in April of 2016, years after Rubio's initial state habeas application was filed. The Supreme Court rejected that "'the prosecution can lie and conceal and the prisoner still has the burden to … discover the evidence,' so long as the 'potential existence' of a prosecutorial misconduct claim might have been detected.'" *Banks v. Dretke*, 540 U.S. 668, 696 (2004) (quoting *Bracy v. Gramley*, 520 U.S. 899, 909 (1997)).

The Director further argues that Rubio's evidence of Villalobos's corrupt influence on the trial—namely, the documents establishing Villalobos used illegal asset forfeiture funds to pay Dr. Welner—cannot be considered by this Court under 28 U.S.C. § 2254(e)(2). MSJ at 125. But § 2254(e)(2) only applies if the applicant "has failed to develop the factual basis of a claim in State court proceedings[.]" And "failure to develop the factual basis of a claim is not established unless there is a lack of diligence, or some greater fault, attributable to the prisoner's counsel." *Williams v.*

*Taylor*, 529 U.S. 420, 432 (2000). The attempt to develop facts in state court need only be "reasonable" in light of the information available at the time. *Harris v. Quarterman*, 496 F.3d 419, 429 (5th Cir. 2007). When a petitioner establishes cause for overcoming procedural default, he may introduce new evidence to support his claim for relief because he "did not 'fail to develop' the record" under § 2254(e)(2). *Barrientes*, 221 F.3d at 771. Because Rubio has demonstrated cause, § 2254(e)(2) does not apply. [48]

Finally, Rubio can demonstrate prejudice to overcome procedural default. Rubio must establish that the misconduct "infect[ed] his entire trial with error of constitutional dimensions." *Murray*, 477 U.S. at 494 (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)). Thus, prejudice is shown when the petitioner demonstrates he was denied fundamental fairness at trial. *Id.* As previously described with respect to the underlying claim, Rubio's trial was rendered fundamentally unfair by a pattern of prosecutorial misconduct that hoodwinked the trial judge into denying valid motions for recusal and defense funding and permitted the prosecution to fund its case through an illegal scheme. Procedural default does not preclude this Court from ruling on the merits of this claim.

---

[48] The Director also argues that Rubio "admits" his state habeas counsel was ineffective in failing to raise this claim. Any ineffectiveness of state habeas counsel would not defeat cause established by state misconduct. Moreover, in his Amended Petition, Rubio preserved for further review the argument that, should this Court determine his state habeas counsel did fail to develop this claim, a higher court should hold that the rationale in *Martinez v. Ryan*, 566 U.S. 1 (2012) applies to state misconduct claims. Am. Pet. at 129 n. 80.

**Claim 5**    **Rubio is entitled to relief because the State violated his Fourteenth Amendment right to equal protection when it pursued the death penalty against him because of his indigent status and based on a public survey.**

Rubio's wealth-based capital prosecution was in bad faith, thereby violating the constitutional guarantee of equal protection. Specifically, Villalobos targeted Rubio because he could not pay a bribe, and Villalobos used Rubio's case to orchestrate a public media campaign designed to deflect attention from the favors that Villalobos gave to those who could. The Director would have this Court believe that the decision to seek death in Rubio's case was untouched by the crimes and wealth-based discrimination that permeated Villalobos's tenure as District Attorney. But those two things cannot be disentangled. And while Rubio asks this Court to stay his proceedings so that he may exhaust this claim in state court,[49] he can demonstrate cause and prejudice to overcome any procedural default.

### A.    Rubio was selectively prosecuted in bad faith and on the basis of his indigence.

To demonstrate that he was selectively prosecuted in violation of the Equal Protection clause, Rubio must show that others similarly situated have not been prosecuted capitally and that his selection for capital prosecution was in bad faith. *United States v. Hayes*, 589 F.2d 811, 819 (5th Cir. 1978). The State may not prosecute a person "based upon an unjustifiable standard such as race, religion, or other

---

[49] Rubio maintains that the claim is not unexhausted because a state remedy remains, and he has requested this Court's leave to return to state court in the contemporaneously-filed motion for a *Rhines* stay.

arbitrary classification." *Oyler v. Boles*, 368 U.S. 448, 456 (1962); *United States v. Armstrong*, 517 U.S. 456, 464 (1996). Rubio has certainly presented substantial evidence that the State's decision to seek death was "invidious or in bad faith." *See United States v. Greene*, 697 F.2d 1229, 1234 (5th Cir. 1983). The Director asks this Court to grant summary judgment for want of disputes over material facts, arguing that indigence never qualifies as a basis for selective prosecution claims and, relying exclusively on the word of Villalobos himself, that there was no bad faith in this case. But Rubio was targeted for capital prosecution because he could not pay to play, because his attorneys were being punished for their refusal to do so in other cases, and because Villalobos needed the high-profile capital prosecution to deflect public focus from the favors he doled out to wealthy defendants. At the very least, Rubio has pled sufficient facts to withstand a judgment on the pleadings.

> **1. Because Rubio is indigent, Villalobos used Rubio's case to deflect scrutiny of the deals he gave to wealthy defendants in exchange for illegal bribes and kickbacks.**

Villalobos's decision to seek death against Rubio was based on an unjustifiable, arbitrary standard. He aggressively prosecuted an indigent man to shield the bribes he accepted from wealthy defendants. The Director contends that Rubio cannot raise a selective prosecution claim based on "his indigent status alone" because indigence is not a suspect classification. MSJ at 145–46. The Director is wrong on two fronts. First, selective prosecution claims are not limited to suspect classes such as race or gender and may be based on other arbitrary classifications, including indigence. *See Wayte v. United States*, 470 U.S. 598, 608 (1985) ("[T]he decision to prosecute may not

be deliberately based upon an unjustifiable standard such as race, religion, *or other arbitrary classification*, including the exercise of protected statutory and constitutional rights.") (emphasis added); *see also Zeigler v. Jackson*, 638 F.2d 776, 779 (5th Cir. 1981) ("[I]f distinctions between similarly situated individuals are to withstand an equal protection analysis, such distinctions must be reasonable, not arbitrary[.]"). Second, Rubio has not alleged indigent status "alone" as the basis for his claim. Rather, a plethora of evidence demonstrates that Villalobos sought death against Rubio based on an unjustifiable standard. He did so because Rubio is indigent and could not pay a bribe; thus, Villalobos used Rubio's case to shield the exceedingly favorable plea bargains and other results Villalobos provided to wealthy defendants who paid to play.

Ignoring clear precedent that controls questions about *selective prosecution*, the Director relies on more general equal protection precedent reciting a rule, applicable in other contexts, that discrimination based on wealth is not enough to establish an equal protection violation. MSJ at 145–46 (citing *Harris v. McRae*, 448 U.S. 297 (1980) and *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973)). But the controlling Supreme Court precedent makes clear that, in the selective prosecution context, the set of forbidden variables is larger: prosecutions based on race, gender, "*or other arbitrary classification*" are equal protection violations. *See Wayte*, 470 U.S. at 604, 608 (considering whether a policy of prosecuting vocal opponents of military registration violated equal protection) (emphasis added). The lower courts have thus considered other arbitrary and invidious motives, including

indigence, under the umbrella of selective prosecution claims. *See*, *e.g.*, *Ruiz v. Dretke*, No. SA-03-CA-303-OG, 2005 WL 2146119, at *29 (W.D. Tex. Aug. 29, 2005) (analyzing whether the state court reasonably found petitioner was not selectively prosecuted based on indigence).

Moreover, Villalobos used Rubio's case to deflect attention from the deals Villalobos gave in exchange for bribes—aggressively prosecuting the indigent in order to protect the deals he gave the wealthy. Shortly before Rubio's case was remanded for retrial, Villalobos received significant negative press for a high-profile murder case (Amit Livingston) in which he accepted a bribe while the defendant was permitted to abscond. Am. Pet. at 135–36.[50] Rubio could not pay such a bribe. With increased scrutiny on his office, Villalobos conducted a public survey to determine whether seeking death against Rubio was politically popular, a tactic he did not use against defendants who bribed him. *Id.* at 136. Finding the decision popular, Villalobos sought death against Rubio and repeatedly used Rubio's prosecution to attract media attention against the trial court's gag order and to deflect attention from the criminal favors he did for wealthy defendants. As the relationship between the *Rubio* and *Livingston* cases demonstrates, Villalobos selectively and arbitrarily prosecuted Rubio based on his indigence and in bad faith.

---

[50] Villalobos sought to avoid bad press in another high-profile murder case by appointing a special prosecutor, who dismissed the case six days later. Villalobos received a bribe in exchange. Am. Pet. at 133.

## 2. Significant evidence demonstrates that Villalobos acted with discriminatory intent.

The Director further argues that, even if indigence qualifies for selective prosecution claims, Rubio failed to show that Villalobos acted with discriminatory purpose in Rubio's case. MSJ at 146. He claims the current record includes no evidence that Villalobos's illegal conduct affected Rubio's trial or the decision to seek death against him. *Id.* at 147. But he ignores the mountainous evidence brought against Villalobos at his federal trial, the survey Villalobos conducted for Rubio's case, and—most significantly—Villalobos's own statement that he would hide behind the veil of prosecutorial discretion to cover for his crimes.

The Director repeatedly cites to *McCleskey v. Kemp*, 481 U.S. 279 (1987), for his argument that Rubio has failed to provide "exceptionally clear proof" that Villalobos acted with discriminatory intent in Rubio's case. MSJ at 146, 149. But *McCleskey* does not control here. Rather than a claim of particularized discrimination against that defendant, *McCleskey* involved an equal protection claim based on a statewide statistical study indicating that, in the aggregate, prosecutors in Georgia sought the death penalty against black defendants who killed white victims at a much higher rate than against white defendants who killed white victims or black defendants who killed black victims. *McCleskey*, 481 U.S. at 287. *McCleskey* held that "general statistics" involving the entire state do not alone raise an inference that a specific prosecutor in a specific case acts with discriminatory intent. *Id.* at 294–96. In contrast, Rubio has alleged significant evidence specific to his prosecution. For example, Villalobos permitted Amit Livingston the opportunity to abscond during a

high-publicity murder case after Livingston forfeited his $500,000 bond, giving Villalobos a kickback from the corresponding wrongful death suit.[51] After receiving negative press for Livingston absconding, and understanding that Rubio's indigence left him incapable of paying a bribe, Villalobos conducted a public survey to gauge whether seeking death against Rubio would be politically expedient. After determining that it was, Villalobos vigorously sought death against Rubio, who could not afford to pay for favor.

The Director also points to Villalobos's testimony during a pretrial hearing for Rubio's case in which Villalobos denied any bad faith motive for the prosecution. MSJ at 147–48. In order to resolve the question of bad faith *on summary judgment*, the Director would rather absurdly have this Court declare that Villalobos's testimony, given before he had been caught running a pay-to-play scheme that landed him in prison, establishes the absence of bad faith as a matter of law. The Director's Motion highlights the factual disputes in this case.

The Director further relies on a highly idiosyncratic reading of the rationale that Villalobos conveyed to author Laura Tillman—to whom Villalobos admitted that he commissioned a formal survey to determine whether seeking death against Rubio would be popular with the county electorate. *Id.* at 148. But the Director does not acknowledge the context in which the survey was done or its implications. Upon information and belief, Villalobos appears to have conducted a survey in no other case,

---

[51] *United States v. Villalobos*, 1:12-cr-374 (S.D. Tex. 2014) (ECF Doc. 354 at 78).

and certainly not in cases where wealthy defendants paid to curry favor. Villalobos, moreover, conducted the survey after he received bad press for the Livingston case—plainly consistent with a scheme to offset negative public opinion developed as a result of favors given to wealthy defendants. Am. Pet. at 135–36. The survey, therefore, is powerful evidence that Rubio's capital prosecution was a product of wealth-based discrimination. Likewise, the Director fails to address the fact that *Villalobos himself* said he would use the guise of prosecutorial discretion to cover for any bad faith decisions he made.[52] Rubio has at minimum alleged significant facts warranting further discovery on this claim, and an order denying summary judgment. Doc. 28 at 10–12; *see also Bracy v. Gramley*, 520 U.S. 899, 905 (1997) (granting discovery based on evidence that judge had accepted bribes in other cases).

### 3. Rubio need not point to identical defendants to establish selective prosecution.

Beyond establishing that the decision to prosecute was in bad faith, Rubio must also make a prima facie showing that others similarly situated were not prosecuted capitally. *United States v. Webster*, 162 F.3d 308, 334 (5th Cir. 1998). The Director posits that Rubio could never identify any similarly situated defendants due to the egregious nature of his crime. Citing no authority for the proposition, the Director points to the fact that Rubio cannot identify another non-indigent defendant who confessed to similarly horrific acts, implying that only offenders accused of identical offense conduct are appropriate comparators for an equal protection claim,

---

[52] *United States v. Villalobos*, 1:12-cr-374 (S.D. Tex. 2014) (ECF Doc. 356 at 202).

without respect to their mental health or mitigation. MSJ at 149–50. But Rubio does not have to point to defendants who engaged in identical offense conduct. Rather, courts have recognized that every offense is different and have declined to enact a specific formula for similarly situated defendants. *See Lindquist v. City of Pasadena*, 669 F.3d 225, 233–34 (5th Cir. 2012) ("[T]he degree to which others are viewed as similarly situated necessarily will depend substantially on the facts and context of the case."). Instead, Rubio need only, based on the context of the cases, identify similarly situated defendants who received disparate treatment. *See Oyler*, 368 U.S. at 456.

As previously discussed, Rubio identified multiple defendants accused of violent murder, in high-profile cases, who bribed Villalobos and received favorable treatment. *See* Am. Pet. at 131–35. That these defendants did not commit the exact same crime is irrelevant. Courts have never held that a defendant must prove he is *identically* situated to others to establish that he is *similarly* situated. Instead, courts have noted that a "multiplicity of factors *legitimately* may influence the government's decision to prosecute one individual but not another." *United States v. Lewis*, 517 F.3d 20, 27 (1st Cir. 2008) (emphasis added); *see also United States v. Venable*, 666 F.3d 893, 900–01 (4th Cir. 2012) (considering whether "legitimate prosecutorial factors … might justify making different prosecutorial decisions"). But the defendant may rebut that the government's decision to prosecute was based on legitimate factors. *See Webster*, 162 F.3d at 334.

The influence of wealth on Rubio's capital prosecution was unconstitutional, as wealthy and poor defendants should be similarly vulnerable to capital prosecutions. Rubio has significant evidence that the decision to seek the death penalty was based on arbitrary, non-legitimate factors. Villalobos sought the death penalty because Rubio was unable to pay a bribe, because his lawyers routinely refused to facilitate bribes from other criminal defendants, and because the capital prosecution diverted attention from those criminal defendants who *did* pay to play. Moreover, Villalobos admitted that, in the event that anyone investigated his disparate treatment of indigent defendants, he would just say it was just "prosecutorial discretion."[53] Thus, Rubio has made a prima facie case that the State treated similarly situated defendants differently because of the arbitrary fact that the wealthy ones could pay bribes.

### B.     This Court may decide this claim on the merits.

This Court should either grant the contemporaneously requested *Rhines* stay because the claim is unexhausted or consider this claim on the merits because Rubio disables any of the potential bars on merits consideration of an exhausted claim. The claim ought to be analyzed as unexhausted because new and material evidence fundamentally alters the equal protection claim presented to the state court, and such fundamental alteration means that the federal-court claim is not exhausted. Even if this Court believes that the federal-court equal protection claim is exhausted because

---

[53] *United States v. Villalobos*, No. 1:12-CR-374 (S.D. Tex. May 15, 2013) (ECF Doc. 356 at 202).

it is the same as the state-court equal protection claim, however, relief is still unrestricted. The state decision was, notwithstanding the procedural posture, on the merits—and that state decision was unreasonable within the meaning of 28 U.S.C. § 2254(d). Moreover, if necessary to overcome procedural default, Rubio can establish cause and prejudice.

1. **Rubio has fundamentally altered this claim and seeks a *Rhines* stay to exhaust.**

While Rubio filed an equal protection claim in state court, he has fundamentally altered that claim here. As a result, Claim Five has not been exhausted, and he should be permitted to return to state court to avail himself of the appropriate post-conviction remedies. Along with almost all other claims presented in the Amended Petition, Claim Five is the subject of a *Rhines* stay sought at the same time as this Reply is filed.

Since he filed in state court, Rubio discovered that Villalobos formally surveyed the county to ensure that seeking death against Rubio was politically sound, which reinforces just how central Rubio's capital prosecution was to the overall pay-to-play scheme. Am. Pet. at 138. Villalobos hid his misconduct and did not admit to using a community survey until he spoke to author Laura Tillman, who published her book in April of 2016, three years after Rubio's initial state habeas application was filed. Am. Pet. at 37, 128. The survey directly ties Villalobos's misconduct to Rubio's case and shows the nexus between wealth-based favoritism and the sensitivity to public opinion that was necessary to neutralize blowback.

The Director's sole answer on this point is limited to a footnote. He simply argues that *Cullen v. Pinholster*, 563 U.S. 170 (2011) bars this Court from considering the survey. MSJ at 142 n. 54. But *Pinholster* is an interpretation of § 2254(d)(1), which applies only if a claim is "adjudicated on the merits" in state court, and the Director does not so much as mention that precondition. *See Nelson v. Davis*, 952 F.3d 651, 671–72 (5th Cir. 2020) 671 (holding that a "fundamentally altered" claim is not adjudicated on the merits and constitutes a different and unexhausted claim). *Pinholster* simply does not apply where there is no merits adjudication. *Id.* at 661 ("Further, *Pinholster*'s bar on new evidence would not apply to an unexhausted claim."); *see also Ward v. Stephens*, 777 F.3d 250, 258 (5th Cir. 2015) (affirming a "habeas petitioner fails to exhaust state remedies 'when he presents material additional evidentiary support to the federal court that was not presented in state court'") (quoting *Graham v. Johnson*, 94 F.3d 958, 968 (5th Cir. 1996)).

The new evidence of the survey fundamentally alters the claim because it goes directly to Villalobos's bad-faith intent in seeking death against Rubio. Unlike the evidence presented to the state court, the survey ties Villalobos's broad scheme of misconduct to Rubio's case and is significant evidence that Villalobos used the Rubio trial—a proceeding against a defendant who could not pay to play—to cover for the favors he doled out to those who could. *Compare Conner v. Quarterman*, 477 F.3d 287, 292 (5th Cir. 2007) (holding claim was not fundamentally altered when new medical records presented in federal court contained information that was before the state court via an affidavit). The survey evidence here is not merely "supplemental,"

because it specifically ties Villalobos's bad-faith conduct to Rubio. *See Vasquez v. Hillery*, 474 U.S. 254, 260 (1986) (holding that mere "supplemental evidence" does not fundamentally alter a claim already considered by the state courts); *Brown v. Estelle*, 701 F.2d 494, 495–96 (5th Cir. 1983) (holding claim not exhausted when it "depends in large measure on factual allegations outside the record" on state habeas). Because Rubio has fundamentally altered his equal protection claim, it is unexhausted and this Court should permit him to return to state court to exhaust.

## 2. If this Court determines Rubio has not fundamentally altered this claim, it may review it on the merits.

Even if this Court determines that Rubio has exhausted his equal protection claim because the federal-court claim was the same as the state-court claim, it may still consider the federal-court claim on the merits. The claim is not defaulted because the TCCA's disposition was not independent of the federal question. This Court may therefore consider the claim on the merits because, under 28 U.S.C. § 2254(d)(2), Rubio can demonstrate the factual unreasonability of its determination. Even if this Court determines that Rubio's federal-court claim is procedurally defaulted, the claim can be considered on the merits here because Rubio demonstrates cause and prejudice to excuse that default.

### a. The claim is not procedurally defaulted because the state court's disposition was not independent of the federal question, and it may be considered on the merits because the state court's decision was unreasonable.

Even if this Court determines that Rubio has not fundamentally altered the equal protection claim for which the TCCA refused authorization, the claim is not

procedurally defaulted because the TCCA's adjudication was not independent of federal law. *See Coleman v. Thompson*, 501 U.S. 722, 735 (1991) (explaining that a claim is not procedurally defaulted and is not independent of federal law if "the last state court to which the petitioner presented his federal claims fairly appeared to rest primarily on resolution of those claims, or to be interwoven with those claims"). In other words, a TCCA dismissal that is not independent of federal law is not an adequate and independent state law ground capable of supporting a procedural default finding in federal court. *See id.* at 729–32.

The Director argues that the TCCA's refusal to authorize under Texas Code of Criminal Procedure Article 11.071 § 5(a)(3) always triggers procedural default in federal court, and the TCCA refused to authorize a similar Equal Protection claim under that provision here. MSJ at 139–40 (citing *Hughes v. Quarterman*, 530 F.3d 336 (5th Cir. 2008)). The Director is incorrect. When considering whether to authorize a second or successive habeas application, the TCCA makes an initial determination as to whether the applicant meets the successor requirements under Texas Code of Criminal Procedure Article 11.071 § 5(a). Under § 5(a)(3), the court considers whether "by clear and convincing evidence, but for a violation of the United States Constitution no rational juror would have answered in the state's favor one or more of the special issues that were submitted to the jury" at the punishment phase of trial. Tex. Code Crim. Proc. art. 11.071 § 5(a)(3).

Rubio argued to the TCCA that he met the requirement under § 5(a)(3) because but for Villalobos' misconduct, he would not have been sentenced to death. In

dismissing his claim, the TCCA considered the merits of the federal question and ultimately concluded the facts around the bribery scheme were "speculative." *Ex parte Rubio*, 2018 WL 2329302, at *4. The TCCA's opinion did not include a "perfunctory dismissal" of the claims with no suggestion that the court considered the merits. *See Hughes*, 530 F.3d at 343. Therefore, the face of the opinion demonstrates that the TCCA's ruling was not independent of the federal question.[54] *See Coleman*, 501 U.S. at 735 ("[C]ourts . . . will presume that there is no independent and adequate state ground for a state court decision when the decision 'fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy and independence of any possible state law ground is not clear from the face of the opinion.") (internal quotation omitted).

Because the TCCA's decision was not independent of the federal question, and was therefore on the merits within the meaning of 28 U.S.C. § 2254(d), this Court can

---

[54] In a footnote, the Director attempts to distinguish the Fifth Circuit's reasoning in *In re Davila*, in which the court held that the TCCA had reviewed the federal question despite the state court's statement to the contrary. MSJ at 140 n. 50. The Director points out that *Davila* centered on a state habeas application dismissed under Texas Code of Criminal Procedure Article 11.071 § 5(a)(1), whereas Rubio's claim was dismissed under § 5(a)(3). MSJ at 140 n. 50. But this distinction did not affect the circuit court's rationale. In *Davila*, the court looked at the TCCA's contradictory language—both stating that it did not review the merits of the *Brady* claim and stating that the petitioner failed to make a prima facie showing of a *Brady* violation. 888 F.3d at 187. Because the TCCA had used language indicating it did review the merits of the claim, Fifth Circuit held that the dismissal was not based on an adequate and independent state law ground. *Id.* at 188. The same principle applies here. While the TCCA stated it dismissed Rubio's case as an abuse of the writ, the court clearly considered the merits of the claim itself and found them wanting as merely "speculative."

determine whether the state court's decision was "unreasonable" under that provision. Under 28 U.S.C. § 2254(d)(2), Rubio can disable the relitigation bar if he can show that the state decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Indeed, the TCCA's decision in Rubio's case was factually unreasonable.

The state court found that the "theories and impact of the bribery scheme were speculative" despite the evidence presented. *Ex parte Rubio*, 2018 WL 2329302, at *4. At the state habeas hearing, trial counsel testified that Villalobos was in federal prison for taking bribes in murder cases and identified the Livingston case as one in which Villalobos took a bribe for a favorable outcome. 1 SHRR 181. Counsel specifically stated that Villalobos "had to go out and hammer these indigents in order—for political reasons." *Id.* Moreover, Villalobos "wanted to hit long balls on the indigents because he was throwing in the towel on the people with money." *Id.* at 182. Counsel further highlighted the CCDA's abusive tactics throughout the trial. *Id.* at 186. The habeas court acknowledged that it was aware of Villalobos's scheme and the resulting federal trial, but ultimately found trial counsel's claims speculative as they related to Rubio's case. *Id.* at 183. The TCCA's ultimate rejection of the claim as "speculative" was unreasonable in light of the significant evidence of Villalobos's misconduct. Villalobos gave substantial favors to defendants who bribed him, such as Livingston, while aggressively seeking death against Rubio. Villalobos was ultimately sentenced to federal prison for his misconduct. The allegations were much more than speculative and the state court unreasonably rejected them.

**b. If the Court determines this claim is procedurally defaulted, Rubio can demonstrate cause and prejudice.**

Even if this Court determines Rubio's claim is defaulted, Rubio can establish cause and prejudice to overcome that default. *See Murray*, 477 U.S. at 488. Rubio may demonstrate cause by "showing that the factual or legal basis for a claim was not reasonably available" or that some form of interference by officials made compliance impracticable. *Id.* The evidence regarding the public survey was unavailable when Rubio filed in state court because Villalobos hid this information and revealed it to author Laura Tillman after Rubio filed his state habeas application.

Ignoring that Villalobos hid his misconduct and the public survey, the Director simply states that Rubio failed to show active governmental interference or the reasonable unavailability of the factual or legal basis for this claim. MSJ at 142 n. 53. To the contrary, when a defaulted claim involves the suppression of evidence by the State, these "factors . . . ordinarily establish the existence of cause for a procedural default." *Strickler v. Greene*, 527 U.S. 263, 283 (1999). Villalobos never disclosed that he used a public survey to shore up support and ensure that his strategy against Rubio would be a politically expedient way to cover for his crimes and deflect attention from the deals he gave the wealthy. Moreover, counsel had no reasonable motive to investigate that such a tactic was used in this case. *See id.* at 283–84 (finding state habeas counsel's reliance that the prosecutor "would fully perform his duty to disclose all exculpatory materials" reasonable).

Rubio can also demonstrate prejudice to overcome procedural default. To demonstrate prejudice on his selective prosecution claim, Rubio must show that, but

for the constitutional error, the result might have been different. *See Pickney v. Cain*, 337 F.3d 542, 545 (5th Cir. 2003) (holding petitioner failed to establish prejudice on equal protection claim when he would have been indicted regardless); *Welsh v. Holt*, No. 94-7351, 1996 WL 84487, at *6 (4th Cir. 1996) (finding no prejudice when underlying selective prosecution claim lacked merit); *United States v. Mills*, 817 F. Supp. 1546, 1557 (N.D. Fla. Mar. 31, 1993) (considering whether petitioner showed prejudice on defaulted selective prosecution claim by making a substantial showing of merits of underlying claim). The elected district attorney sought death against Rubio because Rubio is indigent and could not pay a bribe, and because his case was used as a shield to hide the flagrant and ongoing bribery scheme that afforded wealthy defendants favorable outcomes. Clear-cut evidence shows that Villalobos's decision to prosecute Rubio was invidious and in bad faith. Rubio received disparate treatment due to his inability to pay a bribe. Had this information come to light at the time of trial, the result likely would have been different. Even if this claim is procedurally defaulted, this Court may review the merits.

**Claim 6**      **Rubio is entitled to relief on his due process claim under *Napue v. Illinois*.**

The State's star expert, Dr. Michael Welner, provided false and misleading testimony that was material to Rubio's guilt and sentencing determinations—and the prosecution either knew it or should have. This *Napue* claim was not raised during Rubio's state habeas proceedings, is unexhausted, and a Texas remedy remains available. Rubio has therefore requested the *Rhines* stay necessary to facilitate

exhaustion. Even if a state remedy is unavailable, Rubio could overcome any procedural default under the miscarriage of justice exception.

### A.     The State committed a *Napue* violation.

Rubio has demonstrated all three elements of a *Napue* violation. Dr. Welner's testimony was (1) false and (2) the State knew or should have known about it.[55] There is also (3) a reasonable likelihood that this false testimony affected the jury's verdict in this case. In fact, the false testimony was absolutely essential to both guilt- and sentencing-phase findings against Rubio.

#### 1.   Dr. Welner's testimony was false and misleading.

There are two features of Dr. Welner's testimony at issue, each already referenced in relationship to Claim 3, that trial counsel deficiently failed to prepare for the guilt-phase NGRI litigation. First, Dr. Welner testified that Rubio's pretrial functioning provided a glimpse into his authentic level of mental-health impairment

---

[55] The Director includes a sentence suggesting that this Court should reject the claim on summary judgment because, under his reading of 28 U.S.C. § 2254(e)(2), Rubio would ultimately be unable to introduce evidence in support of it. MSJ at 119. Any summary judgment ruling predicated on the downstream admissibility of evidence is premature without a further opportunity for factual development, especially when the validity of the guilt- and punishment-phase findings are at issue. That being said, § 2254(e)(2) would not bar the introduction of evidence necessary to prove the violation. As set forth in Claim One, Part (B)(2), *supra*, state post-conviction counsel deficiently litigated the issue, and so Rubio did not "fail to develop" the claim and § 2254(e)(2) does not restrict hearing evidence. Rubio incorporates by reference the § 2254(e)(2) arguments made in Claim One, Part (B)(2), *supra*, showing that he does not "fail to develop" a claim when procedural default is excused. *See also* Am. Pet. at 129 n.80 (explaining why *Martinez* should be extended to IATC claims). Finally, even if Rubio did "fail to develop" the claim, he can satisfy the subsectional conditions for a hearing notwithstanding that failure.

because Rubio was unmedicated at that time. Am. Pet. at 142–43. Second, Dr. Welner testified that Rubio was faking psychosis because Rubio did not exhibit mental-health impairments before the second trial. Am. Pet. at 142–43. The Director's primary argument is that both features of Dr. Welner's testimony are in fact true. In the Director's telling, Rubio *was* unmedicated for his pre-trial incarceration, and Rubio *did not* exhibit psychotic symptoms. MSJ at 121–22. The record, however, unambiguously contradicts the Director's argument, and summary judgment is inappropriate.

### a. Rubio was on anti-psychotic medication during the seven years preceding his second trial.

Dr. Welner led the jury to believe that Rubio's pretrial functioning represented his baseline of mental health because, Dr. Welner explained, Rubio was not taking medicine at this time. The TDCJ records, however, disclose that Rubio was, in fact, heavily medicated.[56] Am. Pet. at 143–46. Those records demonstrate that, contrary to Dr. Welner's characterization, the period of treatment was not just a "brief" regimen from Dr. Valverde, but that: Rubio cycled through several different types of medication in the seven years before his second trial, had his dosages periodically elevated, and was largely compliant with his prescription regimen. Am. Pet. at 143–46. The Director does not challenge the veracity or validity of Rubio's TDCJ records—

---

[56] The Director complains that Rubio filing only a portion of his TDCJ records "calls into the question the veracity of the claim." MSJ 107. However, the falsity is fully evident from the face of the 86-page excerpt appended to the application. For further response to this argument, see note 35, *supra*.

how could he—but instead argues that Dr. Welner's testimony should not be interpreted as false because other experts, who had not reviewed Rubio's TDCJ records, reported and testified that Rubio was not always medicated. MSJ at 121. The Director, however, lacks any record support for his characterization of that reporting[57] and testimony.[58] Dr. Welner, moreover, had the TDCJ records—which he received from the prosecution—and still testified falsely.

Take one example of the mismatch between the Director's arguments and the evidence he identified as supportive. To prove the "truth" of Dr. Welner's statement that Rubio was not "on antipsychotic medications" for "the great majority" of the "seven years" before his second trial, 69 RR 130–33, the Director points to Dr. Troy Martinez's report. MSJ at 121 (citing 2 CR 511). But that document is based almost entirely on Rubio's self-reporting, with some references to other medical records indicating that Rubio had at times refused medication. 2 CR 511. Dr. Martinez had not reviewed Rubio's TDCJ records.

---

[57] The Director also cites to 10 CR 1239–40 in support, but volume 10 of the clerk's record does not contain page 1239. If the Director meant to cite to 5 CR 1239–40, then all Dr. Martinez's report highlights was that Rubio was taking 150 mg of Wellbutrin and was asking to have his dose increased because he was still "losing it and breaking down." 5 CR 1239–40. Additionally, that report states only that Rubio was not on psychotropic medicine when seen in June and July of 2008. *Id.* at 1239. This snapshot does not purport to (or in fact) disclose anything about Rubio's anti-psychotic regimen at other times during the seven years before his second trial. It is, quite literally, just a single moment of observational data—data that does not undermine other observations made during periods when Rubio *was taking* his medicine.

[58] The Director cites to 66 RR 20 in support. This page of transcript, however, contains only the foundation for Dr. William Mark Valverde's work as a psychiatrist in Brownsville, the fact that he first met Rubio in 2003, and that he subsequently moved to Mississippi. 66 RR 20.

The Director also cites the report of Dr. Raphael Morris, MSJ at 121, but does not pair the citation with any explanation. As with Dr. Martinez and unlike Dr. Welner, Dr. Morris did not have access to, or review, Rubio's TDCJ records. The Morris Report omits any reference to the TDCJ records at issue, because trial counsel did not provide them. *Cf.* 3 CR 654 (Dr. Morris stating that he only reviewed "a portion of defendant's jail mental health records"). In fact, trial counsel did not even request the TDCJ records until *after* Dr. Morris wrote his report. Am. Pet. at 153. The Morris report, moreover, simply states that Rubio has refused medication, and does not indicate whether such refusal belied or was part of any trend, 3 CR 657; it certainly provides no grounds to believe that Rubio was unmedicated for "the great majority" of his pretrial incarceration. Quite to the contrary, the Morris report shows Rubio having taken both anti-depressant and anti-psychotic medication while incarcerated. 3 CR 657. The Director's focus on experts other than Dr. Welner does nothing to refute that Rubio's records are rife with proof that he was medicated.

In short, nothing the Director offers suggests that Dr. Welner testified accurately when he said that Rubio was unmedicated for "the great majority" of the time between his first and second trials. The fact that the Director reads other record material, from other experts, to lend credence to the ultimate inferences that Dr. Welner predicated with false testimony does not change the fact that the testimonial predicate was, in fact, false.

### b. Rubio's records highlight that he was still experiencing psychotic symptoms notwithstanding his medication.

Having testified that Rubio was almost entirely unmedicated during his pretrial detention, and in order to suggest that he was faking his impairments, Dr. Welner swore to another piece of information: that Rubio lacked signs of psychosis at this time. The TDCJ records demonstrate that this testimony was also false. Am. Pet. 143–48. The Director claims that Dr. Welner's testimony is not false because Dr. Welner "acknowledged" Rubio's "medical notes" and that the records do not contradict his ultimate conclusion that Rubio's psychosis was feigned. MSJ at 121. In fact, Rubio's TDCJ records disclose that, while he was medicated, he was still experiencing psychotic symptoms and was in the midst of a corresponding mental health decline. Am. Pet. 143–48; *supra* at 71–74.

The Director offers nothing of substance in response, merely reciting: "Dr. Welner's opinion in this regard is not contradicted by the piecemeal portions of the TDCJ records Rubio has attached. To the contrary, it is supported by such." MSJ 121–22. But there is no corroborating detail accompanying this assertion. Dr. Welner communicated to the jury that, if Rubio had actually experienced psychosis, he would have "crumbled," and that Rubio would have told people about his struggle. 69 RR 132–33. The TDCJ records show that Rubio was in fact reporting psychotic symptoms to prison staff. Am. Pet. at 146–48. Dr. Welner's testimony left the jury with the false impression that all of Rubio's observed impairments were faked, because they did not show up in the medical records.

### 2. The State knew or should have known that the testimony was false.

The Director contests whether Dr. Welner's testimony was false and misleading, but he offers no separate argument disputing that the State knew or should have known its truth status. *See* MSJ at 121. In fact, the Director expressly admits that the prosecution had the records establishing the falsity of the testimony. *See* MSJ at 121 (stating that Dr. Welner "acknowledged" the contents of Rubio's medical records). In short, this claim comes down to disputes about falsity and materiality, not State knowledge.

### 3. There is a reasonable likelihood that the false testimony affected the jury.

The Director argues that, even if Dr. Welner's testimony was false, it was immaterial. MSJ at 122. In so doing, the Director downplays the effect that Dr. Welner's false testimony likely had on the jury, failing to acknowledge that it was central to the credibility of Dr. Welner's over-arching psychiatric opinion—that *all available evidence* showed that Rubio was fine and feigning his mental health impairments. Dr. Welner's testimony was the linchpin of the State's rebuttal argument against Rubio's insanity defense and was crucial to securing a verdict of guilt. Dr. Welner's description of Rubio's pretrial mental-health profile was not some one-off observation. It was the factual predicate for the proposition that all other observational data about Mr. Rubio's impairments were unreliable, because Rubio was an effective faker. As explained in the Amended Petition, the false testimony thereby corrupted determinations of both guilt (sanity) and sentencing.

The Director's instinctive reliance on material from other experts—material not about the falsified characterization of Rubio's prison records and functioning, but instead used to validate the inference that Rubio was faking—underscores just how significant Dr. Welner's testimony was. Dr. Welner was particularly important because he was the only expert opining on Rubio's sanity who had reviewed all of Rubio's TDCJ records. For that reason, Dr. Welner was the only expert who linked his opinion on Rubio's mental status to Rubio's TDCJ records, whereas others were limited to other jail records and Rubio's self-reporting. Had the jury heard the truth, rather than Dr. Welner's false testimony, it is at least reasonably probable that Rubio would not have been found sane (guilty) or received a death sentence.[59]

## B.  This claim is unexhausted, but Rubio can overcome any potential default.

Claim Six is unexhausted and, along with almost all other claims presented in the Amended Petition, is the subject of a *Rhines* stay sought at the same time as this Reply is filed. If this Court were to determine that the claim is exhausted (and procedurally defaulted), however, then any default would be excused under the miscarriage of justice exception—as to both Rubio's conviction and death sentence. *See House v. Bell*, 547 U.S. 518, 538 (2006) (recognizing miscarriage-of-justice gateway for guilt); *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992) (same for death

---

[59] The Director fails to address that *Napue's* "reasonable likelihood" standard is lower than the materiality standard under *Brady*, and that it is akin to a harmless error rule, *See United States v. Barham*, 595 F.2d 231, 242 (5th Cir. 1979) (explaining this standard as a "low threshold.").

sentence). That exception is satisfied both because Dr. Welner's testimony had a sufficiently likely impact on the guilt (sanity) finding and because it had a sufficiently likely impact on the punishment determination.

The Director's argument to the contrary focuses on the fact that the trial record includes evidence of Rubio's sanity beyond Dr. Welner's false testimony. MSJ at 122–23. The actual-innocence inquiry, however, requires a "holistic judgement about all the evidence" and "its likely effect on reasonable jurors applying the reasonable-doubt standard." *House*, 547 U.S. at 539 (internal quotations removed) (citing *Schlup v. Delo*, 513 U.S. 298, 328 (1995)). As explained above, and in the Amended Petition, the impact of Dr. Welner's false testimony corrupted all fact-finding pertaining to mental health, which was keyed to the false proposition that Rubio's presentation was inauthentic. In other words, Dr. Welner's testimony reverberated throughout the trial, touching every piece of mental health information litigated at both the guilt and sentencing phases of the case. Rubio satisfies two different gateways, one associated with each phase.[60]

**Claim 7        Rubio is entitled to relief on his Sixth Amendment claim that trial counsel failed to investigate and use evidence related to Rubio's mental health during his prior incarceration.**

For whatever reason, the Director consolidated his response to Claims 3 and 7, MSJ at 88–117. But those are distinct IATC claims. Claim 3 is about deficient failure

---

[60] Rubio can also show cause and prejudice for any default, on the ground that *Martinez* and *Trevino* should apply to claims other than IATC challenges. *See* Am. Pet. at 140 n. 97.

to prepare for the NGRI litigation. Claim 7 is about a deficient failure to acquire TDCJ records necessary to litigate NGRI and sentencing-phase issues. There is some overlap, but the allegations are more distinct than alike. As it does with other claims, this Reply begins with the underlying constitutional violation in a subsection A, and moves on to procedural issues in a Subsection B.

A.    **Trial counsel's performance was prejudicially deficient, violating the Sixth Amendment.**

Rubio's trial counsel failed to conduct a reasonable investigation into his psychiatric history—specifically, they failed to promptly obtain and use crucial TDCJ records to prepare their experts and otherwise get ready for trial. Those records, in turn, disclosed behavior consistent with severe mental illness and cognitive impairments, and that the prison medical staff used anti-psychotics and anti-depressants to treat Rubio. In the absence of this information, and as explained in the material pertaining to the *Napue* claim, *see supra* Claim Six, Part (A)(1), Dr. Welner characterized Rubio as a faker. Rubio was fine in prison, Dr. Welner confidently repeated, and was not even taking medication. That testimony was all provably false. The failure to procure the records, and use them over the course of the litigation, prejudiced Rubio at both the guilt and punishment phases of his trial.

1. **Trial counsel failed to investigate and present evidence related to Rubio's mental health during his prior incarceration.**

Aside from a complaint that Rubio attached to the Amended Petition "only" 86 of 415 pages of records that the Court cannot consider anyway,[61] the Director's only argument on deficiency is that Rubio's trial counsel were effective because their decision to ignore Rubio's TDCJ records and withhold them from their own experts must be treated as constructively strategic. MSJ 107–08. Counsel might have obtained the records the day before trial, the argument goes, so this court should simply *presume* that trial counsel was behaving strategically by not using them to prepare. MSJ at 108. This circular explanation defies belief. To be clear, the records were not even prepared by the TDCJ custodian until the day before Rubio's competency hearing. Supp. App. at 210. There is no evidence that trial counsel actually received and reviewed these records before that phase of the proceeding, or

---

[61] The responses to the Director's arguments are provided elsewhere in the Reply and are hereby incorporated by reference. First, The Director says that the attachment of "only" 86 of 415 pages of medical records "calls into question the veracity of this claim." MSJ 107. As explained in Part A of the Introductory Statement, the Amended Petition is a pleading—nothing about the failure to attach every record calls the veracity of the claim into question. Also as explained in footnote 25, *supra*, and even though the Director has access to the records, Rubio is attaching them here to eliminate any further discussion of the issue. Second, the Director cross references a recurring argument about how new evidence cannot be considered because Rubio "failed to develop" the factual predicate of the claim. MSJ at 107. For the same reasons as set forth in Claim One, Part (B)(2), which are hereby incorporated by reference, 28 U.S.C § 2254(e)(2) does not restrict hearings for *Martinez*-postured claims because a prisoner whose state post-conviction counsel deficiently defaults an IATC claim does not "fail to develop" its factual predicate, within the meaning of the statute.

that the records were provided to any of the defense experts. Hoping that this Court blindly indulges a "presumption" of strategy despite the evidence, the Director fails to suggest what a strategic reason for ignoring the records might have been. In any event, controlling Supreme Court precedent establishes that there is no "presumption" that a failure to follow up on red flags in records is strategic. *See Wiggins*, 539 U.S. at 523–24 (2003) (finding deficient performance where counsel failed to follow-up on information in written PSI and Baltimore City Department of Social Services records they had in their possession).

## 2. The deficiency was prejudicial.

In contesting prejudice, the Director argues that "several pieces of record evidence supporting Dr. Welner's testimony" would cure Dr. Welner's false testimony about the seven years during which Rubio awaited his second trial. MSJ at 108. Setting aside momentarily the curative effect of the "several pieces of record evidence" to which the Director refers, there is a more basic problem with his response. He completely ignores the prejudice flowing from defense counsel's failure to give the TDCJ records to *their own* experts, and from the failure to otherwise incorporate them into *their own* witness preparation and trial strategy. Am. Pet. at 155–57.

Now return to Dr. Welner, and the "several pieces of record evidence" that supposedly mitigate the prejudicial effect of his false testimony. The record evidence to which the Director points is information from other experts indicating that Rubio was not taking his anti-psychotics at all times. MSJ at 108–09. The Director's argument, however, proves Rubio's point. The "other" experts all based their characterization on Rubio's self-reporting, because trial counsel deficiently failed to

supply them with the crucial TDCJ records.[62] For example, the Director points to the 2008 and 2010 reports of Dr. Troy Martinez, as well the 2009 report and guilt phase testimony by Dr. Raphael Morris. MSJ 108–10. Each of the reports the Director identifies, however, was completed *before* the TDCJ custodian even prepared the TDCJ records at issue.[63] *See* SHCR 186 (Martinez Report dated August 7, 2008); 5 CR 1230 (Martinez Report dated January 7, 2010); 3 CR 652 (Morris Report Dated April 6, 2009). Nor does the Director argue that Drs. Martinez and Morris reviewed these records, because such review would have been logically impossible.

The Director also overstates other scattered evidence of noncompliance introduced at trial. For example, the 2009 Morris report is not clear as to whether Rubio simply refused to take medications on occasion, or if noncompliance was an ongoing issue. *See* 3 CR 657. And Dr. Morris's trial testimony was only that *at the time of trial* Rubio was not taking medication; it does not contradict Rubio's TDCJ records.[64]

---

[62] To the extent any of the information the Director cites does not trace to a self-report, the response still proves the prejudice because it *does not* trace to TDCJ records at issue.

[63] Dr. Morris' report merely references "a portion of defendant's jail mental health records," and was completed before counsel obtained the TDCJ records. 3 CR 654.

[64] The Director also claims that records support Dr. Welner's testimony because "at least one" supports the State's future dangerousness arguments. MSJ at 114–15. The Director only points to one record that claims Rubio "created a disturbance" while ignoring that the exact same page highlights Rubio's mental illness. See Supp. App. at 265 (explaining that Rubio's lack of personal hygiene can be attributed to his mental condition and that his psychotropic medications have been changed). This one record fails to support the Director's argument that Rubio's records show him to be a future danger. Instead, they reflect a very mentally ill man.

The Director also attempts to contain the prejudice by claiming that parts of the TDCJ records themselves support aspects of Dr. Welner's testimony.[65] MSJ at 110–15. Those records do no such thing, and the Director simply recites evidence capturing isolated moments of moderate functioning, or noncompliance with a medication regimen. Moreover, there are all-too-obvious problems with the argument that the omission of the records was nonprejudical simply because *not every* proposition in Dr. Welner's testimony was inconsistent with them. The fact that not *all of* Dr. Welner's testimony was false does not disprove prejudice.

But even the propositions the Director identifies as having been corroborated by the TDCJ records are not. For example, the Director identifies record references to Rubio talking about nightmares in order to support Dr. Welner's argument that Rubio was not authentically deluded—that Rubio suffered only from parasomnias, whereas delusions would be sustained beyond sleep. MSJ at 112–13. Some examples cited by the Director, however, reflect Rubio having an ongoing delusion *while awake*. MSJ at 112 (citing Supp. App. at 219) (describing a sustained delusion where Rubio wakes up from a nightmare to see physical scratch marks on his body). There are other records that document Rubio as experiencing hallucinations that are not tied to parasomnias. *See, e.g.*, Supp. App. at 216 (Rubio reporting while awake that he felt someone jump on him to choke him, seeing tigers rip his skin off, and seeing shadow people and ghosts). Indeed, Rubio was designated for Jester IV, TDCJ's inpatient

---

[65] Notably, the Director fails to make the same argument in their Motion regarding Claim 6 where the veracity of Dr. Welner's testimony is directly attacked.

psychiatric facility, because he "continues to report shadow people and ghosts." Supp. App. at 216. Other records document "thought content [that] reflects complaints of active auditory hallucinations" while largely unable to sleep. App. (Doc. 17-1) at 48–49. Furthermore, and in sharp contrast to Dr. Welner's assertions, sleep disturbances are actually a common symptom of Rubio's mental health diagnosis. *See supra* at 72–74.

The Director seems to suggest that the TDCJ records capture aspects of Rubio's appearance and grooming habits that undermine the truth of other observations: that Rubio was experiencing delusions, hallucinations, or other signs of mental health decline. MSJ at 110–11. The Director ultimately concedes that Rubio's TDCJ records disclose psychotic symptoms, but appears to imply that these symptoms must have been feigned because there were instances, for example, when Rubio was "neatly dressed with his hair combed and teeth brushed." MSJ at 111 (internal quotation marks and citations omitted). The Director does not connect these observations to Dr. Welner's testimony; in fact, the only mention of Rubio's grooming habits appearing in the testimony is when Dr. Welner says that *when he met with Rubio* he observed him to be "neatly-groomed." 69 RR 64. Dr. Welner simply did not testify about how physical appearance and grooming habits affect a schizophrenia diagnosis.

The Director also ignores mountainous records inconsistent with his preferred picture of Rubio as a kempt, emotionally steady prisoner. *See*, *e.g.*, App. at 48 ("excessive worry and distress"); *id.* at 54 ("seriously distressed" with "frequent and daily crying."); *id.* at 76 (depressed and overwhelmed). Rubio's records in fact disclose

that he cycled between neat and disheveled states, which is behavior consistent with his schizoaffective diagnosis. *See supra* at 70–72. In a clinical interview on November 11, 2004, Rubio was observed to be unshaven and appeared to be losing weight. App. at 85. At that same interview, Rubio "sounded and looked depressed" while also "report[ing] an increase in audio and visual hallucinations." *Id*. The Director's suggestion that Rubio's grooming habits disprove psychosis is verifiably false, both in terms of its premise and conclusion. *See* Supp. App. at 103–04 (Report of Bhushan S. Agharkar, M.D., D.F.A.P.A.) (Discussing Rubio's psychiatric history as reflected in his TDCJ records).

In short, the Director's position on prejudice relies on implausible conclusions from the TDCJ records—outcome-motivated inferences drawn from isolated spikes in functional behavior, but inconsistent with the general level of functioning that the records capture. Indeed, the TDCJ records disclose treatment and functioning that contradict Dr. Welner's testimony in almost every conceivable way. Those records devastate not only Dr. Welner's testimony, but also demonstrate the prejudice associated with the failure of defense counsel to prepare their own experts.

**B.      This court may consider this substantial claim on the merits because any default is excused by state habeas counsel's failure to raise it.**

The Director recognizes that state post-conviction counsel omitted this claim from Rubio's state application. MSJ at 88. The claim is therefore either unexhausted and the appropriate subject of a *Rhines* stay, or it is procedurally defaulted but excused under *Martinez v. Ryan*, 566 U.S. 1 (2012). Rubio is requesting a *Rhines* stay

at the same time that he files this Reply, but the Director disputes that *Martinez* excuses any procedural default. MSJ at 88–89. The Director, however, provides no specific arguments; he simply cross references prior motion content describing the law under *Martinez* and giving a general description of what Rubio's state post-conviction counsel did. *See* MSJ at 89. But counsel can be deficient when the representation is objectively unreasonable in one area, even if they arguably performed admirably in others. *See, e.g., Rompilla*, 545 U.S. at 382 (finding deficient performance where counsel ignored red flags, despite a mitigation investigation involving interviews of five family members and the opinions of three mental health experts). The inquiry is not holistic, and strengths in legal representation do not offset deficiencies.

Doctrinally, the *Martinez* excuse requires a showing of inadequate state post-conviction performance and substantiality. As set forth in the Amended Petition and in Section (A)(2), *supra*, the challenge is substantial. State habeas counsel were also ineffective for failing to raise this substantial claim of ineffective assistance of trial counsel. *See* ABA Guideline 10.15.1 (explaining duty of post-conviction counsel to "litigate all issues, whether or not previously presented, that are arguably meritorious…" and to "continue an aggressive investigation of all aspects of the case"). State habeas counsel had these records—they were in files of trial counsel that undersigned counsel obtained from state habeas counsel. Rubio's habeas counsel, David Schulman, admits that he never reviewed Rubio's TDCJ records, and that he

would have raised this claim if he did. 2d Supp. App. at 417. There was no reason to forfeit this claim.

**Claim 8**     **Rubio is entitled to relief on his due process claim under *Napue v. Illinois* because the State elicited testimony that it knew, or should have known, to be false and misleading from A.P. Merillat.**

During the punishment phase of Rubio's trial, the State called A.P. Merillat to testify as an expert on prison violence and prison classifications. Am. Pet. at 160. Merillat (1) testified falsely as to his pattern of inflating the risk of prisoner danger, and (2) misled Rubio's jury regarding significant components of TDCJ's classifications system. *Id.* at 161−64. Before his testimony, the State informed Rubio's defense team that Merillat had falsely testified in a case recently reversed on appeal—*Estrada v. State*, 313 S.W.3d 274 (Tex. Crim. App. 2010). *Id.* at 159. However, the State did not inform the defense that Merillat also falsely testified in October 2008, during the capital murder trial of Manuel Velez in Cameron County, Texas. *Velez v. State*, No. AP-76,051, 2012 WL 2130890 (Tex. Crim. App. 2012). On the stand in Rubio's case, Merillat admitted to the false testimony in *Estrada* but the State framed the falsity as a one-time, inadvertent mistake. *Id.* at 160−61. By framing *Estrada* as a one-off error, the prosecution avoided the perception that a key future dangerousness witness was a serial exaggerator.

### A.     The State committed a *Napue* violation.

Rubio's due process rights were violated when the State sponsored Merillat's false and prejudicial testimony that went both to the putative expert's history of exaggerating future danger, as well as to the underlying facts in the case. *See Napue*,

360 U.S. at 269. The false testimony pertained to facts other than the credibility of Merillat himself, including, but not limited to, TDCJ's classification system and the restrictions placed on prisoners. Am. Pet. at 157–66. The Director contests whether Merillat's testimony was false and whether there is a reasonable likelihood that the testimony affected the jury's verdict. *Id.* at 158–64. However, if Merillat's testimony was indeed false, the Director offers no reason why the State did not know, or should not be imputed with, knowledge of its falsity.

Rubio alleged that Merillat's testimony was false or misleading in a number of different ways, including:

1. Merillat's history of providing false testimony, by not telling the jury that Merillat testified falsely in *Velez,* in addition to *Estrada*;

2. "[G]rossly misle[ading] the jury as to how an offender convicted of capital murder and sentenced to life would be classified and managed while incarcerated in a TDCJ facility," Supp. App. at 37;

3. Overstating the privileges and understating the restrictions that would be placed upon Rubio if he were sentenced to life;

4. Incorrectly claiming that that TDCJ would not consider Rubio's prior disciplinary history when determining his classification level;

5. Claiming there are no parameters in TDCJ which prevent housing certain inmates with one another when in fact there are; and

6. Claiming that TDCJ had changed its classification system "just prior" to his testimony in *Estrada*, when that actually occurred more than a year prior.

Am. Pet. at 162–63. This testimony misled the jury regarding Merillat's own history of providing false testimony and falsely inflated the jury's impression that Rubio would be more able, or more likely, to commit acts of violence in TDCJ.

For the most part, the Director fails to address the propositions identified. Instead, the Director points to other portions of Merillat's testimony, which the Director claims to be accurate. Of course, that some testimony was true does not, under *Napue*, negate the legal significance of testimony that was false. Contrary to the Director's claim that the falsity of Merillat's testimony represents little more than a battle of the experts, MSJ at 162–63, these are questions of historical fact regarding TDCJ procedure, not of dueling expert opinions. And the objective facts to which Merillat testified were false.

The Director also notes that, although Merillat gave false testimony in *Estrada* and *Velez*, he did not offer the same offending testimony in Rubio's case. MSJ at 160–64. However, these arguments are largely non-responsive to the specific allegations in the Amended Petition. That the testimony from *Estrada* and *Velez* was not identical to the testimony here matters not at all to the allegation that Merillat testified that he had given false testimony in only one prior case.

Because Merillat testified falsely both as to his record of exaggeration and as to the danger Rubio himself presented, the false testimony was especially likely to have had sufficient effect—a reasonably probable one—on a single juror's decision about future dangerousness. Am. Pet. at 165–66. Had the jury heard that Merillat was engaged in an ongoing pattern of falsely exaggerating danger in a prison setting, there was a reasonable likelihood of a different result. The Director argues that Merillat's false testimony in *Velez* was not relevant. Not so. As explained above, the false statement regarding *Velez* goes directly to his credibility and is therefore

relevant under the law. *See Napue*, 360 U.S. at 269 ("The principle that a State may not knowingly use . . . false testimony[] to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness.").

Testimony pertaining to TDCJ's classifications procedures was critical to the jury's assessment of future dangerousness, and thus now to whether Rubio has established materiality. Had the jury learned that Merillat's false testimony was not merely a one-off incident, but was instead a pattern, it would have significantly diminished Merillat's credibility on this important issue. Thus, the Director's attempt to brush this false testimony aside as immaterial, both regarding its substance and Merillat's credibility, fails to account for both the importance of Merillat's testimony and the impact of Rubio's jury learning that he had repeatedly mislead other juries. *See* MSJ at 164–65. The Director concludes his materiality section with the "brutality trumps" proposition discussed in Part B of the Introductory Statement, *supra*—the idea that all deficiencies are nonprejudicial because the crime was simply too aggravated. MSJ at 164–65 (describing "the brutality of Rubio's crime"). The answers to the brutality-trumps position from earlier in this Reply at Part B of the Introductory Statement are hereby incorporated by reference.

## B. This Claim can be considered on the merits because Rubio can overcome any potential default.

Claim Eight is unexhausted and, along with almost all other claims presented in the Amended Petition, is the subject of a *Rhines* stay sought at the same time as this Reply is filed. The Director asserts that this claim is also procedurally defaulted,

which Rubio disputes. MSJ at 151–52. Because plausible arguments exist regarding his failure to present this claim to the state courts, and because there is a nontrivial likelihood that he would be permitted to proceed with them in a successive state habeas application, it would be premature to determine that this claim is procedurally defaulted without permitting Rubio to return to state court.

Even if this claim is treated as defaulted, however, Rubio can establish cause and prejudice to overcome it. The State knowingly relied on Merillat's false testimony, which was an external impediment to raising this claim previously. *See Carrier*, 477 U.S. at 488 ("[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule."). The Director asserts that Merillat's testimony was not false, and therefore that Rubio failed to establish that he can rely on this to excuse a possible default of this claim. MSJ at 151. But because Merillat's testimony was false, any default should be excused. Similarly, the materiality of the *Napue* violation establishes that prejudice exists. Alternatively, Rubio can satisfy the miscarriage-of-justice exception because, absent these crucial misrepresentations, no reasonable juror would find that Rubio deserved the death penalty. *See Sawyer v. Whitley*, 505 U.S. 333, 336 (1992) (miscarriage-of-justice gateway for death sentence).

**Claim 9**     **Rubio is entitled to relief under *Brady v. Maryland* because the State failed to disclose Merillat's false testimony in *Velez*.**

   **A.     The State committed a *Brady* violation.**

Rubio alleges that, in violation of *Brady*, the State suppressed material and favorable impeachment evidence that Merillat falsely testified in *Velez*. Am. Pet. at 166–70. Merillat's testimony at issue in *Velez* was nearly, if not entirely, identical to the disclosed testimony from *Estrada*. While the *reversal* in *Velez* had not yet occurred, that case was prosecuted by the CCDA's Office—the same office that prosecuted Rubio.

The Director does not contest this was favorable impeachment evidence under *Brady*; it argues only non-suppression and materiality. MSJ at 165–70. Regarding suppression, the Director asserts that Rubio "fails to definitively show that the State suppressed impeachment evidence relating to Merillat's false testimony in *Velez*." *Id.* at 167. However, that the same agency prosecuted both Rubio and Velez creates a high likelihood that the prosecution knew of Merillat's false testimony and yet did not disclose it. Am. Pet. at 168–69. To the extent that the suppression question is in doubt, Rubio has requested discovery that could resolve it. Doc. 28 at 16–17. He has requested a subpoena for documents to shed light on when the State learned of Merillat's false testimony in *Velez*, and documentation regarding any decision about whether or not to turn this information over to Rubio's defense counsel. *Id.* Rubio has also requested to depose the two lead prosecutors, Armando Villalobos and Charles Mattingly, for the purposes of, among other things, ascertaining whether they knew or possessed information disclosing the falsity of the testimony in *Velez*. *Id.* at 17.

Despite the factual dispute on this point, the Director opposes discovery. Doc. 31. Summary judgment cannot be granted at this time; there are genuine issues of material fact that remain in dispute.

The Director also contests whether Rubio has met the materiality prong of *Brady*, claiming that disclosing Merillat's false testimony in *Velez* "would have been of marginal value to the defense, and cumulative of what was already presented." MSJ at 168. However, this largely ignores that, contrary to what the jury was told, Merillat had a pattern of providing false and misleading testimony and that *Estrada* was not a one-off error. Am. Pet. at 169. Testimony pertaining to TDCJ's classifications procedures and the restrictions placed on inmates was critical to whether Rubio would be a future danger. Had the jury learned that the State's future dangerousness case hinged on an expert who had been caught falsifying testimony repeatedly, there is a reasonable probability that at least one juror would have answered the question differently. *See Andrus v. Texas*, 140 S. Ct. 1875, 1886 (2020) (explaining that prejudice under *Strickland*, and therefore materiality under *Brady*, only requires one juror to answer a Texas special issue differently).

## B. This claim can be considered on the merits because Rubio can overcome any potential default.

Claim Nine is unexhausted and, along with almost all other claims presented in the Amended Petition, is the subject of a *Rhines* stay sought at the same time as this Reply is filed. The Director also asserted that this claim is procedurally defaulted, MSJ at 152, which Rubio disputes. Even if this claim is treated as procedurally defaulted, however, Rubio can establish cause and prejudice to overcome that default

based on the State's failure to disclose this impeachment evidence. *See Strickler*, 527 U.S. at 289 (holding that cause to overcome procedural default of the claim was established in part on the state's failure to turn over *Brady* material). The Director aptly notes that "cause may be established if suppression is proven" and that "prejudice may be shown if materiality is met." MSJ at 152. Therefore, the standard for excusing default "parallel[s] the suppression and materiality components of the alleged *Brady* violation." *Id.* (quoting *Barnes v. Vannoy*, 697 F. App'x 799, 803 (5th Cir. 2017)). Thus, any potential default should be excused because the *Brady* claim is meritorious.

Claim 10        **Rubio is entitled to relief on his Sixth Amendment claim that defense counsel failed to prepare for, and rebut, Merillat's false testimony during the punishment phase.**

     A.        **Trial counsel's performance was prejudicially deficient, violating the Sixth Amendment.**

Rubio alleges that his Sixth Amendment right to counsel was violated when trial counsel failed to prepare for, and rebut, Merillat's false testimony regarding the prison system and prison classifications. Am. Pet. at 170–73. Trial counsel's performance was deficient because, despite being on notice of Merillat's previous false testimony regarding the subject in *Estrada*, they did not retain an expert on prison classifications or do basic research into the TDCJ classification system. Am. Pet. at 171. Had trial counsel adequately prepared for and rebutted Merillat's testimony, there is a reasonable probability that the outcome of the penalty phase would have been different because of the importance of Merillat's false testimony to whether Rubio would be a future danger. *See Strickland*, 466 U.S. at 694.

The Director only briefly addressed the merits of this claim, mischaracterizing it by recasting it as one only relating to the evidence presented at trial. MSJ at 165. Rather than respond to the specific deficiencies raised by Rubio—trial counsel's failure to prepare and rebut Merillat's testimony—the Director attempts to recast this as a claim about trial counsel "failing to challenge" Merillat's testimony. *Id.* Rubio has indeed asserted that trial counsel should have rebutted the false testimony given by Merillat. Yet trial counsel's deficiencies extend far beyond simply the evidentiary presentation, as counsel failed to prepare for Merillat's testimony by retaining an expert or conducting basic research into the TDCJ classification system. Am. Pet. at 171. The Director offers no argument as to why objectively reasonable counsel would not take these steps, particularly after being placed on notice of Merillat's false testimony in *Estrada*.

Further, the Director's only argument regarding prejudice appears to be that Rubio has not shown prejudice due to "all the aggravating factors, and punishment evidence presented." MSJ at 165. However, the answers to this and the brutality-trumps position from earlier in this Reply at Part B of the Introductory Statement are hereby incorporated by reference

**B.    Any default is excused by state habeas counsel's failure to raise this substantial claim.**

Claim Ten is unexhausted and, along with almost all other claims presented in the Amended Petition, is the subject of a *Rhines* stay sought at the same time as this Reply is filed. The Director, however, asserts that no state remedy remains, and so this claim is exhausted but procedurally defaulted. MSJ at 153. But state habeas

counsel's ineffectiveness excuses any default of this substantial claim. *See Trevino*, 569 U.S. at 429.

Here, state habeas counsel's failure to raise this claim was deficient for the same reason that trial counsel was deficient for making the argument in the first instance. By the time Rubio filed his state habeas application, the TCCA had decided *Velez*. State habeas counsel, David Schulman, should have known this, and it should have further reinforced the need to investigate the accuracy of Merillat's testimony. Regarding this claim, Schulman admits that his failure to raise this claim was due to his failure to review the testimony in question:

> Although I was aware that the CCA had previously found that Merillat testified falsely in the *Estrada* case, I did not closely review his testimony in Rubio's trial to identify possible false or misleading testimony. I also did not attempt to investigate whether Merillat had provided similar false testimony in other cases. Had I taken the steps to assess the falsity of Merillat's testimony in this case and trial counsel's failure to cross-examine Merillat on the issue, I would have raised this ineffective assistance of counsel claim.

2d Supp. App. at 417.

The Director asserts that Schulman was not ineffective and that the claim is insubstantial and meritless. MSJ at 153. Yet despite being put on notice of Schulman's deficiencies, which are detailed in Rubio's Amended Petition, Am. Pet. at 172–73, the Director failed to respond to those allegations and instead relies on Schulman's general handling of Rubio's case, including that Schulman filed a petition, raised claims for relief, utilized experts, and sought funding for said experts. MSJ at 40. The fact that state habeas counsel accomplished tasks in a generic sense is not dispositive of whether counsel was deficient in this discrete area. *See, e.g., Andrus*,

140 S. Ct. at 1882 (finding counsel constitutionally deficient despite having taken some investigative steps). Thus, this Court should find that the default of this claim is excused under *Martinez* and *Trevino*.

## PRAYER FOR RELIEF

John Allen Rubio, requests that this Court consider the pleadings before this Court and grant the following remedies and such other relief as the Court deems appropriate:

1. Issue a writ of habeas corpus to have him brought before it, to the end that he may be discharged from his unconstitutional confinement and restraint and be relieved of his unconstitutional sentence of death;

2. Allow Petitioner leave to conduct discovery pursuant to Rule 6 of the Rules Governing 28 U.S.C. § 2254 Cases to more fully develop the factual bases demonstrating the constitutional infirmities in his conviction and sentence;

3. Conduct an evidentiary hearing pursuant to Rule 8 of the Rules Governing 28 U.S.C. § 2254 Cases; and

4. That this Court grant such other relief as law and justice require.

Respectfully submitted,

DATE: November 16, 2020

/s/ Lee Kovarsky
Lee B. Kovarsky
Principal Attorney

/s/ Kristin Swain
Kristin Swain
Associate Attorney

Phillips Black, Inc.
727 East Dean Keeton St, Jon 6.222
Austin, TX 78705
434-466-8257 (tel.)
l.kovarsky@phillipsblack.org
k.swain@phillipsblack.org

JASON D. HAWKINS
Federal Public Defender

JEREMY SCHEPERS
Supervisor, Capital Habeas Unit

/s/ Jessica Graf
Jessica Graf (TX 24080615)

/s/ Derek VerHagen
Derek VerHagen (TX 24090535)
Assistant Federal Public Defenders

Office of the Federal Public Defender
Northern District of Texas
525 S. Griffin St., Ste. 629
Dallas, TX 75202
214-767-2746
214-767-2886 (fax)
jessica_graf@fd.org
derek_verhagen@fd.org

*Counsel for Petitioner*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Reply in Support

of Petition for a Writ of Habeas Corpus has been served by CM/ECF upon counsel for

Respondent on November 16, 2020:

Garrett Greene
Assistant Attorney General
Criminal Appeals Division
Office of the Attorney General
P.O. Box 12548
Austin, TX 78711-2548
Garrett.Greene@oag.texas.gov

/s/ *Derek VerHagen*
Derek VerHagen