United States District Court
Southern District of Texas
**ENTERED**
April 05, 2024
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JOHN ALLEN RUBIO, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 1:18-CV-088 |
| | § | |
| BOBBY LUMPKIN, | § | |
| | § | |
| Respondent. | § | |

## ORDER AND OPINION

In 2010, John Allen Rubio was sentenced to death for killing his three young children. After unsuccessfully availing himself of Texas appellate and post-conviction remedies, Rubio now petitions for federal habeas corpus relief. Having considered the extensive record and the applicable law, the Court finds that Rubio has not shown an entitlement to the relief he requests.

## I.   Background

### A.  The Crime

On March 11, 2003, Rubio murdered and decapitated his three children: Julissa Quesada (age three), John E. Rubio (age fourteen months), and Mary Jane Rubio (age two months). Rubio was Mary Jane's biological father, and the step-father of Julissa and John. Rubio's common law wife and co-defendant, Angela Camacho, was the mother of all three children.

In the resulting trials, neither the State nor Rubio disputed the basic facts surrounding the disturbing crime. They did, however, hotly debate *why* Rubio committed the unspeakable acts. Rubio claimed that he killed the children because mental illness caused him to believe that they had been possessed or enchanted by witchcraft; the State argued he killed them because of financial stress exacerbated by the impending end of government assistance.

The Texas Court of Criminal Appeals ("TCCA") effectively summarized the facts based on the trial record:

Camacho and [Rubio] began dating after she left Julissa's father, who beat her. She was pregnant with John at that time. Initially they lived in an apartment with [Rubio's] mother and brothers, but when that arrangement ended, they began living on the street. John was born in January 2002. They eventually moved into a house that had no electricity and no running water. During this period, [Rubio] once asked Camacho what she would do if he killed the children. She did not answer him because she thought that he was joking.

In the summer of 2002, Child Protective Services ("CPS") removed Julissa and John from the home and placed them with Camacho's mother. Camacho was pregnant with Mary Jane at that time. In order to get Julissa and John back, Camacho and [Rubio] had to take parenting classes and find adequate housing, and [Rubio] had to obtain employment and submit to periodic drug testing for several months to show that he was no longer using drugs. They did all these things, and CPS returned Julissa and John to the couple in the fall of 2002. However, [Rubio] soon lost his job and resumed his substance abuse. [Rubio] was still unemployed when Mary Jane was born in January 2003.

[Rubio] washed cars and prostituted himself to make money, but they had trouble coming up with enough money to take care of the family.  [Rubio] and Camacho shared their apartment with [Rubio's] mother and two men who were acquainted with [Rubio's] mother. However, [Rubio's] mother, who was a prostitute and drug addict, often failed to pay her share of the rent. [Rubio] and Camacho frequently feared that they would be evicted.

[Rubio] had a male lover, Jose Luis Moreno, who sometimes provided [Rubio] with money and groceries.  Moreno also occasionally supplied [Rubio] with spray paint, which [Rubio] inhaled to get high, and Camacho would throw the cans away when [Rubio] brought them into the apartment.  Although Camacho was upset by this situation and sometimes threatened to leave [Rubio] if he did not end his affair with Moreno, she also understood the value of Moreno's material assistance to the family.

[Rubio] and Camacho were under significant stress, but their children were generally healthy and well-nourished.  [Rubio] and Camacho usually walked with the children to a nearby charity that served lunch and supper Monday through Friday and lunch on Saturday.  They also received benefits from the Women, Infants, and Children ("WIC") Program and food stamps.

Shortly before the offense, [Rubio] and Camacho received a notice informing them that Julissa's food stamp benefits would be terminated because of a problem with her social security number. On the day before the offense, the family went to the hospital to get a copy of Julissa's records. The hospital did not provide them with the records that they needed to correct the problem.

2 / 97

While they were taking the bus home from the hospital, [Rubio] started talking to Camacho about how everyone around them was trying to hurt them. Camacho had not observed him having any problems with people on the bus before. [Rubio] told Camacho that a woman they saw waiting at the bus stop wanted to steal his money. A little girl on the bus offered a piece of candy to their son, John, but [Rubio] would not let John accept it because he thought it might be poisoned. After they got off the bus, a woman with dark marks on her forehead made a rude gesture toward Camacho, and [Rubio] told Camacho that that was the devil's sign and they needed to hurry home. Camacho believed him and began crying as they grabbed the children and ran.

Once they got home, [Rubio] "swept" an egg over Julissa and cracked it into a glass of water. After looking at the results, [Rubio] said that someone had done something evil to Julissa. Camacho was so scared that she was not able to sleep that night, and she did not think that [Rubio] slept, either. They were so frightened that they considered taking the family to a motel, but they could not find [Rubio's] wallet. [Rubio] and Camacho believed that an acquaintance who had been in the apartment earlier that day had stolen it. [Rubio's] missing wallet also contained their share of the month's rent, which was due the next day.

Around 2:00 a.m., Camacho was in the bedroom when she heard [Rubio's] mother coming into the apartment. [Rubio] asked his mother for her share of the rent, and his mother told him that she did not have it. [Rubio] also asked his mother, whom he believed was a witch, to help him fight off the evil spirits, but his mother did not want to help. She told [Rubio] that he had the power and he was the one who would have to use it. She left the apartment around 3:00 a.m.

[Rubio] nailed the back door shut to keep bad spirits from entering the apartment. He also killed their pet hamsters with a hammer and bleach because he believed that his mother had worked witchcraft on them and they were possessed. At some point that morning, [Rubio] began talking about the anti-Christ and an approaching battle between seven good men and seven bad men. He told Camacho that he was one of the good men. She had not heard him talking that way before. Camacho testified that, in the past, [Rubio] had seemed like a normal person except when he was inhaling spray paint. However, [Rubio] had not inhaled spray paint for five days.

Later that day, [Rubio] told Camacho that the children were possessed and that he was going to kill them. When Camacho began to cry, he told her to go into the bathroom so she would not see anything. He decapitated their two-month-old child, Mary Jane, and then he screamed for Camacho to help him. Camacho came out of the bathroom and saw that [Rubio] had placed Julissa on the floor next to Mary Jane's headless body. He was trying to stab and decapitate Julissa, but she was screaming and struggling. Julissa cried, "Papi, stop, don't hurt me." [Rubio] told Camacho to hold Julissa's legs. Camacho did so while [Rubio] stabbed and decapitated Julissa.

[Rubio] then washed the girls' bodies in the kitchen sink and put them into trash bags. He told Camacho to clean the carpet where he had killed them, and to clean the knife he had used. Camacho wiped the carpet with one of Julissa's dresses. [Rubio] put the girls' heads into a bucket in the kitchen. When he came out of the kitchen, he told Camacho to have sex with him, saying that he was going to call his friends to come over and rape her and then he would kill himself. They had sexual intercourse and took a shower together. [Rubio] told Camacho that they would make a pact. He made a cut on his wrist and a cut on her wrist so that they could complete the pact.

*Rubio v. State*, No. AP-76,383, 2012 WL 4833809, at \*2–4 (Tex. Crim. App. Oct. 10, 2012) (mem. op., not for publication).

In addition, in one of Rubio's written statements made to the police, he described the events that followed, although some of his recollections do not entirely align with the sequence from the TCCA's summary:

Julissa and Mary Jane were know [sic] dead and Johnny was still acting very evil. I know that he is not my son but I still loved him like my son. I knew I had to kill Johnny last because he was the strongest. My wife and I both had to hold him down because he was so strong. Johnny was yelling and growling at us. I poured water on him and he kept shaking. I cut his head off with a larger knife. I did not stab Johnny, I just cut his head. He was bleeding all over the carpet. I rather kill him that [sic] let him live with the devil inside him.

After they were all dead my wife and I started to cry. We talked about killing ourselves but we cannot die because we are in limbo. I tried to cut myself and the knife would not cut me like it was not sharp enough to cut me.

\* \* \*

After we put the bodies in plastic bags [Camacho] and I went and took a shower. We cleaned ourselves off from all the blood. I do not remember what we did with our clothes. We then went to the front room and I told my wife that we should make love for the last time because we were going to jail. After we made love we just laid in bed for the rest of the night till the next day.

[Camacho] and I talked about burying the babies . . . in my grandmother's back yard because she was a witch and she could control their evil power. I then started to think and told my wife maybe I should just call the police and tell them what happened. Everybody makes mistakes and we are not all perfect.

(Tr. Trans., Doc. 75–4, 82–83 (cleaned up))  Rubio told Camacho that they would "have to do the right thing" and "turn [them]selves in." (*Id*. at 185)  Rubio's brother then arrived at the house and

called the police.  When they arrived, Rubio said: "just arrest me I know I did something bad but I rather my children be dead than be possessed." (*Id.* at 83)

Camacho gave three police statements that corroborated much of Rubio's account, with minor differences in the timeline of events, such as when she and Rubio had sex or went to the store to buy milk.

The State of Texas charged Rubio with four counts of capital murder.  As discussed below, the State tried Rubio twice for his crime.  In both trials, Rubio's alleged mental illness played a prominent role.

### B.  Rubio's First Trial

The trial court appointed Nathaniel C. Perez and Alfredo Padilla to represent Rubio, who pled not guilty by reason of insanity as to all counts.  Under Texas law, "[d]efendants are presumed to be sane, and the State carries no burden to prove sanity." *Afzal v. State*, 559 S.W.3d 204, 207 (Tex. App.—Texarkana 2018, pet. ref'd).  Texas law establishes the requirements for an insanity defense: "It is an affirmative defense to prosecution that, at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong." TEX. PENAL CODE § 8.01(a).  The term "wrong" means "illegal". *Ruffin v. State*, 270 S.W.3d 586, 592 (Tex. Crim. App. 2008).  A defendant "may be medically insane, yet legally retain criminal responsibility for a crime where a mental condition does not prevent him from distinguishing right from wrong." *Clark v. State*, 592 S.W.3d 919, 930 (Tex. App.—Texarkana 2019, pet. ref'd). As a result, under Texas law, the primary question for deciding insanity is: "Does the defendant factually know that society considers this conduct against the law, even though the defendant, due to his mental disease or defect, may think that the conduct is morally justified?" *Ruffin*, 270 S.W.3d at 592.

5 / 97

Rubio first stood trial in 2003. Both he and the State gave prominent role to his understanding of the difference between whether his conduct was morally or criminally wrong. In fact, "the only real issue in contention at the guilt-innocence phase was [Rubio's] state of mind." *Rubio v. State*, 241 S.W.3d 1, 3–4 (Tex. Crim. App. 2007).

The physical evidence shed little light on Rubio's motive for murdering the children. As a result, Rubio's and Camacho's statements represented critical evidence regarding his state of mind. At the time, Camacho was facing criminal charges and had invoked her Fifth Amendment right to remain silent, rendering her unavailable as a witness. Instead, the State offered and the court admitted all three of her statements. In the first, Camacho reported that "[i]n the past, a long time ago, Rubio had said that he wanted to kill the two children." (Tr. Trans., Doc. 75–3, 222) He had also asked her, "[W]hat would you do if I were to kill the kids . . . ?" (*Id*.) In a second statement, Camacho remarked that while she had "told the detectives that witchcraft was the reason that [they] killed [the] children", that explanation was actually "not true." (*Id*. at 216) She said "the real reason all of this occurred" was "because of money problems. . . . [I]t was better for the children to die than to suffer." (*Id*.) Camacho recalled that Rubio: "told me that he wanted to cut the children's heads off. I asked him why did he want to cut their heads off. He said that we had no money, no way to take care of them. It was better that they go with God. I said O.K." (*Id*. at 217 (cleaned up))

The jury found Rubio guilty of capital murder, implicitly rejecting Rubio's insanity defense.

Under Texas law, once a jury finds an individual guilty of a capital offense, a punishment phase occurs in which the jury hears additional evidence. Upon completion of the hearing, the jury answers special interrogatories. *See* TEX. CODE CRIM. PROC. art.. 37.071 §§ 2(b)(2), (e)(1). As

to Rubio, the trial court held the punishment-phase hearing and presented the jury with four questions:

> (1)  whether Rubio posed a continuing threat to society;
>
> (2)  whether Rubio actually caused the deaths of the victims;
>
> (3)  whether sufficient mitigating circumstances justified life imprisonment instead of the death penalty; and
>
> (4)  whether Rubio suffered from mental retardation.

(1st Tr. Trans., Doc. 48–4, 152–62)

In his opening statement for the punishment phase, Rubio's attorney informed the jury that they had prepared a defense, such as testimony from a licensed social worker.  His lawyers then claimed that Rubio "has instructed us not to do so", and that Rubio requested that the jury answer "yes" to whether Rubio posed a future threat to society and "no" to whether mitigating circumstances warranted a life sentence. (1st Tr. Trans., Doc. 48–1, 14)  Rubio's counsel concluded by saying, "Our client readily accepts your verdict, and readily accepts the sentence of death". (*Id.* at 15–16)

After this opening, the trial court called Rubio and his lawyers to the bench.  Answering the court's questions, Rubio confirmed that his counsel had acted in accordance with his wishes, even though the requested jury responses would result in the death penalty.  Rubio acknowledged that he had directed his counsel freely and voluntarily.  Padilla then questioned Rubio, eliciting that Rubio desired that the jury "assess death" to him, that he believed that God had forgiven him and that he wanted to be with his children in heaven. (*Id.* at 15)

The State proceeded to present unrebutted testimony, after which the jury answered the special issues consistent with Rubio's expressed desire, requiring the imposition of a death sentence.  In November 2003, the Texas state court sentenced Rubio to death. (1st Tr. Trans., Doc. 48–4, 163)

7 / 97

Under Texas law, a "judgment of conviction and sentence of death shall be subject to automatic review by the Court of Criminal Appeals." TEX. CODE CRIM. PROC. ART § 37.071(h). Rubio afforded himself of his rights and appealed the conviction.

In 2004, while Rubio's appeal remained pending, the Supreme Court of the United States issued *Crawford v. Washington*, 541 U.S. 36 (2004), which significantly changed the Confrontation Clause jurisprudence in the country.

The following year, in November 2005, as he awaited the decision on his direct appeal, Rubio initiated a state habeas review. (State Petition, Doc. 48–1, 6)  Under Texas law, both direct appeals and state habeas proceedings run concurrently in capital cases. *See* TEX. CODE CRIM. PROC. art. 11.071 § 4.

After *Crawford*, Rubio's direct appeal focused on the introduction of Camacho's out-of-court statements, which represented a constitutional violation of the Confrontation Clause.  The only issue for the TCCA was whether the admission of Camacho's statements amounted to harmless error.  The TCCA recognized that the evidence "which proves [Rubio's] participation in the murders, such as his own statement and the physical evidence corroborating his and Camacho's accounts of the murders . . . is indeed overwhelming." *Rubio*, 241 S.W.3d at 11.  As to Rubio's state of mind, however, the TCCA found that "the crucial evidence . . . came almost exclusively from one source: Camacho's statements." *Id.*  Based on this finding, the court found that Camacho's "statements likely contributed to the jury's verdict of guilt, such that the error in admitting her statements at trial clearly prejudiced [Rubio's] case." *Id.*  The TCCA reversed the guilty verdict, which automatically mooted Rubio's parallel state habeas challenge. *See Ex parte Rubio*, No. WR–65,784–01, 2008 WL 152726 (Tex. Crim. App. 2008).

During these proceedings, the Texas Department of Criminal Justice—Correctional Institutions Division ("TDCJ") held Rubio on death row at the Polunsky Unit, except for a brief

period for examination at TDCJ's psychological treatment unit, Jester IV.  Following the reversed conviction, the State transferred custody of Rubio back to Cameron County.

### C.  Rubio's Second Trial

The trial court again appointed Perez to represent Rubio.  Perez's reappointment as lead counsel provided an advantage unavailable to most attorneys—i.e., he had already prepared for and litigated a defense for Rubio.  Perez had presented evidence relating to Rubio's mental health to a jury and had observed its reaction.  His experience with Rubio's case provided him with an invaluable backdrop for the second trial.

The trial court also appointed Ed Stapleton as second-chair.  He brought decades of experience to the defense team, having handled felony and capital trials for more than forty years.  He possessed extensive experience litigating mental health issues in capital cases, and had presented and published on capital-punishment and mental-health issues in defense representation.  (*See* Habeas Record, Doc. 83–1, 161–67)

Perez and Stapleton strengthened their team by securing the services of a fact investigator and by retaining Carmen De La Rosa Fisher as a mitigation specialist.  Fisher held a master's degree in social work and was a licensed master social worker.  (*Id.* at 169–70, 211)  She had the responsibility of screening for mental-health issues relevant to Rubio's defense.

Early in their preparations for the second trial, the defense team identified Rubio's mental health as a significant issue.  They benefited not only from Perez's experience with Rubio, but also from having other attorneys and courts scrutinize the defense in the first trial.  For example, in the TCCA's decision reversing the conviction, the court not only analyzed the Confrontation Clause violations, but addressed other issues that trial counsel could take into consideration for the second trial.  In addition, in Rubio's mooted habeas application, his habeas counsel had lodged several ineffective assistance of counsel claims.  For example, Rubio faulted his trial counsel for

9 / 97

not "obtain[ing] expert assistance in time to assist in the presentation of mitigating evidence during the sentencing phase". (Habeas Record, Doc. 77–3, 32)   Rubio also argued that trial counsel should have retained a punishment-phase mental-health expert who could testify about the neglect and sexual abuse that Rubio suffered as a child, and the impact of the abuse, particularly in the context of Rubio's low intelligence and mental illness. (*Id*. at 41)

The defense also retained Dr. Jim Owens to perform a neuropsychological evaluation of Rubio.  The MRI and EEG conducted on Rubio were each "within the normal range of variation" and revealed no evidence of "trauma" and "no evidence of organic neurological disease." (Clerk's Record, Doc. 76–12, 253)   And they hired neuropsychologist Dr. Gilbert Martinez, who administered a comprehensive battery of psychological testing on Rubio.

In the end, the defense team secured the services of at least nine medical and mental-health experts before Rubio's second trial.

### 1.  Competency Trial

The defense initially challenged Rubio's competency to stand for trial.  As a result, the court scheduled a separate proceeding before a jury to determine Rubio's competency. *See* TEX. CODE CRIM. PROC. art.. 46B.051 (authorizing such a hearing).  The court held voir dire to select the jury, which would be distinct from any jury that would consider Rubio's innocence or guilt, or any punishment.  The court appointed Dr. Troy Martinez as a competency expert.  He prepared a lengthy report that extensively discussed Rubio's psychological background.  Dr. Martinez opined that at the time of the murders, Rubio suffered from a psychotic condition, but was "nevertheless capable of appreciating the wrongfulness of his conduct.  Thus, Mr. Rubio was *sane*." (Report, Doc. 76–10, 243 (emphasis in original))

The defense called two mental-health experts, Dr. Jolie S. Brams and Dr. Raphael Morris, who each testified about Rubio's mental state and its impact on Rubio's competency.  Dr. Brams

testified that Rubio experienced a childhood "characterized by chaos and by abuse", which led him to develop a "delusional disorder" that precluded him from "rationally, reasonably consider[ing]" any possible defenses that did not accord with his warped worldview. (Comp. Trial, Doc. 72–24, 108–111)  Dr. Morris opined that Rubio did not possess the "ability to consult with his lawyer with a reasonable degree of rational understanding" and "lack[ed] a rational understanding of the proceedings against him." (*Id*. at 230–231)  The jurors also heard testimony from Dr. William Mark Valverde, a court-appointed psychiatrist from Rubio's first trial, who testified that Rubio exhibited symptoms consistent with paranoid schizophrenia.

The State relied on the testimony of Dr. Martinez, who outlined why he believed that Rubio was legally sane when he committed the murders. (Comp. Trial, Doc. 73–1, 139–97)  The State also called jail staffers as witnesses, and they testified that Rubio was able to clearly communicate with them concerning his medical needs and that he kept his cell clean and orderly. (Comp. Trial. Doc. 73–2, 100–106, 152–53)

Following the presentation of evidence, the jury unanimously found Rubio competent to stand trial.

### 2.  Guilt/Innocence Phase

In July 2010, the trial to determine Rubio's guilt began.  Although the grand jury indicted Rubio in Cameron County, the trial court granted the defense motion to hold the trial in neighboring Hidalgo County, due to extensive pre-trial publicity.

### a.  The State's Case

The State focused its case in chief on the sheer brutality and horror of the crime, and disputed both that Rubio suffered from mental illness and that any mental illness kept him from knowing that his actions were criminally wrong.  As to Rubio's mental state, the State relied on

three primary evidentiary sources: (1) Rubio's police statements; (2) Camacho's trial testimony; and (3) circumstantial factors.

First, the State highlighted Rubio's own words, reading his post-arrest written statement into the record. (Tr. Trans., Doc. 74–14, 20–27)  The State also played Rubio's post-arrest videotaped statement for the jury and submitted a transcript of the video into evidence. (*Id*. at 69–70)

Second, the State called Camacho to testify regarding the murders and Rubio's mental state when he killed the children.  By the time of Rubio's second trial, Camacho had pled guilty to her part in the crime and was serving a life sentence. (Tr. Trans., Doc. 74–13, 136)  Her recollection of the killings generally coincided with the account in Rubio's police statements, with some discrepancies, such as the order in which Rubio killed each child.

As to Rubio's mental state, Camacho testified that before March 2003, Rubio had asked her what she would do "if he killed the babies". (*Id*. at 149)  At the time, she "thought he was playing" and did not pay attention to him. (*Id*. at 148)

She also testified that on the night of the murders, she walked into the kitchen and saw her decapitated son.  When she begged Rubio to kill her, he tried to break her neck, but could not do so. (*Id*. at 163)  The two of them then walked to a nearby grocery store to buy milk. (*Id*. at 166–67)  He acted "normal" during the trip, but when they returned home, he told her "about some spirit, a friend spirit wants [them] together, and that [they] are going to be in prison forever, and for a while we are not going to see each other, and a lot of stuff like that." (*Id*. at 168–69)  In addition, at some point after the murders, Rubio and Camacho showered together, and then Rubio forced her to have sex with him, at the threat of having his friends rape her if she refused. (*Id*. at 153, 210)

Camacho also related what occurred when her friend and brother-in-law arrived at the house and discovered the children's bodies.  When they asked why they had committed the act, she told them that "it was not [Rubio], it was me." (*Id.* at 169)  She did so to defend Rubio, "[b]ecause . . . I think he was crazy or something." (*Id.* at 170)  And she testified that when she and Rubio were incarcerated, he wrote letters to her, instructing her "to act like I was insane . . . so I could get out and got [sic] to a hospital . . . or something like that." (*Id.* at 332–333)

The State also introduced Camacho's third police statement, in which she claimed that she and Rubio decided to kill the children "because of money problems" and not because they believed that the children were possessed. (Statement, Doc. 75–3, 216–18)  However, when cross-examined about the statement, she recanted, denying that financial stress and the suffering of the children had motivated the crime. (Tr. Trans., Doc. 74–13, 252)  When asked why she had made the statement, she answered, "[b]ecause the detective, I don't know which one, they told me that John Allen Rubio was saying that that is why we killed the babies.  That's why we killed the babies.  And that's why I tried to be like him.  I tried to be in the same page.  So I said that, but it wasn't that." (*Id.* at 257; *see also id.* at 255 ("We just made that up."); *id.* at 263 ("All of that is a lie."))

Third, the State presented substantial circumstantial evidence that it believed revealed that Rubio was sane when he killed the children and understood that doing so was a crime.  In its closing argument, the State summarized this evidence. (Tr. Trans., Doc. 74–20, 37–47)  Months before the killings, Rubio asked Camacho what she would do if he "killed the babies".  Two weeks before the murders, he told a friend, "I know how to commit the perfect crime; just say you are insane."  Two days before the crimes, he purchased cleaning supplies that could be used to clean up a crime scene.  After killing the children, he and Camacho placed the bodies in garbage bags to dispose of them.  And when police arrived at the house, Rubio walked toward an officer, held out his arms as if to be handcuffed, and said, "[a]rrest me", acknowledging "at that time that what he

had done and what he intended to do was wrong." When interviewed by police that same night, he waived his right to remain silent and immediately acknowledged, "I killed the kids. What more do you need?" He later "tried to deflect blame off himself" by blaming Camacho for the murders.

### b. The Defense

Rubio's counsel focused his defense on proving that he did not know that his acts were criminal. They called fifteen witnesses, whose testimony centered on Rubio's troubled childhood and the mental illness that had plagued his life.

As its first witness, the defense called Hilda Barrientes, Rubio's mother. (Tr. Trans., Vol. 74–15, 157–55) She detailed her use of alcohol while pregnant with Rubio, and the violence and turmoil that Rubio witnessed and personally experienced in his home as a child. She described how she taught Rubio to become a male prostitute. In addition, Barrientes explained that as a child, Rubio claimed to see shadows and hear voices, some of which told him that he was the "chosen one." (*Id.* at 178) She never sought an evaluation, much less treatment, for Rubio for any form of mental illness. She also acknowledged that Rubio used intoxicants, such as spray paint and marijuana, which she procured for him and which caused him to experience similar delusions.

The defense called numerous other fact witnesses, such as close family members, who testified about Rubio's interaction with the children and his mental state after the killings. These witnesses revealed Rubio's fear of witchcraft, his auditory hallucinations, his delusions involving his deceased grandmother, and his belief in being the "chosen one." They also confirmed that Rubio had struggled with huffing spray paint.

Rubio's counsel also presented Dr. Valverde and Dr. Morris, who provided ample testimony regarding how Rubio's mental illness ultimately manifested in the murders. Dr. Valverde testified that Rubio's symptoms were consistent with a form of paranoid schizophrenia that typically does not respond to medication. (Tr. Trans., Doc. 74–16, 35) He found particularly

14 / 97

noteworthy that Rubio believed he was the "chosen one" and that the end of the world was imminent. Dr. Valverde opined with a reasonable psychiatric probability that when Rubio killed the children, he was suffering from a mental disease or defect that precluded him from knowing that his conduct was criminal. (*Id.* at 48–49)

Dr. Morris focused on the traumatic events in Rubio's childhood, suggesting that Rubio suffered from Post-Traumatic Stress Disorder. (*Id.* at 107–255) He attributed Rubio's childhood trauma to his inability to form healthy attachments. (*Id.* at 118) Dr. Morris diagnosed Rubio with schizophrenia, paranoid type, and opined that Rubio suffered from hallucinations and delusions. He explained that Rubio never received adequate treatment in his formative years for his mental illness, and that Rubio's intense fear and terror drove him to kill the children. (*Id.* at 133–35) He also testified that when committing the crimes, Rubio was suffering from a psychotic disorder. (*Id.* at 143)

### c. The State's Rebuttal

The State presented several rebuttal witnesses, including individuals who had interacted with Rubio while he was in custody. A manager of the jail facility explained that Rubio kept his cell tidy, did not complain about or make allusions to delusions or hallucinations, and did not display any signs of mental illness. (Tr. Trans., Doc. 74–18, 75–80) One fellow inmate testified that Rubio planned to feign insanity: "[Rubio said] [t]hat his attorney had tell him not to pass the IQ test so he can get insane . . . . He was trying to plea he was crazy." (*Id.* at 103) Another inmate overheard Rubio say that when he killed the children, "he wasn't high and that he wasn't crazy." (*Id.* at 130) At a different time, Rubio told this inmate that he intended to plead insanity. When the inmate responded that he (Rubio) was not crazy, Rubio "shushed me and said, yeah, but they don't know that." (*Id.* at 148)

As its final rebuttal witness, the State called Dr. Michael Welner, a psychiatrist who had interviewed Rubio before the trial. (Tr. Trans., Doc. 74–19, 6–174)  He disagreed with the earlier diagnoses of Rubio's mental illness, questioned whether Rubio truly exhibited signs of psychosis, and testified that the nature of the killings demonstrated that Rubio knew his conduct was legally wrong.

Following the close of evidence, the attorneys presented lengthy closing arguments and the court instructed the jury.  On July 26, 2010, after deliberating for about four and a half hours, the jury found Rubio guilty on all four counts of capital murder. (Tr. Trans., Doc. 74–20, 102–06)

### 3.  Punishment Phase

Having found Rubio guilty of capital murder, the jury then heard evidence to consider specific questions that would determine whether Rubio received a life sentence or the death penalty.  In particular, the jury had to answer the following special issues:

(1)    Whether there is a probability that the Defendant would commit criminal acts of violence that would constitute a continuing threat to society;

(2)    Whether the Defendant actually caused the death of the deceased or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken;

(3)    Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

(Tr. Trans., Doc. 74–24, 26–27)  In this punishment phase, Rubio's mental state again played a prominent role.

In seeking the death penalty, the State sought to highlight Rubio's lack of remorse after the killings, the future threat that he posed to fellow inmates, and the impact of the children's death on family members.  For example, the State presented evidence that Rubio seemed jovial when arrested and did not express any remorse to police officers. (Tr. Trans., Doc. 74–21, 54)  The

16 / 97

State introduced additional evidence regarding the horrific nature of the killings, and presented the testimony of family members who explained how deeply they loved the children and the trauma they suffered from the children's deaths. (Tr. Trans., Doc. 74–23, 90–97)  Other evidence concerned Rubio's criminal history, including arrests for public intoxication and possession of marijuana, the report of a domestic disturbance at his house, and his testing positive for drugs while on probation.  Finally, the State submitted evidence that Rubio had set fires in a detention facility and had possessed marijuana while on death row.  One witness described the prison classification system and opined that Rubio would have access to weapons and illegal substances if given a life sentence.  Another witness testified that Rubio would pose a threat to the general population of any prison.

In response, the defense asked the jury to find that Rubio did not present a threat to fellow inmates and that his traumatic background and struggle with mental illness represented mitigating circumstances that warranted a life sentence rather than the death penalty.  The defense resubmitted evidence from the guilt/innocence phase of the trial, such as testimony from Rubio's mother, Dr. Valverde, and Dr. Morris.  Individuals who knew Rubio in school testified that he had attended special education classes and that even though he struggled academically, he had behaved well.  Jail personnel testified that Rubio had been respectful and calm while incarcerated, and that he had not demonstrated violent or other problematic behavior.  And several religious leaders pleaded that Rubio should be extended leniency.

The defense's presentation culminated in the testimony from Dr. Jolie Brams, a licensed clinical psychologist.  She had worked on Rubio's case for over two years, interviewing Rubio extensively, meeting with several of his family members and individuals who knew him well, and reviewing substantial materials that included jail and medical records.  Dr. Brams testified at length about Rubio's traumatic childhood, describing his unstable homelife, his exposure to

violence, his early introduction to substance abuse, and other factors that contributed to his mental difficulties as an adult. (Tr. Trans., Doc. 74–23, 169–237)  She explained how Rubio had grown up in poverty with unresponsive, distant, and dysfunctional toxic parents.  She described Rubio's history of hyperactivity, low intelligence, and learning and emotional disorders.  And she told the jury that Rubio had suffered for years from a thought disorder, a form of psychosis, that left him unable to differentiate between reality and fantasy.  According to Dr. Brams, as a result of all these factors, when Rubio killed the children, he had been mentally ill with delusions and psychotic thoughts that rendered him unable to control his actions. (Tr. Trans., Doc. 74–24, 170–218)

After the presentation of evidence and the arguments of counsel, the jury deliberated and answered the special issues in a manner requiring the imposition of a death sentence.  The trial court sentenced Rubio to death.

### D.  Direct Appeal

In July 2011, Rubio appealed, filing a 111-page brief in which he raised four principal grounds for relief, although only Issue No. Four proves relevant to the instant proceedings.  In that issue, Rubio argued that "the jury's failure to find that he was insane at the time of the offense is so against the great weight and preponderance of the evidence as to be manifestly unjust." (Appellant's Brief, Doc. 76–8, 15); *see also Rubio v. State*, No. AP-76,383, 2012 WL 4833809, at *1 (Tex. Crim. App. Oct. 10, 2012) (not designated for publication).

In October 2012, the TCCA affirmed Rubio's conviction and sentence.  As to Issue No. Four, the TCCA conducted a thorough review of the trial record and reached a conclusion in the State's favor:

> [T]he record contains conflicting evidence as to whether [Rubio] was legally insane at the time he committed the offense. The credibility and weight of this evidence were within the province of the jury. [Rubio] had the burden of proving his affirmative defense by a preponderance of the evidence. The jury's implicit

determination that [Rubio] did not meet this burden was not so against the great weight and preponderance of the evidence as to be manifestly unjust.

*Rubio*, 2012 WL 4833809, at *13.

### E.  2013 and 2016 State Habeas Applications

In October 2013, Rubio initiated his first habeas application. (2013 Habeas Application, Doc. 83–3)  He raised six challenges in his 109-page submission, of which the first three faulted trial counsel's investigation into whether Rubio had suffered Fetal Alcohol Spectrum Disorder ("FASD") stemming from his neonatal exposure to alcohol.

The Texas court provided significant resources for the preparation and litigation of Rubio's state habeas challenge, including appointing two habeas attorneys.  In addition, the state habeas court appointed a mitigation expert and approved $13,000 for an investigation into whether Rubio suffered from FASD.  In connection with the 2013 Habeas Application, Rubio's habeas counsel consulted with experts in psychology, psychiatry, and neuropsychology.

In August 2016, the state habeas court held an evidentiary hearing, which in large measure focused on the FASD evaluation. (Habeas Record, Doc. 83–1)  Rubio's lawyer called five witnesses: second-chair trial counsel Stapleton, two attorneys with experience in capital murder litigation, a jury consultant, and the court-appointed mitigation investigator.  The court also received affidavits from Rubio's habeas experts.

Following the evidentiary hearing, state habeas counsel submitted a supplemental habeas application, raising four additional grounds for relief that centered on allegations of corruption in the District Attorney's office. (2016 Supp. Habeas App., Doc. 80–6, 75–113)  Under Texas law, a subsequent habeas application may proceed only in limited circumstances, including when "the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application . . . because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application". TEX. CODE

CRIM. PROC. art. 11.071 § 5(a)(1).  In April 2017, the state habeas judge found that Rubio's 2016 Supplemental Habeas Application was a subsequent application.  (Order, Doc. 80–6, 175–177)  As required by the Texas statute, the state habeas court directed that the 2016 Supplemental Habeas Application and related materials be sent to the TCCA for further consideration. (*Id.*)

As to the grounds raised in Rubio's 2013 Habeas Application, the state habeas court rendered findings of fact and conclusions of law, recommending that the TCCA adopt them and deny the relief that Rubio requested. (State Habeas Court Order, 83–7, 4–18)  On the issue of whether Rubio's trial counsel had adequately investigated FASD, the court found that they had:

> [Rubio's counsel] Stapleton investigated the possibility that Applicant suffered from FAS or FASD, one medical doctor opined that he was aware of Applicant's mother's alcohol consumption while pregnant with Applicant, but did not diagnose Applicant with FAS. Another medical doctor informed Mr. Stapleton that he found no facial dysmorphia, a classic feature of those who suffer from FAS or FASD. Based on these facts, Mr. Stapleton made a strategic decision to not investigate this issue any further.

(*Id.* at 9)

The matter proceeded to the TCCA for review.  About a year later, in May 2018, the court concluded "that the record supports the trial court's findings of fact and conclusions of law", with two exceptions that do not bear relevance on the instant proceedings.  *Ex parte Rubio*, Nos. WR–65,784–02 and WR–65,784–04, 2018 WL 2329302, at *4 (Tex. Crim. App. 2018).  As a result, the TCCA denied the relief that Rubio sought in his 2013 Habeas Application.  In addition, the court found that Rubio's 2016 filing represented a subsequent application under Texas law, and that Rubio had not satisfied the requirements to receive consideration of those issues.  Thus, the TCCA "dismiss[ed] [the 2016 Supplemental Habeas Application] as an abuse of the writ without reviewing the merits of the claims raised." *Id.* at *5.

### F.  Federal Petition

In September 2019, Rubio filed a Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254, amending it five months later. (Pet., Doc. 17; 1st Am. Pet., Doc. 24)[1]  He raised ten claims, only one of which he had already presented to the state courts.  The Anti-Terrorism and Effective Death Penalty Act (AEDPA) requires an inmate to exhaust state court remedies before seeking federal habeas relief. *See* 28 U.S.C. § 2254(b)(1).  Thus, in February 2021, this Court stayed and administratively closed this matter to allow Rubio to exhaust his state court remedies as to his new claims. (Stay Order, Doc. 53)

### G.  2021 State Habeas Application

In July 2021, Rubio filed his third state habeas application in the TCCA, raising the grounds that he presented for the first time in his federal court Petition.  The Texas court reviewed the 2021 Habeas Application and concluded that Rubio had failed to meet the statutory requirements to allow a subsequent habeas application to proceed.  In January 2022, the TCCA "dismiss[ed] the subsequent application as an abuse of the writ without considering the claims' merits." (Habeas Record, Doc. 81–2, 6)

### H.  Second Amended Federal Habeas Petition

Rubio returned to this Court and submitted his Second Amended Petition, presenting the following ten grounds for relief:

    (1)    Trial counsel did not include a person with qualifying mental health expertise as a member of the defense team.

    (2)    Trial counsel failed to investigate and use evidence about the existence and effects of prenatal exposure to alcohol.

    (3)    Trial counsel failed to investigate and prepare for a guilt/innocence phase defense.

---

[1] This Court appointed counsel to represent Rubio in any federal habeas challenge to his conviction and sentence. (Order, Doc. 3)

(4)     The State violated Rubio's due process rights under the Fourteenth Amendment by engaging in a pattern of misconduct.

(5)     The State violated Rubio's equal-protection rights by pursuing the death penalty against him (1) because of his indigent status and (2) based on a public survey.

(6)     The State violated Rubio's right to due process under *Napue v. Illinois* when it elicited testimony that it knew, or should have known, to be false and misleading.

(7)     Trial counsel failed to investigate and use evidence about Rubio's mental health during his prior incarceration.

(8)     The State violated Rubio's right to due process under *Napue v. Illinois* when it elicited testimony that it knew, or should have known, to be false and misleading from A.P. Merillat.

(9)     The State violated *Brady v. Maryland* by failing to disclose Merillat's false testimony in another case.

(10)    Trial counsel failed to prepare for, and rebut, Merillat's false testimony during the punishment phase.

(2nd Am. Pet., Doc. 61)[2]  After Respondent filed its Answer (Doc. 84), Rubio submitted his Reply (Doc. 87) and separately requested discovery relating to several of his claims. (Motion for Discovery, Doc. 88)  Respondent opposes the requested discovery. (Response, Doc. 89)

## II.     Standard of Review

Honoring principles of comity and federalism, Congress enacted AEDPA "to impose significant limits on the discretion of federal courts to grant habeas relief." *Calderon v. Thompson*, 523 U.S. 538, 554 (1998); *see also Danforth v. Minnesota*, 552 U.S. 264, 278 (2008) (observing that the courts have "adjust[ed] the scope of the writ in accordance with equitable and prudential considerations").  AEDPA imposes exacting procedural requirements to determine what issues a habeas court may consider, and establishes strict guidelines for any review.

---

[2] All future citations to this pleading will be referred to as "Petition" or "Pet."

### A. Deferential Federal Review

As an initial matter, AEDPA establishes that federal habeas review is limited in scope and secondary to the state court process.  States "hold the initial responsibility for vindicating constitutional rights". *Engle v. Isaac*, 456 U.S. 107, 128 (1982); *see also Anderson v. Johnson*, 338 F.3d 382, 386 (5th Cir. 2003) (explaining that federalism guarantees the States "an initial opportunity to pass upon and correct alleged violations of its prisoners' federal rights" (cleaned up)).

AEDPA provides for a deferential federal review.  Rubio disagrees, arguing that the Court should apply *de novo* review because the state court denied him due process. (Pet., Doc. 61, 88) He contends that "[s]ection 2254(d) does not bar relitigation because Rubio was denied a meaningful opportunity to be heard in state post-conviction proceedings." (*Id.*)

AEDPA, however, contains no exception based on alleged irregularities in the state habeas process.  Rubio does not identify any authority creating a judicial exception when state habeas review fails to comply with an inmate's expectations.  On the contrary, "a full and fair hearing is not a prerequisite to the operation of AEDPA's deferential scheme." *Wiley v. Epps*, 625 F.3d 199, 207 (5th Cir. 2010), as revised (Nov. 17, 2010) (citing *Valdez v. Cockrell*, 274 F.3d 941, 946 (5th Cir. 2001)).  Certain exceptions exist, as explained in *Wiley*, but Rubio has not demonstrated that those exceptions apply here.  As a result, the Court declines to apply *de novo* review.

Under AEDPA's rigorous requirements, a federal court reviews "[c]laims presenting questions of law" under Section 2254(d)(1). *Neal v. Vannoy*, 78 F.4th 775, 783 (5th Cir. 2023). That provision "is . . . divided into two categories: the 'contrary to' standard, and the 'unreasonable application' standard." *Id.*  An inmate may only secure relief after showing that the state court's rejection of his claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. §

2254(d)(1), (2).

Claims presenting questions of fact are reviewed under two sections of AEDPA. First, a federal habeas court presumes the underlying factual determinations of the state court to be correct, unless the inmate "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Young v. Dretke*, 356 F.3d 616, 629 (5th Cir. 2004) ("As a federal habeas court, we are bound by the state habeas court's factual findings, both implicit and explicit."). Second, a petitioner must show that the state court's ultimate decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). "Claims presenting mixed questions of law and fact are reviewed under a combination of these provisions; a state court's ultimate legal conclusion is reviewed under Section 2254(d)(1), while the underlying factual findings supporting that conclusion are reviewed under Sections 2254(d)(2) and (e)(1)." *Neal*, 78 F.4th at 783.

In performing the AEDPA review, a federal court generally cannot "develop and consider new evidence." *Shoop v. Twyford*, 596 U.S. 811, 819 (2022). AEDPA limits "review of factual determinations under § 2254(d)(2)" to "'the evidence presented in the State court proceeding,'" and "review of legal claims under § 2254(d)(1) . . . 'to the record that was before the state court.'" *Id.* (quoting *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011)). "A federal court may admit new evidence only in two limited situations: Either the claim must rely on a 'new' and 'previously unavailable' 'rule of constitutional law' made retroactively applicable by [the Supreme Court], or it must rely on 'a factual predicate that could not have been previously discovered through the exercise of due diligence.'" *Twyford*, 596 U.S. at 812 (quoting 28 U.S.C. § 2254(e)(2)(A)).

### B. Exhaustion Requirement

Under 28 U.S.C. § 2254(b)(1), a federal habeas petition "shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State[.]" The exhaustion doctrine precludes federal consideration of any claim raised for the first time in federal court. This limitation applies because, under § 2254, a court can only review a state court's decision. If the petitioner did not raise the issue in the state courts, then no decision exists to review. *See Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002).

As a corollary to exhaustion, the procedural-bar doctrine prescribes that "federal courts will not disturb state court judgments based on adequate and independent state law procedural grounds." *Dretke v. Haley*, 541 U.S. 386, 392 (2004). "That rule procedurally bars federal habeas petitions where 'the last state court to review the petitioner's claims unambiguously based its denial on a state procedural bar.'" *Mullis v. Lumpkin*, 47 F.4th 380, 387 (5th Cir. 2022) (quoting *Gonzales v. Davis*, 924 F.3d 236, 243 (5th Cir. 2019) (per curiam)). For example, a Texas state court's decision to dismiss a habeas application on the grounds that the petition constituted a successive petition and an abuse of the writ would represent "an independent and adequate state ground" triggering the procedural-bar doctrine as to a federal habeas petition containing the same claims. *Gutierrez v. Stephens*, 590 F. App'x 371, 384 (5th Cir. 2014) (quoting *Hughes v. Quarterman*, 530 F.3d 336, 341 (5th Cir. 2008)).

A petitioner bears the burden to overcome any applicable procedural bar, *McCleskey v. Zant*, 499 U.S. 467, 494 (1991), and satisfies this burden by showing: (1) cause and actual prejudice or (2) that "a constitutional violation has probably resulted in the conviction of one who is actually innocent.'" *Haley*, 541 U.S. at 393 (cleaned up). If the defendant received the death penalty, he can demonstrate actual innocence by providing "clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner eligible for the

death penalty under the applicable state law." *Busby v. Davis*, 925 F.3d 699, 710 (5th Cir. 2019) (citing *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992)).

In the present matter, Rubio raises ten claims, although of these, his 2013 Habeas Application contained only Claim Two, in which he alleges that his trial counsel was ineffective for not fully investigating and raising the issue of Rubio's prenatal exposure to alcohol. [3] As to the remaining claims, the Court stayed this proceeding to enable Rubio to submit them to a Texas court, which found the claims an abuse of the writ. As a result, a procedural bar applies to all of Rubio's claims except Claim Two,

The Court will first address Claim Two before examining the procedurally-defaulted claims. With respect to the nine defaulted claims, the Court groups them into three separate categories: (1) claims regarding mental health (Claims One, Three, and Seven); (2) claims regarding prosecutorial corruption (Claims Four and Five); and (3) claims regarding the State's expert witnesses (Claims Six, Eight, Nine, and Ten).

## III.   Analysis of Claim Two: FASD

Rubio contends that his trial counsel failed to investigate and use evidence about the existence and effects of Rubio's prenatal exposure to alcohol. (Pet., Doc. 61, 71) As to this claim, Rubio may secure relief only by demonstrating that the state court's denial was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1), (2). He must show that no possibility exists that "fairminded jurists could disagree that the state court's decision conflicts with [the United States Supreme] Court's precedents." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). A

---

[3] Respondent concedes that Rubio properly exhausted Claim Two by presenting it within the 2013 Habeas Application. (Answer, Doc. 84, 86)

federal habeas court analyzes these issues by relying solely on the record that was before the state court. *Shoop*, 596 U.S. at 819.

As it pertains to Rubio, the state habeas court explained that FAS "is one of several different disorders under what is now recognized as the umbrella 'fetal alcohol spectrum disorder.' ('FASD')."[4] (Habeas Record, Doc. 83–7, 7)  FASD encompasses "a pattern of mental and physical defects that can develop in a fetus in association with high levels of alcohol consumption during pregnancy", and which "can stunt fetal growth or weight, create distinctive facial dysmorphia, damage neurons and brain structures, which can result in psychological or behavioral problems, and cause other physical damage." (*Id.*)  In his Petition, Rubio identifies various effects of brain damage that FASD may cause, including: "[S]ignificant cognitive abnormalities; reduce[d] mathematical skills and school performance; limit[ed] impulse control; impair[ed] social perception; correspond[ing] . . . deficits in higher-level receptive and expressive language, as well as with poor abstractive and metacognitive capacity; and . . . problems with memory, attention, and judgment." (Pet., Doc. 61, 75)

### A.  Trial Counsel's Investigation

The record contains substantial evidence that Rubio's trial counsel appreciated the need to investigate the possibility that Rubio suffered from FASD.  Throughout the preparations for the trial, Rubio's counsel sought and reviewed substantial information relevant to FASD, primarily in the form of evaluations by experts.

Shortly before trial, Rubio identified Dr. John Matthew Fabian as a retained expert who would offer opinions at trial regarding how the "pre-natal alcohol abuse" by Rubio's mother led to "mental health deficiency" and adverse "brain development" in Rubio. (Habeas Record, Doc.

---

[4] Although FAS and FASD represent distinct, albeit related conditions, the Court refers to the entire spectrum disorder as "FASD", distinguishing between the two conditions only when necessary.

83–3, 36; Defense Expert Designations, Doc. 76–18, 2 and 4)  Dr. Fabian had conducted a forensic psychological evaluation of Rubio, meeting with him several times and administering various psychological tests. (Habeas Record, Doc. 83–3, 133)   He reported that Rubio's mother acknowledged that she "abuse[d] alcohol during her pregnancy with him", drinking "about a six-pack per day through her pregnancy." (*Id*. at 138)  Dr. Fabian indicated that the alcohol and drug use "possibly" affected Rubio's "prenatal neurocognitive development". (*Id*. at 160)  Admittedly, the record does not contain any indication that Dr. Fabian expressly considered FAS or FASD as part of his evaluation.

Trial counsel also secured the assistance of Dr. Jim Owens, an Assistant Professor of Pediatrics and Neurology with the Baylor College of Medicine. (Tr. Trans., Doc. 76–12, 253)  He conducted a "detailed neurological examination" and a physical assessment of Rubio, and testified at trial that he did not observe any "dysmorphic features" in Rubio's face, which represented an important finding because "facial dysmorphia [is] one of the signs of [FAS]." (*Id*. at 250; Habeas Record, Doc. 83–1, 250; Owens Report, Doc. 76–12, 248)  In addition, Dr. Owens conducted both an MRI and EEG on Rubio and uncovered no evidence of trauma or brain disease. (Clerk's Record, Doc. 76–12, 252–53)  The State's neuropsychology expert in the competency trial agreed that "[t]he data from the available testing does not reflect retardation, brain damage or cognitive impairment." (Tr. Trans., Doc. 73–3, 141; *id*. at 102 (commenting that "Doctor Owens said that there was no evidence of any brain damage or brain injury. . . . "[I]n layman's terms, [that] means that there is nothing wrong with his brain.").

Defense counsel also retained Dr. Raphael Morris, a psychiatrist, who reviewed Dr. Owen's conclusions with an eye toward exploring the possibility of FASD.  In the competency trial, Dr. Morris testified that he knew of the "substance abuse history" of Rubio's mother and was

concerned about the "contribution of substances while she was pregnant with him." (Tr. Trans, Doc. 72–24, 233)  Yet Dr. Morris did not diagnose Rubio with FASD. (Tr. Trans., Doc. 72–25, 75)

Trial counsel sought additional investigation of possible brain damage.  They proposed retaining Dr. Pablo Stewart to "perform a functional MRI and PET scan to determine whether Mr. Rubio has organic damage that would explain his actions in this crime." (Clerk's Record, Doc. 76–18, 6)  The trial court, however, denied any additional funding for such an inquiry. (*Id.*)

Importantly, the state habeas court noted that, at the time of Rubio's trial, "the opinion of a medical doctor was necessary to make a diagnosis of FAS or FASD." (Habeas Record, Doc. 83–7, 8)  Despite various experts assessing Rubio for brain damage, and at least one prepared to testify about the impact of the pre-natal alcohol abuse by Rubio's mother, no medical doctor had diagnosed FAS or FASD when Rubio's trial began.

### 1.  State Habeas Claims & Evidentiary Hearing

In his 2013 Habeas Application, Rubio raised three claims related to FASD:

(1) "[H]e was denied the effective assistance of counsel, when trial counsel, although fully aware that [his] mother consumed significant amounts of alcohol during the pregnancy when she was carrying [him], failed to investigate the possibility that [he] suffered from a fetal alcohol spectrum disorder";

(2) Trial counsel's failure to investigate FASD meant that he never "learn[ed] that [Rubio] suffers from temporal lobe epilepsy ('TLE')"[5]; and

(3) "[T]he habeas court failed to fund a complete investigation into the effects of pre-natal alcohol abuse by [his] mother, thus preventing court appointed habeas counsel from developing evidence demonstrating that [he] suffers from a fetal alcohol spectrum disorder, as well as temporal lobe epilepsy, thus rendering habeas counsel ineffective."

(Habeas Record, Doc. 83–7, 4)  He argued that various "red flags" should have led his trial counsel to specifically investigate FASD, but they failed to do so.  Examples of those "red flags" included:

- Rubio's bizarre behavior, particularly as recounted in his confession;

---

[5] In his Federal Petition, Rubio abandons his argument relating to TLE.

- testimony in the competency trial that his mother consumed significant amounts of drugs and alcohol while pregnant with him;
- the April 2009 report by Dr. Fabian that Rubio's mother's alcohol use heightened the "prenatal risk factors potentially affecting neurocognitive development";
- a report from Dr. Eric Pinkerman identifying the prenatal alcohol abuse;
- a letter and slideshow from Dr. Brams linking Rubio's developmental issues to his parents; and
- reports by Dr. Martinez and Dr. Morris noting the history of drug and alcohol abuse by Rubio's mother.

(Habeas Record, Doc. 83–3, 26–35)  When the state habeas court authorized $13,000 for the appointment of FASD experts, Rubio secured the services of three additional professionals: Dr. Natalie Novick Brown, an expert on maternal alcohol consumption; Dr. Richard S. Adler, a board-certified psychiatrist; and Dr. Paul D. Connor, a psychologist with expertise in FASD. (*Id.* at 41)  Dr. Brown did not examine Rubio, but he opined that Rubio's "history is typical of someone with FAS or FASD." (*Id.* at 44)  Dr. Adler personally examined Rubio and diagnosed him with "Partial Fetal Alcohol Syndrome, which is one of the Fetal Alcohol Spectrum Disorders (FASD)." (Habeas Record, Doc. 83–7, 6)  Even so, Dr. Adler stated that additional work was necessary to "confirm the diagnosis from a functional perspective" and to rule out the possibility that other disorders caused the observed issues. (Habeas Record, Doc. 83–4, 91)  Dr. Connor reviewed the MRI conducted before Rubio's second trial and opined that his "neuropsychological functioning is consistent with diagnostic guidelines for fetal alcohol syndrome" and that he suffered from mental traits "frequently seen in individuals with FASD." (Habeas Record, Doc. 83–7, 3)  Dr. Connor indicated that Rubio suffered deficits in four domains of neuropsychological functioning: academics, attention, verbal learning and memory, and executive functioning.   And Dr. Siddhartha Nadkarni testified, via affidavit, that the testing performed on Rubio after he entered TDCJ for the second time "reveal[ed] abnormalities that are consistent with the possibility of Temporal Lobe or other Epilepsy and possibly a developmental injury like that sustained in Fetal Alcohol Syndrome." (*Id.*)

30 / 97

In August 2016, the state habeas court held an evidentiary hearing focused on whether Rubio's trial attorneys provided ineffective assistance of counsel by failing to investigate FAS, FASD, and TLE.  In addition to presenting the medical testimony previously summarized, Rubio also offered the opinions of a jury selection expert and two attorneys who collectively argued that trial counsel should have questioned prospective jurors with an eye toward a FASD defense. (Habeas Record, Doc. 83–1, 25–59)  And a mitigation-investigation specialist testified that trial counsel should have investigated the possibility of FASD. (*Id.* at 132–34)

As his final witness, Rubio called his trial counsel, Ed Stapleton.  He explained that he explored the FASD defense, but decided to not pursue it at trial based on four principal reasons: (1) Rubio did not have "any [of the] facial changes" associated with FASD; (2) Dr. Owens' report proved inadequate "to really develop any kind of organic brain damage of any type"; (3) Dr. Morris did not identify any deficiencies in Dr. Owens' report; and (4) the defense was "inadequately funded".[6] (*Id.* at 167–171)  Stapleton believed that if the defense "had the time and the money to keep digging", they would have been able to develop a FASD defense. (*Id.* at 180)  In the absence of adequate resources, Stapleton judged the defense "inefficient", although he did not "think it was my fault". (*Id.* at 187)  And he testified: "Everything I did, I thought was the right decision at the time, even if it was wrong." (*Id.* at 193)

During Stapleton's testimony, an outburst arose from Rubio's lead attorney, Nathaniel Perez.  As Stapleton spoke about his representation of Rubio, Perez cried out, "We—we provided ineffective assistance of counsel." (*Id.* at 187)  At a later point in the hearing, the presiding judge commented on Perez's outburst:

> Well, I appreciate you falling on the sword.  The problem, Nat, is that's up to whoever makes those findings. But I will tell you this.  I—And I told you all this right after the trial. I mean, there's—there's a lot to be said about how the case was

---

[6] Rubio emphasizes that his attorneys "made the false assumption" that "some sort of facial changes" would be required for FASD to exist. (Habeas Record, Doc. 83-1, 167)  But as Stapleton's own testimony reveals, defense counsel based their decision to not pursue a FASD defense on various grounds, and not merely on the absence of dysmorphia.

tried the second time around. But one thing that people around gonna tell you is that when you were in the trenches, having to deal with what you had to deal with, including, you know, not having enough funding, and those things, you all did what you had to do as trial lawyers, and you—you worked with what you had.

I understand that there may have been deficiencies, and I understand that you all may believe with hindsight that there were things that could have been done differently. I'm not certain that even the cases that you win you don't have some doubts. "Maybe I should have done this. It would have been easier." And so I respect that, Mr. Perez. And I know that you and Mr. Stapleton have worked hard on this case, and have worked on other cases before, and that you all respect each other. So I—I'll—the record will reflect that too.

(*Id.* at 203)

### 2. State Habeas Adjudication

After receiving evidence and testimony, the state habeas court found that Rubio's trial counsel "were aware that, throughout the time she was pregnant with [Rubio], . . . [his] mother routinely consumed significant amounts of alcohol". (Habeas Record, Doc. 83–7, 7)  And they knew about Rubio's "bizarre behavior", which included "a history of visual, auditory, and sensory hallucinations." (*Id.*)  Based on that knowledge, Rubio's counsel sought to identify "a causal link between [his mother's] alcohol use during her pregnancy" and his psychological problems. (*Id.*)

After reaching its findings of fact, the state habeas court denied Rubio's claims regarding his counsel's failure to investigate FAS, FASD, or LTE.  The court premised its decision on four principal grounds.

First, the court found that, in light of the state of science's understanding of FASD at the time of Rubio's trial, "[t]here [was] insufficient evidence to find that . . . the development, investigation and presentation of a full-scale FASD based defense was reasonably available to trial counsel." (*Id.* at 8)

Second, trial counsel "conducted a thorough and detailed investigation into the [well-documented] bizarre behavior by retaining numerous medical doctors and mental health experts," who collectively opined that "the cause of this behavior was something other than

FASD." (*Id.*)  Given this information, trial counsel "made a strategic decision to not investigate this issue any further." (*Id.* at 9)

Third, evidence of FASD presented a dilemma to trial counsel, as such evidence could be useful for mitigation, but would also pose a threat of future danger.  When faced with such a dilemma, a trial attorney "must necessarily make a strategy decision as to whether such evidence should be utilized at trial." (*Id.* )  This reality reinforced that Rubio's counsel had merely made a strategic decision regarding whether to present a FASD defense.

Finally, Rubio had "failed to demonstrate that there is a reasonable probability that, had [his] trial counsel presented evidence that [Rubio] suffers from FAS or FASD, that the jury would have answered the mitigation issue differently." (*Id.* at 10)  In particular, the state habeas court emphasized "the evidence of the heinousness of the crime . . . as well as the evidence of aggravating factors and [Rubio's] future dangerousness, which was presented at trial." (*Id.*)

Rubio appealed the decision to the TCCA, which affirmed the state habeas court's rulings. On the issue of FAS, FASD, and LTE, the TCCA concluded that the record supported the lower court's findings of fact, with the exception of the finding regarding the state of science as to FAS and FASD at the time of Rubio's trial. *See Ex parte Rubio*, 2018 WL 2329302, at *4 ("We find that the record supports the trial court's findings of fact and conclusions of law, with the exception of finding twenty-two and the first paragraph of finding fifty-four.").  Applying *Strickland v. Washington*, 466 U.S.668 (1984), the Texas court first concluded that Rubio had failed to demonstrate that trial "counsel's representation fell below an objective standard of reasonableness." *Id.* at *3.  The court then found that "in light of the heinous nature of the crime and the mitigating evidence trial counsel presented, [Rubio] has not demonstrated that the result of his trial would have been different but for counsel's decision not to further investigate FAS/FASD or epilepsy." *Id.*

### B.  AEDPA Review

Rubio now presents his FASD claim to this Court.  He must show that no possibility exists that "fairminded jurists could disagree that the state court's decision conflicts with [the United States Supreme] Court's precedents." *Richter*, 562 U.S. at 102; *see also Owens v. Lumpkin*, No. 22-40217, 2023 WL 4676842, at *4 (5th Cir. July 21, 2023) ("[W]e can only grant Owens's petition if all fairminded jurists would disagree with the Texas Court of Criminal Appeals.").  On the issue of deficient performance, courts ask whether "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Strickland*, 466 U.S. at 687.  The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003).  Instead, a reviewing court "measure[s] . . . attorney performance" for "reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688.  The review is "highly deferential" and avoids "the distorting effect of hindsight" by looking at "counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id*. at 689–90.  In that light, federal courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable assistance." *Id*. at 689.  As to prejudice, Rubio "must show that *all* fairminded jurists *would* agree there *was* prejudice." *Sanchez v. Davis*, 936 F.3d 300, 307 n.39 (5th Cir. 2019) (emphasis in original).  This standard means that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Strickland*, 466 U.S. at 694.

Rubio has not made this showing.  On the contrary, the Court finds that the relevant evidence supports the state court's decision.

First, the record demonstrates that trial counsel's representation did not fall below an objective standard of reasonableness.  They investigated whether a causal connection existed between Rubio's mother's substance abuse and the bizarre behavior that Rubio exhibited,

obtaining assessments and opinions from numerous experts with different qualifications.  Dr. Fabian confirmed that Rubio's mother had engaged in pre-natal alcohol use.  Dr. Owens conducted a thorough evaluation of Rubio, including the review of an MRI, and found no "trauma" or "evidence of organic neurological disease". (Clerk's Record, Doc. 76–12, 251)  Given this report, defense counsel could not "really develop any kind of organic brain damage of any type." (Tr. Trans., Doc. 83–1, 169)  Even so, trial counsel retained Dr. Morris to review Dr. Owens' report, and he (Dr. Morris) found nothing amiss in Dr. Owens' efforts.  In short, multiple defense experts at the time of Rubio's trial opined that Rubio did not have brain damage.  And the State's expert, Dr. Welner, concurred: "[Rubio's] neuropsychological testing demonstrated that he had no evidence of brain damage and that he had no evidence of brain disease." (Tr. Trans., Doc. 74–19, 119)

The Fifth Circuit has explained that a trial attorney does not provide ineffective assistance by failing to investigate FASD when a "qualified neuropsychologist . . . after extensive testing, concluded that [the defendant] had no brain damage." *Gonzales v. Stephens*, 606 F. App'x 767, 773 (5th Cir. 2015).  "[R]easonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *See Rompilla v. Beard*, 545 U.S. 374, 383 (2005).  And when faced with multiple defense expert's credible conclusions, trial counsel need not "canvass[ ] the field to find a more favorable defense expert."[7] *Dowthitt v. Johnson*, 230 F.3d 733, 748 (5th Cir. 2000).  In the present case, Rubio's trial counsel obtained the evaluations and conclusions of Drs. Fabian, Owens, and Morris, none of which supported further investigation for FASD.

---

[7] Rubio's trial counsel actually sought additional funding to continue investigating the issue, but the trial court denied the request.

In addition, even in the context of the 2013 Habeas Application, Rubio relied on three experts, but none of them conclusively diagnosed Rubio with FASD.  At best, Dr. Adler diagnosed Rubio with Partial FAS—a condition that includes some features of FAS—but he also indicated that additional testing was necessary to confirm the diagnosis.  In the end, the evidence on which Rubio relied before the state habeas court does not prove that Rubio could have presented a strong FASD defense.  And as the state habeas court reasoned, any FASD defense would have presented a dilemma.  The evidence could prove useful for mitigation, but could also reveal a propensity for future dangerousness.  Overall, Rubio's trial counsel "was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies". *Richter*, 562 U.S. at 107.  Given the information available to them, defense counsel's decisions regarding a FASD defense fell within the parameters of reasonable strategic decisions for defense counsel, and in no manner fell below objective standards of reasonableness.

Rubio likewise has not demonstrated that the TCCA reached the wrong conclusion when assessing the prejudice prong of the *Strickland* standard, much less that fairminded jurists could disagree that its decision conflicts with the applicable Supreme Court precedents.  As an initial challenge, Rubio argues that the TCCA applied the wrong standard.  Specifically, he argues that "[i]nstead of performing the prejudice analysis that *Strickland* requires—evaluating whether the deficiency had a 'reasonable probability' of affecting the trial outcome[–the TCCA] instead required Rubio to 'demonstrate[] that the result of his trial would have been different but for counsel's decision not to further investigate[.]' *Ex parte Rubio*, 2018 WL 2329302, at *7." (Pet., Doc. 61, 94–95 (citation omitted))

Rubio's argument, however, proves unpersuasive.  The TCCA decision cited the relevant section of *Strickland*. *See Ex parte Rubio*, 2018 WL 2329302, at *7 (citing *Strickland*, 466 U.S. at 694).  And the court adopted the state habeas court's recommendation, which included the precise

language from the Supreme Court. (*See* State Habeas Decision, Doc. 83–7, 14)  Based on the entirety of the TCCA's decision, it is evident that the single sentence that Rubio quotes represents nothing more than "a shorthand method to refer to the correct standard." *Charles v. Stephens*, 736 F.3d 380, 393 (5th Cir. 2013) (rejecting a similar argument); *see also Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) ("[R]eadiness to attribute error is inconsistent with the presumption that state courts know and follow the law."); *Sussman v. Jenkins*, 636 F.3d 329, 360 (7th Cir. 2011) ("[W]e do not believe the court's use of a 'short-hand' recitation of the *Strickland* test suggests that it employed the incorrect standard.").

Turning to the application of that standard, the query is whether a reasonable probability exists "that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.  The TCCA answered this question in the negative.  Rubio has not demonstrated that all fairminded jurists would disagree with that conclusion.

First, defense counsel placed extensive evidence of Rubio's mental health before the jurors.  Although defense counsel did not expressly refer to FASD, they presented evidence of similar negative effects from mental illness.  It is true that evidence regarding FASD would have presented some unique factors for the jury to consider, but its incremental impact is lessened by the substantial evidence regarding Rubio's mental illness.  In addition, as the state habeas court emphasized, evidence of FASD can pose "a significant double-edged problem" for attorneys because it "is mitigating in the sense that it might support an inference that [a defendant] is not as morally culpable for his behavior, but it also is aggravating in the sense that it might support an inference that [he] is likely to continue to be dangerous in the future."[8] *Gates v. Davis*, 660 F. App'x 270, 278 (5th Cir. 2016).

---

[8] Rubio's defense team attempted to avoid the quandary by focusing on evidence of mental illness that allowed for the amelioration of impulsivity and other negative effects through medication. (*See* Tr. Trans., Doc. 74–16, 234)  In other words, the mental-health evidence that the defense team provided to the jury presented a dulled double-edged sword.

Finally, at trial, the Government emphasized the shocking nature of the crime, which is a relevant factor in the *Strickland* prejudice analysis. *See Carty v. Thaler*, 583 F.3d 244, 263 (5th Cir. 2009) ("In this re-weighing, the brutality of the crime is relevant but does not automatically trump additional mitigating evidence."); *Martinez v. Quarterman*, 481 F.3d 249, 259 (5th Cir. 2007) ("After considering all of the mitigating evidence, we hold that the additional mitigating evidence was not so compelling, especially in light of the horrific facts of the crime, that the sentencer would have found a death sentence unwarranted."); *Smith v. Quarterman*, 471 F.3d 565, 576 (5th Cir. 2006) ("In the light of brutal and senseless nature of the crime, and all of the other evidence of Smith's violent conduct, it is unlikely that [the mitigating] evidence . . . would have made any difference.").  At all stages of the present matter, no party has ever contested, and no reasonable person could doubt, that this case involves the horrific killing of three children.  The TCCA concluded that, "in light of the heinous nature of the crime", even when balanced by "the mitigating evidence trial counsel presented", Rubio had not shown prejudice. *Ex parte Rubio*, 2018 WL 2329302, at *3.  In reaching this conclusion, the Texas court properly applied the law to the facts of this case.

Ultimately, Rubio has not established that the TCCA, when concluding that Rubio's counsel did not provide ineffective assistance of counsel with respect to a possible FASD defense, reached a conclusion that conflicts with applicable Supreme Court precedents.  At the very least, Rubio fails to show that fairminded jurists could disagree on that point.  As a result, he falls short of meeting his burden under AEDPA and is entitled to no relief on this claim.

## IV.   Analysis of Procedurally Defaulted Claims

Rubio did not present his remaining nine claims in 2013 and, as a result, the TCCA has never considered the merits of those challenges.  Rubio included them in his 2016 Supplemental Habeas Application and 2021 Habeas Application, but the Texas court declared the new claims a

subsequent application and an abuse of the writ, dismissing the claims without reviewing their merit. *Ex parte Rubio*, 2018 WL 2329302, at *5 (concerning new claims in 2016 Supplemental Habeas Application); Habeas Record, Doc. 81–2, 6 (concerning 2021 Habeas Application)).

This history triggers procedural default, a rule that "bars federal habeas petitions where 'the last state court to review the petitioner's claims unambiguously based its denial on a state procedural bar.'" *Mullis*, 47 F.4th at 387 (quoting *Gonzales*, 924 F.3d at 243). A Texas state court's decision to dismiss a habeas application on the grounds that it represents a successive petition and an abuse of the writ constitutes "an independent and adequate state ground" that requires the application of the procedural-bar doctrine to any federal habeas petition containing the same claims. *See Gutierrez*, 590 F. App'x at 384 (quoting *Hughes*, 530 F.3d at 341).

Petitioners can overcome the procedural bar through various exceptions, but they bear the burden of demonstrating that one applies. *See McCleskey*, 499 U.S. at 494. For example, a petitioner may demonstrate (1) cause and actual prejudice or (2) that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Haley*, 541 U.S. at 393 (cleaned up). When a petitioner challenges the death penalty imposed as a sentence, he can demonstrate actual innocence by providing "clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law." *Busby*, 925 F.3d at 710 (citing *Sawyer*, 505 U.S. at 336).

In the present case, Rubio claims that he can overcome the procedural bar for each of his nine procedurally-defaulted claims. As previously explained, the Court groups his claims as follows: (1) mental health (Claims One, Three, and Seven); (2) prosecutorial corruption (Claims Four and Five); and (3) the State's expert witnesses (Claims Six, Eight, Nine, and Ten). Within each group, the Court will first analyze whether Rubio has overcome the procedural bar, and then consider whether he would be entitled to relief even if he overcame that bar. *See Trevino v. Davis*,

861 F.3d 545, 548 (5th Cir. 2017) (finding that while the petitioner overcame the procedural bar, he was not entitled to relief on the merits).

### A. Claims Regarding Mental Health

Rubio contends that he received ineffective assistance of trial counsel through their failure: (1) to include a qualified mental health expert as an additional member of the defense team (Claim One); (2) to properly investigate and prepare for the guilt and innocence phase (Claim Three); and (3) to investigate and use evidence about Rubio's mental health from his period of incarceration between his two trials (Claim Seven). Rubio acknowledges that the procedural bar applies to these claims, but argues that he overcomes it because his state habeas counsel provided ineffective assistance of counsel by failing to raise these issues in the 2013 Habeas Application.

In 2012, the Supreme Court established that the ineffective representation by state *habeas counsel* can constitute "cause" to overcome the procedural bar that precludes consideration of an ineffective assistance of *trial counsel* claim. *See Martinez v. Ryan*, 566 U.S. 1 (2012).[9] To succeed on such a theory, the petitioner must first demonstrate that his ineffective assistance of trial counsel claim is "substantial—*i.e.*, has some merit". *Cantu v. Davis*, 665 F. App'x 384, 386 (5th Cir. 2016); *see also Murphy v. Davis*, 737 F. App'x 693, 703 (5th Cir. 2018) (describing the test of whether a claim is substantial as "whether the claim is debatable by reasonable jurists"). To show that his claim has merit, the petitioner must satisfy the *Strickland* test—i.e., "(1) that counsel's performance was deficient; and (2) that such deficient performance prejudiced the defense."

---

[9] Respondent challenges Rubio's attempt to submit the evidence that he presented for the first time in his 2021 Habeas Application. Respondent argues that Rubio "negligently failed to develop their factual bases in state court" and that the evidence was "negligently not presented to the state court in a procedurally correct manner". (Answer, Doc. 84, 56) Contrary to this position, federal law permits courts to consider "evidence outside the state record" in the limited context of "establishing an excuse for procedural default" because of state habeas counsel's representation. *Mullis v. Lumpkin*, 70 F.4th 906, 910-11 (5th Cir. 2023); *see also Segundo v. Davis*, 831 F.3d 345, 351 (5th Cir. 2016). Still, courts cannot take into account new evidence when determining the merits of the underlying claim. *See Tong v. Lumpkin*, 90 F.4th 857, 866-67 (5th Cir. 2024).

*Beatty v. Davis*, 755 F. App'x 343, 345 (5th Cir. 2018). The petitioner must then "show that habeas counsel was ineffective in failing to present those claims in his first state habeas proceeding." *Garza v. Stephens*, 738 F.3d 669, 676 (5th Cir. 2013). And finally, the petitioner must demonstrate "that he was prejudiced by the deficient performance—that is, that there is a reasonable probability that he would have been granted state habeas relief had the evidence been presented in the state habeas proceedings." *Newbury v. Stephens*, 756 F.3d 850, 872 (5th Cir. 2014); *see also Canales v. Stephens*, 765 F.3d 551, 571 (5th Cir. 2014). "The likelihood of a different result must be substantial, not just conceivable." *Wessinger v. Vannoy,* 864 F.3d 387, 391 (5th Cir. 2017) (quoting *Richter*, 562 U.S. at 112).

### 1. Claim One: Failure to Include Qualified Mental Health Expert on Defense Team

Rubio argues that based on his pervasive and serious history of acute mental illness, "[n]o defense team could adequately investigate and understand this case without having a person with qualifying mental health expertise at its core." (Pet., Doc. 61, 44) In particular, he characterizes his defense team as presenting a "scattershot sentencing case", and contends that an appropriate mental-health expert "would have guided the defense through appropriate investigations, and to the appropriate experts." (*Id*. at 52) For example, he believes that such an expert would have identified the need for:

> further screening to explore neuropsychological abnormalities, especially in relation to frontal lobe functioning, and adverse consequences from prenatal alcohol exposure; a full neuropsychological battery concerning additional sources of brain injury, trauma, and central nervous system disorder/impairment; and a robust investigation into Fetal Alcohol Spectrum Disorders ("FASD"), using appropriate medical, neuropsychological, and psychological tools.

(*Id*. at 53) Rubio claims that the absence of a guiding mental-health professional prejudiced him at each phase: the competency hearing, the guilt/innocence trial, and punishment phase. "The

deficiency was particularly prejudicial at the punishment phase, when Rubio would have needed to convince only a single juror to spare his life." (*Id*. at 52)

To overcome the procedural default on this claim, Rubio must demonstrate: (1) that he presents a substantial claim–i.e., that under *Strickland*, his trial counsel's representation fell below an objective standard of reasonableness and that the deficiency prejudiced him; (2) that his state habeas counsel's failure to present this claim in the 2013 Habeas Application fell below an objective reasonable standard; and (3) that had his habeas counsel presented the claim in 2013, a reasonable probability exists that the state habeas court would have granted the relief that Rubio seeks.

### a.  Substantial Claim: Deficient Performance

When arguing that his defense team's representation fell below a standard of reasonable performance by trial counsel, Rubio relies primarily on his contention that his defense team failed to comply with guidelines from the American Bar Association and the State Bar of Texas.  The 2003 ABA Guidelines instruct that an attorney defending his client against capital charges should assemble a defense team consisting of at least two attorneys, a fact investigator, and a mitigation-investigation specialist, with "at least one member qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments." American Bar Association, *American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, 31 Hofstra L. Rev. 913, 952 (2003).  The presence of a qualified screening specialist ensures that the defense team can "recommend such further investigation of the subject as may seem appropriate." *Id*. at 957.  The comments to the ABA

Guidelines allow for the mental-health specialist to be either "one of the four individuals constituting the smallest allowable team or an additional team member". *Id.*

Similarly, the State Bar of Texas in 2006 promulgated the *Guidelines and Standards for Texas Capital Counsel*, which also recommend counsel's reliance on a mental-health-screening specialist as a core member of the defense team. The Texas Guidelines recognize that "[c]ounsel's own observations of the client's mental status . . . can hardly be expected to be sufficient to detect the array of conditions . . . that could be of critical importance." *Guidelines and Standards for Texas Capital Counsel*, 69 Tex. B.J. 966, 977, Guideline 3.1(A) (2006). Accordingly, the Texas Guidelines instruct that "mental health experts are essential to defending capital cases" because issues such as "psychiatric impairment, combined with a history of physical and sexual abuse, are common among persons convicted of violent offenses on death row." *Id.* The Texas Guidelines, like their ABA counterpart, allow for a defense team to be comprised of only four people, as long as one member is "qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments." *Id.*

Rubio's trial attorneys knew of the Texas and ABA Guidelines, the former of which were issued between Rubio's first and second trials. Before the second proceeding, Rubio's counsel filed a Motion to Adopt the ABA Guidelines, although they clarified at the hearing that they did not necessarily want the trial court to "adopt" the Guidelines, but rather wanted a "recognition of their existence" as a "standard to know what [the defense] should be doing, and therefore, what [resources the defense] should appropriately ask for".[10] (Tr. Trans., Doc. 72–7, 29; Tr. Trans., Doc. 72–6, 4)

---

[10] The record contains only the State's response to and the trial court's discussion of the motion, but does not appear to include the motion itself. (*See* Clerk's Record, Doc. 76-3, 53; Hearing, Doc. 72-7)

Relying on the national and Texas professional standards, Rubio contends that "trial counsel deficiently failed to include a person with qualifying mental health expertise on the defense team." (Pet., Doc. 61, 33)  He contends that not only did his defense team's failure to retain a mental-health-screening expert fall below objective standards of reasonableness, but that had they done so, a reasonable probability exists that the outcome of the trial or of the punishment phase would have been different.  In addition, he argues that his habeas counsel acted below an objective standard of reasonableness by not raising this claim in the 2013 Habeas Application, and that had habeas counsel done so, the state habeas court would have granted him relief.

Rubio's argument, however, fails at the first step.  He has not demonstrated that his trial counsel's conduct with respect to a mental health defense fell below an objective standard of reasonableness.

For starters, while Rubio emphasizes the Texas and ABA Guidelines, the Supreme Court has not adopted the guidelines as an "inexorable command with which all capital defense counsel must fully comply" to provide constitutionally effective representation. *Bobby v. Van Hook*, 558 U.S. 4, 17 (2009) (internal quotation marks omitted).  Courts consider professional guidelines as instructive, but the Constitution itself imposes "one general requirement: that counsel make objectively reasonable choices." *Van Hook*, 558 U.S. at 9; *see also Strickland*, 466 U.S. at 688 ("The proper measure of attorney performance remains simply reasonableness under prevailing professional norms.").  In that analysis, guidelines represent "only guides" with respect to an attorney's conduct.[11] *Van Hook*, 558 U.S. at 8.

---

[11] Rubio cites two decisions for his argument that "[o]ther courts recognize that the norms embedded in ABA Guideline 4.1 require trial counsel to include an individual with qualifying mental health expertise as a core member of the defense team." (Reply, Doc. 87, 34 (citing *Eaton v. Wilson*, No. 09-CV-261-J, 2014 WL 6622512, at *33-36 (D. Wyo. Nov. 20, 2014) and *Chatman v. Walker*, 773 S.E.2d 192 (Ga. S. Ct. 2015)))  But in both cases, the absence of a mental-health member on the defense team represented only one feature of counsel's deficient representation.  Neither court found that a constitutional violation occurred based solely on the absence of a mental-health screening specialist.

In addition, Rubio misconstrues the ABA and Texas Guidelines when he contends that "the mitigation specialist and the person having mental-health-screening expertise *must be different people*". (Pet., Doc. 61, 46) (emphasis added). Both Guidelines require a defense team consisting of two attorneys, an investigator, and a mitigation specialist. The comments to the ABA Guidelines expressly allow for the mental-health screening specialist to be either "*one of the four* individuals constituting the smallest allowable team or an additional team member". *See id.* (emphasis added). And the Texas Guidelines implicitly allow one of the four team members to function as the screening expert, as long as the person is "qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments". *Tex. Guidelines*, 69 Tex. B.J. at 967. Neither the ABA nor the Texas Guidelines precludes the mitigation specialist–or any other of the required four defense team members–to fulfill the recommended presence of a mental-health screening expert.

Moreover, even taking into account the ABA and Texas Guidelines, the record does not support that the representation by Rubio's defense team fell below an objective standard of reasonableness on the issue of Rubio's mental health. In preparation for his second trial, Rubio's counsel assembled a team that included consideration of Rubio's past and current mental-health concerns. In particular, they retained Carmen De La Rosa Fisher to serve as a mitigation specialist and to screen for mental-health issues. (Habeas Record, Doc. 83–1, 168–171) Ms. Fisher held a Master's Degree in social work and a social worker license. (*Id.* at 170) Trial counsel believed that Ms. Fisher's experience and education enabled her to satisfy the Texas and ABA Guidelines:

> Ms. Fisher was extremely good at what she did, and people liked her a lot. She was great at going through CPS records, and that sort of thing. I was assuming that she could meet the requirements that the guidelines have. I think both the Texas and the ABA guidelines require that you have a mental health professional on your staff. I was assuming that she could fill that role.

(*Id*. at 168–69)  In addition, defense counsel consulted with numerous other experts regarding Rubio's mental health. (*See id*. at 168–170; *see also* State Habeas Court Findings, Doc. 83–7, 8 (noting that Rubio's trial counsel retained "numerous medical doctors and mental health experts" in their attempt to understand his "bizarre behavior"))  And one of Rubio's lawyers, Stapleton, possessed significant experience and knowledge regarding mental health concerns among criminal defendants.  He had published regarding "handling mental health problems . . . in criminal cases" and "had been working with psychologists, and psychiatrists, and neurosurgeons, and neuropsychs" for many years. (Habeas Record, Doc. 83–1, 165)  Based on his experience, Stapleton believed he could "fill in just with" his discussions with experts. (*Id*. at 170)  Whether or not his belief proved correct, his experience at the very least provided him a solid foundation on which to communicate with the various experts and to consider issues that they identified regarding Rubio's mental health.

Rubio characterizes Ms. Fisher as unqualified to serve as the mental-health-screening specialist, but his criticism falls short.  The professional standards do not prescribe specific qualifications for such a specialist.  The ABA Guidelines specify only that the person be "qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments." *ABA Guidelines*, 31 Hofstra L. Rev. at 952.  Similarly, the Texas Guidelines require no specific licensure or educational background.  As for Ms. Fisher, Rubio does not demonstrate that her Master's Degree in social work and license as a master social worker represented inadequate qualifications.  Indeed, courts have recognized that a licensed clinical social worker can possess the requisite qualifications "to diagnose and treat mental disorders." *Lucio v. Lumpkin*, 987 F.3d 451, 477 (5th Cir. 2021); *see also Lucio v. State*, 351 S.W.3d 878, 898 (Tex. Crim. App. 2011) (finding that a clinical social worker with "a master's degree in social work" and "the highest national clinical license" enabled her "to do diagnosis and treatment of mental

health disorders"); *Kimberlin v. State*, No. 05-18-00018-CR, 2019 WL 1292471, at *6 (Tex. App.–Dallas, 2019) (recognizing that as "a licensed clinical social worker" in Texas, the witness could "diagnose and treat mental and emotional disorders").  In fact, Rubio's state habeas counsel relied on the testimony of a social worker, Gina Vitale, who opined as to the "red flags" that she would have identified had she been on Rubio's trial team. (*See* Hearing, Doc. 83–1, 131–32)  Ms. Vitale's qualifications resemble those of Ms. Fisher's, and Rubio does not fault the reliance of state habeas counsel on Ms. Vitale's opinions.  Moreover, while Rubio's trial counsel, Stapleton, testified to the state habeas court that he should have retained an individual with a Ph.D. in psychology as the mental-health screening expert, he also did not "have any regrets about picking" Ms. Fisher and viewed that selection as a "strategic decision". (*Id.* at 193)  In addition, no authority requires that the mental-health screening expert possess a Ph.D.

By the time of trial, numerous experts had examined Rubio, allowing his counsel to evaluate his mental health from psychological, neurological, and social bases.  For example, Dr. Fabian, a forensic and clinical psychologist, performed a forensic psychological evaluation of Rubio for the express purpose of developing mitigating evidence. (Clerk's Record, Doc. 76–13, 179)  According to the findings of the state habeas court, the experts rendered "various diagnoses", including "delusional disorder with other psychotic features; severe learning disorder; schizophrenia, paranoid type; major depressive disorder, recurrent; inhalant dependence; cannabis abuse; psychotic disorder NOS (not otherwise specified); and, Attention Deficit Hyperactivity Disorder (ADHD)." (State Habeas Court Decision, Doc. 83–7, 8)

Rubio also relies on new evidence that he submits for the first time to this Court–namely, reports from Dr. Bhushan Agharkar and Dr. Robert Ouaou.  The former identifies areas of concern which he claims would have alerted counsel to "the need to work with experts in various disciplines related to Rubio's mental health." (Pet., Doc. 61, 52)  And Dr. Ouaou offers that had

Rubio's trial counsel retained an expert such as himself, the expert would have "administered a complete neuropsychological battery to determine whether Rubio has brain damage." (*Id*. at 47)

As a threshold matter, Rubio cannot rely on this new evidence to show that his claim is substantial. *See Tong v. Lumpkin*, 90 F.4th 857, 866-67 (5th Cir. 2024) (refusing to consider evidence outside the state court record to decide if an inmate's underlying *Strickland* claim was substantial). A federal court considering a § 2254 habeas petition cannot consider evidence that was not properly placed before the state courts, unless the claim relies on "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable;" or is based on "a factual predicate that could not have been previously discovered through the exercise of due diligence". 28 U.S.C. § 2254(e)(2)(A). Additionally, the petitioner must demonstrate that "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." *Id*. at § 2254(e)(2)(B). And the petitioner cannot evade these requirements by arguing that state habeas counsel was ineffective for failing to introduce the evidence in the state court proceedings. *Shinn v. Ramirez*, 596 U.S. 366, 382 (2022) ("[S]tate postconviction counsel's ineffective assistance in developing the state-court record is attributed to the prisoner.") The Section 2254(e)(2) standard "is a stringent one" reserved for "extraordinary cases", *Shinn*, 596 U.S. at 371, and Rubio has not demonstrated that he meets it. He does not rely on a new constitutional rule and has not shown that the proposed evidence was previously unavailable to him even after the exercise of due diligence. Instead, Rubio blames his state habeas counsel for not developing this evidence in those proceedings. (Pet., Doc. 61, 68–69) But this argument, by its very nature, concedes that the evidence was then available to him. *See Newbury*, 756 F.3d at 869 ("[T]he fact that Newbury now claims that state habeas counsel should have presented this evidence in the state habeas proceedings necessarily

constitutes an admission that the evidence was available at that time."). Based on these legal principles, the Court cannot consider the new evidence that Rubio offers.

In any event, even if the Court considered the evidence, neither Dr. Agharkar nor Dr. Ouaou present testimony that prove material to Claim One. As previously explained, Rubio's trial counsel retained various mental health experts, none of whom concluded that Rubio suffered from brain "trauma" or "neurological disease." (Clerk's Record, Doc. 76–12, 253) Trial counsel had a right to rely on these experts' views, as the Constitution imposes no requirement that attorneys "scour the globe on the off chance something will turn up." *Rompilla*, 545 U.S. at 383; *see also Segundo v. Davis*, 831 F.3d 345, 352 (5th Cir. 2016). The fact that other experts can review the record in hindsight and identify additional areas of inquiry does not in itself reflect that trial counsel's representation fell below an objective standard of reasonableness.

Rubio also presents a declaration from his state habeas counsel, who states: "I did not contact or speak with Rubio's trial counsel until just before the evidentiary hearing, so I was not aware that Mr. Stapleton recognized that his mitigation specialist did not have the expertise to fill the role required by the ABA Guidelines. Had I known this, l would have raised this claim in Rubio's state habeas application." (Habeas Record, Doc. 81–4, 55) Contrary to Rubio's argument, however, an attorney falling on his sword in retrospect is not dispositive. "After an adverse verdict at trial even the most experienced counsel may find it difficult to resist asking whether a different strategy might have been better, and, in the course of that reflection, to magnify their own responsibility for an unfavorable outcome. *Strickland*, however, calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind." *Harrington*, 562 U.S. at 109–10; *see also Rabe v. Thaler*, 649 F.3d 305, 309 (5th Cir. 2011) ("A court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.

The court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." (cleaned up)).  Even if the Court considered the declaration of David A. Schulman, this evidence would not lead to the conclusion that Rubio's habeas counsel's representation fell below an objective standard of reasonableness.

Ultimately, Rubio has not demonstrated that his trial counsel's decisions regarding the members of the defense team and their investigation of mental health defenses fell below the applicable standard.  Not only did Stapleton himself have substantial experience regarding mental health issues in capital cases, but he and Rubio's other counsel, Perez, obtained the expertise of specialists, including Ms. Fisher, and reasonably believed at the time that she was qualified to screen Rubio for mental health concerns.  The record supports the conclusion that Rubio's trial counsel made decisions that satisfied any applicable standard of reasonableness.

### b.  Substantial Claim: Prejudice

Even if Rubio had demonstrated that his defense team's representation fell below an objective standard of reasonableness by not including a qualified mental health screening expert, he cannot show that the failure prejudiced him.  Rubio must demonstrate that "under Texas's capital sentencing statute, the additional mitigating evidence is so compelling that there is a reasonable probability that at least one juror could have determined that because of the defendant's reduced moral culpability, death is not an appropriate sentence." *Tong*, 90 F.4th at 866.  "The likelihood of a different result must be substantial, not just conceivable." *Id*.  In making this determination, a court must "reweigh the evidence in aggravation against the totality of available mitigating evidence." *Canales v. Davis*, 966 F.3d 409, 412 (5th Cir. 2020); *see also Smith v. Spisak*, 558 U.S. 139, 154 (2010) (finding that the defendant was not prejudiced by

counsel's failures in light of the horrific nature of the crime as well as the defendant's "boastful and unrepentant confessions and his threats to commit further acts of violence").

The record reflects that at each stage of the proceedings–i.e., the competency hearing, the guilt-innocence trial, and the punishment phase–the defense team presented evidence regarding Rubio's mental health.  He fails to demonstrate that had his defense team hired a different mental-health expert, they would have developed evidence sufficiently distinct from the evidence admitted in these proceedings so as to make a difference in the result of any of them.  In addition, at the guilt-innocence trial and the punishment phase, the State presented substantial evidence of the crime's appalling nature.  The jury was entitled to consider this evidence when determining guilt-innocence, as well as at the punishment phase. *See Nelson v. Lumpkin*, 72 F.4th 649, 662 (5th Cir. 2023) (reasoning that given the brutal circumstances of the murder, the defendant was not prejudiced by counsel's failure to develop certain mitigating evidence); *Luna v. Lumpkin*, 832 F. App'x 849, 853 n.1 (5th Cir. 2020) (explaining that to determine whether prejudice existed in a Texas death penalty case, courts "reweigh the mitigation evidence—what was presented at trial as well as what should have been—against the aggravating evidence").  Rubio has not demonstrated that in light of the crime's abhorrent nature, any omitted mental-health evidence or defense would have altered the outcome.

### c. State Habeas Counsel's Performance

To succeed on his procedurally-defaulted claim, Rubio must also demonstrate that his state habeas counsel acted below an objective standard of reasonableness by not presenting the claim in the 2013 Habeas Application.  And he would have to show that had his state habeas counsel presented such a claim, "there is a reasonable probability that he would have been granted state habeas relief". *Newbury*, 756 F.3d at 872; *see also Mamou v. Davis*, 742 F. App'x 820, 828 (5th Cir. 2018).

As to the first prong, Rubio must demonstrate that his state habeas counsel's "decision not to bring specific claims fell outside of 'professional norms'" that were "prevailing when the representation took place."[12] *Ayesta v. Davis*, 933 F.3d 384, 389 (5th Cir. 2019) (cleaned up). Habeas counsel may engage in "winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." *Id*. at 394 (quoting *Jones v. Barnes*, 463 U.S. 745, 751–752 (1993)).

Rubio fails to satisfy the controlling standard. His state habeas counsel consisted of two attorneys and a mitigation expert. They reviewed a record that contained extensive evidence regarding Rubio's mental health, and ultimately presented a 109-page application that raised six challenges. In the first three claims, they focused on FASD, obtaining $13,000 to conduct an investigation into the issue. At the hearing, they admitted stipulated affidavits from four FASD experts, and "offered the live testimony of five witnesses, including a trial consultant with expertise in jury selection, two attorneys with expertise in capital murder trial work, a mitigation specialist, and [Rubio's] second-chair trial attorney [Stapleton] who had organized and directed the defense's 'team of experts.'" *Ex parte Rubio*, 2018 WL 2329302, at *3. In light of these thorough efforts, the record does not demonstrate that they acted below an objective standard of reasonableness when deciding what issues to present in the 2013 Habeas Application.

### d.  Prejudice in State Habeas Proceedings

Rubio also does not show that had his state habeas counsel presented Claim One in his 2013 Habeas Application, the state habeas court would have granted him the relief he requests. The state habeas court expressly noted that Rubio's trial counsel had retained various experts who examined Rubio and opined as to his mental health, in particular with respect to his "bizarre

---

[12] The Court's conclusion that Rubio's Claim One is not substantial naturally defeats his argument that his state habeas counsel should have presented the claim to the state habeas court. *See Slater v. Davis*, 717 F. App'x 432, 438 (5th Cir. 2018) ("Cause is not satisfied just because habeas counsel failed to raise very nonfrivolous claim."). In this section, the Court assumes for purposes of the analysis that Claim One is substantial.

behavior". Rubio argued that his trial team should have conducted a more thorough investigation of FASD, but the state habeas court rejected that argument, explaining that trial counsel had "investigate[d] the effects of prenatal alcohol abuse on [Rubio]." (State Habeas Court Findings, Doc. 83–7, 14)  In the same vein, had Rubio included Claim One in the 2013 Habeas Application, his argument would have been very similar–i.e., he would have argued that while his trial team retained a mental health expert and mitigation specialist, and one of his attorneys possessed extensive experience with mental-health defenses in capital cases, his defense team should have also retained an additional mental-health screening expert.  The state habeas court found such an argument with respect to FASD unpersuasive.  Rubio provides no evidence or argument demonstrating that an analogous argument with respect to including a mental-health screening expert on the defense team would have succeeded.

As to Claim One, Rubio neither shows that he presents a substantial claim nor that his state habeas counsel provided ineffective assistance of counsel.  As a result, he is not entitled to relief on this claim.

### 2. Claim Three: Failure to Adequately Investigate and Present an Insanity Defense

In his third claim, Rubio faults trial counsel's efforts "to adequately investigate and prepare [his] sanity defense." (Pet., Doc. 61, 104)  Rubio identifies two specific errors that his counsel allegedly committed.  First, he alleges that his trial attorneys misunderstood the legal standards for an insanity defense, resulting in "both testifying defense experts appl[ying] the incorrect legal standard in assessing [his] sanity". (*Id.*)  Second, Rubio claims that trial counsel failed to supply his experts or to offer into evidence "critical information about the case", such as

his "TDCJ and jail records." (*Id.*)  These failures, Rubio contends, deprived him of his Sixth Amendment right to effective counsel.[13]

As Claim Three is procedurally defaulted, Rubio must demonstrate: (1) that he presents a substantial claim–i.e., that under *Strickland*, his trial counsel's representation fell below an objective standard of reasonableness and that the deficiency prejudiced him; (2) that his state habeas counsel's failure to present this claim in the 2013 Habeas Application fell below an objective reasonable standard; and (3) that had his habeas counsel presented the claim in 2013, a reasonable probability exists that the state habeas court would have granted the relief that Rubio seeks.

### a.  Substantial Claim: Deficient Performance

Rubio argues that he presents a substantial claim because his trial counsel performed below an objectively reasonable standard by not understanding the law for a not-guilty-by-reason-of-insanity defense, leading to the improper questioning of witnesses and an inadequate preparation of Rubio's expert witnesses.  Rubio must show that this argument satisfies the *Strickland* test of deficient performance and prejudice.

As an initial matter, when viewing the record as a whole, Rubio fails to demonstrate that his trial counsel either misunderstood the legal standard for his insanity defense or conducted witness examination or the preparation of expert witnesses based on an incorrect understanding. In Texas, the Penal Code prescribes that it "is an affirmative defense to prosecution that, at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know

---

[13] Rubio also mentions other alleged errors by trial counsel which are unrelated to the main thrust of his claim.  In particular, he contends that (1) "trial counsel had not flagged for Dr. Valverde the testimony of Moreno, who stated that Rubio claimed to know how to commit the 'perfect crime' by feigning insanity"; (2) "Dr. Valverde [had not] been able to review Angela Camacho's statements about the night of the incident"; (3) "Dr. Morris had not been made aware that Camacho had claimed that Rubio talked about killing the children months before the incident"; (4) Dr. Morris had not "been able to interview Moreno"; and (5) "Dr. Morris had [not] been unable to review Dr. Welner's interview with Rubio." (Pet., Doc. 61, 30–31)  He devotes limited attention to these specific allegations, and the Court finds that none proves significant or satisfies the *Martinez* or *Strickland* standards.

that his conduct was wrong." TEX. PENAL CODE § 801.  Texas courts have rendered clear that the correct question is whether the defendant understood that his conduct was legally wrong, and not just morally wrong. *See Ruffin*, 270 S.W.3d at 592 ("Thus, the question for deciding insanity is this: Does the defendant factually know that society considers this conduct against the law, even though the defendant, due to his mental disease or defect, may think that the conduct is morally justified?").

In Rubio's first trial, his counsel presented an insanity defense, albeit unsuccessfully.  In his direct appeal from that first conviction, Rubio squarely raised the issue of this defense.  The TCCA summarized the law concerning the defense, including that "[i]n the context of the insanity defense, the word 'wrong' means illegal." *Rubio*, 2012 WL 4833809, at *1.  When considering whether the trial record contained evidence to support the jury's decision to find that Rubio was not insane, the appellate court observed that "the trial record contains evidence that [Rubio] was legally insane at the time of the offense, but it also contains substantial evidence that he was not legally insane." *Id.*  Given the conflicting evidence, the credibility and weight of which rested in the province of the jury, the court rejected Rubio's appeal on this point.  Years later, as Rubio's counsel for his second trial prepared for his defense, they had the benefit of the TCCA's decision, including its unambiguous recitation of Texas law regarding an insanity defense.  In other words, the TCCA's ruling provided guidance for trial counsel to fashion a defense in the second trial.

And Rubio's trial counsel demonstrated their correct understanding of Texas' insanity defense throughout the trial.  In voir dire, counsel discussed the insanity defense with the venire. The prosecution, which usually questioned individual venire members first, consistently indicated that "case law has defined that 'wrong' means illegal." (Tr. Trans., Doc. 74–4, 30)  When Rubio's counsel conducted his voir dire, he never intimated that his understanding of the insanity defense

differed in any way.  For example, he never asked questions indicating that he believed an insanity defense under Texas law concerned whether the defendant considered the crime morally wrong.

Upon the selection and empaneling of the jury, the trial commenced.  And in the questioning of expert witnesses Dr. William Mark Valverde and Dr. Raphael Morris, Rubio's trial counsel again demonstrated that they understood the correct legal standard.  As to Dr. Valverde, Rubio's trial counsel first elicited his opinion that Rubio suffered from psychosis.  The following questions walked through the legal definition of an insanity defense:

> Q.    Now, the other portion of that affirmative defense, as far as beyond the fact of the severe mental disease or defect, is that at the time of the commission of the murders, when the conduct charged, which is the murder of the three children, at the time that the three children were murdered, did John Rubio know that his conduct was wrong?

> A.    In my opinion, no.

> * * *

> Q.    [ ] Now, there is going to be an issue—I would like you to assume—we don't have the law yet from the judge, but I would ask you to assume that there is some Texas case law that says, all right, knowledge of "wrong" means knowledge of "illegal." . . .  All of those indicate a knowledge that he would be arrested and that his conduct was contrary to law, that the police would come and get him, that his conduct was illegal. How does that reconcile with your opinion and belief that at the time he committed the murders, he did not know that his conduct was wrong?

> A.    Okay. Mr. Stapleton, my response was that based on his delusion, he did not believe at the time that his conduct was wrong. Did he know that others would view it as wrong? Did he know that others might view it as illegal? Perhaps. But that doesn't address the issue of the state of mind of John Allen Rubio at that moment in time. It is what he felt had to be done regardless of the consequences.

(Tr. Trans., Doc. 74–16, 49–50)  In this exchange, Rubio's counsel led Dr. Valverde through questions based on the correct standard for an insanity defense under Texas law.

The same occurred with Dr. Morris, a forensic psychiatrist who met with Rubio numerous times before preparing his 2009 report.  Dr. Morris interviewed people who knew Rubio, considered psychological test results, and reviewed reports made by previous mental health

experts.  Dr. Morris had testified approximately ten times in other cases about insanity. (*Id*. at

145)

Trial counsel's questioning of Dr. Morris followed the same pattern.  Dr. Morris first

opined that Rubio suffered from a severe mental disease or defect–namely, schizophrenia.

Rubio's counsel then asked Dr. Morris whether at the time of the murders, Rubio knew "that his

conduct was wrong". (*Id*. at 144)  Dr. Morris answered that Rubio "did not know that it was

wrong." (*Id*. at 145)  Counsel then honed in on the legal definition of insanity:

> Q.      Now, later–and whatever the actual sequence was, later we have, "Arrest
> me. What more do you want? I killed the kids." There is that presentation to the
> police that he knew they were illegal. You are aware of that?
>
> A. Yes, I am.
>
> Q. All right. And so how does that fit in with your opinion that at the time of the
> killings he did not know that the conduct was wrong?

(*Id*. at 145)  The court sustained an objection to Dr. Morris's initial response, but in the end, he

testified that "at the time that he (Rubio) is actually doing it, in my opinion, he is not able to think

about right and wrong at that moment." (*Id*. at 146)  As with Dr. Valverde, the questioning of Dr.

Morris by Rubio's trial counsel reveals a proper understanding of the insanity defense under Texas

law.  Even on cross examination, the State noted that Dr. Morris's report referenced Texas Penal

Code § 8.01 for the definition of insanity, and Dr. Morris testified on cross examination that he

kept this legal definition in mind when evaluating Rubio. (*Id*. at 160)  Dr. Morris acknowledged

that his report also referenced whether Rubio knew that his conduct was "morally wrong", but he

clarified that he had not had time to amend that language. (*Id*. at 178–79)  Although the State

challenged Dr. Morris's testimony in closing argument by contending that he had applied an

incorrect standard (*see* Tr. Trans., Doc. 74–20, 126), the totality of his testimony reveals, at most,

that he made differing statements on the issue.

Ultimately, the record demonstrates that Rubio's trial counsel understood the legal standard for an insanity defense under Texas law, and that they questioned witnesses and prepared experts based on this correct understanding. While Rubio presents instances in which the distinction between legally wrong and morally wrong became blurred, the overall picture remains clear. Rubio fails to show that his trial counsel's performance was deficient on this issue.[14]

### b. Substantial Claim: Prejudice

Even if Rubio had demonstrated that his defense team's representation fell below an objective standard of reasonableness in its preparation for and presentation of an insanity defense, he cannot show that the failure prejudiced him. The testimony regarding Rubio's insanity defense at most included statements based on both a "legally wrong" and a "morally wrong" standard. But Rubio presents no convincing argument that had the jury not heard the competing testimony based on a "morally wrong" standard, it would have found him not guilty by reason of insanity. On the contrary, the jury also heard ample evidence based on the correct "legally wrong" standard, and choose to not accept it. And the jury heard substantial evidence supporting the conclusion that Rubio understood that his actions were legally wrong. This evidence supported the jury's rejection of an insanity defense, and Rubio has not carried his burden to show that removing a few references to an incorrect definition of insanity would have led the jury to disregard the evidence controverting his insanity defense.

Given that Rubio fails to show that his counsel engaged in deficient performance, and that any deficient performance prejudiced him, he has not demonstrated a substantial issue as to Claim Three.

---

[14] Rubio includes, as part of Claim Three, the argument that trial counsel failed to "investigate and present information related to Rubio's documented history of mental illness in TDCJ and jail records". (Pet., Doc. 61, 109–117) He presents the same argument as part of his Claim Seven, and the Court addresses that argument at length when considering that claim. *See infra.*, Sect. IV.A.3. As explained in that section, Rubio is not entitled to relief based on this argument.

### c. State Habeas Counsel's Performance

To overcome the procedural bar as to Claim, Rubio must also demonstrate that his state habeas counsel's failure to present this claim in the 2013 Habeas Application fell below an objective reasonableness standard. The record does not support such a conclusion. Rather, the record demonstrates that Rubio's trial counsel understood the legal standard for an insanity defense under Texas law and prepared for trial based on that correct understanding. While the record contains some references to a "morally wrong" standard, the instances are few and are balanced by unambiguous statements by witnesses and Rubio's trial counsel based on the correct standard. State habeas counsel reviewed a record that presented a mixed and, in the ultimate analysis, a weak claim. When considering whether to present an issue on habeas, counsel acts reasonably by electing to not pursue those deemed dubious. *See Kossie v. Thaler*, 423 F. App'x 434, 437 (5th Cir. 2011) ("An appellate attorney need not, and should not, raise every nonfrivolous claim, but rather should 'winnow out weaker arguments' to maximize the likelihood of success on appeal."). Rubio has not demonstrated that his habeas counsel's decision to not present Claim Three in the 2013 Habeas Application fell below an objective standard of reasonableness.

### d. Prejudice in State Habeas Proceedings

Finally, Rubio must show that had his habeas counsel presented Claim Three in the 2013 Habeas Application, a reasonable probability exists that the state habeas court would have granted the relief that Rubio seeks. "The likelihood of a different result must be substantial, not just conceivable." *Wessinger,* 864 F.3d at 391 (quoting *Harrington*, 562 U.S. at 112). Rubio fails to make this showing. On the contrary, the controverted nature of the evidence on the issue of an insanity defense renders it highly unlikely that the habeas court would have agreed with Rubio on this claim.

### 3. Claim Seven: Failure to Use Mental Health Evidence from Prior Incarceration

Rubio also argues that his "Sixth Amendment right to counsel was violated because the defense failed to investigate and use evidence related to Rubio's mental health during his prior incarceration." (Pet., Doc. 61, 155)  In particular, he alleges that his incarceration between his two trials "generated a trove of medical records from both TDCJ and the county jails [that] consistently documented his severe mental illness and cognitive impairment". (*Id.*)  By failing to uncover these records in a timely manner and not providing them to Rubio's experts, his trial counsel "allowed the State to leave the impression that Rubio went largely unmedicated for the better part of a decade without any significant mental health symptomology." (*Id.*)  In particular, Rubio contends that the records would have enabled his trial counsel to controvert Dr. Welner's trial testimony that Rubio was not on antipsychotic medication while incarcerated and that Rubio did not "experience[e] persistent delusions and hallucinations." (Reply, Doc. 87, 74)  According to Rubio, the records "completely contradict[ ]" Dr. Welner's testimony because they "document[] severe mental health issues" and "show that Rubio was on antipsychotics and antidepressants for nearly the entire time between his first trial in 2003 and his return to county jail in 2007." (Pet., Doc. 61, 110)

As Claim Seven is procedurally defaulted,  Rubio must demonstrate: (1) that he presents a substantial claim–i.e., that under *Strickland*, his trial counsel's representation fell below an objective standard of reasonableness and that the deficiency prejudiced him; (2) that his state habeas counsel's failure to present this claim in the 2013 Habeas Application fell below an objective reasonable standard; and (3) that had his habeas counsel presented the claim in 2013, a

reasonable probability exists that the state habeas court would have granted the relief that Rubio seeks.[15]

### a. Substantial Claim: Deficient Performance

To present a substantial claim, Rubio bears the burden to show that his trial counsel's handling of the prison records fell below an objective standard of reasonableness. He does not meet this burden.

Rubio's argument turns on his contention that his trial counsel obtained the prison records in an untimely manner–i.e., on the eve of trial. The record, however, includes references to the TDCJ records at the competency hearing. (*See* Comp. Trial, Doc. 73–2 at 32; Comp. Trial, Doc. 73–1, 152; Clerk's Record, Doc. 76–10, 216) And Rubio appears to acknowledge that his trial counsel possessed the prison records before that proceeding. (*See* Initial Reply, Doc. 41, 80) Importantly, the competency hearing occurred four months before the guilt-innocence phase, which provided Rubio's trial counsel ample time to review and utilize the prison records in the manner they thought best suited to their client's interest.

At trial, Rubio's counsel had to determine whether and, if so, how to use the prison records. Rubio highlights various portions of those records to argue that they show that he was prescribed mental health medications for several years while in prison between his two trials, and that he exhibited behavior consistent with a severe mental health illness. But he cannot contest that the record also contains evidence indicating that Rubio often refused to take the prescribed medication. For example, Dr. Troy Martinez, an expert that the trial court appointed for the competency trial, reported that Rubio told him that "[w]ith the exception of taking an anti-depressant until he stopped it about 8 months ago, [Rubio] reports having refused all other

---

[15] In connection with Claim Seven, Rubio relies on several submitted exhibits, such as an affidavit indicating that TDCJ provided the prison records to Rubio's trial counsel in February 2010. (*See* Doc. 24-1, 210) But he fails to show that he relies on a new constitutional rule or that the proposed evidence was previously unavailable to him even after the exercise of due diligence. As a result, the Court will not consider this new evidence. *See* 28 U.S.C. § 2254(e)(2).

psychotropics for the past few years with the possible exception of one day about 18 months ago." (Clerk's Record, Doc. 76–10, 218)  Similarly, Dr. Morris noted that Rubio "refused antipsychotic medications, mostly due to the sedating effects." (Clerk's Record, 76–11, 77)  Rubio's counsel had to balance this mixed bag.  While Rubio was prescribed mental health medications during his incarceration between trials, and this fact could support his insanity defense, if he raised the issue as part of that defense, the State could offer evidence that he consciously refused the medication, allowing the jury to draw negative inferences from his refusal.

The prison records also contain differing data concerning Rubio's mental health while incarcerated.  Rubio focuses on evidence demonstrating his odd behavior while in state custody.  But Dr. Martinez highlighted that the records likewise revealed "frequent and numerous documentations of Mr. Rubio *self-reporting* a myriad of complaints suggestive of (a very *atypical*) psychosis". (Clerk's Record, Doc. 76–10, 219–20 (emphasis added))  And the documents contain "remarkably little evidence of staff actually witnessing (or documenting at the very least) functional behavior indicative of a psychotic condition." (*Id.*)  At times, prison staff described Rubio as lucid, goal directed, reality based, and without delusions or hallucinatory behavior. (*Id.*)

Moreover, Rubio cannot successfully argue that the prison records would have completely undermined Dr. Welner's testimony.  As an initial matter, Dr. Welner reviewed the "TDCJ Medical records" as part of his evaluation. (Tr. Trans., Doc. 75–5, 15)  In addition to considering these documents, he "[did] his own research.  He [did] his own interviews.  He [] conducted his own analyses and evaluation. . . . And he [] talked to the defendant.  He [] interviewed the defendant." (Tr. Trans., Doc. 74–18, 216–17)  The breadth of information that Dr. Welner considered would have limited any cross-examination that Rubio's trial counsel could have attempted with the prison records.  Dr. Welner had considered that information and found it unpersuasive in light of

the overall set of data that he reviewed before concluding that Rubio did not suffer from a severe mental disease or defect.

In the end, not only did Rubio's trial counsel have access to the prison records sufficiently in advance of the guilt/innocence trial, but their decision to not utilize those documents with the jury falls within the type of reasonable strategic decisions of trial counsel. Contrary to Rubio's contention, the prison records do not represent one-sided evidence in his favor. They provide some information supporting the argument that Rubio suffered from a severe mental disease or defect, but also contain information that controverts such an argument. Trial counsel have broad discretion to make strategic decisions when considering whether to use evidence that presents strengths and weaknesses. *See*, *e.g.*, *Moore v. Johnson*, 194 F.3d 586, 617 (5th Cir. 1999) (noting that courts consistently reject ineffective assistance claims if "the record established counsel conducted an adequate investigation, but made an informed trial decision not to use the potentially mitigating evidence because it could have a prejudicial backlash effect on the defense"). In the present case, Rubio has failed to demonstrate that his trial counsel's handling of the prison records fell below an objective standard of reasonableness.

### b. Substantial Claim: Prejudice

Rubio also demonstrates no prejudice from the alleged deficient performance of his trial counsel in connection with the prison records. Even had his lawyers obtained the prison records at an earlier point, and had utilized them during the trial, no reasonable probability exists that the jury would have reached a different decision with respect to his guilt or innocence, or of his punishment. The contents of the prison records would have supported use by counsel for both sides. At most, the jury would have heard additional competing evidence regarding Rubio's mental health and sanity. Rubio does not demonstrate that the prison records would have significantly shifted the balance of that evidence in the jury's mind. *See*, *e.g.*, *Druery v. Thaler*,

647 F.3d 535, 541–42 (5th Cir. 2011) (holding that counsel was not ineffective for failing to introduce certain mitigating evidence because that same evidence could have also been viewed as aggravating evidence by the jury).  Absent such a showing, Rubio cannot satisfy his burden to show prejudice.

### c.  State Habeas Counsel's Performance

Given the imperfect nature of Claim Seven, it is not surprising that Rubio's state habeas counsel chose to not include it within the 2013 Habeas Application.  The "performance inquiry [is] whether counsel's assistance was reasonable considering all the circumstances." *Segundo v. Davis*, 831 F.3d 345, 350 (5th Cir. 2016). And state habeas counsel possesses the discretion to focus on a few issues deemed the strongest, while foregoing those issues with a lower chance of success. *See, e.g.*, *Kossie*, 423 F. App'x at 437 (explaining that counsel acts reasonably by "winnow[ing] out weaker arguments" to ensure the greatest chance of success).  Rubio fails to demonstrate that the omission of this issue in the 2013 Habeas Application was anything other than a strategic decision to not advance a weak argument.  As a result, he has not satisfied his burden to show that his state habeas counsel's performance fell below an objective standard of reasonableness.

### d.  Prejudice in State Habeas Proceedings

Rubio also cannot show actual prejudice from his state habeas counsel's decision to not present Claim Seven to the habeas court.  No reasonable probability exists that had that court considered an argument tracking Claim Seven, it would have granted Rubio any relief on this claim.  The reasons that support the Court's finding that Claim Seven does not represent a

substantial claim also support the conclusion that the state habeas court would have reached the same decision.

### B. Prosecutorial Corruption

Rubio makes two claims based on alleged prosecutorial corruption: (1) that the State violated his due process rights by engaging in flagrant misconduct through the actions of the corrupt Cameron County District Attorney (Claim Four) and (2) that the State violated his equal protection rights by pursuing the death penalty based on his indigent status and the results of a public survey (Claim Five).

#### 1. Claim Four: Due Process Violation

Rubio contends that the State violated his due process rights under the Fourteenth Amendment when the former Cameron County District Attorney, Armando Villalobos, engaged in a "flagrant and ongoing" pattern of misconduct that proved prejudicial to Rubio. (Pet., Doc. 61, 118) Rubio describes Villalobos's conduct in detail, the reprehensibility of which no party disputes, and which ultimately led to Villalobos's conviction for extortion, racketeering, and RICO conspiracy. *See United States v. Villalobos*, 601 F. App'x 274 (5th Cir. 2015). In particular, Rubio emphasizes the following seven instances of Villalobos's misconduct and its alleged relation to the prosecution against Rubio.

> (1)  Villalobos oversaw a kickback scheme in connection with asset forfeiture funds. In one instance, Villalobos directed the appointment of two friends to an asset forfeiture proceeding, in return for a kickback. Some of the seized monies went into the asset-forfeiture fund, which the District Attorney Office's used to pay expert witness Dr. Welner in the case against Rubio.

> (2)  One of Rubio's trial attorneys—Nathaniel Perez—was one of several attorneys who filed a federal lawsuit for parity between indigent funding and that for county prosecutors. *See Salas, et al. v. Cameron County*, 1:10-CV-037 (S.D. Tex. Feb. 22, 2010). In response, Villalobos placed Perez on a "blacklist" that prevented his clients from receiving probation, plea bargain agreements, or the ability to review discovery.

(3)     Even though the District Attorney's Office repeatedly objected to the allocation of funds in Rubio's case for purposes such as expert assistance, Villalobos at the time was personally enriching himself through his corrupt activities.

(4)     Attorney Alfredo Padilla served as Rubio's second chair in the original trial. The District Attorney's Office then hired Padilla.  Rubio moved to disqualify the District Attorney's Office from prosecuting his case because of Mr. Padilla's employment.  The trial court denied the motion.

(5)     The District Attorney's Office improperly used its subpoena power to seize information, including legal documents, from Rubio's cell phone before the second trial.

(6)     The prosecution ignored a court order preventing press releases and media interviews about Rubio's case.

(7)     In 2016, author Laura Tillman published THE LONG SHADOW OF SMALL GHOSTS: MURDER AND MEMORY IN AN AMERICAN CITY, in which she claimed that Villalobos conducted polling which led him to believe that residents wanted the District Attorney's Office to seek the death penalty against Rubio.

(Pet., Doc. 61, 119–30)  Rubio argues that these examples reveal a comprehensive and flagrant pattern of misconduct that permeated the prosecution against him.

Rubio concedes that this claim is procedurally defaulted, but argues that he has established cause and prejudice to overcome the procedural bar.  Under that doctrine, "the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986).  Objective external factors can include "that the factual or legal basis for a claim was not reasonably available to counsel," or that "some interference by officials . . . made compliance impracticable". *Id.* (cleaned up); *see also Prible v. Lumpkin*, 43 F.4th 501, 514 (5th Cir. 2022).

As for prejudice, the "habeas petitioner must show 'not merely that the errors at . . . trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.'" *Murray*, 477 U.S. at 494

(quoting *United States v. Frady,* 456 U.S. 152, 170 (1982)).  The "showing of pervasive actual prejudice" is nothing other "than a showing that the prisoner was denied 'fundamental fairness' at trial." *Murray*, 477 U.S. at 494.

### a. Cause

As to Claim Four, Rubio posits that he demonstrates cause through Villalobos's "failure . . . to reveal that he conducted a public survey before seeking death against Rubio", and by "hid[ing] the fact that he used ill-gotten money from his civil-asset forfeiture scheme to fund Rubio's prosecution." (Pet., Doc. 61, 131)  These grounds, however, do not establish cause.

As an initial matter, Rubio knew about most of the allegations of misconduct at the time of trial.  His defense team filed motions alleging government misconduct, including regarding the State's use of its subpoena power, its interaction with the press despite a gag order, its objection to the allocation of funds, the placement of Perez on a "blacklist", and the State's employment of Padilla.  The trial court fully explored those issues in a pre-trial hearing. (Tr. Trans., Doc. 73–15)  Given the presentation of these issues to the trial court, Rubio cannot contend that the information regarding these claims was not reasonably available to him in 2013 when he filed his original habeas application.

It is true that Rubio, in 2013, had no knowledge of Tillman's book, which she published three years later.  In that book, Tillman reports that Villalobos wrote her a letter revealing that he relied on community polling when deciding to prosecute Rubio as a capital case.  This source, however, does not help Rubio.  As an initial matter, Section 2254(e)(2) precludes the Court's consideration of the information.  In addition, Villalobos acknowledged his consideration of community opinion in a hearing before Rubio's second trial, explaining that he "believe[d] that the majority of the citizens of Cameron County want me to proceed on the death penalty for John Allen Rubio". (Tr. Trans., Doc. 73–15, 90–91).  To the extent that Villalobos's consideration of

public opinion provided Rubio with an argument of selective prosecution or other misconduct, he possessed the information necessary to develop the claim even before the 2010 trial.

### b. Prejudice

Even if Rubio could demonstrate cause for not presenting Claim Four in his 2013 Habeas Application, he nevertheless fails to show any prejudice. For him to meet this burden, the record must reveal errors at trial that "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Smith v. Quarterman*, 515 F.3d 392, 403 (5th Cir. 2008) (quoting *Murray*, 477 U.S. at 488). He falls far short of this high standard. Most notably, he establishes no connection between Villalobos's misconduct and Rubio's own case. For example, the record contains no evidence that Villalobos requested, or would have accepted, money for leniency on Rubio. The record is devoid of any evidence regarding an alleged "blacklist" that included Rubio's counsel, Perez, or any manner in which such a list led to specific decisions by the State against Rubio. In addition, while Rubio complains of the State's objection to his funding requests, he cannot deny that his defense team retained no less than nine medical and mental health experts. Ultimately, while no party disputes that Villalobos engaged in gross misconduct as District Attorney, the record contains no evidence indicating that the misconduct affected the prosecution against Rubio.

The alleged revelations in Tillman's book also would not demonstrate prejudice, even if the Court considered that evidence. In the alleged letter on which Tillman relies, Villalobos includes polling as only one factor in the decision to seek the death penalty. He also based the decision on "the unsettling, shocking, and unescapable images of the babies that were murdered". Laura Tillman, THE LONG SHADOW OF SMALL GHOSTS: MURDER AND MEMORY IN AN AMERICAN CITY 153 (2016). He had made similar comments before, including at a pre-trial hearing when he explained why the State sought the death penalty: "And the very nature of the offense, he held

down and strangled his babies. Held them down, stabbed them, cut their heads off. The last one, he couldn't even cut the head off completely. He had to yank the  head off. *Because of that and that alone, we are seeking the death penalty*." (Tr. Trans., Doc. 73–15, 90–91 (emphasis added)) The prosecution does not commit misconduct when it weighs the heinousness of a crime to decide whether to seek the death penalty.  And assuming that Villalobos considered community opinion as a factor, his doing so would not demonstrate that Rubio was denied fundamental unfairness at trial.

### c.   Merits Review (in the alternative)

Given that Rubio has not satisfied his burden to show cause and prejudice, the Court does not reach the merits of Claim Four.  But even if the Court applied a merits review, the same analysis that leads the Court to conclude that Rubio has not established prejudice would also undermine his ability to prove a violation of his due process rights.  He would have to show that the alleged misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Gutierrez v. Quarterman*, 201 F. App'x 196, 202 (5th Cir. 2006) (citing *Donnelly v. DeChristoforo,* 416 U.S. 637, 643 (1974)).  But the disconnect between Villalobos's misconduct and the prosecution of Rubio undermines any claim by him to show fundamental unfairness.

### 2.   Claim Five: Equal Protection Violation

Rubio alleges that the State violated his equal protection rights "when it pursued the death penalty against him because of his indigent status and based on a public survey." (Pet., Doc. 61, 132)  He rests this claim on the same factual allegations as those he presents as to Claim Four.  In short, he contends that Villalobos dispensed leniency to those who bribed him, "and to preempt any criticism for granting leniency to those capable of paying, he prosecuted indigent defendants", such as Rubio, "with maximum conceivable force." (*Id.*)  According to Rubio, Villalobos detracted

from his own criminal activity by directing an aggressive prosecution against Rubio in "bad faith". In addition, Rubio alleges that Villalobos relied on a community poll to decide to seek the death penalty. He did not use such sources with wealthy defendants, rendering the prosecution of Rubio as a capital case "an arbitrary, unjustifiable decision." (*Id*. at 132 and 138)

Rubio did not present this claim in his 2013 Habeas Application. Three years later, he submitted his 2016 Supplemental Habeas Application, which included an equal protection challenge. Specifically, he argued that he "was denied equal protection by the State's refusal to discuss the possibility of a plea bargain, because the state's refusal was part of an illegal and on-going bribery scheme." (Habeas Record, Doc. 83–6, 86) The trial habeas court forwarded Rubio's successive habeas application to the TCCA, which concluded that "the information forming the basis for this argument was known to [Rubio's] trial attorney since the time of [his] trial" and that the "theories about the impact of the bribery scheme were speculative". *Ex parte Rubio*, 2018 WL 2329302, at *4.

Then, when Rubio filed the instant matter, this Court stayed the case for Rubio to return to Texas courts, where he presented Claim Five, relying on the statements about the community poll within Tillman's book. Rubio now argues that the "new evidence of the survey fundamentally alters the claim because it goes directly to Villalobos's bad-faith intent in seeking death against Rubio." (Pet., Doc. 61, 126) This argument, however, proves unpersuasive. The Court need not determine whether Claim Five is fundamentally different from the equal protection claim that Rubio included in his 2016 Supplemental Habeas Application, as the TCCA considered Claim Five in 2022 and concluded that it represented an abuse of the writ. *See Ex parte Rubio*, 2022 WL 221485, at *3. This ruling definitively established that Claim Five is exhausted and procedurally defaulted.

As a result, to overcome the procedural bar, Rubio must demonstrate cause and prejudice. He fails on both prongs.

### a. Cause

Rubio argues that the State's misconduct establishes cause, (Pet., Doc. 61, 141; Reply, Doc. 87, 96–97), but he fails to explain how the factual or legal basis for his equal protection claim was not reasonably available to his state habeas counsel, or how any interference by officials prevented him from investigation or presenting the claim.   On the contrary, the TCCA in 2018 concluded that Rubio, in 2013, possessed the information necessary to present Claim Five. *Ex parte Rubio*, 2018 WL 2329302, at *4.   The same court reached the same conclusion in connection with the 2021 Habeas Application.   These decisions reinforce that no impediment existed to Rubio presenting Claim Five from the outset, in 2013. *See Ford v. Davis*, 910 F.3d 232, 235 (5th Cir. 2018) (finding that the Court of Criminal Appeals' decision not to allow a successive habeas application means it "necessarily found that [the petitioner] knew or reasonably could have known about the factual basis").   As a result, he cannot establish cause to excuse his procedural default.

### b. Prejudice

In addition, Rubio cannot establish the prejudice required to overcome the procedural bar. As with Claim Four, Rubio establishes no connection between the State's efforts against him and Villalobos's misconduct.   In particular, the record contains no indication that the District Attorney based its prosecution of Rubio on his indigency status.   Rubio highlights Villalobos's well-known misdeeds in particular cases and weaves a tale of comprehensive corruption across all cases that the District Attorney prosecuted during Villalobos's tenure.   But Rubio cannot demonstrate prejudice through speculative theories that stack inference upon inference.   In the end, he fails to

identify errors at trial that "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions".

With respect to the information in Tillman's book from 2016, Rubio's reliance on that source also proves speculative. The record contains no credible information that Villalobos relied on polling when exercising prosecutorial discretion. Not only can the Court not consider Tillman's book under Section 2254(e)(2), but even if it did, the book presents only hearsay statements from a single alleged letter. Moreover, even in that letter, Villalobos acknowledges that the decision to seek the death penalty against Rubio stemmed from multiple grounds, including the nature of the crime, which weighed heavily in the prosecutor's decision. Not only does the book reveal no trial error, it falls far short of establishing an error of constitutional dimensions.

### c. Merits Review (in the alternative)

Even if the Court conducted a merits review of Claim Five, the Court would dismiss it. The Fourteenth Amendment prevents a prosecution based on "a discriminatory effect" and "motivated by a discriminatory purpose." *United States v. Armstrong*, 517 U.S. 456, 465 (1996) (quoting *Wayte v. United States*, 470 U.S. 598, 608 (1985)). Rubio must "prove that he received treatment different from that received by similarly situated individuals and that the unequal treatment stemmed from a discriminatory intent." *Taylor v. Johnson*, 257 F.3d 470, 473 (5th Cir. 2001). He fails to do so. He alleges that Villalobos discriminated against indigent defendants, but such individuals generally do not constitute a constitutionally suspect class. *See Carson v. Johnson*, 112 F.3d 818, 821–22 (5th Cir. 1997) ("Neither prisoners nor indigents constitute a suspect class."). Only two distinguishing characteristics trigger heightened scrutiny under the equal-protection clause for indigent individuals: (1) "because of their impecunity they [are] completely unable to pay for some desired benefit"; and (2) "as a consequence, they sustain[] an absolute deprivation of a meaningful opportunity to enjoy that benefit." *San Antonio Indep. Sch. Dist. v.*

*Rodriguez*, 411 U.S. 1, 20 (1973). The record does not satisfy this standard as to Rubio. He does not even allege that Cameron County had an official bribery policy that led to discrimination. And he has not shown that "the decisionmakers in his case acted with discriminatory purpose." *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987); *see also Hughes v. Dretke*, 160 F. App'x 431, 436 (5th Cir. 2006) (finding that the petitioner presented no direct evidence that his conviction resulted from a racially discriminatory practice). As a result, he presents no viable equal protection claim.

### C. Expert Testimony

In his third group of procedurally-defaulted claims, Rubio advances the following four theories related to the State's experts:

Claim Six: The State knew or should have known that it elicited false testimony from Dr. Michael Welner.

Claim Eight: The State knew or should have known that it elicited false testimony from A.P. Merillat.

Claim Nine: The State violated *Brady v. Maryland* by not disclosing Merillat's false testimony from a prior case.

Claim Ten: Trial counsel was ineffective by not preparing for Merillat's false testimony during the punishment phase.

Rubio did not raise these claims in his 2013 Habeas Application, but included them in his 2021 Habeas Application. The TCCA found the claims an abuse of the writ, which rendered them procedurally defaulted in this Court. As to each claim, Rubio argues that he can overcome the procedural bar, and that his claims have merit. The Court disagrees as to the first point, precluding a merits review. But even if the Court could consider these claims, the Court would nevertheless find them lacking merit.

### 1. Claim Six: Dr. Welner's Alleged False Testimony

Rubio contends that the State violated his due process rights under the Fourteenth Amendment by eliciting "false testimony from Dr. Michael Welner when it asked him to testify that, because Rubio was not taking anti-psychotic medication, the absence of psychotic symptoms meant that Rubio did not have an authentic mental health disorder." (Pet., Doc. 61, 145)

To overcome the procedural bar as to this claim, Rubio relies on the doctrine of a fundamental miscarriage of justice, which requires that he show that he is actually innocent of the crime. *Dretke v. Haley*, 541 U.S. 386, 393 (2004). He faces a high hurdle to meet this standard. A convicted defendant "comes before the habeas court with a strong—and in the vast majority of the cases conclusive—presumption of guilt." *Schlup v. Delo*, 513 U.S. 298, 326 (1995). As a result, "tenable actual-innocence gateway pleas are rare." *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013); *see also Wilkerson v. Cain*, 233 F.3d 886, 889 (5th Cir. 2000) ("[A] substantial showing of actual innocence is extremely rare".). Importantly, "the actual innocence excuse for procedural default requires factual innocence, not mere legal insufficiency." *McGee v. Lumpkin*, No. 22-10188, 2022 WL 18935854, at *1 (5th Cir. Sept. 8, 2022) (cleaned up) (quoting *Bousley v. U.S.*, 523 U.S. 614, 623 (1998)).

This doctrine also allows an individual who receives the death penalty to acknowledge having committed the criminal act, but still challenge the sentence, by demonstrating that the record contains "clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law." *Busby*, 925 F.3d at 710 (quoting *Whitley*, 505 U.S. at 336). "[T]he habeas petitioner's claim must tend to negate not just the jury's *discretion* to impose a death sentence but the petitioner's very *eligibility* for that punishment". *Rocha v. Thaler*, 619 F.3d 387, 405 (5th Cir.), *clarified on*

*denial of reconsideration*, 626 F.3d 815 (5th Cir. 2010) (emphasis in original); *see also Gutierrez v. Saenz*, 93 F.4th 267, 293 (5th Cir. 2024) (adopting the phrase "not death eligible").

In the present case, Rubio relies on both avenues, asking the Court to excuse the procedural default "because, absent Dr. Welner's crucial misrepresentations, no reasonable juror would find that Rubio was sane at the time of the offense and therefore guilty, and because no reasonable juror would find that Rubio deserved the death penalty if he were found guilty of capital murder." (Pet., Doc. 61, 155)

### a.  Dr. Welner's Testimony and Rubio's Challenge

As its final rebuttal witness, the State called Dr. Michael Welner, a forensic psychiatrist who interviewed Rubio and others who knew him. (Tr. Trans., Doc. 74–19, 6–174)  "Additionally, he reviewed witness statements, transcripts of testimony, [Rubio's] statements, mental health evaluations, and institutional records." *Rubio*, 2012 WL 4833809, at *11.  Based on that review, he identified "several instances in which [Rubio's] professed delusions were contradicted by other things that [he] had said or done," "opined that [Rubio] did not suffer from a severe mental disease at the time he committed the offense," and told the jury that Rubio "took anti-psychotic medications for only a brief part of the time that he was in custody, but he did not generally exhibit psychotic symptoms." *Id.* at *13.

Rubio argues that the State violated his right to due process under *Napue v. Illinois* when it elicited testimony that it knew, or should have known, was false and misleading from Dr. Welner. (Pet., Doc. 61, 145)  In particular, Rubio alleges that Dr. Welner gave false testimony by saying that Rubio "was not taking anti-psychotic medication" and that "the absence of psychotic symptoms meant that Rubio did not have an authentic mental health disorder." (*Id.* at 145) Relying on his medical records from TDCJ and the Hidalgo County jail, a portion of which he presents on federal habeas review, Rubio identifies several drugs which doctors prescribed him

during his incarceration. He also emphasizes that the TDCJ records reflect that he reported experiencing visual and auditory hallucinations and delusions when incarcerated awaiting the second trial. (*Id.* at 149–51) This evidence, Rubio argues, exposes Dr. Welner's testimony as untruthful. And according to Rubio, "the impact of Dr. Welner's false testimony corrupted all fact-finding pertaining to mental health . . . at both the guilt and punishment phases of the case." (Reply, Doc. 87, 107)

### b. "Actual Innocence" within Guilt/Innocence Phase

Rubio first claims that absent Dr. Welner's allegedly false testimony, no reasonable juror would have found him sane at the time that he killed the children.

As a threshold matter, the law does not clearly enable a Section 2254 petitioner to overcome procedural default by arguing that absent a constitutional error, the jury would have found the petitioner not guilty by reason of insanity ("NGBRI"). A petitioner demonstrates a fundamental miscarriage of justice by showing "factual innocence, not mere legal insufficiency." *Bousley*, 523 U.S. at 623. In contrast, an individual who presents a NGBRI defense is not arguing that he is factually innocent. Rather, the NGBRI defense represents an affirmative defense, which concerns legal, rather than factual innocence. The Fifth Circuit recently considered this issue in a now-vacated decision. *See Crawford v. Cain*, 68 F.4th 273, 289 (5th Cir.), *reh'g en banc granted, opinion vacated,* 72 F.4th 109 (5th Cir. 2023). The panel concluded that a prisoner could not show actual innocence by alleging that the jury should have found him not guilty by reason of insanity. Although the decision has no authoritative weight due to its vacated status, the reasoning within it has some force. And if the *en banc* court ultimately adopts the same reasoning, the decision would automatically preclude Rubio's Claim Six.

In any event, irrespective of the ultimate disposition of *Crawford*, and assuming that Rubio can claim actual innocence based on his NGBRI defense, the argument would not prevail.

Rubio presents a false-evidence claim, which requires him to prove that: (1) a witness gave false testimony; (2) the falsity was material; and (3) the prosecution used the testimony knowing it was false. *Reed v. Quarterman*, 504 F.3d 465, 473 (5th Cir. 2007). And in the context of a Section 2254 decision, he must show that there is a "reasonable probability" that the jury would have found him not guilty had the false testimony been omitted. *Dickson v. Quarterman*, 462 F.3d 470, 477 (5th Cir. 2006).

Rubio's argument fails at several levels. Foremost, the record does not support the conclusion that Dr. Welner provided any false testimony. Rubio focuses on the fact that doctors prescribed Rubio medications when he was incarcerated, and that he exhibited some symptoms of mental illness. While true, the record also contains controverting evidence, including that Rubio refused to take the medications, and that Rubio feigned symptoms of mental illness.[16] (*See* Answer, Doc. 84, 173–76 (citing various statements in the record)) For example, Dr. Martinez observed in 2008 that Rubio reported refusing to take prescribed medication. (Report, Doc. 76–10, 218) Two years later, Dr. Martinez observed that Rubio was taking only an anti-depressant, and not psychotropic medication. One of Rubio's own experts, Dr. Morris, testified that Rubio "has not been on anti-psychotic medications for years, several years now." (Tr. Trans., Doc. 74–16, 130) In the end, Dr. Welner had an ample foundation to testify that Rubio was not taking psychotropic medications while incarcerated and had shown no symptoms of insanity. Rubio's counsel possessed some evidence to challenge Dr. Welner's testimony, but that evidence

---

[16] Not only does Rubio ignore the controverting evidence, he also displays a lack of precision when referring to evidence that allegedly supports his position. For example, he alleges that in 2007, "he continued to take medication for his psychosis", as shown by "jail records indicat[ing] that, leading up to trial, Rubio was again taking Wellbutrin and Vistaril." (Pet., Doc. 61, 148–49) But Wellbutrin is typically characterized as an anti-depressant and Vistaril as an antihistamine; the record establishes neither as a psychotropic medication. *See GlaxoSmithKline LLC v. Teva Pharms. USA, Inc.*, No. CV 13-726, 2014 WL 12603224, at *1 n. 2 (E.D. Pa. Mar. 10, 2014) (describing Wellbutrin as a "prescription anti-depressant drug"); *Nastase v. Sanders*, No. C09-1138-RAJ-BAT, 2010 WL 1536720, at *3 (W.D. Wash. Feb. 3, 2010), report and recommendation adopted, 2010 WL 1536721 (W.D. Wash. Apr. 15, 2010) ("Vistaril is an anti-histamine that is commonly prescribed for itching and rashes, and sometimes is used as a short-term treatment for anxiety and sleep disorders.").

represented common impeachment evidence, with the jury left to determine what weight to ascribe to Dr. Welner's statements.

In addition, Rubio fails to show that Dr. Welner's allegedly false statements were material. Many witnesses provided testimony regarding Rubio's mental health; the issue proved a central focus of each stage of the proceedings. Rubio falls far short of showing that absent any error, the statements by Dr. Welner, within a trial replete with evidence concerning Rubio's mental health, would have been material, much less that it would have led every reasonable juror to conclude that Rubio was insane.[17]

### c. "Actual Innocence" within Sentencing Phase

Based on the same analysis regarding Dr. Welner's testimony in the preceding section, Rubio cannot show "actual innocence" in connection with the sentencing proceedings. In no manner has he presented "clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found [him] eligible for the death penalty". *Busby*, 925 F.3d at 710. In no manner does he "negate" his "very *eligibility* for that punishment". *Rocha*, 619 F.3d at 405 (emphasis in original). In fact, he shows no error of any kind concerning the challenged statements by Dr. Welner. At most, he presents examples of impeachment evidence that his counsel could have used to challenge Dr. Welner's testimony, with the witness having abundant evidence to support his position. This showing does not demonstrate actual innocence, proving fatal to the application of the fundamental-miscarriage-of-justice exception to the procedural bar.

### 2. Claim Eight: Alleged False Testimony from A. P. Merillat

Rubio presents three claims regarding the testimony of A.P. Merillat, a criminal investigator for the Huntsville Special Prosecution Unit. The State called Merillat during the

---

[17] As a final deficiency, Rubio does not demonstrate that the State knowingly elicited any false testimony from Dr. Welner.

punishment phase to testify regarding prison violence and the prison classification system. In Claim Eight, Rubio alleges that the State elicited testimony from Merillat that it knew, or should have known, was false. (Pet., Doc. 61, 161)  In particular, Rubio contends that Merillat "misled Rubio's jury regarding significant components of TDCJ's classifications system, and also the extent to which he testified falsely in other cases." (*Id*. at 162)

To advance Claim Eight, Rubio must overcome the procedural bar.  On this front, and as with Claim Six, Rubio relies on the fundamental-miscarriage-of-justice exception.  In addition, he also argues that he can establish cause and prejudice under *Carrier*, and that the State's misconduct was an external factor that prevented him from raising the claims in the 2013 Habeas Application.  However, based on a review of the record and the applicable law, the Court concludes that Rubio has established neither exception.  Moreover, even if the merits of Claim Eight could be reached, the Court would find it deficient.

To consider Claim Eight, as well as the other two claims that concern Merillat's testimony, the Court first summarizes the record concerning the witness and his testimony.

### a.  Merillat's Testimony

In the years before Rubio's second trial, the State frequently called Merillat as a witness to testify regarding the prison classification system. (Tr. Trans., Doc. 51–36, 191, 197)  In general, Merillat testified about the Texas Department of Criminal Justice and its regulations for individuals sentenced to death or to life without parole.  For example, and of particular relevance to Claim Eight, in 2007, the State and a capital-murder defendant each presented evidence during the punishment phase of Adrian Estrada about the TDCJ system's treatment of individuals sentenced to life without parole. *See Estrada v. State*, 313 S.W.3d 274, 287 n. 12 (Tex. Crim. App. 2010).  When the State called Merillat as a rebuttal witness, he testified that, "after 10 years of [restrictive] status, a sentenced-to-life-without-parole capital murderer could achieve a lower

(and less restrictive) . . . classification status". *Id*. at 286.  Based on notes that the jury sent to the court when deliberating, the issue appeared to be of importance to the jury, which ultimately answered the special interrogatories in a way that required the court to impose the death penalty against Estrada.   In the ensuing appeal, the State acknowledged that Merillat had provided incorrect testimony, but both the State and Estrada agreed that the error had been unintentional and stemmed from a change in TDCJ regulations that took effect about three months before Merillat testified. *Id*. at 287; *see also Gobert v. State*, No. AP-76,345, 2011 WL 5881601, at *6 (Tex. Crim. App. Nov. 23, 2011) (not designated for publication) (referring to Merillat's testimony in *Estrada* as "unintentionally inaccurate").  But based on the incorrect testimony given in 2007, the TCCA ordered a new punishment hearing, finding that a "fair probability" existed "that [the defendant's] death sentence was based upon Merillat's incorrect testimony as evidenced by the jury's notes." *Id*.

In 2008, while the *Estrada* appeal was pending, Merillat testified in a capital case against Manuel Velez, and provided the same testimony as in *Estrada*.  After the court imposed the death penalty on Velez based on the jury's answers to the special interrogatories, Velez appealed.  And in June 2012, the TCCA again found that Merillat had provided incorrect testimony based on the outdated TDCJ regulation. *See Velez v. State*, 2012 WL 2130890, at *31–33 (Tex. Crim. App. 2012).  The court reversed Velez's sentence because it could "not find beyond a reasonable doubt that Merillat's false testimony did not contribute to the conviction or punishment". *Id*. at *33.

In the prosecution of Rubio, before his second trial, the State disclosed the *Estrada* matter to defense counsel, recognizing that a Texas court "overturned a punishment sentence in a capital murder case based on [Merrilat's] testimony". (Tr. Trans., Doc. 74–22, 183)

During the punishment phase against Rubio, the State called Merillat to testify about TDCJ's classification system for inmates, contrasting the security for individuals on death row

with the security for the prison system's general population.  He testified that TDCJ classified prisoners on a scale of G-1 through G-5, from least to most restrictive. (Tr. Trans., Doc. 74–22, 206)  He represented that TDCJ applied G-3, the midpoint security status, to individuals convicted of capital murder, but not sentenced to death. (*Id.* at 206 and 214)  And he discussed the availability of weapons, drugs, and alcohol within TDCJ, and commented that prisoners had "abundant opportunities to commit crimes of violence". (*Id.* at 220–232) This testimony bore relevance to the jury's need to answer the  special interrogatories, including whether "there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society". TEX. CODE CRIM. PROC. § 37.071(b)(1).  The trial court could not impose the death penalty unless the jury unanimously answered the special interrogatories in a certain manner, which it did.

In addition, the State questioned Merillat during direct examination about his "mistake" in the *Estrada* case. (Tr. Trans., 74–22, 185–86)  Merillat described how "[t]he prison system had changed their classification system just prior to [his] testimony [in *Estrada*] and didn't give [him] the information." (*Id.* at 203)  He explained that in *Estrada*, he had given "information that [he] had believed to be correct," but "what amounted to bad information" because he did not have "the most current documents." (*Id.* at 203)

On cross examination, Rubio's defense counsel confronted Merrilat with his testimony from *Estrada*, attempting to have Merrilat confirm that he had made TDCJ procedures look "more lenient" toward convicted murderers than they actually were, and that TDCJ possessed

resources and procedures "to protect the inmates and to protect the people that have access to them." (*Id.* at 240–241)

Neither the State nor Rubio's defense team questioned Merillat about *Velez*, which at the time remained on appeal.

Rubio now alleges that Merillat "overstated the privileges an inmate like Rubio would have if he were sentenced to life, and [ ] understated the restrictions placed on those same inmates." (Pet., Doc. 61, 166) According to Rubio, Merillat's testimony "falsely inflated the jury's impression that Rubio would be more able, or more likely, to commit acts of violence in TDCJ." (*Id.*)   In addition, Rubio argues that Merillat "misled the jury to believe that the false testimony . . . had been limited to *Estrada*", and by minimizing his responsibility for that incorrect testimony. (*Id.* at 167)

### b.  Fundamental Miscarriage of Justice

Rubio first presented Claim Eight in his 2021 Habeas Application, and the TCCA found it to be an abuse of the writ.  To overcome the procedural bar that now applies, Rubio argues that he has demonstrated a fundamental miscarriage of justice because "absent these crucial representations [by Merillat], no reasonable juror would find that Rubio deserved the death penalty." (Pet., Doc. 61, 170)

Rubio fails to persuade.  As explained in connection with the challenge based on Dr. Welner's testimony, Rubio must show "actual innocence" by demonstrating that the record contains "clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law." *Busby*, 925 F.3d at 710.  "[T]he habeas petitioner's claim must tend to negate not just the jury's *discretion* to impose a death sentence but the petitioner's very *eligibility* for that punishment". *Rocha*, 619 F.3d at 405 (emphasis in original).

In Claim Eight, Rubio does not challenge his eligibility to receive a death sentence. Instead, he argues that Merillat's testimony unduly swayed the jury into exercising its discretion by answering the special interrogatories in a manner that resulted in the death sentence. Such a claim does not permit the application of the fundamental-miscarriage-of-justice exception.

In any event, Rubio also fails to establish the merits of Claim Eight. In order to support his false-evidence claim, Rubio would have to prove that: (1) a witness gave false testimony; (2) the falsity was material; and (3) the prosecution used the testimony knowing it was false. *Reed v. Quarterman*, 504 F.3d 465, 473 (5th Cir. 2007). "The testimony is material if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Canales*, 765 F.3d at 573 (internal quotation marks omitted). "A reasonable probability means a substantial, not just conceivable, likelihood of a different result." *Canfield v. Lumpkin*, 998 F.3d 242, 248 (5th Cir. 2021) (cleaned up).

As a starting point, Rubio does not identify any false testimony. He highlights the false testimony that Merillat provided in *Estrada* and *Velez*, but Merillat did not repeat that testimony to the jury that considered Rubio's sentence. In addition, Rubio argues that Merillat understated the restrictions that TDCJ would impose on an inmate sentenced to life without parole, and overstated the opportunity that Rubio would have to behave violently. But within this argument, Rubio does not identify any factually incorrect statements by Merillat.

Instead, Rubio submits the affidavit of Frank AuBuchon, a former corrections officer and Administrator for Classifications Operations in TDCJ. (AuBuchon Aff., Doc. 81–3, 264–66) AuBuchon characterizes Merillat's testimony as "false and misleading", in particular with respect to "how an offender convicted of capital murder and sentenced to life would be classified and managed while incarcerated in a TDCJ facility." (*Id.*) He identifies various alleged errors in Merillat's testimony.

83 / 97

Not only can the Court not consider such evidence under § 2254(e)(2), even if it could, the affidavit would at best create a battle of the experts, which cannot establish a fundamental miscarriage of justice. *See, e.g.*, *Boyle v. Johnson*, 93 F.3d 180, 186 (5th Cir. 1996) ("The fact that other experts disagreed with Dr. Erdmann is insufficient, by itself, to call Dr. Erdmann's testimony into question.").

Finally, even assuming that Merillat's testimony to the Rubio jury could be considered false, Rubio does not establish its materiality. Merrilat's testimony concerned whether Rubio represented a continuing danger to society, if he was given a sentence of life imprisonment without the possibility of parole. Even had Rubio's defense team completely discredited Merrilat, a reasonable jury had ample evidence to still conclude that Rubio represented a continuing danger, based on his behavior in prison and the horrific nature of his crime. *See*, e.g., *United States v. O'Keefe*, 128 F.3d 885, 898 (5th Cir. 1997) (rejecting *Napue* claim on the grounds that there was no "reasonable probability that the jury would have reached a different outcome even had it been fully aware of all of the alleged inconsistencies and falsehoods" in the witness testimony). For example, the jury heard that Rubio started a fire while incarcerated, placing other inmates and prison employees in danger. (Tr. Trans., Doc. 74–21, 68) Jurors heard evidence concerning Rubio's history of drug use and his previous crimes. (Tr. Trans., Doc. 74–22, 152–54) And the State reminded the jury of the horrific nature of the crime, which "alone may be sufficient to sustain the jury's finding of future dangerousness." *Buntion v. State*, 482 S.W.3d 58, 66 (Tex. Crim. App. 2016). Amidst the significant evidence that supported the jury's responses to the special interrogatories, Rubio cannot establish that any inaccurate statements by Merillat proved the linchpin that led the jury to its conclusions.

### c.  Cause and Prejudice

Rubio also argues, albeit summarily, that he can demonstrate cause and prejudice to permit the Court to disregard the procedural bar, by demonstrating that "the State's knowing reliance on this false testimony [represented] an external impediment to raising this claim previously." (Pet., Doc. 61, 169)  Rubio's brief argument on this point proves insufficient.

Under the cause-and-prejudice doctrine, "the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986).  Objective external factors can include "that the factual or legal basis for a claim was not reasonably available to counsel," or that "some interference by officials . . . made compliance impracticable". *Murray*, 477 U.S. at 488 (cleaned up); *see also Prible*, 43 F.4th at 514.  As for prejudice, the "habeas petitioner must show 'not merely that the errors at . . . trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.'" *Murray*, 477 U.S. at 494 (quoting *Frady*, 456 U.S. at 170).  The "showing of pervasive actual prejudice" is nothing other "than a showing that the prisoner was denied 'fundamental fairness' at trial." *Murray*, 477 U.S. at 494.

As to cause, Rubio cannot show that his defense counsel lacked the factual or legal basis to present Claim Eight within his 2013 Habeas Application.  He argues that the State's "knowing reliance on [Merillat's] testimony" represents "an external impediment to raising this claim previously."  (Pet., Doc. 61, 170)  While he accurately depicts the State as relying on Merillat's testimony, he does not explain how the fact that the State called Merillat as a witness and elicited testimony from him presented any impediment to Rubio presenting a claim regarding Merillat a few years later.  By 2013, Rubio knew of both the *Estrada* and the *Velez* decisions.  He still did not

present Claim Eight within the 2013 Habeas Application, proving fatal to his attempt to establish cause so as to overcome the procedural bar.  In addition, even if he could show cause, his position would still falter at the prejudice prong, as the record in no manner supports the conclusion that any constitutional error occurred, much less one that denied Rubio of fundamental fairness at trial.  The jury heard abundant evidence concerning Rubio's dangerousness and the nature of the crime.  Rubio cannot show that any remarks from Merillat represented the key evidence that led the jury to answer the special interrogatories so as to require the death sentence.

### d.   Merits Review (in the alternative)

As explained, Rubio's Claim Eight fails because it is procedurally defaulted and he has not demonstrated that any exception applies that would enable the Court to disregard the default.  The same analysis would also lead the Court to deny the claim on the merits, as Rubio has not satisfied the elements for a false-evidence claim.

### 3.   Claim Nine: *Brady* Violation in Connection with Merillat's Testimony

In a position overlapping with Claim Eight, Rubio alleges that the State violated *Brady* by not disclosing prior to trial that Merillat had provided false testimony in *Velez*. (Pet., Doc. 61, 170)  According to Rubio, his defense team could have used the information "to significantly damage Merillat's credibility." (*Id.*)

Rubio acknowledges that Claim Nine is procedurally defaulted.  He argues, however, that the Court should disregard the procedural bar under the cause-and-prejudice doctrine based on "the State's failure to disclose this impeachment evidence, an external impediment to raising this claim previously." (*Id.* at 173)  In addition, he contends that the fundamental-miscarriage-of-justice exception also applies, as absent the "crucial misrepresentations" stemming from the State's failure to disclose Merillat's false testimony in *Velez*, "no reasonable juror would find that Rubio deserved the death penalty." (*Id.* at 174)

Based on the record and the applicable law, the Court concludes that neither exception applies.

### a.  Fundamental Miscarriage of Justice

As with Claim Eight, Rubio does not meet the threshold requirements of this exception. First, he does not negate his eligibility for a death sentence, rendering the exception inapplicable. See *Rocha*, 619 F.3d at 405 ("[T]he habeas petitioner's claim must tend to negate not just the jury's *discretion* to impose a death sentence but the petitioner's very *eligibility* for that punishment." (emphasis in original)).

Second, Rubio does not demonstrate that any *Brady* violation occurred.  Under *Brady*, the State "has a duty to disclose exculpatory evidence that is material to either guilt or punishment." *Bower v. Quarterman*, 497 F.3d 459, 476 (5th Cir. 2007).  "To establish a *Brady* violation, a defendant must show: (1) the evidence at issue was favorable to the accused, either because it was exculpatory or impeaching; (2) the evidence was suppressed by the prosecution; and (3) the evidence was material." *Reeder v. Vannoy*, 978 F.3d 272, 277 (5th Cir. 2020). "Suppressed evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Murphy v. Davis*, 901 F.3d 578, 597 (5th Cir. 2018) (internal quotation marks omitted).  A "reasonable probability" is one sufficient to undermine confidence in the outcome of the trial. *United States v. Bagley*, 473 U.S. 667, 682 (1985).  "The materiality of *Brady* material depends almost entirely on the value of the evidence relative to the other evidence mustered by the state." *Rocha*, 619 F.3d at 396–97 (adding that "the impeached testimony of a witness whose account is strongly corroborated by additional evidence supporting a guilty verdict . . . generally is not found to be material").

Rubio's argument fails because the record demonstrates that no suppression occurred, and that the information concerning Merillat's testimony in *Velez* was not material. On the first point, the undisputed chronology proves fatal to Rubio's position. At the time of Rubio's second trial, the *Velez* decision remained on appeal. No Texas court had determined that Merillat had provided inaccurate testimony in that case. Rubio appears to argue that the State, aware of the finding by a Texas court that Merillat had provided inaccurate testimony in *Estrada*, should have disclosed that Merillat had provided similar testimony in *Velez*, even though that case remained on appeal. No authority supports such a position.

And third, even if the State bore a duty under *Brady* to disclose Merillat's testimony in *Velez*, such information would have done nothing more than provide cumulative impeachment evidence to defense counsel. It is undisputed that Rubio's counsel knew of Merillat's erroneous testimony in *Estrada*, and both the State and Rubio questioned Merillat about that testimony in the punishment phase. The suppression of cumulative impeachment evidence typically cannot support a *Brady* violation. *See United States v. Sipe*, 388 F.3d 471, 489 (5th Cir. 2004) ("[E]vidence which impeaches an already impeached witness is by definition cumulative; its suppression does not give rise to a *Brady* violation."). And in the present case, this conclusion rings true. The jury heard abundant evidence that supported its answers to the special interrogatories. In light of the State's strong case for a death sentence, such as the testimony that Rubio acted violently even when held under strict prison security, Rubio has not shown a reasonable probability that the jury would have answered the special issues differently had it known that Merillat had testified incorrectly on two occasions, instead of only in one instance.

### b. Cause and Prejudice

Rubio also argues that he can show cause and prejudice to enable the Court to disregard the procedural default as to Claim Nine. He cannot.

First, Rubio contends that he establishes cause because the State relied on Merillat's testimony at trial without the jury hearing about his testimony in *Velez*. (Reply, Doc. 87, 120)  The fatal defect in this position, however, is that Rubio makes no attempt to explain why he could not have raised Claim Nine in the 2013 Habeas Application.  At the time of the second trial, Rubio's counsel knew of the *Estrada* decision, and by 2013, they knew of *Velez*.  Rubio presents no reason why he lacked the factual or legal basis to present Claim Nine in 2013.  A showing of cause requires that the petitioner identify an external factor that precluded the presentation of the claim in the initial habeas application.  Rubio identifies no such external factor.

### c.  Merits Review (in the alternative)

As explained, Rubio's Claim Nine fails because it is procedurally defaulted and Rubio has not demonstrated that any exception applies that would enable the Court to disregard the default. The Court's analysis of the alleged *Brady* violation would also lead the Court to deny the claim on the merits, as Rubio has not satisfied the elements for such a claim.

### 4.  Claim Ten: Trial Counsel Ineffective in Preparation for Merillat's Testimony

In this claim, Rubio faults his trial counsel for "not retain[ing] an expert on prison classifications, despite being on notice of Merillat's previous false testimony regarding the subject in *Estrada*." (Pet., Doc. 61, 174)  Rubio asserts that trial counsel should have hired an expert, like AuBuchon, to "assist[] trial counsel in establishing that Merillat's testimony was false." (*Id.* at 175) He adds that even if his defense team did not need to retain an expert, they should have researched the TDCJ classification system more thoroughly, so as to cross-examine Merillat more rigorously. Ultimately, he contends that an effective attorney could have "presented the accurate version of TDCJ's classification system" and "emphasized the significant restrictions TDCJ places on inmates." (*Id.* at 161)

Rubio concedes that Claim Ten is procedurally defaulted, as he did not present the claim until his 2021 Habeas Application.  He argues, however, that the Court should disregard the procedural default under *Martinez*, because his habeas counsel provided ineffective assistance of counsel by not raising the claim in the 2013 Habeas Application. (*Id*. at 176–177)

Under *Martinez*, to overcome the procedural default, Rubio must demonstrate: (1) that he presents a substantial claim–i.e., that under *Strickland*, his trial counsel's representation fell below an objective standard of reasonableness and that the deficiency prejudiced him; (2) that his state habeas counsel's failure to present this claim in the 2013 Habeas Application fell below an objective reasonable standard; and (3) that had his habeas counsel presented the claim in 2013, a reasonable probability exists that the state habeas court would have granted the relief that Rubio seeks.

### a.  Substantial Claim: Deficient Performance

Rubio must first demonstrate that his trial counsel's performance with respect to the issue of the TDCJ classification system and Merillat's testimony fell below an objective standard of reasonableness.  In essence, Rubio argues that his trial counsel should have retained an expert to controvert Merillat, and should have more effectively prepared for cross examination.  Rubio faces a significant hurdle.  Not only do courts typically engage in a deferential review when considering *Strickland* claims, with respect to issues such as the selection of experts and the cross examination of witnesses, courts apply ample latitude, considering that such matters fall squarely within the discretion of trial counsel, enabling them to make difficult strategic decisions within a "wide range of reasonable professional assistance." *Nelson v. Davis*, 952 F.3d 651, 659 (5th Cir. 2020); *see also Rhoades v. Davis*, 852 F.3d 422, 434 (5th Cir. 2017) (describing such choices made by counsel as "virtually unchallengeable" under *Strickland*.).

In the present case, Rubio's counsel cross-examined Merillat regarding the TDCJ classification system and his false testimony in *Estrada*.  The record does not support the conclusion that their efforts fell outside the ambit of reasonable professional assistance.  While Rubio may be able to identify lines of questions that his defense team should have used with Merillat, the ability to do so represents nothing more than "Monday-morning quarterbacking on a Thursday". *United States v. Molina-Uribe*, 429 F.3d 514, 520 (5th Cir. 2005).  Such challenges cannot support a *Strickland* claim.

### b.  Substantial Claim: Prejudice

In addition, Rubio cannot establish prejudice from any deficiencies in his trial counsel's performance.  He identifies no information that his defense team should have presented to the jury, whether through the cross examination of Merillat or via an expert of their own, that creates the "reasonable probability" of changing the outcome of the punishment phase.  Rubio's own conduct while incarcerated hinders his ability to demonstrate prejudice as to Claim Ten.  Even if his defense team had given greater emphasis to the restrictions that Rubio would face in TDCJ's general population, the State also presented testimony that Rubio had been housed under the strictest levels of confinement and had nevertheless acted violently and harmed others.  The jury also heard that Rubio managed to possess marijuana while incarcerated.  In light of this record, Rubio cannot demonstrate that a different result would have ensued through a more robust cross examination of Merillat or the creation of a battle of the experts.

### c.  State Habeas Counsel's Performance

Apart from failing to demonstrate that he presents a substantial claim, Rubio also fails to show that his state habeas counsel provided ineffective assistance by failing to raise Claim Ten in the 2013 Habeas Application.

Under this prong of the analysis, Rubio must "show that habeas counsel was ineffective in failing to present [the claim] in his first state habeas proceeding." *Garza*, 738 F.3d at 676.  He must further demonstrate "that he was prejudiced by the deficient performance—that is, that there is a reasonable probability that he would have been granted state habeas relief had the evidence been presented in the state habeas proceedings." *Newbury*, 756 F.3d at 872; *see also Canales*, 765 F.3d at 571.  "The likelihood of a different result must be substantial, not just conceivable." *Wessinger,* 864 F.3d at 391 (quoting *Richter*, 562 U.S. at 112).

It is axiomatic that reasonable habeas attorneys may "winnow out weaker arguments" to increase the probability of success on stronger claims. *Kossie*, 423 F. App'x at 437.  In the present case, Claim Ten represents a particularly weak claim.  By 2013, the *Estrada* and *Velez* decisions were public record.  But those rulings revealed only that Merillat had provided "unintentionally inaccurate" testimony.  In Rubio's case, Merillat had not even repeated the erroneous information, and the defense cross examined him about his inaccurate testimony in *Estrada*.  In that context, Rubio's state habeas counsel had to decide whether to present a claim based on quintessential trial tactics and strategic decisions.  Rubio has not demonstrated that he should have.

Moreover, no reasonable probability exists that had Claim Ten appeared in the 2013 Habeas Application, the TCCA would have granted relief to Rubio.  In fact, other individuals have presented claims in habeas that concerned Merillat's testimony and were based on the *Estrada* and *Velez* decisions.  In those cases, the courts have consistently found no error that warranted relief.  *See, e.g., Ex parte Norman*, Nos. WR–74,743–01, WR–74,743–02, 2012 WL 3600318, at *1 (Tex. Crim. App. 2012) (not designated for publication) (rejecting AuBuchon's opinion that Merillat testified falsely); *Ex parte Swain*, No. WR–64,437–02, 2012 WL 5452217, at *1 (Tex. Crim. App. 2012) (not designated for publication) (refusing to find any error in Merillat's testimony when he did not make the same mistake as in *Estrada*); *Sparks v. Davis*, No. 3:12-CV-

469-N, 2018 WL 1509205, at *15 (N.D. Tex. 2018) (finding no constitutional error when Merillat made the same mistake in a 2008 trial as he had in *Estrada* and *Velez*, but which the defense corrected on cross-examination); *Devoe v. Stephens*, No. A–14–CA–151–SS, 2014 WL 5684997, at *2 (W.D. Tex. 2014) (refusing to allocate funds to retain AuBuchon when "[i]n Devoe's trial, Merillat did not repeat the factual inaccuracy presented in *Estrada*" and "[t]he testimony in Devoe's trial made clear an inmate with a capital murder conviction could not obtain a less restrictive classification than a G–3 classification). While these cases concerned different types of challenges, they collectively reflect that claims based on Merillat's false testimony in *Estrada* and *Velez* have proven ineffective. They render it less likely that the TCCA would have favorably viewed any claim based on Merillat's testimony in Rubio's case, had one been included in the 2013 Habeas Application.

### d.  Merits Review (in the alternative)

Rubio has not satisfied the requirements of *Martinez* to overcome the procedural bar as to Claim Ten. But even if the Court considered the claim on *de novo* review, it would deny the challenge. The record does not support the conclusion that Rubio's trial counsel provided ineffective assistance of counsel through their preparation for and cross examination of Merillat, or in the decision to not present their own expert regarding the TDCJ classification system and other issues related to Texas prisons.

## V.  Discovery Motion

In addition to filing his Petition, Rubio also moved for discovery as to his prosecutorial-misconduct and false-evidence claims (Claim Four through Claim Nine). (Mot. for Discovery, Doc. 88) Specifically, he requested the authorization to depose Villalobos and another prosecutor, and an order for the production of various categories of documents, including: materials held by the Cameron County District Attorney's Office relating to any polling conducted about whether to

93 / 97

seek the death sentence in Rubio's case; documents related to civil assert forfeiture funds used to hire the State's expert witnesses; documents regarding the State's interference with defense funding and the abuse of its subpoena power; and materials relating to Dr. Welner's and Merillat's testimony.

On March 28, 2024, the Court denied the Motion for Discovery. (Order, Doc. 93)  In this section, the Court explains the grounds for that ruling.

Traditional habeas law limits a petitioner's ability to engage in discovery. "A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997); *Anderson v. Butler*, 886 F.2d 111, 113 (5th Cir. 1989) (noting that in the Section 2254 context, "the writ of habeas corpus is no ordinary civil proceeding").  Rule 6(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[a] judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Civil Procedure and may limit the extent of discovery."  Good cause exists where the allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be entitled to habeas relief. *Bracy*, 520 U.S. at 908–09.

Still, as an initial matter, "before facilitating the development of new evidence," courts must "determine that it could be legally considered in the prisoner's case." *Shoop*, 142 S. Ct. at 2044.  A petitioner typically cannot show good cause for discovery as to a claim in federal court if procedural impediments preclude considering the merits of that claim. *Campbell v. Dretke*, 117 F. App'x 946, 959 (5th Cir. 2004).  In addition, under AEDPA, if a petitioner has "failed to develop the factual basis of [his] claim in State court proceedings," 28 U.S.C. § 2254(e)(2), a federal court may allow discovery and admit new evidence in only two situations: (1) "[e]ither the claim must rely on a 'new' and 'previously unavailable' 'rule of constitutional law' made retroactively applicable by [the United States Supreme] Court"; or (2) "it must rely on a 'factual predicate that

94 / 97

could not have been previously discovered through the exercise of due diligence.'" *Shoop*, 142 S.Ct. at 2044.

In the present case, Rubio did not request from Texas state courts the discovery that he now seeks on federal review.  At most, in his 2021 Habeas Application, he generally requested that "discovery as may be necessary to a full and fair resolution herein be allowed." (Habeas Record, Doc. 81–3, 195)  But he did not specify the nature of the request and did not otherwise develop the factual basis for it.

In his Motion for Discovery, Rubio does not rely on any previously unavailable rule of constitutional law and has not shown that he could not have developed his claims for presentation in his 2021 Habeas Application, or earlier, if he had been diligent.  In addition, the claims for which he seeks discovery are procedurally defaulted, and as explained in this Order and Opinion, no exception applies so as to disregard the procedural bar.  He otherwise has not shown good cause for discovery.

As a result, the Court concludes that Rubio is not entitled to the discovery that he requests.

## VI.    Conclusion

For the reasons in this Order and Opinion, it is:

**ORDERED** that John Allen Rubio's Second Amended Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2255 (Doc. 61) is **DENIED** and his claims are **DISMISSED WITH PREJUDICE**.

## VII.    Certificate of Appealability

Under AEDPA, a prisoner cannot seek appellate review from a lower court's judgment without receiving a Certificate of Appealability.  *See* 28 U.S.C. § 2253(c).  Rubio has not yet requested that this court grant him a COA, but the district court must rule upon a certificate of appealability when it "enters a final order adverse to the applicant." Rule 11, RULES GOVERNING

95 / 97

§ 2254 PETITIONS. "The COA statute establishes procedural rules and requires a threshold inquiry into whether the circuit court may entertain an appeal." *Slack v. McDaniel*, 529 U.S. 473, 482 (2000). A court may only issue a COA when "the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

The severity of an inmate's punishment, even a sentence of death, "does not, in and of itself, require the issuance of a COA." *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000). Still, "any doubts as to whether a COA should issue must be resolved in [the petitioner's] favor." *Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir. 2000).

A district court that has denied habeas relief on procedural grounds should issue a certificate of appealability only "when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.* "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy §2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack*, 529 U.S. at 484. In making these determinations, courts view a petitioner's arguments "through the lens of [AEDPA's] deferential scheme". *Druery*, 647 F.3d at 538. If a prisoner does not meet the applicable standard, "no appeal would be warranted." *Slack*, 529 U.S. at 484.

Rubio raises important issues, and the Court has considered them carefully. Based on its review of the extensive record, the arguments of counsel as presented in their substantial briefing, and the applicable law, including the AEDPA standards and controlling precedent, the Court finds that a certificate of appealability should not issue on any of Rubio's claims.

All other relief not expressly granted is denied.

96 / 97

The Court will separately issue a Final Judgment in accordance with this Order and Opinion.

Signed on April 5, 2024.

Fernando Rodriguez, Jr.
United States District Judge